UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KPM ANALYTICS NORTH AMERICA CORPORATION,<br><br>*Plaintiff,*<br><br>v.<br><br>BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD, ARNOLD EILERT, MICHELLE GAJEWSKI, ROBERT GAJEWSKI, RACHAEL GLENISTER, GREGORY ISRAELSON, IRVIN LUCAS, AND PHILIP OSSOWSKI<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 21:-10572<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **JURY TRIAL DEMAND**<br>) |

**VERIFIED COMPLAINT**

Plaintiff KPM Analytics North America Corporation alleges upon its own knowledge or otherwise on information and belief as follows:

1.     Plaintiff KPM Analytics North America Corporation ("Plaintiff", "KPM Analytics", or "KPM") brings this lawsuit to remedy the ongoing attack by Defendants Blue Sun Scientific, LLC, its parent, The Innovative Technologies Group & Co., Ltd. ("ITG") (both collectively, "Blue Sun"), and several of KPM Analytics' former employees to misappropriate KPM Analytics' trade secrets and steal its business.  KPM Analytics operates a business unit named Unity Scientific, which makes and markets instruments that analyze the composition of various substances found in many common products, including pet and human food products. To facilitate the use of its instruments, KPM Analytics has spent years of time, effort and expense developing highly valuable sets of test data, calibration data, and its own proprietary

software code, among other things, that KPM Analytics maintains as confidential trade secrets and protects through detailed confidentiality procedures and with non-disclosure agreements.

2.      Blue Sun is a competitor of KPM Analytics that has stolen KPM Analytics' trade secret data and calibration sets, and now is actively marketing the use of those exact data and calibration sets on Blue Sun's own web site for use with Blue Sun's competing analyzer product and services.  Defendants Arnold Eilert, Michelle Gajewski, Robert Gajewski, Rachael Glenister, Gregory Israelson, Irvin Lucas, and Philip Ossowski (collectively the "Individual Defendants") (together with Blue Sun referred to as the "Defendants"), are all former employees of KPM Analytics who are now working for or with Blue Sun.  Each has breached their contracts with KPM Analytics, and/or violated operative laws, requiring them to maintain as secret and not make any use of the trade secrets and other confidential information of KPM Analytics, and in several cases not to compete with KPM Analytics for a limited period of time.  Blue Sun tortiously interfered with the contracts and obligations of those Individual Defendants and otherwise violated applicable federal and state laws by, among other things, knowingly and purposefully luring the Individual Defendants from the employ of KPM Analytics to exploit their confidential knowledge of Plaintiff's products and services, including ***surreptitiously employing at least some of the Individual Defendants while they were simultaneously employed by KPM Analytics for over a year***, all to exploit, misuse and steal Plaintiff's trade secrets and confidential information.  In doing so, all of the Defendants have violated the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et. seq.*, the Massachusetts Uniform Trade Secrets Act, Mass. Gen. L. c. 93 §§ 42-42G, and common law.  The theft and misuse of these trade secrets and confidential information also constitutes unlawful conversion, unjust enrichment, and a violation of the Massachusetts Unfair and Deceptive Trade Practices Act, Mass. Gen. L. c. 93A, §§ 2, 11.

## Parties

3.      Plaintiff KPM Analytics is a corporation formed under the laws of the State of Delaware with a principal place of business located at 113 Cedar Street, Suite S3, Milford, Massachusetts. The Unity Scientific business unit of KPM Analytics is headquartered in Milford, Massachusetts.

4.      Defendant Blue Sun is a limited liability company organized under the laws of the State of Maryland, with a principal office located at 8017 Dorsey Run Road, Suite H, Jessup, Maryland.

5.      Defendant The Innovative Technologies Group & Co., Ltd. is a corporation incorporated under the laws of the State of Maryland with a principal office also located at 8017 Dorsey Run Road, Suite H, Jessup, Maryland. On information and belief, it is the parent corporation and owner of Blue Sun.

6.      Defendant Arnold Eilert is an individual residing in Wauconda, Illinois.

7.      Defendant Michelle Gajewski is an individual residing in North Aurora, Illinois.

8.      Defendant Robert Gajewski is an individual residing in North Aurora, Illinois.

9.      Defendant Rachael Glenister is an individual residing in Colorado Springs, Colorado.

10.      Defendant Gregory Israelson is an individual residing in St. Louis, Missouri.

11.      Defendant Irvin Lucas is an individual residing in North Hollywood, California.

12.      Defendant Philip Ossowski is an individual residing in Midland, North Carolina.

**Jurisdiction and Venue**

13.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this case raises a federal question and because 18 U.S.C., § 1836 *et seq*. creates a federal civil cause of action.

14.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

15.     This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over each of the Defendants by virtue of the Massachusetts long arm statute, Mass. Gen. L. c. 223A, § 3.  The conduct of each of the Defendants articulated herein caused and continues to cause damage to Plaintiff that Plaintiff has suffered and continues to suffer within the Commonwealth of Massachusetts.  The trade secrets and confidential information forming the subject matter of this Verified Complaint is all stored on servers located in Massachusetts since at least 2016, including for all relevant times involving these Defendants.  Each of the Individual Defendants were employed by Plaintiff as a Massachusetts-based employer and were paid by Plaintiff's Massachusetts office.  Plaintiff administered each Individual Defendant's health insurance and retirement benefits from its Massachusetts office.  Each of the Individual Defendants regularly corresponded with Plaintiff's Massachusetts office, and each of these full-time employees traveled to Massachusetts multiple times each year as part of their employment for training, sales and management meetings and to meet with customers.  The ultimate management of KPM's Unity Scientific Business is based in

Massachusetts. Blue Sun's conduct as described herein, also regularly consisted of communicating with employees of Plaintiff, a Massachusetts-based employer.

17.     Venue is proper in this District because the Plaintiff is located in this District, the harm to the Plaintiff was and continues to be suffered in this District, and because a significant number of witnesses, documents and other evidence is located within this District.

## KPM Analytics' Business and Trade Secrets

18.     KPM Analytics is in the business of, among other things, manufacturing machines to perform spectrographic analyses of a variety of substances used in many industries and commercial applications.  This business line of KPM Analytics is run through a business unit called Unity Scientific.  Through this business unit, KPM Analytics is a leading provider of near infrared ("NIR") analysis instrumentation at issue here.

19.     Unity Scientific, Inc. was founded in 2001 to better address customers' needs with an easier to use, more reliable and more accurate Near Infrared (NIR) analyzer, at a competitive price point.  Designed to measure substances and their attributes such as moisture, oil, or protein found in products such as flour, agricultural ingredients, chocolate and processed foods, these instruments were easy to implement, operate and maintain at-line or in the quality laboratory.

20.     After a series of corporate transactions, (the "Corporate Transactions") KPM Analytics owned and operated Unity Scientific as a wholly owned business unit and became, at all relevant times, the party to the contracts with each of the now former employees and consultants described below.

21.     Spectroscopy is a scientific technique that measures the diffraction of light or other electromagnetic radiation propagated through a given substance to help determine the composition of that substance.  Near Infrared Spectroscopy ("NIR spectroscopy") specifically

uses a portion of the infrared electromagnetic spectrum (infrared light) to determine the composition of a wide variety of substances.  KPM Analytics manufactures, and has manufactured, a variety of NIR analyzers that are used in this sort of spectroscopy.

22.     In 2001, Unity Scientific introduced the SpectraStar 2200 Spinning Drawer (1100 to 2200 nm), the first truly standalone NIR multi-constituent measuring device that eliminated the need for an external computer. In 2007, Unity Scientific introduced two new extended wavelength models, the SpectraStar 2500 (RTW) (1100 to 2500 nm) and the SpectraStar 2500X (RTW) (680 to 2500 nm), to provide a broader offering necessary to further penetrate the feed and forage industries. In 2014, Unity Scientific introduced three new instruments: the SpectraStar 1400 XL (RTW) (1400 to 2500 nm), SpectraStar 2500 XL (RTW) (1100 to 2500 nm) and the SpectraStar 2500 XL-R (RTW) (680 to 2500 nm).  These configurations had new, improved optics and InGaAs detectors, Windows 7, SSD, and R99 reference standardization, all advances to ensure repeatability and accuracy.  Starting in 2016, KPM (through Unity Scientific) introduced the new SpectraStar XT series with a modern feel, ease of operation and is the best performing NIR instrument on the market today. The series has three models: 1400XT (1400 - 2600 nm), 2600XT (1100 - 2600 nm) and 2600 XT-R (680 - 2600 nm).

23.     All of these analyzers utilize KPM Analytics' NIR technologies based on mathematical models that allow the user to predict the contents of a constituent material with similar accuracy to that of slower and more expensive reference methods (*e.g.*, wet chemistry methods).  KPM's NIR instruments can analyze several constituents in less than one (1) minute, compared to reference laboratory results that can take 3-5 days and at a higher cost.

24.     To achieve such performance, KPM's products need to not only measure the substance(s) being analyzed, but also to then integrate those observed results with calibration

data in order to perform specific analyses for specific constituents.  Calibration data development

requires significant time and investment to ensure accuracy. This is particularly true when

analyzing organic materials that vary with many factors, including the season, geography, grain

type, spectroscopic scatter and temperature.

25.     NIR spectroscopy is a non-destructive spectroscopic method that uses near-

infrared light to measure molecular overtone and combination bands.  These bands are broad and

create a complex spectrum in which it can be difficult to assign specific features to specific

chemical components.  Therefore, building calibrations is completed by chemometricians that

are trained to extract information from the chemical systems using data collection techniques and

tools like signal processing, pattern recognition, mathematical modeling, and statistical analysis.

26.     Over the years, KPM has developed an extensive calibration database applying

these collection techniques and tools to many years of crop testing, season after season. KPM's

current calibration database is robust, stable, and based on *over 20 years of data collection*.

Typically, 50-100 reference samples are needed to build a single preliminary calibration.

Building even this minimum single database of samples requires significant investments and

takes weeks if not months to compile for one calibration.  Increased sample size generates a

more robust calibration.

27.     KPM's database contains tens-of-thousands of samples, collected over several

decades, geographies, droughts, rainy seasons, crop diseases, recoveries, etc.

28.     KPM Analytics assembly of its database and the particular datasets it contains

over decades started at the founding of the Unity Scientific business and continues through

today. These data sets are collected over long-time frames by partnering with KPM's customers.

KPM Analytics employs chemometricians and technical account managers who work with the

customer to collect and process a high number of observed variations with simultaneously measured laboratory results in order to permit unique calibrations for use on the NIR analyzer instruments. By way of example, the KPM standard library today has over 500,000 reference chemistry values, and that standard library represents only roughly 50% of the data in KPM's database library.

29.     It would require decades of effort and significant investments, partnering with an extensive host of customers over several harvest seasons, for a competitor to replicate such a database library asset.

30.     In utilizing an NIR spectroscopy analyzer, once the spectroscopy is performed and referenced to the appropriate calibration library dataset(s), the results are reported out to the customer utilizing proprietary software called UCAL. UCAL Software is currently in its fourth major release. The UCAL software has been in a continuous mode of development, testing and release for over 12 years. This continued development has required the support of software developers, contractors, testers, and mathematicians. UCAL software has been developed through extensive investment and is a critical tool needed to support KPM's NIR instruments. A significant investment and several years of effort would be required to replace or replicate UCAL from the ground up.

31.     KPM Analytics takes very seriously safeguarding its trade secrets and it protects and "keeps" confidential the data itself, the source code used to create calibrations and execute them on their instruments, and the information from its customers with whom KPM has partnered in these efforts over the years.  Only specific employees and consultants that work with this information and these materials are granted access to the protected locations where they are stored.  All calibration datasets and reference values are stored on a protected, confidential

Windows File Server. Source code for applications that run KPM's instruments and create its calibrations are stored in secure vaults using GitHub. Users that must work with the data or software on a local computer have backup agents installed to protect the data. There are procedures in place with KPM Analytics' managed IT provider that require management sign-off for permissions and has access-control processes. KPM treats this information as highly protected and does not share it with anyone else unless pursuant to strict non-disclosure arrangements.  Similarly, as detailed below, non-disclosure and confidentiality agreements are also maintained for KPM's employees and personnel.

### The Individual Defendants Were Obligated to Maintain Plaintiff's Trade Secrets as Confidential and Many Agreed Not To Compete with KPM Analytics

32.     Arnold Eilert became an employee of Unity Scientific on or about January 2, 2003.  Mr. Eilert was given a new position as Applied Technology Manager in 2008.  His executed offer letter for this position dated September 24, 2008 stated, among other things, that "[t]his position requires the execution of a Confidentiality and Non-Competition Agreement…." (the "Eilert Offer Letter," copy attached as Exhibit 1.) On September 30, 2008, Mr. Eilert executed the Confidentiality and Non-Competition Agreement (the "Eilert Agreement," a copy of which is also included as part of Exhibit 1.) By executing the Eilert Agreement, Mr. Eilert agreed to maintain as secret Unity Scientific's confidential information. The Eilert Agreement also provided that in the event Mr. Eilert breached it, he agreed to the entry of preliminary injunctive relief. As an employee of KPM, Mr. Eilert had access to KPM's trade secrets and confidential information, including its valuable datasets, source code and customer files. Mr. Eilert's last day of employment with Plaintiff was December 31, 2020.  On information and belief, he has now become an employee of Blue Sun.

33.     Rachael Glenister became an employee of Unity Scientific on or about August 24, 2015. Ms. Glenister's offer letter, which she executed, stated "This offer is contingent on your execution of Unity's Confidentiality and Non-Competition Agreement (attached)." (the "Glenister Offer Letter," a copy of which is attached as Exhibit 2.)  On August 23, 2015, Ms. Glenister executed a Confidentiality and Non-Competition Agreement with Westco Scientific Instruments, Inc. d/b/a Unity Scientific (the "Glenister Agreement," a copy of the Glenister Agreement is also included as part of Exhibit 2.) By executing the Glenister Agreement, Ms. Glenister agreed to maintain as secret Unity Scientific's confidential information. The Glenister Agreement also provided that in the event Ms. Glenister breached it, she agreed to the entry of injunctive relief.  As an employee of KPM, Ms. Glenister had access to KPM's trade secrets and confidential information, particularly its customer files. Ms. Glenister's final day as an employee of Plaintiff was July 10, 2020. On information and belief, Ms. Glenister is now an employee of Blue Sun. As Blue Sun is a direct competitor to KPM Analytics, her joining Blue Sun also violated the non-competition provisions of the Glenister Agreement.

34.     Gregory Israelson became an employee of Unity Scientific on or about March 7, 2016.  Mr. Israelson's offer letter, which he executed, stated "This offer is contingent on your execution of Unity's Confidentiality and Non-Competition Agreement (attached)." (the "Israelson Offer Letter," a copy of which is attached as Exhibit 3.) On March 4, 2016, Mr. Israelson executed a Confidentiality and Non-Competition Agreement with Westco Scientific Instruments, Inc. d/b/a Unity Scientific (the "Israelson Agreement," a copy of which is also included with Exhibit 3.) By executing the Israelson Agreement, Mr. Israelson agreed to maintain as secret Unity Scientific's confidential information. The Israelson Agreement also provided that in the event Mr. Israelson breached it, he agreed to the entry of preliminary

injunctive relief. As an employee of KPM, Mr. Israelson had access to KPM's trade secrets and confidential information, including its valuable datasets, source code and/or customer files. Mr. Israelson's last day of employment with KPM was March 12, 2021. On information and belief, Mr. Israelson is now an employee of Blue Sun of has acted in Blue Sun's behalf. As Blue Sun is a direct competitor to KPM Analytics, his joining Blue Sun, and any work he did for Blue Sun while employed by KPM as noted below, also violated the non-competition provisions of the Israelson Agreement.

35.     Irvin Lucas began his employment with Unity Scientific on January 5, 2015. On January 5, 2015, he signed a Confidentiality and Non-Competition Agreement in which he agreed to maintain as secret Unity Scientific's confidential information (the "Lucas Agreement," a copy of the Lucas Agreement is attached as Exhibit 4.) The Lucas Agreement also provided that in the event Mr. Lucas breached it, he agreed to the entry of preliminary injunctive relief. As an employee of KPM, Mr. Lucas had access to KPM's trade secrets and confidential information, including its valuable datasets, source code and/or customer files. His last day of employment was May 17, 2019. Prior to returning his company computer upon his departure, Mr. Lucas wiped clean the computer. In light of the allegations below, Mr. Lucas' wiping of his computer clean prior to returning it suggests that he was engaged in improper conduct, including but not limited to the potential disclosure of KPM's trade secrets to Blue Sun or others. Mr. Lucas became an employee of Blue Sun no later than January 17, 2020. On information and belief, Mr. Lucas is now Blue Sun's President. As Blue Sun is a direct competitor to KPM Analytics, his joining Blue Sun also violated the non-competition provisions of the Lucas Agreement.

36.     Philip Ossowski became an employee of Plaintiff on or about March 26, 2019. Mr. Ossowski executed a Non-Competition, Non-Solicitation and Confidentiality Agreement (the "Ossowski Agreement") in which he agreed to maintain as secret Plaintiff's trade secrets and other confidential information. (A copy of the Ossowski Agreement is attached as <u>Exhibit 5</u>.) As an employee of KPM, Mr. Ossowski had access to KPM's trade secrets and confidential information, including its valuable datasets and/or customer files. Mr. Ossowski's final day as an employee of KPM was January 29, 2021. On information and belief, Mr. Ossowski is now an employee of Blue Sun. As Blue Sun is a direct competitor to KPM Analytics, his joining Blue Sun also violated the non-competition provisions of the Ossowski Agreement.

37.     Robert Gajewski became an employee of Unity Scientific in 2003 and was fully employed with Unity Scientific and then KPM until February 1, 2019. On September 25, 2008, Mr. Gajewski executed a Confidentiality and Non-Competition Agreement with Unity Scientific (the "Robert Gajewski Agreement," a copy of which is attached as <u>Exhibit 6</u>.) By executing the Robert Gajewski Agreement, Mr. Gajewski agreed to maintain as secret Unity Scientific's confidential information. The Robert Gajewski Agreement also provided that in the event that Mr. Gajewski breached it, he agreed to the entry of preliminary injunctive relief. On January 31, 2019, Mr. Gajewski stopped being an employee of KPM. In Mr. Gajewski's termination letter (the "Gajewski Termination Letter") Mr. Gajewski acknowledged the obligations to maintain the confidentiality of KPM's confidential information. (A copy of the Gajewski Termination Letter is also attached as part of <u>Exhibit 6</u>.)  Mr. Gajewski subsequently became an independent contractor with KPM Analytics from February 1, 2019 until May 13, 2019. Then, pursuant to an offer letter dated May 7, 2019 (the "Rob Gajewski Offer Letter"), which Mr. Gajewski signed, Mr. Gajewski resumed full employment with Plaintiff on May 13, 2019. (A copy of the Robert

Gajewski Offer Letter is attached as part of Exhibit 6.) That Offer Letter makes express reference to KPM's policies, which included an employee handbook containing express restrictions on the use of confidential information. (A copy of portions of the handbook is also attached as part of Exhibit 6). As an employee of KPM, Mr. Gajewski had access to KPM's trade secrets and confidential information, including its valuable datasets, source code and/or customer files. After learning of Mr. Gajewski's conduct as described below, KPM terminated his employment on or about April 5, 2021.

38.     Beginning in or about 2008, Michelle Gajewski became a consultant for Unity Scientific, Inc. On or about January 1, 2014, Michelle Gajewski became an employee of Westco Scientific Instruments, Inc. d/b/a Unity Scientific in the position of Service Coordinator/Sales Support. On December 27, 2013, prior to starting her employment with Unity Scientific, she signed a Non-Disclosure Agreement in which she agreed to maintain as secret Unity Scientific's confidential information (the "Michelle Gajewski Agreement," a copy of which is attached as Exhibit 7.) The Michelle Gajewski Agreement also provided that in the event Mrs. Gajewski breached it, she agreed to the entry of preliminary injunctive relief. Michelle Gajewski is, and at all relevant times has been, married to Robert Gajewski. As an employee of KPM, and/or as the spouse of Robert Gajewski, Mrs. Gajewski had access to KPM's trade secrets and confidential information, including its valuable datasets, source code and/or customer files. After learning of Mr. and Mrs. Gajewski's conduct as described below, KPM terminated her employment on or about April 5, 2021.

39.     The non-disclosure and confidentiality obligations, and any non-competition obligations, of each of the former employees described above survived the termination of their employment and remain in force.

## Plaintiff Discovers and Investigates Blue Sun's
## Misappropriation of Trade Secrets

40.     Approximately two years ago, in 2018, Blue Sun entered the market to compete with the Unity Scientific unit of KPM Analytics. Blue Sun is selling its "Phoenix" NIR Analyzer, and as detailed below has recently begun doing so in conjunction with illegally using KPM Analytics' datasets and confidential information.

41.     Beginning in February 2021, KPM became suspicious that a number of its former employees and consultants had been hired by Blue Sun and may have provided KPM's trade secrets to Blue Sun, and that Blue Sun was actively using KPM's trade secrets. KPM undertook an investigation that identified numerous emails confirming that certain employees were violating their non-disclosure agreements with Plaintiff, aided by Blue Sun, and indicating that Blue Sun has in fact been using KPM's trade secrets and confidential information.  Indeed, some of the Individual Defendants seemed to have acted on behalf of Blue Sun while still employed by KPM Analytics. These emails include the following examples recently discovered by KPM in the email archives of several of its current and former employees:

42.     On January 11, 2019, KPM's then employee Arnold Eilert sent an email from his personal email account to KPM employee Michelle Gajewski at her unityscientific.com email address and also to the address rob@bluesunscientific.com. (The "January 11 Email" a copy of which is attached hereto as Exhibit 8.)  The January 11 Email recounts a call that Mr. Eilert had conducted with a Jae Kim at UC San Diego Medical Center, a Unity Scientific customer.  The email, among other things, states to Robert Gajewski and Michelle Gajewski, "If Blue Sun is looking to pursue sales/development for this application, it might make sense for someone to contact Jae to discuss how they might be able to move it forward."  In the January 11 Email, the rob@bluesunscientific.com email address is associated with the name "Rob Roberts."  As set

forth below, that email address in fact belongs, and belonged at that time, to Robert Gajewski

who at that time was an employee of KPM Analytics.  The labeling of the email address with the

pseudonym "Rob Roberts" indicates knowledge that Robert Gajewski was also unlawfully

affiliated with Blue Sun while still employed by KPM and an effort to obscure his identity.  In

any event, there was no legitimate reason why Robert Gajewski should have had a Blue Sun

email address while he was employed at KPM, or why KPM's employees Mr. Eilert and Mrs.

Gajewski were corresponding with Mr. Gajewski on behalf of Blue Sun.

43.     On July 9, 2020, Mr. Gregory Israelson received an email at his

kpmanalytics.com email address from a greg@bluesunscientific.com at Blue Sun (the "July 9

Email" a copy of which is attached as Exhibit 9.)  On information and belief, the email address

greg@bluesunscientific.com also belonged to Mr. Israelson. Because he was then still one of

KPM's employees, there was no legitimate reason why Mr. Israelson contemporaneously would

have maintained an email address at competitor Blue Sun. Moreover, the July 9 Email contained

a link for a known software tool used for remote copying of files with a request to join a session.

On information and belief, Mr. Israelson's sole purpose in sending this software copying tool to

himself at his kpmanalytics.com email address was to permit the copying of files from KPM to

Blue Sun without KPM's authorization.

44.     On July 18-19, 2019, Robert Gajewski apparently traveled to the company Post

Foods in Battle Creek, Michigan to service thirteen pieces of equipment. Post is a long-time

KPM customer and the machines he was servicing were KPM Analytics' analyzer machines.

The documentation (the "Post Documentation") supporting that visit, however, appears on Blue

Sun letterhead and identifies Robert Gajewski as the "Blue Sun Service Engineer." This all

happened despite the fact that Mr. Gajewski had resumed being a full-time employee of KPM

Analytics over two months earlier on May 13, 2019. (A copy of this Post Documentation is attached as Exhibit 10.)

45.     On August 14, 2019, KPM's customer Lamb Weston sent an email to Robert Gajewski at the email address rob@bluesunscientific.com and to Michelle Gajewski at her unityscientific.com email address (the "August 14 Email" a copy of which is attached as Exhibit 11.) The August 14 Email stated:

> Michelle/Rob.
>
> This is Nina from Lamb Weston in Quincy WA.
> I check weekly NIR today in the morning and it was working perfectly fine, but from now on dish with solids stop turning, and message in Red letters says:
> "Internal  Reference data scan collected but spectra values were clipped".
> I just want to make sure is that a lamp or something else happen.
> I'm so appreciated for your help or suggestions.

There was no legitimate reason why Robert Gajewski should have had a Blue Sun email address on August 14, 2019, at which point he was employed by KPM. Nor was there a legitimate reason why one of the KPM's customers would have been emailing him at a Blue Sun email address versus his KPM/Unity Scientific email address, or why Michelle Gajewski as a KPM Analytics employee should have been corresponding with anyone at Blue Sun about a KPM Analytics' customer's needs.

46.     On September 5, 2019, the package delivery firm UPS sent an email to Michelle Gajewski at her unityscientific.com email address advising her that a package had been delivered to Blue Sun Scientific. Plaintiff knows of no legitimate reason why Michelle Gajewski would have been sending a package to Blue Sun while she was still employed with Plaintiff nor does the Plaintiff know what was contained in that package.

47.     On December 16, 2019, UPS sent an email to Michelle Gajewski at her unityscientific.com email address updating her, at the request of Blue Sun, on the status of a

package sent to Gerald Saporito at Post Foods, the individual at Post Foods who had contacted Michelle's husband Robert Gajewski about performing maintenance work in July 2019, as described above.  KPM knows of no legitimate reason why Michelle Gajewski would have been corresponding about a package involving Blue Sun while she was still employed with KPM nor does the KPM know what was contained in that package.

48.     On January 17, 2020, another one of KPM Analytics/Unity's customers, Olam, sent an email to Robert Gajewski at his kpmanalytics.com email account and also to Mr. Lucas, who was then employed at Blue Sun, about questions regarding existing KPM Analytics' analyzer equipment at Olam. (The "January 17 Email Chain" a copy of which is attached as Exhibit 12.)   KPM is unaware of any legitimate reason why one of its customers would be emailing Mr. Gajewski together with anyone else at competitor Blue Sun or why any question about KPM Analytics' equipment would have been directed to Blue Sun.

49.     On January 14, 2020, an email involving Plaintiff's customer A&L Canada Laboratories, Inc. was sent copying Plaintiff's former employee Mr. Joshua Sarver then at Blue Sun and proposing the transition of the customer from Plaintiff to Blue Sun. (The "January 14 Email Chain," a copy of which is attached as Exhibit 13.)  Among other things, the January 14 Email states: "With that in mind I would like to proceed as follows. This solution switches you from your Unity instrument platform to the b/sun. The major advantage of this is that the b/sun instruments are interchangeable."  It further states: "We then need to expand the database with Ucal. We can do this with predicted values from the Unity instrument as lab data or we could expand the database with actual lab data."  On January 20, 2020, the customer forwarded the January 14 Email to Mr. Eilert at his unityscientific.com email address. KPM does not know why Mr. Eilert, who served as a KPM employee for almost another entire year after this email,

apparently took no action on behalf of KPM Analytics regarding the proposed transfer of its customer to competitor Blue Sun. Instead, the following day, on January 21, 2020, Mr. Eilert forwarded an email from his KPM Analytics account to his personal email account containing customer data concerning A&L Canada Laboratories, Inc. (the "January 21 Email" a copy of which is attached as Exhibit 14.)

50.     Beginning on February 6, 2020 through March 30, 2020, Robert Gajewski traded emails with a representative of ProAnalytics Pty Ltd. and with Irvin Lucas, apparently then working at Blue Sun, concerning replacement parts (a copy of this series of emails are attached as Exhibit 15.) ProAnalytics Pty Ltd. is a distributor of Plaintiff's products in Australia. Some of these emails were sent to and from Robert Gajewski's Blue Sun email address, and others were sent to and from his KPM Analytics email address. The order attached to these emails shows that ProAnalytics Pty Ltd. ultimately purchased the replacement parts from Blue Sun instead of from Plaintiff. KPM is unaware of any legitimate reason why its employee, Mr. Gajewski, would be assisting a competitor in this fashion or why Mr. Lucas, who was then (and still remains) under a non-compete obligation to KPM was working for Blue Sun or assisting in Mr. Gajewski's efforts.

51.     On March 26, 2020, Gerald Saporito of KPM's customer Post Consumer Brands sent an email to Robert Gajewski at his unityscientific.com email address stating: "Attached you will find the PO for the NIR curve calibrations." (A copy of the "March 26 Email" is attached as Exhibit 16.) The purchase order attached to the email identifies the Supplier as "Blue Sun Scientific LLC." The attachment also references a quote given to Post by Robert Gajewski on March 23, 2020, while he was employed by KPM Analytics, to perform work for Blue Sun on the KPM Analytics' analyzer equipment located at KPM's customer Post.

52.     On July 9, 2020, UPS sent an email to Michelle Gajewski at her KPM Analytics/Unity Scientific email address (mgajewski@unityscientific.com) stating that her package had been delivered. The recipient of the package was identified as "Blue Sun Scientific." The Plaintiff is unaware of the contents of the package delivered to Blue Sun or why she was sending anything to Blue Sun.

53.     On November 24, 2020, an anonymous email had been sent to KPM Analytics at the email address info@kpmanalytics.com, but trapped in its spam folder. That email stated: "Hello, You should know that Rob Gajewski is also working for a company called Blue Sun Science.  It appears he is working for both Unity and Blue Sun."

### Blue Sun's Public Use of Plaintiff's Trade Secrets

54.     As of March 29, 2021, Blue Sun has published 34 application notes on its website about its Near Infrared products. Application notes are case studies. They are created to describe the ability of a specific calibration to perform on a range of samples. Application notes show calibration statistics based on the data used to create the calibration that have been collected from many different sources and using different reference chemistry laboratories.

55.     For each data point shown in the application note there is a unique sample that has been measured using NIR spectroscopy and simultaneously measured on a reference method.

56.     These reference methods can vary depending on the product that is being analyzed, requiring costly and complex chemical tests to determine.

57.     A typical application note will have thousands of data points used to create the underlying calibrations that are being presented.

58.     The "Skim Milk Powder Application Note," below has over five-thousand unique chemical reference measurements made to create the calibration.

59.     Application Notes are a critical component to the sale of NIR spectroscopy equipment.

60.     When a customer evaluates a system to purchase, it is not only purchasing the spectrometer hardware.

61.     A customer purchases the ability of the system to provide the results for their products of interest and have accurate parameter/constituent results as compared to reference methods.

62.     Applications notes create confidence and trust that a supplier has the calibration history to perform certain measurements for their product of interest.

63.     The more data and variation that each application note has is a measure of the size and robustness of the underlying calibration models.

64.     Blue Sun has published these notes now as technical descriptions of the results achieved from analyzing substances using the Blue Sun Phoenix NIR Analyzers. Of their 34 application notes, 13 of them list "robga" as the author. On information and belief, this is a reference to Robert Gajewski who, until the date of filing of this Verified Complaint, was employed by KPM Analytics.

65.     In its investigation, KPM Analytics searched the files on the KPM computer it has been supplying to Robert Gajewski as KPM's employee. On that computer, KPM found datasets, calibration model sets and software as they existed on the same date that Blue Sun published its application notes. All are KPM Analytics' proprietary, confidential data and trade secrets. Using those datasets, calibration model sets and software, KPM has regenerated the calibration results.

66.     So far, at least 11 of these 13 Blue Sun application notes, published on Blue Sun's webpage and reporting results from spectroscopy performed on Blue Sun's Phoenix analyzer,

*identically match* the regenerations performed by KPM Analytics from the datasets, calibration model sets and software versions found on Mr. Gajewski's KPM computer. In other words, Blue Sun's application notes and the spectroscopy work done with Blue Sun's Phoenix analyzer must have used KPM's datasets and other confidential trade secrets from Mr. Gajewski's KPM computer.  The following example is illustrative:

67.      The following example is a comparison of Blue Sun's application note for the analysis of Skim Milk to KPM Analytics' regenerated results from KPM Analytics' proprietary datasets and software for Skim Milk found on Mr. Gajewski's KPM computer.

68.      This is a screenshot of the Blue Sun website as visited on March 25, 2021:



69.      The linked pdf file for the  "Skim Milk Powder Application Note," which was retrieved at the link https://9aadee27-00f9-496c-b821-

54bbf3443394.filesusr.com/ugd/1738b7_654bc41ca2894b95aca46cc91c1c8fa2.pdf, contains the

following pages (copy attached as Exhibit 17):



# Phoenix Application Note
## Skim Milk Powder

### Introduction

This application note describes the general results when measuring skim milk powder using for the Phoenix NIR Analyzers.

### Method

All samples were run on a Phoenix Series NIR Analyzer and calibrations were developed using Alligator Calibration software.

All samples were analyzed at room temperature. All samples were mixed well before analyzing

The large cup was used for analysis.

### Results

Samples were collected from many different global locations.

All results are on as-is basis.

### Definitions

**# of Samples**: Total number of samples for each constituent.

**Range**: Constituent range in the calibration

**$R^2$**: Correlation coefficient is the agreement between the wet chemistry and NIR results. Correlation is dependent on lab accuracy and constituent range.

**SECV**: Cross Validation Error of the calibration. This value is approximately what can be expected when using the calibration for routine analysis.

| Constituent | # of Samples | Range | $R^2$ | SECV |
|---|---|---|---|---|
| Moisture | 1200 | 2.5 – 4.6 | 0.83 | 0.10 |
| Fat | 1050 | 0.1 – 1.2 | 0.90 | 0.07 |
| Protein | 1400 | 31.9 – 38.6 | 0.97 | 0.25 |
| Lactose | 950 | 48.8 – 57.0 | 0.95 | 0.41 |



70.     The properties of the PDF file show that it was created and last modified on January 2, 2021, at 10:25:08. The author of the PDF document is "robga," which again KPM Analytics understands to be Robert Gajewski.

71.     The Blue Sun Application Note – Skim Milk Powder contains four graphs that display the calibration values (NIR Values) to the Reference Values (Ref values) for the skim

milk product. Each plot shows every unique sample (plotted square) that is compared against the calibration. Because each data point on the graph is a unique sample with its own reference value when one plots thousands of samples, ***these graphs are like fingerprints of the calibration model and the raw data*** that creates them.  To create a separate but exact match of the NIR values and the measured chemistry reference values for so many points is statistically impossible to duplicate.

72.     On the same date, January 2, 2021, that the Blue Sun Application Note was published, notably, the KPM electronic records for the same data on Mr. Gajewski's KPM computer show these files were modified.

73.     KPM Analytics then used generated graphs from the KPM data for skim milk present on Mr. Gajewski's KPM computer. These comparison graphs were saved from the UCAL 4 calibration software setting the specific graphing characteristics to have the same scaling and plotting features that are shown in the Blue Sun Application Note. (A copy of the KPM Analytics' comparison graphs is attached here to as Exhibit 18.)

74.     The graphs depicted in the Blue Sun Application Note and those generated from the KPM datasets, calibration model sets, and software are identical.

75.     These two graphs for measuring the presence of Lactose compare the Blue Sun Application Note's (zoomed in on the upper quadrant) calibration points (first graph) with the KPM Analytics Database's (zoomed in on the upper quadrant) calibration points (second graph). They are identical.



76.    Comparing the complete graph from the Blue Sun Application Note (first graph) with the entire graph from the KPM Analytics database (second graph) also show the results to be identical:





77.    Likewise, comparing the moisture measurement results graphic from the Blue Sun Application Note (first graph) with the graphic from the KPM Analytics database (second graph) show them to be identical:





78.    Likewise, comparing the protein measurement graphic from the Blue Sun

Application Note (first graph) with the graphic from the KPM Analytics database (second graph)

show them to be identical.





79. Finally, comparing the fat graphic from the Blue Sun Application Note (first graph) with the graphic from the KPM Analytics database (second graph) show them to be identical:





80. Blue Sun's Application Note, its underlying datasets, calibrations, and reporting software tool, therefore, were all taken directly from KPM Analytics' database, and specifically from the KPM computer of Robert Gajewski.

81. At least ten other application notes on Blue Sun's website show similar identicality to KPM Analytics' confidential trade secrets when directly compared.

**Lost Customers, Opportunities and Ongoing Damages Suffered By KPM Analytics**

82. As a result of Defendants' unlawful conduct, KPM Analytics already has been damaged. The extent of that damage is still under investigation and will also require discovery from Defendants, and potentially from third-parties. However, in addition to the customer service opportunities and purchase orders described above, KPM has already been able to identify at least the following specific losses:

83.    KPM lost a $61,000 order for customer Texas A&M AgriLife in 2020. The sales opportunity for this order was generated for Plaintiff by Ms. Glenister on or about September 4, 2019. Ms. Glenister closed the sales opportunity on June 9, 2020, with an entry stating that the customer had "No Budget/Lost Funding." Contrary to Ms. Glenister's representations, KPM has now learned that Blue Sun received an order from Texas A&M AgriLife on April 20, 2020 and amended it on July 20, 2020. July 20, 2020, notably, was also the date that Ms. Glenister left her employment with KPM.

84.    Plaintiff has also now learned that it lost a sales opportunity for Panhandle Milling, an opportunity created by Ms. Glenister while she was an employee of Plaintiff. After Ms. Glenister left Plaintiff's employ, Panhandle Milling placed an order with Blue Sun late in 2020.

85.    Plaintiff also lost a sales opportunity to Agri-King, Inc., an opportunity created by Ms. Glenister while she was an employee of Plaintiff.  After Ms. Glenister left Plaintiff's employ, Agri-King placed an order with Blue Sun.

86.    KPM Analytics' investigation into actual and potential lost sales is continuing. KPM, however, remains in the impossibly unfair position of competing with itself as Blue Sun continues to market and sell NIR spectroscopy machines and services utilizing KPM Analytics' precise data sets, calibration model sets and software tools.

## Count I – Defend Trade Secrets Act 18 U.S.C. § 1836(b)(1)
### (Against All Defendants)

87.    Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

88.    Defendants' conduct violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*.

89.     Plaintiff possessed and possesses trade secrets as described further above, including but not limited to its datasets, software tools, technical knowledge and customer information.

90.     Plaintiff's trade secrets have independent economic value.

91.     At all relevant times, Plaintiff took reasonable measures to keep its trade secrets confidential and secret.

92.     Defendants misappropriated Plaintiff's trade secrets as is defined in 18 U.S.C. § 1839(5)(B).

93.     The trade secrets that Defendants misappropriated were intended for use and/or were in fact used in interstate and foreign commerce.

94.     As a direct and proximate result of Defendants' unlawful misappropriation of Plaintiff's trade secrets in violation of the DTSA, Plaintiff has been damaged in an amount to be determined at trial.

95.     As a direct and proximate result of Defendants' unlawful misappropriation of Plaintiff's trade secrets in violation of the DTSA, Defendants have been unjustly enriched.

96.     As a direct and proximate result of Defendants' unlawful misappropriation of Plaintiff's trade secrets, Plaintiff is suffering and will continue to suffer irreparable harm if Defendants' misappropriation and use of Plaintiff's trade secrets is not enjoined.

97.     The misappropriation of Plaintiff's trade secrets was done in bad faith and was willful and malicious.

### Count II – Misappropriation of Trade Secrets
### (Against All Defendants)

98.     Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

99.     By their actions, including those described above, Defendants have wrongfully misappropriated, disclosed, and/or used certain of Plaintiff's proprietary and confidential information and trade secrets, including but not limited to, its datasets, software tools, technical knowledge and customer information.

100.    The copying, disclosure, use and/or destruction of such information by Defendants constitutes an unauthorized copying, disclosure, or use of trade secrets and information in violation of the common law and M. G. L. c. 93, § 42 *et seq*.

101.    Plaintiff has and will suffer substantial, immediate and irreparable harm and damages unless Defendants are enjoined from disclosing and using such proprietary and/or confidential business information and trade secrets.

<u>**Count III – Breach of Contract**</u>
<u>**(Against Individual Defendants)**</u>

102.    Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

103.    Each of the Individual Defendants entered into a contract with Plaintiff to maintain as confidential and not use or disclose Plaintiff's trade secrets after leaving Plaintiff's employ.

104.    Each of the Individual Defendants materially breached their respective contract or contracts by using or disclosing Plaintiff's confidential information.

105.    As a direct and proximate result of such breaches, Plaintiff has been damaged. Further, as a direct and proximate result of such breaches, Plaintiff is being irreparably harmed by the Individual Defendants' use and disclosure and will continue to be irreparably harmed if the Individual Defendants' conduct use and disclosure of Plaintiff's confidential information is not enjoined.

## Count IV – Violation of Covenant of Good Faith and Fair Dealing
### (Against Individual Defendants)

106.     Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

107.     Each of the Individual Defendants entered into a contract with Plaintiff to maintain as confidential and not use or disclose Plaintiff's trade secrets after leaving Plaintiff's employ. Implied in each of those agreements is the covenant of good faith and fair dealing.

108.     Each of the Individual Defendants materially violated the covenant of good faith and fair dealing implied in their respective contract or contracts by using or disclosing Plaintiff's confidential information.

109.     As a direct and proximate result of such violations, Plaintiff has been damaged. Further, as a direct and proximate result of such conduct, Plaintiff is being irreparably harmed by the Individual Defendants' use and disclosure and will continue to be irreparably harmed if the Individual Defendants' conduct use and disclosure of Plaintiff's confidential information is not enjoined.

## Count V – Breach of Duty of Loyalty
### (Against Individual Defendants)

110.     Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

111.     KPM is in a high-tech business and generates much of its revenue from the use of its intellectual property.  KPM's confidential information is highly valuable.

112.     Each of the Individual Defendants held positions of trust and confidence and had access to confidential KPM information.  In order for each of the Individual Defendants to perform their jobs at KPM, they required access to and knowledge of KPM's proprietary and

confidential information, which KPM trusted they would keep in confidence and required each Individual Defendant to sign non-disclosure agreements to protect that confidential information.

113.    Each of the Individual Defendants breached their duty of loyalty to KPM by using and disclosing KPM's confidential information to a competitor.

114.    As a direct and proximate result of such breaches, Plaintiff has been damaged. Further, as a direct and proximate result of such breaches, Plaintiff is being irreparably harmed by the Individual Defendants' use and disclosure and will continue to be irreparably harmed if the Individual Defendants' conduct, use and disclosure of Plaintiff's confidential information is not enjoined.

### Count VI – Breach of Contract
### (Against Individual Defendants Glenister, Israelson, Lucas and Ossowski)

115.    Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

116.    Each of the Individual Defendants Glenister, Israelson, Lucas and Ossowski entered into a contract with Plaintiff in which they agreed not to compete with Plaintiff by working for a competitor of Plaintiffs for a limited and reasonable period after leaving Plaintiff's employ.

117.    Each of the Individual Defendants Glenister, Israelson, Lucas and Ossowski materially breached their respective contract(s) by entering the employ of Plaintiff's direct competitor Blue Sun within the proscribed periods of time, which are still running today.

118.    As a direct and proximate result of such breaches, Plaintiff has been damaged. Further, as a direct and proximate result of such breaches, Plaintiff is being irreparably harmed by this competition and will continue to be irreparably harmed if the conduct is not enjoined.

## Count VII – Tortious Interference with Contractual Relations
### (Against Blue Sun and ITG)

119.    Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

120.    Each of the Individual Defendants were contractually bound to maintain as confidential and not use or disclose Plaintiff's trade secrets, and/or work for a competitor such as Blue Sun, after leaving Plaintiff's employ.

121.    Blue Sun and ITG were aware of these contracts and the Individual Defendants' contractual obligations not to use or disclose Plaintiff's trade secrets, and/or work for a competitor such as Blue Sun, after leaving Plaintiff's employ.

122.    Blue Sun and ITG intentionally and maliciously interfered with those contracts for the purpose of harming their competitor, KPM Analytics.

123.    As a direct and proximate result of Blue Sun's tortious interference, Plaintiff has been damaged. Further, as a direct and proximate result of Blue Sun's conduct, Plaintiff is being irreparably harmed and will continue to be irreparably harmed if the conduct is not enjoined.

## Count VIII – Conversion
### (Against All Defendants)

124.    Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

125.    Defendants wrongfully exercised dominion and control over Plaintiff's property, trade secrets, and confidential information and, by failing to return same, converted Plaintiff's property and confidential information without legal justification, authorization or privilege.

126.    As a direct and proximate result of Defendants' conduct, Plaintiff has been and/or will be damaged.

### Count IX – Unjust Enrichment
### (Against All Defendants)

127.    Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

128.    Through their misappropriation, use and disclosure of Plaintiff's confidential information, Defendants benefitted.

129.    The benefit that Defendants received by their misappropriation, use and disclosure of Plaintiff's confidential information was done at Plaintiff's expense.

130.    It would be unjust and inequitable to allow Defendants to retain the benefit that they received through their misappropriation, use and disclosure of Plaintiff's confidential information.

### Count X – Violation of M. G. L. c. 93A, § 11
### (Against Blue Sun and ITG)

131.    Plaintiff realleges and incorporates all foregoing paragraphs as if fully set forth herein.

132.    Plaintiff is a "person" and engages in "trade or commerce" within the meaning of M. G. L. c. 93A, §1.

133.    Defendants, Blue Sun and ITG are a "persons" and engage in "trade or commerce" within the meaning of M. G. L. c. 93A, §1.

134.    The actions of Defendants, Blue Sun and ITG, as set forth above constitute willful and knowing violations of M. G. L. c. 93A, §11, and they have occurred primarily and substantially within Massachusetts.

135.    The wrongful practices include, without limitation, misappropriating Plaintiff's proprietary and/or confidential business information and otherwise compromising its goodwill,

tortiously interfering with Plaintiff's contractual relationships with its current and former employees, tortiously interfering with Plaintiff's contractual relationships with its current and prospective customers, utilizing misappropriated trade secrets, proprietary and/or confidential information for the purposes of targeting customers of Plaintiff, and encouraging its employees and Plaintiff's former employees to misuse Plaintiff's confidential information.

136.   As a direct and proximate result, Plaintiff has suffered and will continue to suffer substantial damages.

WHEREFORE, Plaintiff KPM Analytics North America Corporation respectfully requests that this Court:

a.  Enter judgment in Plaintiff's favor on all counts;

b.  Enter a preliminary and permanent injunction against all Defendants, prohibiting them from using or disclosing any of Plaintiff's trade secrets and requiring the return of all copies of such trade secrets and confidential information;

c.  Enter a preliminary and permanent injunction against Individual Defendants Glenister, Israelson, Lucas and Ossowski, prohibiting them from working for Blue Sun for the periods specified in their respective agreements with Plaintiff;

d.  Awarding damages to Plaintiff on account of its actual losses and Defendants' conversion, unjust enrichment, breaches of contract and duties, and their misappropriation of Plaintiff's trade secrets;

e.  Awarding Plaintiff attorneys' fees and costs under the DTSA as a result of Defendants' bad faith and willful and malicious misappropriation of Plaintiff's trade secrets;

f.  Awarding Plaintiff double damages under the DTSA as a result of Defendants' willful and malicious misappropriation of Plaintiff's trade secrets;

g.  Awarding Plaintiff double or treble damages and attorneys' fees on account of Defendants' unfair and deceptive trade practices in violation of M. G. L. c. 93A, § 11;

h.  Award Plaintiff reasonable attorneys' fees and costs as provided for by the contracts between it and the Individual Defendants.

i.  Such other relief as this Court deems just and proper.

### Jury Demand

Plaintiff KPM Analytics North America Corporation demands a trial by jury on all claims so triable.

Respectfully submitted,

KPM Analytics North America Corporation,

By its attorneys,

*/s/* John T. Gutkoski

John T. Gutkoski (BBO No. 567182)
Scott R. Magee (BBO No. 664067)
Paige Zacharakis (BBO No. 699108)
Morse, Barnes-Brown & Pendleton, P.C.
480 Totten Pond Road, 4th Floor
Waltham, MA 02451
Phone: (781) 622-5930
Fax: (781) 622-5933
jgutkoski@morse.law
smagee@morse.law
pzacharakis@morse.law

Dated:  April 5, 2021

## **VERIFICATION**

Eric J. Olson, under penalty of perjury, verifies that he is the Vice President of Engineering and Quality of KPM Analytics North America Corporation. and that the facts in this Verified Complaint (except those facts based upon information and belief) are true and accurate to the best of his knowledge.

/s/ *Eric J. Olson*_____

Eric J. Olson