**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

KPM ANALYTICS NORTH AMERICA
CORPORATION,

        *Plaintiff*,

  v.

BLUE SUN SCIENTIFIC, LLC, THE
INNOVATIVE TECHNOLOGIES GROUP &
CO., LTD., ARNOLD EILERT, MICHELLE
GAJEWSKI, ROBERT GAJEWSKI, RACHAEL
GLENISTER, GREGORY ISRAELSON, IRVIN
LUCAS, AND PHILIP OSSOWSKI,

        *Defendants.*

Civil Action No. 4:21-CV-10572-TSH

**PLAINTIFF KPM ANALYTICS NORTH AMERICA CORPORATION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
PRELIMINARY INJUNCTION AND ITS EMERGENCY MOTION FOR
<u>EXPEDITED DISCOVERY</u>**

i

**TABLE OF CONTENTS**

I.    FACTS CURRENTLY KNOWN ABOUT DEFENDANTS' MISCONDUCT. .................. 1

    A.    KPM Has Spent Decades Creating And Refining Its Proprietary And Confidential Datasets, Calibrations And Software Tools Providing It A Competitive Advantage In Near Infra-Red Spectroscopy. ........... 1

    B.    "Fingerprint"-like Evidence Establishes That Defendants Have Misappropriated And Are Now Using KPM's Proprietary Trade Secrets. ........... 3

    C.    KPM Has Discovered That The Individual Defendants Have Been Assisting Or Outright Working For Blue Sun, Including Some *While Still Employed* By KPM. ................ 5

II.    ARGUMENT. ................ 6

    A.    KPM Is Entitled To The Entry Of A Preliminary Injunction Based On The Currently Known Facts. ................ 6

        1.    The Currently Known Facts Establish That KPM Has A Strong Likelihood Of Success In Proving Its Claims. ................ 7

            a.    The Defendants Have Stolen and Misused KPM's Trade Secrets in Violation of Federal and State Law. ................ 8

            b.    KPM Is Also Likely To Successfully Establish Its Additional Tort And Breach of Contract Claims. ................ 11

        2.    Plaintiff Will Suffer Irreparable Harm If a Preliminary Injunction Is Not Entered. ................ 14

        3.    The Balance of Hardships and Public Interest Favor Granting an Injunction. ................ 15

    B.    This Court Should Permit Expedited Discovery Prior to Holding a Hearing on Plaintiff's Preliminary Injunction Motion. ................ 16

III.    CONCLUSION. ................ 19

## TABLE OF AUTHORITIES

**Cases**

*Alexander & Alexander v. Danahy*,
21 Mass. App. Ct. 488 (1986) .................................................................................................. 15

*Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*,
386 F.Supp.3d 89 (D. Mass. 2019) ........................................................................................... 8

*Am. Stop Loss Ins. Brokerage Svcs, Inc. v. Prince*,
2001 WL 173178, No. 01-0215 (Mass. Super. 2001) .............................................................. 17

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
794 F.3d 168 (1st Cir. 2015) ............................................................................................... 8, 16

*Aspect Software, Inc. v. Barnett*,
787 F.Supp.2d 118 (D. Mass. 2010) ........................................................................................ 16

*Bos. Sci. Corp. v. Lee*,
No. CIV.A. 13-13156-DJC, 2014 WL 1946687, at *5 (D. Mass. May 14, 2014) .................... 14

*Bowne of Boston, Inc. v. Levine*,
1997 WL 781444, No. CIV.A. 97-5789A (Mass. Super. 1997) .............................................. 15

*Browne v. Merkert Enters.*,
1998 WL 151253, No. CIV. A. 98-386 (Mass. Super. 1998) .................................................. 17

*Cablevision of Boston, Inc. v. Public Improvement Com'n of City of Boston*,
184 F.3d 88, (1st Cir. 1999) ..................................................................................................... 13

*Corp. Techs., Inc. v. Harnett*,
731 F.3d 6 (1st Cir. 2013) ...................................................................................................... 7, 8

*EchoMail, Inc. v. Am. Express Co.*,
378 F.Supp.2d 1 (D. Mass. 2005) ....................................................................................... 15, 19

*Fine v. Guardian Life Ins. Co. of Am. & Park Ave. Sec.*,
450 F. Supp. 3d 20 (D. Mass. 2020) ........................................................................................ 13

*FrontRunner HC, Inc. v. Waveland RCM, LLC*,
No. 20-10230-DJC, 2020 WL 7321161 at *11 (D. Mass. Dec. 11, 2020) ....................... passim

*G.S. Enters, Inc. v. Falmouth Marine, Inc.*,
410 Mass. 262, 571 N.E.2d 1363 (1991) ................................................................................. 14

*Grand Pac. Fin. Corp. v. Brauer*,
57 Mass. App. Ct. 407, 783 N.E.2d 849 (2003) ...................................................................... 12

*Hartford Accident & Indem. Co. v. Millis Roofing & Sheet Metal, Inc.*,
11 Mass. App. Ct. 998, 418 N.E.2d 645 (1981) ...................................................................... 14

*In re Aerovox, Inc.*,
281 B.R. 419 (Bankr. D. Mass. 2002) ...................................................................................... 7

*In re Fannie Mae Derivative Litigation*,
227 F.R.D. 142 (D.D.C. 2005)................................................................................................. 19

*Incase Inc. v. Timex Corp.*,
488 F.3d 46 (1st Cir. 2007)...................................................................................................... 8

*Investors Bank & Trust Co. v. Gunes*,
1994 WL 879800, at *3, No. 94-2567F (Mass. Super. 1994)................................................. 15

*J.T. Healey & Son, Inc. v. James A. Murphy & Son, Inc.*,
357 Mass. 728 (1970) ............................................................................................................. 9

*Koufos v. U.S. Bank, N.A.*,
939 F. Supp. 2d 40 (D. Mass 2013) ........................................................................................ 13

*Laughlin v. Orthofix Intern., N.V.*,
293 F.R.D. 40 (D. Mass. 2013)................................................................................................ 18

*Maine Point, LLC v. Collins*,
No. 18-12072-DJC, 2018 WL 5303038, at *4......................................................................... 9

*McMann v. Doe*,
460 F.Supp.2d 259 (D. Mass. 2006) ....................................................................................... 18

*Michelson v. Digital Fin. Servs.*,
167 F.3d 715 (1st Cir.1999)..................................................................................................... 14

*New England Circuit Sales v. Randall*,
1996 WL 1171929, at *3, No. 1:96 CV 10840 (D. Mass. 1996)............................................. 17

*Nieves-Marquez v. Puerto Rico*,
353 F.3d 108 (1st Cir. 2003).................................................................................................... 17

*Optos, Inc. v. Topcon Med. Sys., Inc.*,
777 F.Supp.2d 217 (D. Mass. 2011) ........................................................................... 9, 11, 15, 16

*Picker Intern. Corp. v. Imagining Equipment Services, Inc.*,
   931 F.Supp. 18 (D. Mass. 1995) ................................................................................ 11

*Quaker State Oil Refining Corp. v. Garrity Oil Co.*,
   884 F.2d 1510 (1st Cir. 1989) ................................................................................... 13

*Russomano v. Novo Nordisk Inc.*,
   960 F.3d 48  (1st Cir. 2020) ....................................................................................... 7

*Shipley Co. v. Kozlowski*,
   926 F. Supp. 28 (D. Mass. 1996) ............................................................................... 17

*St. Louis Grp., Inc. v. Metals and Additives Corp., Inc.*,
   275 F.R.D. 236 (S.D. Tex. 2011) ............................................................................... 18

*Stone Legal Res. Group v. Glebus*,
   2002 WL 35654421, at *10-13 (Mass. Super. Dec. 17, 2002) .................................. 17

*Sunflower Elec. Power Corp. v. Sebelius*,
   No. 08-2575-EFMDWB, 2009 WL 774340, at *2 (D. Kan. Mar. 20, 2009) ............ 19

*TouchPoint Solutions, Inc. v. Eastman Kodak Co.*,
   345 F.Supp.2d 23 (D. Mass. 2004) ............................................................................ 10

*Unum Grp. v. Loftus*,
   220 F. Supp. 3d 143 (D. Mass. 2016) ........................................................................ 12

*Veridien, Inc. v. Phelan*,
   No. 034418BLS, 2003 WL 22481390, at *2, (Mass. Super. 2003) ............................ 7

*Viken Detection Corp. v. Videray Techs. Inc.*,
   384 F.Supp.3d 168 (D. Mass. 2019) ........................................................................ 8, 9

*Woods v. Wells Fargo Bank, N.A.*,
   733 F.3d 349 (1st Cir. 2013) ...................................................................................... 13

*Young v. Wells Fargo Bank, N.A.*,
   717 F.3d 224 (1st Cir. 2013) ...................................................................................... 14

**Statutes**

18 U.S.C. § 1836(b) ......................................................................................................... 8

M. G. L. c. 93, § 42(1) ................................................................................................... 11

M. G. L. c. 93A § 11 ...................................................................................................... 13

Plaintiff KPM Analytics North America Corporation ("KPM" or the "Plaintiff") submits this Memorandum of Law in Support of its Motion for a Preliminary Injunction and its Emergency Motion for Expedited Discovery against the Defendants Arnold Eilert ("Mr. Eilert"), Michelle Gajewski ("Mrs. Gakewski"), Robert Gajewski ("Mr. Gajewski"), Rachael Glenister ("Ms. Glenister"), Gregory Israelson ("Mr. Israelson"), Irvin Lucas ("Mr. Lucas"), and Philip Ossowski ("Mr. Ossowski") (collectively referred to as the "Individual Defendants"), The Innovative Technologies Group & Co., Ltd. ("ITG"), and its subsidiary, Blue Sun Scientific, LLC (referred to together herein as "Blue Sun").

## I.    FACTS CURRENTLY KNOWN ABOUT DEFENDANTS' MISCONDUCT.

### A.    KPM Has Spent Decades Creating And Refining Its Proprietary And Confidential Datasets, Calibrations And Software Tools Providing It A Competitive Advantage In Near Infra-Red Spectroscopy.

KPM is in the business of manufacturing machines to perform spectrographic analyses of a variety of substances used in many industries and commercial applications. This business line of KPM is run through a business unit called Unity Scientific. Through this business unit, KPM is a leading provider of near infrared ("NIR") spectroscopy analysis instrumentation. (Verified Complaint, ("Compl.")  ¶¶ 18-19.)

Spectroscopy is a scientific technique that measures the diffraction of light or other electromagnetic radiation propagated through a given substance to help determine the composition of that substance. Near Infrared Spectroscopy ("NIR spectroscopy") specifically uses a portion of the infrared electromagnetic spectrum (infrared light) to determine the composition of a wide variety of substances. KPM manufactures, and has manufactured, a variety of NIR analyzers that are used in this sort of spectroscopy. (*Id.* ¶¶ 21-22.)

All of these analyzers utilize KPM's NIR technologies based on mathematical models that allow the user to predict the contents of a constituent material with similar accuracy to that of

1

slower and more expensive reference methods (*e.g.*, wet chemistry methods). (*Id.* ¶ 23.) To achieve such performance, KPM's products need to not only measure the substance(s) being analyzed, but also to then integrate those observed results with calibration data in order to perform specific analyses for specific constituents. Calibration data development requires significant time and investment to ensure accuracy. (*Id.* ¶¶ 23-25.)

Over the years, KPM has developed an extensive calibration database applying these collection techniques and tools to many years of crop testing, season after season. KPM's current calibration database is robust, stable, and based on ***over 20 years of data collection***. (*Id.* ¶ 26.) KPM's database contains tens-of-thousands of samples, collected over several decades, geographies, droughts, rainy seasons, crop diseases, recoveries, etc. (*Id.* ¶¶ 26-27.) These data sets are collected by partnering with KPM's customers to collect and process a high number of observed variations with simultaneously measured laboratory results in order to permit unique calibrations for use on the NIR analyzer instruments. (*Id.* ¶ 28.)

It would require decades of effort and significant investments, partnering with an extensive host of customers over several harvest seasons, for a competitor to replicate such a database library asset. (*Id.* ¶ 29.)

In utilizing an NIR spectroscopy analyzer, once the spectroscopy is performed and referenced to the appropriate calibration library dataset(s), the results are reported out to the customer utilizing proprietary software called UCAL. The UCAL software has been in a continuous mode of development, testing and release for over 12 years requiring the support of software developers, contractors, testers, and mathematicians. UCAL software has been developed through extensive investment and is a critical tool for KPM's instruments. A significant investment and years of effort would be required to replicate UCAL. (*Id.* ¶ 30.)

KPM Analytics takes very seriously safeguarding its trade secrets and it protects and "keeps" confidential the data itself, the source code used to create calibrations and execute them on their instruments, and the information from its customers with whom KPM has partnered in these efforts over the years.  Only specific employees and consultants that work with this information are granted access to them.  All calibration datasets and reference values are stored on a protected, confidential Windows File Server. Source code for the UCAL applications that run KPM's instruments and create its calibrations are stored in secure vaults using GitHub. Users that must work with the data or software on a local computer have backup agents installed to protect the data with sign-off for permissions and access-control processes. KPM treats this information as highly protected and does not share it with anyone else unless pursuant to strict non-disclosure arrangements.  Similarly, non-disclosure and confidentiality agreements are also maintained for KPM's employees and personnel.  (*Id.* ¶ 31.)

> **B.** **"Fingerprint"-like Evidence Establishes That Defendants Have Misappropriated And Are Now Using KPM's Proprietary Trade Secrets.**

Blue Sun is a competitor of KPM for NIR analyzer products and services.  (Compl. ¶ 2.) Blue Sun is selling its "Phoenix" NIR Analyzer and has recently begun doing so in conjunction with illegally using KPM Analytics' datasets and confidential information. (*Id.* ¶ 40.) As of March 29, 2021, Blue Sun has published 34 application notes, or case studies, on its website about its Near Infrared products. (*Id.* ¶ 54.)  They are created to describe the ability of a specific calibration to perform on a range of samples. (*Id.*)  Application notes show calibration statistics based on the data used to create the calibration that have been collected from many different sources and using different reference chemistry laboratories. (*Id.*)  A typical application note will have thousands of data points used to create the underlying calibrations that are being presented. (*Id.* ¶ 57.)

3

Application Notes are a critical component to the sale of NIR spectroscopy equipment. (*Id.* ¶ 59.)  When a customer evaluates a system to purchase, it is not only purchasing the spectrometer hardware but also the ability of the system to provide the results for their products of interest and to have accurate parameter/constituent results as compared to reference methods. (*Id.* ¶¶ 60-62.) Application notes create confidence and trust that a supplier has the calibration history to perform certain measurements for their product of interest.  (*Id.*)

Blue Sun has published these notes now as technical descriptions of the results achieved from analyzing substances using the Blue Sun Phoenix NIR Analyzers. Of their 34 application notes, 13 of them list "robga" as the author. KPM understand that this refers to Robert Gajewski who, until the date of filing of the Verified Complaint, was employed by KPM.  (*Id.* ¶ 64.)

KPM searched the files on the KPM computer it has been supplying to Robert Gajewski as KPM's employee. On that computer, KPM found datasets, calibration model sets and software as they existed on the same date that Blue Sun published its application notes. All are KPM Analytics' proprietary, confidential data and trade secrets. Using those datasets, calibration model sets and software, KPM has regenerated the calibration results.  (*Id.* ¶ 65.)

At least 11 of these 13 Blue Sun application notes, published on Blue Sun's webpage and reporting results from spectroscopy performed on Blue Sun's Phoenix analyzer, ***identically match*** the regenerations performed by KPM Analytics from the datasets, calibration model sets and software versions found on Mr. Gajewski's KPM computer.  In other words, Blue Sun's application notes and the spectroscopy work done with Blue Sun's Phoenix analyzer must have used KPM's datasets and other confidential trade secrets from Mr. Gajewski's KPM computer. (*Id.* ¶¶ 66-81.)  Because each data point on the graph is a unique sample with its own reference value, when one plots thousands of samples ***these graphs are like fingerprints of the calibration***

4

*model and the raw data* that creates them.  (*Id.* ¶ 71.)  To create a separate but exact match of the NIR values and the measured chemistry reference values for so many points is statistically impossible to duplicate. (*Id.*) Blue Sun, therefore, used KPM's trade secrets to create these Application notes.

      **C.**      **KPM Has Discovered That The Individual Defendants Have Been Assisting Or Outright Working For Blue Sun, Including Some *While Still Employed* By KPM.**

In addition to the misappropriation described above by Defendant Robert Gajewski, KPM has now learned that several of its former employees who have left to go work for Blue Sun had been working for Blue Sun, or otherwise acting on Blue Sun's behalf, while still employed by KPM.  (*Id.* ¶¶ 40-53.)  Each of the Individual Defendants is a now former KPM employee, who had executed employment agreements expressly promising to protect and not misuse KPM's proprietary information and confidential trade secrets.  (*Id.* ¶¶ 32-39.)  Six of the seven expressly agreed to be subject to injunctive relief from a court should they breach those agreements.  (*Id.*)  Four of the seven (Glenister, Israelson, Lucas and Ossowski) also have non-competition provisions for limited periods that are still in effect prohibiting them from working at a direct competitor such as Blue Sun, yet they are believed to now be employed by Blue Sun.  (*Id.*)

Despite their employment with KPM, email archives now reveal the Individual Defendants had been assisting, and in some cases simultaneously working directly for, Blue Sun.  (*Id.* ¶¶ 40-53.)  Both Mr. Gajewski and Mr. Israelson maintained email addresses for both companies simultaneously.  (*Id.* ¶¶ 42, 43, 50.)  The Individual Defendants solicited customers of KPM for Blue Sun services and/or encouraged then to move their spectroscopy business to Blue Sun.  (*Id.* ¶¶ 40-53.)  Several customers appear to have been confused about whether they were dealing with these KPM employees on behalf of KPM or on behalf of Blue Sun.  (*Id.*)  Ms. Glenister also

appears to have terminated sales efforts she was engaged in for KPM only to revive those opportunities for Blue Sun.  (*Id.* ¶¶ 82-86.)

## II.    ARGUMENT.

KPM seeks a preliminary injunction to prevent the irreparable harm it continues to suffer due to the Defendants' actions as outlined above.  Specifically, the Plaintiff seeks a preliminary injunction: (1) enjoining the Defendants from their present conduct of utilizing or disseminating any of the Plaintiff's confidential, proprietary information and trade secrets, (2) requiring the Defendants to account for and return the information and materials at issue, (3) restraining the Defendants during the pendency of the litigation from contacting any current or former customer of the Plaintiff's, and (4) enforcing the restrictive covenants as agreed to by Mr. Eilert, Mrs. Gajewski, Mr. Gajewski, Ms. Glenister, Mr. Israelson, Mr. Lucas, and Mr. Ossowski in their respective Confidentiality and Non-Competition Agreements.

As set forth herein, the facts currently known to and pled by KPM support the entry of such a preliminary injunction.  KPM recognizes, however, that it has only recently begun its investigation, many of the details regarding the Defendants' conduct and its timing exists only in the hands of Defendants, and that additional limited discovery would assist the Court is most efficiently assessing the full scope of the Defendants' wrongdoing.  KPM, therefore, requests that the Court order expedited discovery in this matter, and then schedule a hearing on the merits of KPM's motion for a preliminary injunction.

> ### A.    KPM Is Entitled To The Entry Of A Preliminary Injunction Based On The Currently Known Facts.

Four factors typically govern the grant of a preliminary injunction:

[1] the movant's likelihood of success on the merits; [2] whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief; [3] the balance of relative hardships, that is, the hardship to the nonmovant if enjoined as

6

opposed to the hardship to the movant if no injunction issues; and [4] the effect, if any, that an injunction or the lack of one may have on the public interest.

*Russomano v. Novo Nordisk Inc.*, 960 F.3d 48, 52 (1st Cir. 2020); *see also*, *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013) (affirming the district court's entry of preliminary injunction restraining former employee).

Here, six of the seven Individual Defendants – Mr. Eilert, Ms. Glenister, Mr. Israelson, Mr. Lucas, Mr. Gajewski and Mrs. Gajewski – all agreed to the entry of injunctive relief against them should they breach their agreements with KPM. (*See* Compl. Exs. 1-6 (para. 6) and Ex. 7 (para. 9).)   As detailed above and in the Verified Complaint, each one has breached at least the confidentiality provisions, the duty of loyalty, and any applicable non-competition provisions of their respective agreements.  Pursuant to their express agreements, KPM is therefore entitled to have the Court enter preliminary injunctive relief enjoining their ongoing conduct.  *See, e.g., In re Aerovox, Inc.*, 281 B.R. 419, 436 (Bankr. D. Mass. 2002) (finding the debtor would suffer irreparable injury if the Court did not grant an injunction as specific performance of the asset purchase agreement between the parties); *Veridien, Inc. v. Phelan*, No. 034418BLS, 2003 WL 22481390, at *2, (Mass. Super. 2003) (granting preliminary injunction enforcing a 1-year non-compete agreement where defendant agreed that preliminary injunctive relief would be an appropriate remedy for any breach).

As to defendants Blue Sun, ITG and Mr. Ossowski (and to all the Individual Defendants), the Court also should enter a preliminary injunction to protect KPM during the pendency of this case because each of the four factors favors granting KPM that protection.

> **1.      The Currently Known Facts Establish That KPM Has A Strong Likelihood Of Success In Proving Its Claims.**

In the First Circuit, "proving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d

168, 173 (1st Cir. 2015); (*see also Corp. Techs., Inc.*, 731 F.3d at 10 ("likelihood of success is the main bearing wall of the four-factor framework.") (internal quotations and citation omitted)). The facts currently known to KPM strongly establish the likelihood it will prevail in establishing its asserted causes of action.

> a.   **The Defendants Have Stolen and Misused KPM's Trade Secrets in Violation of Federal and State Law.**

The misappropriation and misuse of confidential trade secrets violates both federal and Massachusetts state law. The Federal Defend Trade Secrets Act ("DTSA") and Massachusetts' Uniform Trade Secrets Act are virtually equivalent. *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 386 F.Supp.3d 89, 94 (D. Mass. 2019). Massachusetts requires a plaintiff to establish: "(1) the information at issue constitutes a trade secret, (2) the plaintiff took reasonable steps to secure the confidentiality of the information and (3) the defendant obtained the trade secret through improper means." *Viken Detection Corp. v. Videray Techs. Inc.*, 384 F.Supp.3d 168, 177 (D. Mass. 2019); *see also Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007). Federal law adds the additional element that the trade secret be misused in interstate or foreign commerce. 18 U.S.C. § 1836(b); *Viken Detection Corp.*, 384 F.Supp.3d at 177. KPM has a strong likelihood of successfully establishing all four elements.

First, a trade secret includes, among other things, specified information that is contained or embodied in formulas, patterns, compilations, programs, devices, methods, techniques, processes, customer lists, inventions, and specifically includes scientific, technical or customer data. M. G. L. c. 93, § 42(4). At the time of its misappropriation, the information must have been subject to reasonable actions to protect against its disclosure or use without consent of its owner. *Id.* In short, a trade secret is "any confidential information used in the plaintiff's business that gives the owner an advantage over competitors who do not know or use it." *Viken Detection Corp.*, *supra*; *see also*

8

*Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F.Supp.2d 217 (D. Mass. 2011) (granting preliminary injunction against defendant who stole plaintiff's customer list upon moving from employ of plaintiff to competitor); *Maine Point, LLC v. Collins*, No. 18-12072-DJC, 2018 WL 5303038, at *4 (holding plaintiff likely to succeed on misappropriation) (citing, *J.T. Healey & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970)).

The currently known facts establish that KPM's extensive data and calibration sets and its UCAL software programming tools are trade secrets as defined by the law.  KPM's NIR business and analyzers require the use of KPM's data and calibration sets in its data libraries in order to work.  (Compl. ¶¶ 23-24.)  The reporting of the resulting data comparisons and analysis requires the use of KPM's proprietary software.  (Compl. ¶ 30.)  KPM has developed and assembled its datasets and software through decades of effort and expense, working hand in hand with its customers over many growing seasons. (Compl. ¶¶ 27-30.)  It would take legitimate competitors many years, even decades, to develop such data libraries on their own. (Compl. ¶ 29.)  This information lies at the heart of KPM's NIR spectroscopy business and forms the basis of its competitive advantage in the marketplace. (Compl. ¶¶ 22-26.)

Second, KPM has taken extensive steps to maintain the confidentiality of this information and keep it secret.  For example, only specific employees and consultants that work with KPM's confidential and proprietary information and materials are granted access to the protected server where the calibration datasets are stored. (Compl. ¶ 31.)  Similarly, the source code for applications that run KPM's instruments and create its calibrations are stored in secure vaults using GitHub and any person accessing the calibration data must work with the data or software on a local computer containing backup agents to protect the data. (*Id*.) Finally, non-disclosure and confidentiality agreements are maintained for KPM's employees and personnel. (*Id*.)  These actions more than

9

satisfy the legal requirements for reasonable measures of confidentiality. *See, e.g., FrontRunner HC, Inc. v. Waveland RCM, LLC*, No. 20-10230-DJC, 2020 WL 7321161 at *11 (D. Mass. Dec. 11, 2020) (reasonable protections supporting entry of preliminary injunction included using non-disclosure agreements with employees, "security precautions" to limit "access to its servers based on an employee's job title and function", and updating security procedures); *TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F.Supp.2d 23, 29 (D. Mass. 2004) (finding reasonable protections established by implementing non-disclosure agreements, password protecting servers, and repeatedly asserting orally the information was confidential) (citing, *Picker Intern. Corp. v. Imagining Equipment Services, Inc*., 931 F.Supp. 18, 23 (D. Mass. 1995); *see also*, *Optos, Inc.*, 777 F.Supp.2d, at 239-240.

Third, Defendants have taken KPM's confidential information using improper means. Under M. G. L. c. 93, § 42(1), improper means includes unreasonable intrusion or access into electronically stored information and the breach or inducement of a breach of confidential information. *See, e.g., FrontRunner HC, Inc.,* 2020 WL 7321161, at * 11 (finding individual defendants' actions of downloading data, transferring it to a USB drive, and forwarding documents to their new email addresses at competitor and to their personal email addresses constituted improper means); *Optos, Inc.*, *supra* at 241 ("[a]s a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means."). The Application Notes on Blue Sun's website and the data generated from Blue Sun's Phoenix NIR Analyzer were prepared with KPM's datasets, calibrations and software taken directly from Defendant Robert Gajewski's KPM computer while he was a KPM employee. (Compl. ¶¶ 54-81.) Individual Defendants, Mr. Gajewski and Mr. Israelson both maintained Blue Sun email addresses while simultaneously working for KPM. (Compl. ¶¶ 42-43.) Mr. Isrealson emailed a software file copying tool from his

10

Blue Sun email address to his KPM email address.  (Compl. ¶ 43.)  While an employee of KPM, Mr. Gajewski corresponded with a KPM customer and visited that customer to service KPM machines, but all the while acting as a representative of competitor Blue Sun. (Compl. ¶¶ 44, 47.) All of this was done in direct contradiction of the confidentiality requirements in the Individual Defendants' employment agreements and in violation of the duties of loyalty they owed to KPM as employees.  (Compl. ¶¶ 32-39.)

Finally, Defendants have misappropriated and used KPM's trade secrets in interstate commerce. At the present time, KPM is aware that its confidential information created and stored in Milford, Massachusetts has been used at its customers locations in San Diego, California (Compl. ¶ 42) Battle Creek, Michigan (Compl. ¶ 44), Quincy, Wyoming (Compl, ¶ 45) for the benefit of Blue Sun located in Jessup, Maryland, (Compl. ¶¶ 4-5).  Blue Sun is also promoting its products nationally and internationally through its website with application notes containing and based upon KPM's confidential information. (Compl. ¶¶ 54-81.)

Therefore, KPM has established it is likely to succeed in establishing its claims for theft and misappropriation of trade secrets under federal and state law.

### b.    KPM Is Also Likely To Successfully Establish Its Additional Tort And Breach of Contract Claims.

The currently known facts also establish that KPM has a likelihood of success of establishing its additional tort claims of conversion, unjust enrichment, and unfair and deceptive trade practices, as well as its claims based upon the Individual Defendants' employment contracts and the tortious interference with those contractual relationships.

The same facts and circumstances described above that establish the theft and misuse of trade secrets also support KPM's additional tort claims:  Conversion requires a defendant to have "intentionally or wrongfully exercise[d] acts of ownership, control or dominion over personal

11

property to which he has no right of possession at the time...." *Grand Pac. Fin. Corp. v. Brauer*, 57 Mass. App. Ct. 407, 412, 783 N.E.2d 849, 857 (2003); *see also Unum Grp. v. Loftus*, 220 F. Supp. 3d 143, 148 (D. Mass. 2016). A successful cause of action for unjust enrichment requires the "retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Koufos v. U.S. Bank, N.A.*, 939 F. Supp. 2d 40, 52 (D. Mass 2013); *see also Fine v. Guardian Life Ins. Co. of Am. & Park Ave. Sec.*, 450 F. Supp. 3d 20, 35 (D. Mass. 2020). A violation of M. G. L. c. 93A § 11 further requires that the defendant's conduct constituted an unfair and deceptive trade practice. While this requires "an individualized, fact-specific inquiry," *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013) (internal quotation omitted), "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Cablevision of Boston, Inc. v. Public Improvement Com'n of City of Boston*, 184 F.3d 88, (1st Cir. 1999); *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1513 (1st Cir. 1989).

Defendants' conduct establishes each of the elements of these causes of action. Blue Sun's Application Notes on its website are identical to and were generated from KPM's datasets, calibrations and software taken directly from Defendant Robert Gajewski's KPM computer while he was a KPM employee. (Compl. ¶¶ 54-81.) Blue Sun represents that it is using these same datasets with its Phoenix NIR Analyzer for customers. (*Id.*) The Individual Defendants provided Blue Sun with these datasets and software property as they worked simultaneously for KPM while working for or at least assisting Blue Sun, (*id.* at ¶¶ 42-53) and in doing so have taken KPM customers and opportunities for Blue Sun, (*id.* at ¶¶ 44-45, 48, 50-51, 82-86). Such shocking conduct is a far cry from fair and open competition and, instead, constitutes unfair and deceptive business practices.

Additionally, Defendants took their actions despite the express confidentiality obligations in the Individual Defendants' employment agreements with KPM.  (Compl. ¶¶ 32-39.)  Therefore, their actions constitute breaches of contract, *see, e.g., Bos. Sci. Corp. v. Lee,* No. CIV.A. 13-13156-DJC, 2014 WL 1946687, at *5 (D. Mass. May 14, 2014) (citing *Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir.1999)), and of good faith by the Individual Defendants, s*ee, e.g., Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 238 (1st Cir. 2013) (quoting *Hartford Accident & Indem. Co. v. Millis Roofing & Sheet Metal, Inc.*, 11 Mass. App. Ct. 998, 418 N.E.2d 645, 647 (1981)). They also establish KPM's likelihood of success in establishing that Blue Sun tortiously interfered with those employment agreements. *See, e.g.*, *G.S. Enters, Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 272, 571 N.E.2d 1363 (1991).

Lastly, KPM seeks to enforce the still current non-compete agreements against Defendants Ms. Glenister, Mr. Israelson, Mr. Lucas, and Mr. Ossowski.  An employer has a right to enforce reasonable non-compete restrictive covenants contained in employment agreements. *See, e.g., Anal. Corp. v. Data Transl., Inc.*, 371 Mass. 643, 647 (1976); *Alexander & Alexander v. Danahy*, 21 Mass. App. Ct. 488, 498 (1986).  The non-compete provisions in the Glenister, Israelson, Lucas, are all for the limited period of two years and the Ossowski Agreement is for one year. [1] (Compl. ¶¶ 33-36 and Exs. 2-5.) These are of limited, reasonable and enforceable durations.  *See Bowne of Boston, Inc. v. Levine*, 1997 WL 781444, No. CIV.A. 97-5789A (Mass. Super. 1997) ("Massachusetts courts have consistently enforced covenants of up to two years, even as great as five years duration, if they are otherwise reasonable under the circumstances."); *Investors Bank &*

---

[1] Ossowski's non-compete provision complies with M. G. L. c. 149 § 24L(b)(iv)'s one-year limitation on non-compete provisions as it was entered after October 1, 2018.

13

*Trust Co. v. Gunes*, 1994 WL 879800, at \*3, No. 94-2567F (Mass. Super. 1994) (injunction enforcing a two year non-compete provision).

### 2.    Plaintiff Will Suffer Irreparable Harm If a Preliminary Injunction Is Not Entered.

In a trade secret case, irreparable injury is presumed. *EchoMail, Inc. v. Am. Express Co.*, 378 F.Supp.2d 1, 4 (D. Mass. 2005). "Threatened or continued use of another party's trade secrets creates a presumption of irreparable harm as a matter of law." *FrontRunner HC, Inc.*, 2020 WL 7321161, at \*12 (citing *Optos, Inc.*, 777 F.Supp.2d at 241; *Aspect Software, Inc. v. Barnett*, 787 F.Supp.2d 118, 130 (D. Mass. 2010)).

Beyond the legal presumption, KPM will continue to suffer irreparable injury if a preliminary injunction is not entered at this time. (*See* Compl. ¶¶ 54-81.)  KPM has already uncovered evidence of customers being confused by whether employees are working for KPM or for Blue Sun, and whether KPM or Blue Sun is now servicing KPM's analyzer products.  (Compl. ¶¶ 42-53.)  If Blue Sun is not enjoined, this type of confusion will only proliferate. KPM has spent over 20 years and invested an enormous amount of money in cultivating its calibration data sets, source code, equipment, and good will with its customers in order to create a superior product and now risks the loss of customers and potentially its business due to the misappropriation of these trade secrets. (Compl. ¶¶ 26, 86.)

Blue Sun is also eroding KPM's ability to market itself and its products and services as unique based on its 20-plus years' worth of data collection and calibration development. (*See* Compl. ¶ 26.)  Due to the Defendants' improper actions, customers can now go to Blue Sun and receive an extremely similar if not identical experience because Blue Sun is using the same data set collections for the customer's product analyses. (Compl. ¶¶ 54-81.)

14

3. **The Balance of Hardships and Public Interest Favor Granting an Injunction.**

The final two steps in assessing a preliminary injunction motion is "a balance of equities in the plaintiff's favor, and service of the public interest." *FrontRunner HC, Inc.*, 2020 WL 7321161, at * 13 (citing *Arborjet, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015) (internal quotation marks omitted). Trade secrets need to be strongly protected as matter of public policy. *See Optos, Inc.*, 777 F.Supp.2d at 241-42 (holding the public interest of optometrists in having "the widest possible choice of retinal imaging products" did not outweigh the plaintiff's interests in keeping its trade secrets confidential) (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). Massachusetts also recognizes that "[i]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted." *Shipley Co. v. Kozlowski*, 926 F. Supp. 28, 30 (D. Mass. 1996); *New England Circuit Sales v. Randall*, 1996 WL 1171929, at *3, No. 1:96 CV 10840 (D. Mass. 1996) ("[a]llowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged").)

The magnitude of harm KPM stands to suffer if a preliminary injunction is not granted outweighs any harm that could potentially impact the Defendants from its issuance. Allowing the Defendants to continue with their conduct will result in the continued irreparable injury to KPM as described above. In contrast, the preliminary injunction will only temporarily put a stop to the Defendants' illicit use of KPM's confidential, proprietary information and trade secrets, enforce the non-disclosure provisions each Individual Defendant voluntarily entered into, and preserve KPM's good will with its customers. *See Browne v. Merkert Enters.*, 1998 WL 151253, No. CIV. A. 98-386 (Mass. Super. 1998); *Am. Stop Loss Ins. Brokerage Svcs, Inc. v. Prince*, 2001 WL 173178, No. 01-0215 (Mass. Super. 2001); *Stone Legal Res. Group v. Glebus*, 2002 WL 35654421, at *10-13 (Mass. Super. Dec. 17, 2002) (awarding injunctive relief to enforce non-compete and

15

non-disclosure agreement to protect employer's good will and confidential information). Notably, Blue Sun will still be able to sell its Phoenix NIR analyzer products and services. It simply will not be permitted to do so using KPM.s datasets, calibration data settings and reporting software.

> **B.    This Court Should Permit Expedited Discovery Prior to Holding a Hearing on Plaintiff's Preliminary Injunction Motion.**

Expedited discovery is appropriate in the present circumstances in order for the Plaintiff to determine what information the Individual Defendants have transferred to Blue Sun, exactly how extensive Blue Sun's use of that information has been, and how such use has harmed Plaintiff before a hearing on this Preliminary Injunction Motion is conducted.

This Court permits reasonable expedited discovery when there is good cause to do so. *See Laughlin v. Orthofix Intern., N.V.*, 293 F.R.D. 40, 41 (D. Mass. 2013) (stating that the "First Circuit has not addressed the proper standard to determine whether 'good cause' exists to justify discovery of the sort contemplated…[h]owever, a majority of district courts – including this district – have applied the 'reasonableness' standard."). *See also St. Louis Grp., Inc. v. Metals and Additives Corp., Inc.*, 275 F.R.D. 236, 239 (S.D. Tex. 2011); *McMann v. Doe*, 460 F.Supp.2d 259, 265 (D. Mass. 2006). When using the "good cause" standard, courts commonly consider: "(1) whether a preliminary injunction in pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request is made." *St. Louis Grp., Inc.*, *supra* at n.4 (citing *Sunflower Elec. Power Corp. v. Sebelius*, No. 08-2575-EFMDWB, 2009 WL 774340, at *2 (D. Kan. Mar. 20, 2009); *In re Fannie Mae Derivative Litigation*, 227 F.R.D. 142, 143 (D.D.C. 2005)). Each of these factors weighs in favor of allowing expedited discovery here.

16

The related first and third factors are met, as Plaintiff is simultaneously filing a Motion for Preliminary Injunction, giving a purpose to the need for expedited discovery. In a trade secret case like this, irreparable harm is presumed. *FrontRunner HC, Inc.*, *supra* at \*12; *EchoMail, Inc.*, 378 F.Supp.2d at 4. Even so, additional facts will assist this Court and allow Plaintiff to get all the relief it is entitled to receive. Plaintiff's investigation into the extent of Defendants' use and disclosure of its trade secrets necessarily has been limited to the information in its own possession, custody or control. In that investigation, Plaintiff found numerous emails showing that now-former KPM employees were disclosing to Blue Sun highly valuable trade secrets that Plaintiff has taken extensive precautions to protect, including through use of their personal and Blue Sun email accounts, (Compl. ¶¶ 42-53), making discovery of information from those accounts critical. Expedited discovery into the extent to which Defendants have obtained, used, and disclosed KPM's confidential information will give Plaintiff – and this Court – a greater understanding of the degree to which Plaintiff is being irreparably harmed due to Defendants' conduct, ensuring that the Court's ruling on Plaintiff's Motion for Preliminary Injunction is properly tailored to a fuller panorama of the facts than is presently known.

As to the related second and fourth factors, Plaintiff is only requesting a limited set of document requests to the Defendants (one set of 25 requests) and a deposition of each Defendant, limiting the depositions of five of the nine defendants to only 3.5 hours each. The full 7 hours of deposition for each of Robert Gajewski and Michelle Gajewski is necessary, unlike the 3.5 hours sought for the other individual defendants, because they were both employees of KPM until April 5, 2021, prior to which they were actively providing Blue Sun with KPM's highly valuable and confidential trade secrets, including the unique and highly confidential data from KPM that Blue Sun published on its website. (Compl. ¶¶ 37-38, 42, 64-67, 70-73.) Plaintiff intends primarily to

17

target the document requests and deposition topics concerning (i) which trade secret and confidential information Defendants misappropriated from KPM, (ii) how Defendants' accessed and stole KPM's trade secrets and confidential information and provided them to Blue Sun, and (iii) the use and disclosure that Blue Sun has made of those trade secrets and confidential information leading to harm to KPM. Allowing expedited discovery on those topics will give KPM and the Court the essential information required to determine who to enjoin, from what conduct, concerning what information, and how to tailor an effective order preventing further irreparable harm to KPM. Such targeted requests will limit any burden on the Defendants only to that reasonably necessary to evaluate the preliminary injunction factors so that this Court can prohibit them from further unlawful conduct that irreparably harms KPM. Finally, KPM will be serving the Emergency Motion for Expedited Discovery and this memorandum with the summons and Complaint on each Defendant to put them on notice of their preservation and collection obligations, and in particular KPM's intended scope of discovery topics, allowing them a reasonable time to comply with any document requests and depositions and thereby minimizing the burden due to any expedited timeline.

Finally, the fifth factor is met because the Complaint in this matter was filed the day before the Motion for Preliminary Injunction and Expedited Discovery, meaning it is well in advance of when discovery would typically be initiated. Waiting until a traditional discovery schedule, after the Defendants have appeared and responded to the Complaint, the parties have conducted a Rule 26(f) conference, and the Court has set a scheduling order in the normal course, would exacerbate the irreparable harm that KPM is suffering due to the Defendants' use and disclosure of its trade secrets.

**III.    CONCLUSION.**

For the foregoing reasons, KPM respectfully requests that the Court grant its Motion for Preliminary Injunction or, in the alternative, grant its Motion for Expedited Discovery and then schedule a hearing on the Motion for a Preliminary Injunction as set forth in each respective motion filed herewith.

Respectfully Submitted,

KPM ANALYTICS NORTH AMERICA CORPORATION

By its attorneys,

*/s/ John T. Gutkoski*
John T. Gutkoski (BBO# 567182)
Scott R. Magee (BBO # 664067)
Paige K. Zacharakis (BBO# 699108)
Morse, Barnes-Brown
& Pendleton, P.C.
CityPoint
480 Totten Pond Road, 4th Floor
Waltham, MA 02451
Phone: (781) 622-5930
Fax: (781) 622-5933
jgutkoski@morse.law
smagee@morse.law
Date: April 6, 2021                    pzacharakis@morse.law

## Certificate of Service

This hereby certifies that on April 6, 2021, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be served upon the Defendants by overnight mail, signature required.

*/s/ John T. Gutkoski*
John T. Gutkoski

19