UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

───────────────────────────────

KPM ANALYTICS NORTH AMERICA
CORPORATION,

       *Plaintiff,*

       v.

BLUE SUN SCIENTIFIC, LLC, THE
INNOVATIVE TECHNOLOGIES GROUP
& CO., LTD., ARNOLD EILERT,
MICHELLE GAJEWSKI, ROBERT
GAJEWSKI, RACHAEL GLENISTER,
GREGORY ISRAELSON, IRVIN LUCAS,
AND PHILIP OSSOWSKI

       *Defendants.*

───────────────────────────────

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 4:21-CV-10572-TSH

**PLAINTIFF KPM ANALYTICS NORTH AMERICA CORPORATION'S OPPOSITION
TO THE MOTIONS TO DISMISS FILED BY THE INDIVIDUAL DEFENDANTS**

# Table of Contents

INTRODUCTION ................................................................................................................. 1

RELEVANT FACTUAL BACKGROUND ......................................................................... 2

ARGUMENT ....................................................................................................................... 6

    I.    The Individual Defendants' Motions Improperly Dispute The Facts KPM Pled. .............. 6

    II.    KPM Has Properly Stated Claims For Trade Secret Violations, Conversion And Unjust Enrichment, As Well As Breaches of Contracts, Fair Dealing And Loyalty. .......................... 7

        A.    KPM's Complaint Specifies the Trade Secrets Misappropriated and Property Converted ............................................................................................................................ 8

        B.    KPM Adequately Alleged the Known Details Regarding Each Individual Defendants' Misconduct as Well as Unjust Enrichment Received ........................................................ 11

        C.    These Same Allegations Properly Support KPM's Claims For Breach of Contract, Covenant of Good Faith, and Duty of Loyalty ................................................................. 13

    III.    The Reasonableness, Enforceability And Proper Scope Of The Four Non-Compete Provisions Cannot Be Addressed At This Preliminary Stage Of The Case ............................. 14

    IV.    Neither KPM Nor Mrs. Gajewski Any Longer Resides In Connecticut, So The Case Against Her Should Not Be Transferred There ...................................................................... 15

CONCLUSION .................................................................................................................. 17

## Table of Authorities

### Cases

*Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 386 F.Supp.3d 89 (D. Mass. 2019) 7
*FabriClear, LLC v. Harvest Direct, LLC*, 481 F.Supp.3d 27 (D. Mass. 2020) ............................ 9
*Fine v. Guardian Life Ins. Co. of Am. & Park Ave. Sec.,* 450 F. Supp. 3d 20 (D. Mass. 2020) ..... 7
*Governo Law Firm LLC v. Bergeron*, 166 N.E.3d 416 (Mass. 2021) ........................................... 11
*Iconics, Inc. v. Massaro*, 266 F.Supp.3d 449 (D. Mass. 2017) ................................................... 9, 13
*In re Fin, Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 121 (1st Cir. 2019) ................................... 7
*Incase Inc. v. Timex Corp.*, 488 F.3d 46 (1st Cir. 2007) .............................................................. 7
*Integrated Cash Mgmt. Servs. v. Digital Transactions, Inc.*, 920 F.2d 171 (2d Cir. 1990) .......... 9
*Lava Laundry, Inc. v. Daniels Equipment Co., Inc.*, 18 Mass. L. Rptr. 414, 2004 WL 2423983
    (Mass. Super. Ct. Oct., 13, 2004) ......................................................................................... 16
*Moog, Inc. v. ClearMotion, Inc.*, Civ. No 1:19-cv-12066-IT, 2020WL6162921 (D. Mass. Oct. 21,
    2020) ................................................................................................................................... 13
*Peggy Lawton Kitchens, Inc. v. Hogan*, 18 Mass. App. Ct. 937, 466 N.E.2d 138 (1984) ............ 10
*Picker Int'l Corp. v. Imaging Equip. Servs., Inc.,* 931 F. Supp. 18 (D. Mass. 1995) ................. 9, 10
*Portfolioscope, Inc. v. I-Flex Solutions Ltd.*, 473 F.Supp.2d 252 (D. Mass. 2007) ..................... 11
*QLS Logistic Servs., LLC v. JAWS Associates, LLC*, Civil Action No. 17-cv-11891-ADB, 2018
    WL 5816342 (D. Mass. Nov. 6, 2018) .................................................................................. 17
*Sentient Jet, LLC v. Apollo Jets, LLC*, No. 13-CV-10081, 2014 WL 1004112 (D. Mass. Mar. 17,
    2014) ................................................................................................................................... 11
*Staffbridge, Inc. v. Gary D. Nelson Assoc., Inc.,* No. 024912BLS, 2004 WL 1429935 *4 (Mass.
    Super. Ct. June 11, 2004) ..................................................................................................... 13
*Sutra, Inc. v. Iceland Exp.*, No. CIV. A. 04-11360-DPW, 2008 WL 2705580 (D. Mass. July 10,
    2008) ................................................................................................................................ 9, 10
*TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261 (D. Mass. 2008) ................................. 15
*Unum Group v. Loftus,* 220 F.Supp.3d 143 (D. Mass. 2016) ..................................................... 12
*Viken Detection Corp. v. Videray Techs. Inc.*, 384 F.Supp.3d 168 (D. Mass. 2019) ................... 7
*Williams v. America Online, Inc.*, 2001 WL 135825 (Mass. Super. Ct. Feb. 8, 2001) ................ 16

### Statutes

18 U.S.C. § 1836(b) ............................................................................................................... 8

**INTRODUCTION**

Plaintiff KPM Analytics North America Corporation ("KPM") brought tort claims against Defendants Blue Sun Scientific, LLC ("Blue Sun") and Innovative Technologies Group & Co., Ltd. ("ITG") (together "Blue Sun" or "the Corporate Defendants"), as well as tort and contract claims against seven of KPM's former employees (the "Individual Defendants"), (Corporate and Individual Defendants referred herein collectively as "Defendants").  The Individual Defendants now work for or on behalf of Blue Sun, or they apparently have done so recently, many of them while they were simultaneously still employed by KPM.

KPM brought suit promptly after KPM learned that Defendants had engaged in a pattern of misappropriating several types of KPM's trade secrets in violation of a variety of federal and state laws.  KPM simultaneously moved for expedited discovery and a preliminary injunction to bar the wrongful conduct by all Defendants.  This Court ordered expedited discovery and a hearing on the preliminary injunction, concluding that "KPM has demonstrated a reasonable likelihood of success on the merits of its preliminary injunction action."  ECF No. 44 at 2.

Despite the Court's conclusion, the Individual Defendants press their seven separate motions to dismiss alleging primarily that KPM has failed to state any valid claim.  All of the Motions are overlapping and improper in that they argue against the facts pled by KPM rather than accepting them as true, which is required at this stage of proceedings.  *See* ECF Nos. 24, 26, 28, 30, 32, 34 and 36.  The Individual Defendants also unfairly take KPM to task for not yet knowing the full extent of each defendant's secretive wrongdoing and the details and timing for all of their actions.  *See id.*  The truth is KPM's Verified Complaint provides the Defendants adequate notice of KPM's claims, and additional specifics will be revealed in the expedited discovery already ordered by the Court. All of motions are meritless, and they should be denied.

## RELEVANT FACTUAL BACKGROUND

KPM's detailed Verified Complaint alleges the following facts.  KPM is in the business of manufacturing machines to perform spectrographic analyses of a variety of substances used in many industries and commercial applications.  This business line of KPM is run through a business unit called Unity Scientific.  Through this business unit, KPM is a leading provider of near-infrared ("NIR") spectroscopy analysis instrumentation, which relies on comparison of test samples to existing, known databases to determine the composition of a wide variety of substances.  (Verified Complaint, ("Compl.")  ¶¶ 18-19, 22.)  Over the years, KPM has developed an extensive database of calibration data sets applying these collection techniques and tools to many years of crop testing, season after season. KPM's current calibration database is robust, stable, and based on ***over 20 years of data collection***.  (*Id.* ¶ 26.)  In utilizing an NIR spectroscopy analyzer, once the spectroscopy is performed and referenced to the appropriate calibration library dataset(s), the results are reported out to the customer utilizing proprietary software called UCAL. (*Id.* ¶ 30.)  KPM Analytics takes very seriously safeguarding its trade secrets and it protects and "keeps" confidential the data sets themselves, the source code used to create the calibrations and employ them on their instruments, and the information developed from partnering with its customers in these efforts over the years.  (*Id.* ¶ 31.)

Defendants are a recent competitor of KPM for NIR analyzer products and services. (Compl. ¶ 2.)[1]  As of March 29, 2021, Blue Sun has published 34 application notes, or case studies, on its website about how its NIR products allegedly operate and perform.  (*Id.* ¶ 54.) The application notes describe the abilities of a spectrometer to measure a substance using

---

[1] In the Complaint, KPM defines Blue Sun and ITG collectively as "Blue Sun."  Blue Sun is a majority-owned subsidiary of ITG and is the marketing arm of ITG for its version of NIR analyzer products and services.

specific calibrations over a range of samples.  (*Id.*)  Application notes show results based on the data sets used to create the calibration that have been collected from many different sources and using different reference chemistry laboratories.  (*Id.*)  A typical application note will employ thousands of data points used to create the underlying calibrations that are being presented. (*Id.* ¶ 57.)

Application notes are a critical component to the sale of NIR spectroscopy equipment. (*Id.* ¶ 59.)  When a customer evaluates a system to purchase, it is not only purchasing the spectrometer hardware but also the ability of the system to provide the results for their product(s) of interest and have accurate parameter/constituent results as compared to reference methods. (*Id.* ¶¶ 60-62.)  Applications notes create confidence and trust that a supplier has the calibration history to perform certain measurements for their product of interest.  (*Id.*)

Blue Sun has published notes showing technical descriptions of the results defendants purportedly achieved from analyzing substances using the competing Blue Sun Phoenix NIR Analyzers. Of the 34 application notes, 13 of them list "robga" as the author. KPM understands that this refers to Robert Gajewski who, until the date of filing of this Verified Complaint, was employed by KPM.  (*Id.* ¶ 64.)

KPM searched the files on the KPM computer it has been supplying to Robert Gajewski as KPM's employee. On that computer, KPM found its datasets, calibration model sets and software as they existed on the same date that Blue Sun published its application notes. All are KPM's proprietary, confidential data and trade secrets. Using those datasets, calibration model sets and software, KPM has regenerated the calibration results.  (*Id.* ¶ 65.)

At least 11 of these 13 Blue Sun application notes, published on Blue Sun's webpage and reporting results from spectroscopy performed on Blue Sun's Phoenix analyzer, ***identically***

***match*** the regenerations performed by KPM from the datasets, calibration model sets and software versions found on Mr. Gajewski's KPM computer.  In other words, Blue Sun's application notes and the spectroscopy work done with Blue Sun's Phoenix analyzer must have used KPM's datasets and other confidential trade secrets from Mr. Gajewski's KPM computer. (*Id.* ¶¶ 66-81.)  Because each data point on the graph is a unique sample with its own reference value when one plots thousands of samples, ***these graphs are like fingerprints of the calibration model and the raw data*** that creates them.  (*Id.* ¶ 71.)  To create a separate but exact match of the NIR values and the measured chemistry reference values for so many points is statistically impossible.  (*Id.*)

While this hard evidence currently available to KPM is most damning of Blue Sun, ITG and Mr. Gajewski, KPM has pled the facts it has been able to learn so far about each of the Individual Defendants.  Each of the Individual Defendants is a now former KPM employee, who had executed employment agreements expressly promising to protect and not misuse KPM's proprietary information and confidential trade secrets.  (*Id.* ¶¶ 32-39.)  Six of the seven expressly agreed to be subject to injunctive relief from a court should they breach those agreements.  (*Id.*) Four of the seven (Glenister, Israelson, Lucas and Ossowski) also have non-competition provisions for limited periods that are still in effect prohibiting them from working at a direct competitor such as Blue Sun, yet they are believed to have been or now be employed by Blue Sun.  (*Id.*)  Despite their employment with KPM, email archives now reveal the Individual Defendants had been assisting, and in some cases simultaneously working directly for, Blue Sun, apparently with the knowledge and assistance of the Corporate Defendants and, in many cases, each other.  (*Id.* ¶¶ 40-53.)

Specifically, KPM has pled a number of specific actions by the Individual Defendants in which they, in various combinations, were involved over a two-year time frame in approaching current KPM customers and offering and/or providing them services for KPM's analyzer products, ***but on behalf of Blue Sun*** despite their remaining employed at (or recently having left) KPM. (*Id.*) To offer such services of KPM's products the Individual Defendants were using or leveraging their access to and knowledge of KPM's trade secrets including its data sets, software and product details. (*See id.*) The allegations include: Eilert, Mr. Gajewski and Mrs. Gajewski being involved in offering KPM customer UC San Diego Medical Center application development services for Blue Sun while they were employed at KPM with at least Mr. Gajewski simultaneously maintaining a Blue Sun email address, (*id.* ¶ 42), Israelson also simultaneously having email addresses with KPM and with Blue Sun, (*id.* ¶ 43), Mr. Gajewski servicing KPM products at KPM customer Post Foods but doing so as a representative of Blue Sun and Mrs. Gajewski being involved in related shipments and correspondence, (*id.* ¶¶ 44, 47 and 51), Mr. and Mrs. Gajewski involved in correspondence with KPM customer Lamb Weston about an issue with a KPM analyzer but involving Mr. Gajewski portrayed as a representative of Blue Sun, (*id.* ¶ 45), Lucas acting for Blue Sun but involved in correspondence with Mr. Gajewski (then at KPM) addressing questions from KPM customer Olam about KPM's equipment and with KPM distributor ProAnalytics Pty Ltd. leading to its purchase of replacement parts from Blue Sun rather than KPM, (*id.* ¶¶ 48 and 50), Eilert employed at KPM but involved with another former KPM employee who had moved to Blue Sun in correspondence about switching KPM customer A&L Canada Laboratories, Inc. to Blue Sun and claiming that the Blue Sun NIR analyzer products were then "interchangeable" with KPM's analyzers, (*id.* ¶

49), and Glenister directing sales opportunities and orders she developed at KPM for KPM customer Texas A&M Agri Life and others instead to Blue Sun, (*id.* ¶¶ 83-85).

Moreover, since it filed its Verified Complaint, KPM has continued to learn of additional wrongdoing by some of the Individual Defendants.  For example, as presented to the Court on May 13, 2021, KPM learned from its customer Disney that Eilert and Mrs. Gajewski while still employed by KPM: actively diverting KPM's business to Blue Sun, performing services on KPM's products using KPM's trade secret resources but representing themselves to be working for Blue Sun, thereby confusing the customer Disney, and then signing Disney to a "renewal" contract for Blue Sun and taking money that Disney thought it was paying to KPM.  ECF No. 43. KPM further represents here that in the past few weeks it has learned of other examples of the Individual Defendants misusing KPM trade secrets to confuse other customers and divert additional business for KPM products and services to Blue Sun.  KPM further expects that the currently ordered, expedited discovery will shed further light on the specific actions taken by each of the Individual Defendants in coordination with and on behalf of Blue Sun.

## ARGUMENT

### I.    The Individual Defendants' Motions Improperly Dispute The Facts KPM Pled.

Throughout their Motions, the Individual Defendants improperly dispute the facts. They ignore many of the factual allegations KPM has pled and cherry-pick out a few facts which they then wrongly dispute.  For example, Mr. Gajewski argues that the Complaint fails to allege that he or anyone "misappropriated or improperly used" KPM's proprietary UCAL software.  ECF No. 28 at 2.  Yet, KPM expressly alleged that 11 of the 13 Application Notes published on Blue Sun's website utilize not only KPM's trade secret calibration data sets but report them with graphs utilizing KPM's UCAL software that originated on Mr. Gajewski's KPM computer.

(Compl., ¶¶ 64-66, and 70-74.)  Similarly, he argues KPM "has not alleged that Mr. Gajewski actually provided those application notes to Blue Sun," ECF No. 28 at 5, while KPM alleged in detail why the notes on Blue Sun's website that bear his name "robga" in fact came from him and his computer, (Compl., ¶¶ 67-75.)  In another glaring example, Eilert acknowledges KPM's allegations about his participating in correspondence diverting KPM's customers for service to Blue Sun so it could service those same KPM products, but he argues that this was not "diverting business that KPM otherwise would have done.  Mr. Eilert was simply trying to help an existing customer."  ECF No. 24 at 6.

"In ruling on the motion, a court must 'treat all well-pleaded facts in the complaint as true and draw all reasonable inferences in favor of the plaintiff.'"  *Fine v. Guardian Life Ins. Co. of Am. & Park Ave. Sec.,* 450 F. Supp. 3d 20, 26 (D. Mass. 2020), *quoting, In re Fin, Oversight & Mgmt. Bd. for P.R.*, 919 F.3d 121, 127 (1st Cir. 2019).   The Court should reject every instance where the Individual Defendants violate these cardinal principles.

## II.   KPM Has Properly Stated Claims For Trade Secret Violations, Conversion And Unjust Enrichment, As Well As Breaches of Contracts, Fair Dealing And Loyalty.

KPM has adequately pled claims for misappropriation of trade secrets in violation of the Federal Defend Trade Secrets Act ("DTSA") and Massachusetts state law.  The DTSA and the Massachusetts' Uniform Trade Secrets Act are virtually equivalent.  *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 386 F.Supp.3d 89, 94 (D. Mass. 2019). Massachusetts requires a plaintiff to establish: "(1) the information at issue constitutes a trade secret, (2) the plaintiff took reasonable steps to secure the confidentiality of the information and (3) the defendant obtained the trade secret through improper means." *Viken Detection Corp. v. Videray Techs. Inc.*, 384 F.Supp.3d 168, 177 (D. Mass. 2019); *see also Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).  Federal law adds the additional element that the trade secret be misused in

interstate or foreign commerce. 18 U.S.C. § 1836(b); *Viken Detection Corp.*, 384 F.Supp.3d at 177.  KPM similarly has adequately pled the conversion of this same property by the Defendants for their own unjust enrichment.

The Individual Defendants attack these claims by arguing KPM did not specify the trade secrets or property and that it was confidential and proprietary to KPM. They also contend KPM was required to plead all details about how each Individual Defendant took or otherwise misused KPM's property and all benefits received.  Neither attack withstands scrutiny.

### A.  KPM's Complaint Specifies the Trade Secrets Misappropriated and Property Converted

Defendants wrongly assert that KPM failed to plead what property they misappropriated or converted, and in regard to KPM's datasets, whether it constitutes a trade secret.  *See, e.g.,* ECF No. 28 at 5-6, 11; No. 26 at 10-11; No. 30 at 6; No. 34 at 6.  Defendants are inconsistent here, conceding that KPM points to its calibration data sets as one type of misappropriated property, but attacking that data as constituting a trade secret.  They also ignore the other trade secrets and property KPM has specified.

 Defendants focus solely on one type of trade secret alleged in the Complaint, to wit, the calibration data sets KPM has assembled and protected over a period of many years.  (Compl. ¶¶ 23-29.)  The calibration data sets stolen by Defendants are protectible trade secrets. KPM detailed how it has assembled its extensive databases of calibration data sets over twenty years of collecting, processing, selecting and refining data. (Compl. ¶¶ 24-29.)  While some of that data comes from tens of thousands of samples obtained by partnering with KPM's clients, (*id.*), Defendants do not explain how such partnerships might render the data non-proprietary to KPM, non-confidential, or otherwise not protectible as trade secrets. Indeed, the law is clear that even publicly available components (which KPM's data from private customers most certainly is not)

can be contained within trade secret compilations. *See, e.g., Iconics, Inc. v. Massaro*, 266 F.Supp.3d 449, 454 (D. Mass. 2017) (denying summary judgment of no protectible trade secret even if aspects of the trade secret had been publicly disclosed) (citing *Sutra, Inc. v. Iceland Exp.*, No. CIV. A. 04-11360-DPW, 2008 WL 2705580, at *4 (D. Mass. July 10, 2008) (" 'A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.' ") (quoting *Integrated Cash Mgmt. Servs. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990))); *Picker Int'l Corp. v. Imaging Equip. Servs., Inc.,* 931 F. Supp. 18, 38 (D. Mass. 1995), *aff'd sub nom. Picker Int'l Inc. v. Leavitt*, 94 F.3d 640 (1st Cir. 1996) ("A compilation of public information is protected if that information is, as a result of a business' efforts, combined in a unique way.*"*) Beyond that, Defendants' argument that the data sets must not be confidential because some of the data was obtained by partnering with customers ignores the allegation in the Complaint showing that any one piece of the compilation of the data (*i.e.,* potentially known to one customer), would not have the value of the completed data set: "Because each data point on the graph is a unique sample with its own reference value when one plots thousands of samples, these graphs are like fingerprints of the calibration model and the raw data that creates them," (Compl. ¶ 71), bringing the allegations squarely within the holdings of *Iconics*, *Sutra*, and *Picker Int'l*, establishing that such unique combinations of components qualify as a trade secret.

Even if some components of a trade secret are known to others, that does not mean that that trade secret has been disclosed and is not protectable.  For example, in *FabriClear, LLC v. Harvest Direct, LLC*, 481 F.Supp.3d 27, 35 (D. Mass. 2020), the plaintiff had disclosed the ingredients of its formula for an insecticide as part of a trademark application, but, the Court

observed, "it did not disclose the composition of those ingredients (apart from the four active ingredients, which account for roughly 1% of the formula). And nothing in the complaint suggests the public would know the composition of the remaining ingredients in the absence of such a disclosure." The Court therefore denied the motion to dismiss plaintiff's misappropriation of trade secrets claim. Similarly, here, even if one customer knew *some* of the components of the calibration data sets, neither that customer nor the public would know the remaining components. *See also Peggy Lawton Kitchens, Inc. v. Hogan*, 18 Mass. App. Ct. 937, 466 N.E.2d 138, 139-40 (1984) (noting that a cookie recipe could qualify as a trade secret despite using "basic ingredients" such as "flour, sugar, shortening, chocolate chips, eggs, and salt" because "[t]he combination in which those ingredients are used, the diameter and thickness of the cookie, and the degree to which it is baked ... constitute a formula which its proprietor could protect from infringement by an employee who either gains access to the formula in confidence or by improper means.")

Beyond the data sets, Defendants ignore that KPM has alleged the existence of other trade secrets. KPM has also alleged that it maintains its "proprietary software called UCAL" as confidential and highly protected. (Compl. ¶¶ 30-31.) KPM then alleges that for Defendants to create the data sets on their own (in the event that they deny having taken the data sets from KPM), it would have been statistically impossible without KPM's trade secrets, (Compl. ¶ 71), which includes the UCAL software. (Compl. ¶¶ 30-31, 99.) KPM further alleges that the information published by Blue Sun "identically match[es] the regenerations performed by KPM Analytics from the datasets, calibration model sets and *software versions* found on Mr. Gajewski's KPM computer. (Compl. ¶ 66 (emphasis added).) "In other words, Blue Sun's application notes and the spectroscopy work done with Blue Sun's Phoenix analyzer must have

used KPM's datasets and other confidential trade secrets from Mr. Gajewski's KPM computer." (*Id.*; *see also* Compl. ¶¶ 73-74 (alleging that the Blue Sun Application Notes were generated with KPM's "UCAL 4 calibration software").)  Taken together, KPM has adequately alleged that Defendants have also obtained and misused KPM's proprietary, trade secret software. Significantly, the Individual Defendants do not contest this or that misappropriation of that software alone supports KPM's trade secret causes of action.

KPM's alleged property forms also constitute property that can be converted. Massachusetts Courts have concluded that databases of information that were collected over the course of a company's business are the type of property that is capable of being converted. *Governo Law Firm LLC v. Bergeron*, 166 N.E.3d 416, 426 (Mass. 2021).  Likewise, software is capable of being converted.  *Portfolioscope, Inc. v. I-Flex Solutions Ltd*., 473 F.Supp.2d 252, 256 (D. Mass. 2007) (finding allegations in the complaint stating that the defendant "was in wrongful possession of tangible copies of software and code" was enough to survive a motion to dismiss).  And of course, customer information is also capable of being converted. *Sentient Jet, LLC v. Apollo Jets, LLC*, No. 13-CV-10081, 2014 WL 1004112, at *11 (D. Mass. Mar. 17, 2014).

**B.     KPM Adequately Alleged the Known Details Regarding Each Individual Defendants' Misconduct as Well as Unjust Enrichment Received**

The Individual Defendants wrongly criticize KPM for not providing even more specificity defining when each of them allegedly took and misused each trade secret or property of KPM.  *See, e.g.,* ECF No. 28 at 5-6, 11; No. 26 at 5-6; No. 30 at 5-6; No. 32 at 5-6; No. 34 at 4-6; and No. 36 at 5-6.  Defendants ignore, or attempt to white-wash, explain or otherwise contest KPM's specific allegations about their involvement in actions and communications with customers on behalf of Blue Sun while some or all of the Individual Defendants were still

working for KPM.  *See id.*  As summarized above, KPM identified each act it could identify at the time of filing its Complaint where the Individual Defendants confused customers about the company they were representing and whether it was Blue Sun or KPM that was offering to service or actually servicing their KPM analyzer products, and contemporaneously maintained email accounts and conducted correspondence for both KPM and Blue Sun.  *See, supra*, Relevant Factual Background.  KPM also specifically alleged that its NIR analyzers use its calibration data sets and its proprietary UCAL software.  (Compl., ¶¶ 23-29.)  It specified that it would take Blue Sun decades of effort to be able to provide the same products and services on its own without using the trade secrets and property of KPM.  (*Id.*)  Defendants offer no explanation for how they could have been offering to service, servicing and successfully stealing away these KPM customers without the use of KPM's data sets, software and technical details.

Some Individual Defendants also claim that KPM failed to allege that Defendants obtained a specific benefit such that any of them have been unjustly enriched.  That too is false. The Complaint is replete with allegations of benefits the Defendants obtained through their misconduct.  (*E.g.,* Compl. ¶ 28-29 (data that "would require decades of effort and significant investments…for a competitor to replicate"); ¶¶ 54-66 (describing the number of these data sets unlawfully obtained by Defendants); ¶ 71 (possession of data that would be statistically impossible to replicate); ¶ 83 (order from Texas A&M AgriLife); ¶ 84 (order from Panhandle Mining); ¶ 85 (order from Agri-King).)

The law does not require more from KPM at this early pleading stage.  *See, e.g., Unum Group v. Loftus,* 220 F.Supp.3d 143, 146 (D. Mass. 2016) (denying defendant's motion to dismiss and granting plaintiff's motion for preliminary injunction where defendant was seen entering the plaintiff's Worcester facility and "was captured on surveillance video leaving the

building with two boxes and a briefcase" and a few days later "was seen on video returning to Unum's offices around 7:45pm, and exiting the building an hour later with a shopping bag full of documents"); *Moog, Inc. v. ClearMotion, Inc.*, Civ. No 1:19-cv-12066-IT, 2020WL6162921, at *7 (D. Mass. Oct. 21, 2020) (finding the allegations that the trade secrets included "design[s] specifically and exclusively for ClearMotion, and was not intended to be produced for any other purpose," were sufficient to put the defendant on "notice at the pleading stage that [the plaintiff's] trade secrets concern the design and manufacture of the Aspen Assembly.") (internal quotation marks omitted); *Iconics, Inc. v. Massaro*, 266 F.Supp.3d 449, 456 (D. Mass. 2017) (finding plaintiff specifically defined what the "trade secret" was "'with clarity that can be understood by a lay person'" during or after the discovery phase of the litigation and therefore the defendant's argument that the plaintiff could not identify what the trade secret is that was allegedly stolen by the defendants was not credited) (quoting *Staffbridge, Inc. v. Gary D. Nelson Assoc., Inc.,* No. 024912BLS, 2004 WL 1429935, at *4 (Mass. Super. Ct. June 11, 2004)).

The Individual Defendants here have more than adequate notice of the KPM trade secrets and property that has been taken and misused, the simultaneous and duplicitous conduct they engaged in while still employed at KPM, and the customers who have been misled and confused by their deceptions.   Should any doubts remain in the mind of any Individual Defendant, they will be answered further by the expedited discovery already ordered by the Court to take place starting next week.

### C.    These Same Allegations Properly Support KPM's Claims For Breach of Contract, Covenant of Good Faith, and Duty of Loyalty

The Individual Defendants recycle the same pleading deficiency argument as to KPM's causes of action for breaches of contract, the covenant of good faith and fair dealing, and the duty of loyalty – arguing that KPM has not specified exactly what each defendant did that

violated their obligations and duties to KPM.  *See, e.g.,* ECF No. 28 at 8-10; No. 26 at 7-9; No. 24 at 7-9; No. 30 at 7-9; No. 32 at 7-9; No. 34 at 7-9; and No. 36 at 7-9.  Defendants' argument is as unavailing here for the contract-based claims as it is above for the tort claims.  KPM alleged the existence of contracts with each of the Individual Defendants obligating them to keep KPM's trade secrets confidential and not to misuse KPM's property.  (Compl. ¶¶ 9-13.)[2]  KPM, as detailed above, also pled the actions that not only misappropriated and misused KPM's trade secrets and property but also violated their contracts, constituted bad faith and breached any semblance of the loyalty they owed to their employer KPM.  (*Id.* ¶¶ 40-86.)  Indeed, it is surprising how any employee could simultaneously work at or on behalf of two competitor companies, confuse clients and customers, and take away business, but then feign confusion or a lack of notice as to how any such actions could constitute bad faith and disloyalty.

### III.   The Reasonableness, Enforceability And Proper Scope Of The Four Non-Compete Provisions Cannot Be Addressed At This Preliminary Stage Of The Case

Four of the Individual Defendants – Lucas, Israelson, Glennister and Ossowski – challenge the enforceability and scope of the non-compete provisions in their employment contracts under Connecticut or Massachusetts law.  ECF Nos. 34 at 1017; 32 at 11-18; 30 at 11-18; and 36 at 11-12.  They all argue that geographic restrictions and duration are unreasonable and unnecessary to adequately protect KPM's interests.  *See id.*

These four Individual Defendants, however, fail to explain how the Court can possibly determine what is reasonable under the circumstances and what is necessary to protect KPM's legitimate business interests at this early stage of the case.  *See id.*  Neither the Court nor the

---

[2] Mr. Gajewski alone disputes the existence or enforceability of his contractual obligations, but his short argument consists of disputing the facts pled by KPM, improper in a motion to dismiss. *See* ECF No. 28 at 8.

parties currently have a full understanding of Defendants' misconduct, with how many customers Defendants have misused or offered to misuse KPM's trade secrets, how successful Defendants have been, where those customers are geographically located, what will be required to alleviate the harm to KPM caused by Defendants, or any of a host of other details necessary to assess the complete circumstances.  KPM has alleged the existence of these non-compete restrictions, and that it requires their enforcement to protect its well-earned competitive advantages and legitimate business interests.  Those allegations are presumed and must be taken to be true for purposes of these Motions.  Any determinations of reasonableness and fairness must await the development of the factual record.  *See, e.g., TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 267-68 (D. Mass. 2008) (denying Rule 12(b)(6) motion and refusing to dismiss, rejecting a claim alleging that a non-compete was unreasonable in scope and duration because reasonableness is "based on all the circumstances" and plaintiff's allegations must be taken as true).

### IV.    Neither KPM Nor Mrs. Gajewski Any Longer Resides In Connecticut, So The Case Against Her Should Not Be Transferred There

Six of the seven Individual Defendants have not challenged the jurisdiction of this Court nor argued that venue here is improper.  While the Corporate Defendants' have challenged personal jurisdiction their motion lacks merit and should be denied.  *See* KPM's Opposition to Defendants' Blue Sun and ITG's Motion to Dismiss, filed contemporaneously with this Opposition.  Moreover, any defect in jurisdiction over the Corporate Defendants would be resolved by a transfer to Maryland, where they are located and headquartered.

Mrs. Gajewski, alone among the Defendants, seeks a transfer of the case against just her to the District of Connecticut.  *See* ECF No. 26 at 11-12 (notably her final argument).  The sole basis for her request is seeking to enforce the choice of venue clause in her non-disclosure

agreement, signed in earlier days when KPM's Unity business was located in Connecticut before moving to Massachusetts. *See id.* Notably, Mrs. Gajewski herself lives in Illinois, (Compl. ¶ 7), from where the burden of defending a case in Massachusetts or Connecticut should be the same. She offers no argument to the contrary. *See* ECF No. 26 at 11-12.

Choice of venue provisions are not unilaterally enforced. *See, e.g, Lava Laundry, Inc. v. Daniels Equipment Co., Inc.*, 18 Mass. L. Rptr. 414, 2004 WL 2423983 (Mass. Super. Ct. Oct., 13, 2004) (deciding against enforcing a forum selection clause finding that "[b]ased on the specific facts of this case, plaintiff has demonstrated the unfairness and unreasonableness inherent in enforcement of the forum selection clause at issue."); *Williams v. America Online, Inc.*, 2001 WL 135825 (Mass. Super. Ct. Feb. 8, 2001) (deciding not to enforce forum selection clause in part due to balance of public policy interests). Indeed, Mrs. Gajewski concedes that forum selection clauses are not enforced when unreasonable under the circumstances, but then wrongly asserts that Massachusetts has no interest in this case and no factors favor keeping it here. *See* ECF No. 26 at 11-12.

To the contrary, Massachusetts has strong interests in having the case adjudicated here. KPM is a business headquartered in Massachusetts, the harm from the Defendants' conduct was felt in Massachusetts by a Massachusetts-based employer whose employees were poached by the Defendants and who divulged KPM's trade secrets that KPM creates, maintains and protects here in Massachusetts. (*See* Compl., ¶¶ 3, 18-20.) Much of the evidence likely to be subject of discovery is located here in Massachusetts. In contrast, Connecticut has little interest in the case given that no trade secrets, evidence, or any of the parties reside in that state.

The efficient resolution of the case also favors keeping the case against Mrs. Gajewski together with those against the other Defendants. KPM has an interest in obtaining convenient

and effective relief.  Transferring the case against just one defendant would lead to multiplying discovery and trials and the costs and fees associated with them.  Moreover, this Court has already ordered expedited discovery and a hearing on a preliminary injunction after finding that KPM has established a reasonable likelihood of success on the merits.  *See* ECF No. 44 at 2. Changing venue now for a single defendant would dramatically delay and inconvenience KPM's pursuit of relief.

The judicial system also has an interest in having the claims against all parties heard in one Court—this one.  It would needlessly drain the resources of the judiciary for two Courts to hear two trials with evidence that will overlap substantially.  "[A]llowing Plaintiff to sue all Defendants in the same forum promotes 'the goal of judicial economy' and avoids 'conjur[ing] up the chimera of inconsistent outcomes.'"  *QLS Logistic Servs., LLC v. JAWS Associates, LLC*, Civil Action No. 17-cv-11891-ADB, 2018 WL 5816342, *4 (D. Mass. Nov. 6, 2018) (internal quotations omitted).  The Court should reject Mrs. Gajewski's transfer request as unreasonable.

## CONCLUSION

For the foregoing reasons, the Individual Defendants' Motions to Dismiss should be denied, or at the very least deferred until after the expedited discovery ordered by the Court has been taken.

KPM Analytics North America Corporation,

By its attorneys,

*/s/ John T. Gutkoski*
John T. Gutkoski (BBO No. 567182)
Cesari & McKenna LLP
One Liberty Square, Suite 310
Boston, MA 02109
Phone: (617) 951-2500
JTG@c-m.com

**AND**

Scott R. Magee (BBO No. 664067)
Paige Zacharakis (BBO No. 699108)
Morse, Barnes-Brown & Pendleton, P.C.
480 Totten Pond Road, 4th Floor
Waltham, MA 02451
Phone: (781) 622-5930
Fax: (781) 622-5933
smagee@morse.law
pzacharakis@morse.law

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document(s) was served on all counsel of record via ECF on June 3, 2021.

*/s/* Scott R. Magee
Scott R. Magee