**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| KPM ANALYTICS NORTH AMERICA CORPORATION, | ) ) ) | **CIVIL ACTION** |
| Plaintiff, | ) | **NO. 4:21-CV-10572-TSH** |
| v. | ) ) | |
| BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, MICHELLE GAJEWSKI, ROBERT GAJEWSKI, RACHAEL GLENISTER, GREGORY ISRAELSON, IRVIN LUCAS, and PHILIP OSSOWSKI, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER AND MEMORANDUM ON DEFENDANTS' MOTIONS TO DISMISS (Docket Nos. 20, 23, 25, 27, 29, 31, 33, & 35)

**July 15, 2021**

**HILLMAN, D.J.**

KPM Analytics North America Corporation ("Plaintiff" or "KPM") filed this action against Blue Sun Scientific, LLC, ("Blue Sun") and The Innovative Technologies Group & Co., Ltd. ("ITG") (collectively, "Corporate Defendants"); Robert Gajewski; Michelle Gajewski; Arnold Eilert; Rachael Glenister; Gregory Israelson; Irvin Lucas; and Philip Ossowski (collectively, "Individual Defendants"). KPM alleges violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, the Massachusetts Uniform Trade Secrets Act ("MUTSA"), conversion, and unjust enrichment against all Defendants. It also alleges breach of contract, violations of the covenants of good faith and fair dealing, and breach of duty of loyalty against certain Individual Defendants and tortious interference with contractual relations and

unfair or deceptive trade practices, in violation of M.G.L. 93A, § 11, against the Corporate Defendants.

The Corporate Defendants move to dismiss for lack of personal jurisdiction and for failure to state a claim. (Docket No. 20). The Individual Defendants move to dismiss for failure to state a claim, and one moves for dismissal based upon improper venue. (Docket Nos. 23, 25, 27, 29, 31, 33, 35). After hearing and for the following reasons, the Court issues this ruling to dismiss certain claims and certain Defendants. Please see the Appendix attached to this Order for a chart summarizing which motions have been granted and which motions have been denied.

## Background[1]

KPM is a corporation with a principal place of business in Milford, Massachusetts. (Compl., ¶ 3, Docket No. 1). KPM's business division Unity Scientific ("Unity") manufactures instruments which analyze the chemical composition of common substances found in consumer products, such as the amount of moisture, oil or protein in flour, agricultural ingredients, chocolate, or processed foods. (¶¶ 1, 18-19). These instruments are designed to be easy to operate and maintain in a production line or in a quality control laboratory. (*Id.*). Each analyzer contains the measuring apparatus and a computer which can report the data from each measurement to KPM for chemical analysis.

KPM's analyzers use near infrared ("NIR") spectroscopy, a scientific technique which measures the diffraction of light or other electromagnetic radiation and provides faster results than traditional wet chemistry testing methods. (¶ 21). The readings that the analyzers produce

---

[1] The following facts are taken from the Plaintiff's Verified Complaint (Docket No. 1) and assumed true for the purposes of this motion.

must be referenced against the proprietary data in KPM's calibration database, which uses calibration datasets to match the measurements reported by the analyzer to the properties associated with certain chemicals (water, oil, protein) based on samples and reference values in the database.  (¶ 24).  Per KPM, each calibration dataset in its calibration database is drawn from as many as 50-100 samples that KPM has collected over the past twenty years, and the database includes tens of thousands of samples and over 500,00 reference chemistry values. (¶ 26).  KPM's technicians and engineers work with customers to collect and process observed variations of constituent materials with simultaneously measured laboratory results to create calibration datasets.  (¶ 28).  One calibration dataset may take weeks or months to prepare; the more samples, the more accurate the calibration and the analysis. (¶ 26).  KPM asserts that it would require decades of effort, significant investments, and an extensive customer base for a competitor to establish a comparable calibration database.  (¶ 29).

Once NIR spectroscopy is performed on a sample and referenced to the appropriate calibration dataset in the database, KPM reports the results of the analysis to the customer using its proprietary UCAL Software.  That software has been continuously developed, updated, tested, and released for the past twelve years.  (¶ 30).   KPM asserts that significant investment and several years of effort would be required to replace or replicate the software, which is critical to support NIR analyzers.  (*Id.*).

In order to ensure that only its employees and consultants that work with the calibration data can access it, KPM's IT provider has established procedures to protect this information. They require management sign-off and instituted access-control processes and the calibration database is stored on a protected, confidential Windows File Server.  (¶¶ 30-31).  KPM also

requires non-disclosure and confidentiality agreements with its employees to prevent dissemination. (*Id*.).

Blue Sun, a Maryland-based limited liability corporation, entered the NIR analyzer market in 2018 as KPM's direct competitor. (¶¶ 4, 40). ITG is Blue Sun's parent company and owner and is also incorporated and headquartered in Maryland. (*Id.*).

In early 2021, KPM began to suspect that Blue Sun had persuaded seven of KPM's current and former employees (the Individual Defendants) to misappropriate KPM's trade secrets and confidential information in violation of their non-disclosure and/or non-competition agreements. (¶ 41). Blue Sun later hired those employees when they left KPM and have used and continue to use KPM's trade secrets and confidential data to attract new customers and poach KPM's existing clients and business opportunities. (*Id.*).

*Robert Gajewski*

Robert Gajewski worked for KPM from 2003 until January 13, 2019 as an employee; from February 1, 2019 to May 13, 2019 as an independent contractor; and from May 13, 2019 to April 5, 2021 as an employee. (¶ 37). On September 25, 2008, he executed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's confidential information. (Docket No. 1-6 at 1-9). Upon his resignation as an employee in 2019, he signed a letter acknowledging that "all trade secrets, business plans and procedures, client contact list and other confidential information of KPM" were proprietary information that he could not use pursuant to his prior 2008 agreement. (*Id*. at 10-11). When he rejoined KPM as a business development director in June 2019, his offer letter included and referenced an employee handbook, which contained restrictions on the use of KPM's confidential information. (*Id*.). As an employee of KPM, Robert Gajewski had access to trade secrets and confidential information, including

datasets, source code, and customer files.  (Compl. ¶ 37).  KPM alleges that Gajewski acted on behalf of Blue Sun while employed by KPM on numerous occasions.  (¶¶ 42, 44–45, 48, 50–51, 53, 64–81).

On January 11, 2019, KPM employee Arnold Eilert sent Michelle Gajewski and rob@bluesunscientific.com an email that a KPM customer was dissatisfied with KPM's human breast milk application, which KPM was "de-emphasizing." Eilert wrote that, "[w]hat I would like to have told [the KPM client] is that I know of a start-up company that may be interested in continuing where Unity left off, but I don't know if that is true.  If Blue Sun is looking to pursue sales/development for this application it might make sense for someone to contact Jae to discuss how they might be able to move it forward."  (Docket No. 1-8).

On July 18–19, 2019, Gajewski traveled to Michigan to service KPM analyzers for KPM's customer, Post Foods, but documentation from the visit identifies Mr. Gajewski as a "Blue Sun Service Engineer."  (Docket No. 1-10; Compl. ¶ 44).  On August 14, 2019, KPM customer Lamb Weston's employee sent an email about an error code on her KPM analyzer to Michelle Gajewski's KPM email address and to rob@bluesunscientific.com—KPM believes that the rob@bluesunscientific.com email address belongs to Robert Gajewski.  (Compl. ¶ 45).

On January 17, 2020, KPM customer Olam sent emails requesting assistance with the calibration dataset for garlic powder to Gajewski's KPM email address and irvin@bluesunscientific.com; Gajewski responded to assist the customer and removed irvin@bluesunscientific.com from the ensuing email chain.  (Docket No. 1-12; Compl. ¶ 48).

On March 26, 2020, Post Consumer Foods, another KPM customer, sent a $900 purchase order for equipment to Rob Gajewski's KPM email address, but the order form showed that Blue

Sun, not KPM, was the equipment supplier, and that Gajewski had provided the reference quote for the transaction three days earlier.  (Docket No. 1-16 at 3).

On November 24, 2020, KPM discovered an anonymous email sent to info@kpmanalytics.com which claimed that Mr. Gajewski was working for both KPM and Blue Sun.  (Compl. ¶ 53).

By March 29, 2021, Blue Sun had published 34 application notes on its website about its NIR Spectroscopy products.  (¶ 54).  Application notes are a "critical component" of the sale of NIR spectroscopy equipment because they "create confidence and trust that a supplier has the calibration history to perform certain measurements for their product of interest."  (¶¶ 59, 62).  When a customer purchases an NIR spectroscopy product, it also purchases the ability of the accompanying calibration database to take the measurements collected by the analyzer, measure it against the calibration database, and have accurate parameter/constituent results compared to traditional reference methods.  (¶ 60).  An application note demonstrates the ability of a specific calibration to perform on a range of samples—in other words, how accurate the analyzer's measurements are compared to more traditional (and time-consuming) chemistry reference methods.  (*Id.*).  Each data point in the application note reflects a unique sample that has been measured using both NIR spectroscopy and a traditional chemistry reference method.  (¶ 55).  A standard application note has thousands of data points.  (¶ 57).

As of March 29, 2021, 13 of Blue Sun's 34 application notes listed "robga" as the author—KPM alleges that "robga" is Mr. Gajewski, who was still employed by KPM when Blue Sun's application notes were published.  (¶ 64).  KPM conducted a digital search of the work computer it had supplied to Gajewski. (¶ 65).  It reviewed the various KPM datasets, calibration models, and software on Mr. Gajewski's KPM's computer, used them to generate application

notes for specific products, and compared those application notes with Blue Sun's published application notes. (¶ 65). According to KPM, at least 11 of the 13 Blue Sun application notes authored by "robga" identically match the versions found on Mr. Gajewski's KPM computer. (¶ 66).

For example, Blue Sun's skim milk powder application note, by "robga," is a pdf file dated January 2, 2021. (¶ 70). It includes four graphs which purport to show the accuracy of Blue Sun analyzers in measuring four constituents in powdered skim milk: fat, lactose, moisture, and protein. (Docket No. 1-17). KPM's records show that Gajewski accessed and modified KPM's data on skim milk powder on January 2, 2021. (¶ 72). KPM used the values in the files that Gajewski had accessed on his KPM computer on January 2, 2021 to generate graphs for fat, lactose, moisture, and protein, and compared that application note to Blue Sun's skim milk powder application note and found that they were identically matched. (¶¶ 73-9). KPM believes that ten other application notes on Blue Sun's website show similar identicality, and alleges that Blue Sun's application notes, its underlying datasets, calibrations, and reporting software tool were all derived from KPM confidential information taken from Gajewski's KPM computer. (¶ 80-81).

On April 5, 2021, after learning of this and other conduct, KPM terminated both Robert Gajewski and Michelle Gajewski's employment. (¶¶ 37–38).

*Michelle Gajewski*

Michelle Gajewski, Robert Gajewski's wife, worked for KPM as a consultant from 2008 to 2014; she become an employee in January 2014 in the role of Service Coordinator/Sales Support. (¶ 38). On December 27, 2013, she signed a Non-Disclosure Agreement agreeing to protect KPM's confidential information. (Docket No. 1-7). § 11 of the Agreement provides that

any dispute arising out of the Agreement or the parties' relationship "shall be mediated, arbitrated or litigated solely within the state of Connecticut."  Through her employment at KPM and/or as Robert Gajewski's spouse, Michelle Gajewski had access to KPM's trade secrets and confidential information, including datasets, source code, and customer files.  (Compl. ¶ 38).

On several occasions, Michelle Gajewski received tracking notifications at her KPM email address regarding UPS packages related to Blue Sun.  (¶ 46).  On September 5, 2019, UPS emailed Gajewski that a package had been delivered to Blue Sun.  (*Id.*).  On December 16, 2019, UPS notified her, at the request of Blue Sun, about a package sent to Gerald Saporito at Post Foods; Post Foods was the client that Robert Gajewski visited in July 2019 to service KPM analyzers, although the client's records indicated he was a Blue Sun technician.  (¶ 47).  On July 9, 2020, UPS emailed Michelle Gajewski that her package to Blue Sun had been delivered, presumably implying that she had sent the second package to Blue Sun herself. (¶ 52).  KPM does not know what any of the packages contained and is not aware of any legitimate business reason for Gajewski to receive shipping alerts about packages to Blue Sun or track packages sent by KPM customers on Blue Sun's behalf.

On January 11, 2019, KPM employee Arnold Eilert sent Michelle Gajewski and rob@bluesunscientific.com an email that a KPM customer, UC San Diego Medical Center, was dissatisfied with KPM's human breast milk application, which KPM was "de-emphasizing."  Eilert wrote that: "[w]hat I would like to have told him is that I know of a start-up company that may be interested in continuing where Unity left off, but I don't know if that is true.  If Blue Sun is looking to pursue sales/development for this application it might make sense for someone to contact Jae to discuss how they might be able to move it forward."  (Docket No. 1-8).  The complaint does not state whether either responded.

On August 14, 2019, KPM client Lamb Weston sent an email to Michelle Gajewski and [rob@bluesunscientific.com](mailto:rob@bluesunscientific.com) seeking help with an error message on a KPM analyzer.  (¶ 45).  The complaint does not state whether either responded.

*Arnold Eilert*

Arnold Eilert worked for KPM as an Applied Technology Manager from 2008 to 2020.  (¶ 32).  On September 30, 2008, he signed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's confidential information.  (Docket No. 1-1).  In his role with KPM, Eilert had access to KPM's trade secrets and confidential information, including datasets, source code, and customer files.  (¶ 32).

On January 11, 2019, Eilert sent an email from his personal email account to Michelle Gajewski at her KPM email address and to [rob@bluesunscientific.com](mailto:rob@bluesunscientific.com) which informed the recipients that a KPM customer, UC San Diego Medical Center, was not satisfied with KPM's human breast milk application, that Eilert had informed the customer that KPM was "de-emphasizing this application," suggested that Blue Sun may be able to develop a better system, mused that "someone" should reach out to the customer, and provided the customer's contact person and phone number.  (¶ 42; Docket No. 1-8).  Specifically, Eilert wrote that: "[w]hat I would like to have told him [the KPM customer] is that I know of a start-up company that may be interested in continuing where Unity left off, but I don't know if that is true.  If Blue Sun is looking to pursue sales/development for this application it might make sense for someone to contact Jae to discuss how they might be able to move it forward."  (Docket No. 1-8).

On January 20, 2020, KPM customer A&L Canada forwarded an email chain to Eilert's KPM email address.  The email chain was a discussion between A&L and a former KPM employee who had since moved to Blue Sun about phasing out the use of KPM's analyzers and

using Blue Sun analyzers instead.  (¶ 49; Docket No. 1-13).  Mr. Eilert, still a KPM employee, took no action to prevent the loss of KPM's customer to Blue Sun.  (*Id*.).  Instead, he forwarded the email chain from his KPM email to his personal email account.  (Docket No. 1-14).

Eilert left KPM on December 31, 2020, and is now employed by Blue Sun.  (¶ 32).

*Rachael Glenister*

Rachael Glenister worked for KPM from August 24, 2015 to July 10, 2020.  (¶ 33).  On August 23, 2015, she signed a Confidentiality and Non-Competition Agreement agreeing to maintain KPM's confidential information.  (Docket No. 1-2).  In her role with KPM, Glenister had access to KPM's trade secrets and confidential information, particularly its customer files. (Compl. ¶ 33).

KPM alleges that Glenister caused KPM to lose at least three sales opportunities to Blue Sun, either while she was employed by KPM or in violation of her non-competition agreement. On September 4, 2019, Glenister generated a $61,000 sales opportunity from Texas A&M AgriLife, but she closed the opportunity on June 9, 2020, reporting that the customer had "No Budget/Lost Funding."  (¶ 83).  KPM later learned that Blue Sun received an order from Texas A&M AgriLife on April 20, 2020 and amended it on July 20, 2020, the date that Glenister left KPM. [2] (*Id*.).  Glenister also created a sales opportunity with Panhandle Milling while employed by KPM, but after Glenister left KPM, Panhandle placed an order with Blue Sun in late 2020.  (¶ 84).  Finally, Glenister created a sales opportunity with Agri-King, Inc. before she left KPM, but Agri-King Inc. ultimately placed an order with Blue Sun.  (¶ 85).

---

[2] The Complaint provides two different end dates for Glenister's employment at KPM: July 10, 2020 (¶ 33) and July 20, 2020 (¶ 83).  Therefore, Blue Sun either amended its purchase order from AgriLife the day that Glenister left KPM, or ten days later.

Glenister left KPM on July 10, 2020, and is now employed by Blue Sun. (¶ 33). KPM alleges her employment at Blue Sun violates her non-competition agreement. (*Id.*).

*Gregory Israelson*

Gregory Israelson worked for KPM from March 4, 2016 to March 12, 2021. (¶ 34). On March 3, 2016, Israelson signed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's confidential information. (Docket No. 1-3). In his role with KPM, Israelson had access to KPM's trade secrets and confidential information, including datasets, source code, and customer files. (¶ 34).

On July 9, 2020, while employed by KPM, Israelson received an email at his KPM email address from greg@bluesunscientific.com, which KPM believes also belongs to Israelson. (Docket No. 9). The email contained a link for a software program used for remote copying of files with a request to join a session. (¶ 43). KPM alleges that Mr. Israelson's purpose in sending this software copying tool was to provide confidential KPM information to Blue Sun without KPM's knowledge or authorization, and that there is no reason why Israelson should have had a Blue Sun email address while employed by KPM. (*Id.*).

KPM alleges that Mr. Israelson is now an employee of Blue Sun (or has acted on Blue Sun's behalf) in violation of his non-competition agreement with KPM. (¶ 34).

*Irvin Lucas*

Irvin Lucas worked for KPM from January 5, 2015 to May 7, 2019. (¶ 35). On January 5, 2015, Lucas signed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's confidential information. (*Id.*). In his role with KPM, Lucas had access to KPM's trade secrets and confidential information, including datasets, source code, and customer files. (¶ 35).

Lucas became an employee of Blue Sun in 2020, conduct which KPM alleges violates his non-competition agreement. (*Id.*). KPM believes Lucas is now the president of Blue Sun. (*Id.*). Lucas wiped his KPM company computer before returning it and leaving KPM. (*Id.*). Per KPM, this action suggests that Lucas was involved in improper conduct that he wished to conceal from KPM, including the potential disclosure of KPM trade secrets to Blue Sun or others. (*Id.*).

On January 17, 2020, KPM customer Olam emailed Robert Gajewski at his KPM email address and Lucas, who was then employed at Blue Sun, asking for assistance with the garlic powder application on a KPM analyzer. (Docket No. 1-12).

On March 30, 2020, ProAnalytics, a KPM distributor, purchased replacement parts from Blue Sun through Gajewski, rather than from KPM; the purchase order for the parts was emailed to Gajewski, with Lucas copied as a secondary recipient. (*Id.*). KPM alleges that Lucas remained bound by his non-competition agreement with KPM during both the Olam and ProAnalytics correspondences.

*Philip Ossowski*

Philip Ossowski worked for KPM from March 26, 2019 to January 29, 2021. (¶ 36). On April 10, 2019, he signed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's trade secrets and confidential information. (*Id.*). In his role with KPM, Ossowski had access to KPM's trade secrets and confidential information including datasets and/or customer files. (¶ 36). There are no specific allegations concerning Ossowski's conduct in the complaint, besides Blue Sun's allegation that Ossowski's current employment with Blue Sun violates his noncompetition agreement with KPM. (*Id.*).

KPM brings six claims against the Corporate Defendants: violation of the Defend Trade Secrets Act (Count I); violation of the Massachusetts Uniform Trade Secrets Act (Count II);

tortious interference with contractual relations (Count VII); conversion (Count VIII); unjust enrichment (Count IX); and unfair or deceptive trade practices, in violation of M.G.L. 93A, §11 (Count X). KPM raises seven claims against the Individual Defendants: violation of the Defend Trade Secrets Act (Count I); violation of the Massachusetts Uniform Trade Secrets Act (Count II); breach of contract (Count III); violation of the implied covenant of good faith and fair dealing (Count IV); breach of duty of loyalty (Count V); conversion (Count VIII); and unjust enrichment (Count IX). KPM also raises a breach of contract claim against Defendants Glenister, Israelson, Lucas, and Ossowski based on violation of noncompetition agreements they signed with KPM (Count VI). Defendants move to dismiss all claims. (Docket Nos. 20, 23, 25, 27, 29, 31, 33, & 35).

## Legal Standards

### *Lack of Personal Jurisdiction – Federal Rule of Civil Procedure 12(b)(2)*

When considering a Rule 12(b)(2) motion, "the inquiry is whether the plaintiff had proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008). The plaintiff bears the burden of showing that the court may exercise personal jurisdiction over the defendant and "must put forward evidence of specific facts to demonstrate that jurisdiction exists." *A Corp. v. All Am. Plumbing*, 812 F.3d 54, 58 (1st Cir. 2016) (internal quotation marks and citation omitted). Further, courts "take the plaintiff's evidentiary proffers as true and construe them in the light most favorable to the plaintiff's claim." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 65 (1st Cir. 2014). Finally, courts also "consider uncontradicted facts proffered by the defendant." *Id.*

*Failure to State a Claim – Federal Rule of Civil Procedure 12(b)(6)*

In evaluating a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000). To survive the motion, the complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

## Discussion

## I. Corporate Defendants

### A. Lack of Personal Jurisdiction

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995). Thus, to establish personal jurisdiction over the Corporate Defendants, KPM must satisfy the requirements of both the Massachusetts long-arm statute and the Due Process Clause of the Fourteenth Amendment. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 290, 100 S.Ct. 559, 62 L.Ed.2d 490

(1980). "[C]ourts should consider the long-arm statute first, before approaching the constitutional question." *SCVNGR, Inc. v. Punchh, Inc.*, 478 Mass. 324, 330, 85 N.E.3d 50 (2017). Determining first whether the long-arm statute's requirements are met is consistent with the duty to avoid "decid[ing] questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States*, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905).

### 1. Massachusetts Long-Arm Statute

The Massachusetts long-arm statute provides, in relevant part: "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person...causing tortious injury by an act or omission in this commonwealth." M.G. L. c. 233A, § 3(c). Thus, a defendant must have caused tortious injury in the Commonwealth and the plaintiff's claims must have arisen from that injury. This requirement has been considered satisfied in cases where out-of-state conduct has allegedly caused tortious injury in Massachusetts. *Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 982 (1st Cir. 1986) (fraudulent representations made by out-of-state defendant to Massachusetts company constituted acts that conferred jurisdiction under subsection (c)).

Corporate Defendants argue that §3(c) does not apply because none of their alleged actions occurred within the forum. KPM relies on the decision in *Captivate, LLC v. Datalock Sys., Inc.*, 198-cv-02429-BLS2, 2019 WL 7707968 (Mass. Sup. Ct. Dec. 10, 2019) to support its argument that the alleged out-of-state conduct can satisfy §3(c).

In *Captivate*, the Superior Court found that §3(c) permits personal jurisdiction over a non-resident defendant for actions directed at a Massachusetts corporation. *Id.* Captivate, a Massachusetts corporation, alleged that a long-time employee, Kenneth Hafen, had stolen $5

million from the company.  *Id.* at *1.  The theft was allegedly accomplished through the creation

of a sham corporation, DataLock, that billed Captivate for goods and services it never received.

*Id.*  Captivate further alleged that Eric Frommer, Hafen's son-in-law and a resident of Florida,

had allegedly assisted in the illegal scheme via DataLock.  *Id.* at *2.  The physical address

connected to the P.O. Box listed on DataLock's invoices was Frommer's home address.  *Id.*

DataLock's bank records showed that checks drawn from its account were made payable directly

to Frommer.  *Id.*  Captivate claimed that Fommer's conduct had resulted in substantial injury to

the company, but Frommer moved to dismiss for lack of personal jurisdiction.  *Id.*  The Superior

Court found that P.O. Box and bank record allegations were sufficient to support Captivate's

claim that Frommer was involved in the theft, that there was a basis to infer Frommer knowingly

participated in intentional misconduct directed at a Massachusetts company, and that it could

exercise personal jurisdiction over Frommer pursuant to §3(c).  *Id.*

As in *Captivate*, KPM's allegations against the Corporate Defendants are sufficient to

establish personal jurisdiction under § 3(c).  KPM has alleged that the Corporate Defendants

knowingly and intentionally used the Individual Defendants to steal KPM's trade secrets and

other confidential information.  Two of the Individual Defendants—Robert Gajewski and

Gregory Israelson—had active Blue Sun email addresses while they were still employed by

KPM.  (Compl. ¶¶ 34, 42-3).  Blue Sun posted eleven application notes on its website that

contain data identical to the proprietary data found on Robert Gajewski's KPM computer which

appear to have been created by Gajewski in January 2021, when he was still a KPM employee.

(¶ 64).  These allegations are sufficient to support KPM's claim that the Corporate Defendants

were involved in the alleged theft of trade secrets and knowingly participated in intentional

misconduct directed at a Massachusetts company. Accordingly, §3(c) of the long-arm statute supports a finding of jurisdiction over the Corporate Defendants.

KPM also relies on the decision in *The Scuderi Grp., LLC v. LGD Tech., LLC*, 575 F. Supp. 2d 312, 320-21 (D. Mass. 2008), where the court concluded that a chapter 93A violation constitutes a tortious injury for the purposes of § 3(c). *Id.* (citing *La Vallee v. Parrot–Ice Drink Prods. of Am., Inc.*, 193 F. Supp. 2d 296, 300 (D. Mass. 2002) ("[T]he First Circuit Court of Appeals has 'assume[d], without deciding, that a Chapter 93A violation would constitute a tortious injury under [subsection (c)].'") (quoting *Lyle Richards Int'l, Ltd. v. Ashworth, Inc.*, 132 F.3d 111, 114 (1st Cir.1997))). KPM's allegation that the Corporate Defendants violated Chapter 93A (Count X) further supports a finding of jurisdiction under § 3(c) of Massachusetts' long-arm statute.

### 2. Constitutional Due Process

"The exercise of personal jurisdiction may, consistent with due process, be either 'specific or case-linked' or 'general or all-purpose.'" *Cossart v. United Excel Corp.*, 804 F.3d 13, 20 (1st Cir. 2015) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011)). Because KPM waives any argument that Massachusetts may exercise general jurisdiction over the Corporate Defendants, it must establish that the Corporate Defendants' contacts with the Commonwealth are sufficient for this Court to assert specific jurisdiction.

The inquiry into whether a defendant has the requisite "minimum contacts" necessary to support specific personal jurisdiction is inherently imprecise: "the criteria which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative." *International Shoe Co. v.*

*Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). To assist in this necessarily individualized assessment, a plaintiff seeking to establish specific jurisdiction must demonstrate that three conditions are satisfied:

> "First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must ... be reasonable."

*Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir. 2008) (quoting *Adelson v. Hananel*, 510 F.3d 43, 49 (1st Cir. 2007)).

### (a) Relatedness

The relatedness inquiry "serves the important function of focusing the court's attention on the nexus between a plaintiff's claim and the defendant's contacts with the forum." *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995). The court "must consider the contacts between the defendants and the forum state viewed through the prism of plaintiff['s] ... claim." *Cossart*, 804 F.3d at 20 (alterations in original) (citation omitted). "The evidence produced to support specific jurisdiction must show that the cause of action either arises directly out of, or is related to, the defendant's forum-based contacts." *Harlow v. Children's Hosp.*, 432 F.3d 50, 60-61 (1st Cir. 2005). Thus, "[t]here must be more than just an attenuated connection between the contacts and the claim." *Phillips*, 530 F.3d at 27; *see also Walden v. Fiore*, 571 U.S. 277, 290, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014) ("The proper question is not where the plaintiff experienced the particular injury or effect but whether the defendant's conduct connects him to the forum state.").

The Corporate Defendants contend that KPM's claims do not "arise out of or relate to" any of their activities within Massachusetts, while KPM relies on *Astro-Med* to demonstrate that a nonresident defendant's out-of-state conduct can constitute a sufficient nexus to confer

jurisdiction in the forum state. *See Astro-Med, Inc. v. Nihon Kohden America, Inc.*, 591 F.3d 1 (1st Cir. 2009). In *Astro-Med*, a California corporation violated a Florida-based employee's Employment Agreement with a Rhode Island company. *Id.* at 10. The Rhode Island plaintiff sued the California-based corporate defendant for tortious interference with contractual relations and misappropriation of trade secrets in the District of Rhode Island, but the California defendant argued that jurisdiction could not lie in Rhode Island because all the company's dealings with the employee took place in either California or Florida. *Id*. at 6,10. The First Circuit rejected that premise, concluding that a defendant "need not be physically present in the forum state to cause injury (and thus 'activity' for jurisdictional purposes) in the forum state." *Id* at 10. (quoting *N. Laminate Sales v. Davis*, 403 F.3d 14, 25 (1st Cir. 2005)). Instead, it determined that the relatedness requirement was satisfied because the California defendant's conduct in California and Florida was the cause of the breach of contract in Rhode Island and the in-forum injury was clearly related to the Rhode Island company's tortious interference claim. *Id.*

Like the plaintiff in *Astro-Med*, KPM's allegations against the Corporate Defendants are sufficient to demonstrate relatedness. Whether the Corporate Defendants' contact with KPM's employees or former employees occurred outside of Massachusetts is immaterial; as alleged, the Corporate Defendants conduct relates to contracts between a Massachusetts company and its employees. Therefore, the tortious harm resulting from the Corporate Defendants' alleged interference is an in-forum injury and the relatedness condition is fulfilled.

To provide support for its other claims against the Corporate Defendants, KPM relies on *Conning v. Halpern,* 2019 WL 2514730 (D. Mass. June 18, 2019). In *Conning*, the court articulated that "the effects of intentional torts in the forum state may suffice to satisfy the relatedness requirement where intentional conduct was expressly aimed at the forum state and

caused harm the defendant knew would likely be suffered in the forum state. *Id.* at \*6 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)). KPM asserts that it stores its confidential information and trade secrets on servers physically located in Massachusetts. (Docket No. at 4). As alleged, the Corporate Defendants' misappropriation of trade secrets and conversion of KPM's confidential information constitute intentional conduct aimed and causing harm in Massachusetts. Accordingly, the relatedness requirement is also met for those claims.

*(b) Purposeful Availment*

"In determining whether the purposeful availment condition is satisfied, our key focal points are the voluntariness of the defendants' relevant Massachusetts contacts and the foreseeability of the defendants falling subject to Massachusetts's jurisdiction." *Copia Communications, LLC v. AMResorts, L.P.*, 812 F.3d 1, 5 (1st Cir. 2016) (quotation marks and citation omitted). Voluntariness requires that the defendant's contacts with the forum state are "not based on the unilateral actions of another party or a third person." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 716 (1st Cir. 1996) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174 (1985)). Foreseeability requires that "the defendant's contacts with the forum state be such that he should reasonably anticipate being haled into court there." *Id.* (citing *World-Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559). When inquiring whether Defendant has purposefully availed itself of the forum, however, the only relevant contacts are those that gave rise to the cause of action. *See Copia*, 812 F.3d at 5.

The Corporate Defendants argue that they never purposefully availed themselves of the Massachusetts forum. Blue Sun's only contact with Massachusetts is communications with former KPM employees which did not take place in the Commonwealth (none of the seven Individual Defendants reside in Massachusetts). Further, Blue Sun does not maintain an office,

mailing address, or own property in Massachusetts. Blue Sun also does not market products, conduct business, pay taxes, make sales, or employ anyone in Massachusetts. (Docket No. 21 at 10–11).

KPM alleges that Blue Sun was fully aware of the confidentiality agreements between KPM and its former employees. KPM claims that Lucas, who was subject to a KPM confidentiality and non-compete agreement, likely knew agreements of that nature were standard practice at KPM. Given that the Complaint alleges Lucas was Blue Sun's president at the time of the complained-of conduct, KPM argues that the Corporate Defendants were aware that other KPM employees were subject to similar agreements.

KPM again relies on *Astro-Med* to support its argument. There, the defendant company's knowledge of the employee's Employment Agreement with the Rhode Island-based plaintiff was sufficient to constitute purposeful availment. *Astro Med*, 591 F.3d at 10. The court determined that it must have been foreseeable to the defendant corporation that it might be held accountable for its conduct in the Rhode Island forum. *Id.* Here, KPM has plausibly alleged that the Corporate Defendants had knowledge of the employment agreements between KPM and its former employees requiring confidentiality. Given that KPM is a Massachusetts-based employer, that knowledge makes it foreseeable that the Corporate Defendants might be held accountable for their conduct in Massachusetts. (Docket No. 50 at 12). Accordingly, the Corporate Defendants have purposefully availed themselves of the Massachusetts forum.

Regarding KPM's tort claims, the First Circuit's decision in *N. Laminate* is illustrative. *N. Laminate v. Davis*, 403 F.3d 14 (1st Cir. 2005). There, the court determined that the Defendant knew that his misrepresentations in New York would likely cause financial injury to the plaintiff in New Hampshire, and this knowledge made it foreseeable that the Defendant could

be held accountable for his actions in a New Hampshire court. *Id.* Here, KPM alleges that the Corporate Defendants are responsible for misappropriation of KPM's trade secrets and conversion of its confidential information (Counts I, II, and VIII). It is similarly reasonable to presume that the Corporate Defendants knew this conduct would likely cause financial injury to Massachusetts-based KPM. Such knowledge makes it sufficiently foreseeable that the Corporate Defendants may be held accountable for these actions in Massachusetts, satisfying the purposeful availment requirement.

*(c) Reasonableness*

Asserting jurisdiction must comport with traditional notions of "fair play and substantial justice." *International Shoe*, 326 U.S. at 320. "Out of this requirement, courts have developed a series of factors that bear on the fairness of subjecting a nonresident to a foreign tribunal." *Nowak*, 94 F.3d at 717. These "gestalt factors" are:

> (1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*C.W. Downer*, 771 F.3d at 69 (alterations in original) (quoting *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994)). The gestalt factors help the court do substantial justice, especially where the relatedness and purposeful availment inquiries are close. *Nowak*, 94 F.3d at 717. "In such cases, the gestalt factors may tip the constitutional balance." *Id.* Consequently, our assessment of these factors operates on a sliding scale: "[T]he weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Ticketmaster*, 26 F.3d at 210. "The reverse is

equally true: a strong showing of reasonableness may serve to fortify a more marginal showing of relatedness and purposefulness." *Nowak*, 94 F.3d at 717.

### (i) Burden of Appearance

While it is always a burden for a foreign defendant to appear in the forum state, to accord this factor any substantial weight, the defendant must show that the "exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way." *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994).

Because they are Maryland-based entities, the Corporate Defendants argue that defending themselves in Massachusetts presents a significant burden. They emphasize that Blue Sun has no contact with Massachusetts and that ITG has only limited and unrelated contacts. This burden, however, is no different than the burden that any other foreign defendants haled into a court in the Commonwealth faces. Since the Corporate Defendants have done nothing to demonstrate that their burden is special or unusual, this factor tips in favor of exercising jurisdiction.

### (ii) Interest of the Forum

"Massachusetts has a significant interest in ensuring that contracts entered into by Massachusetts residents are given full effect." *Champion Exposition Servs., Inc. v. Hi-Tech Elec., LLC*, 273 F. Supp. 2d 172, 179 (D. Mass. 2003). Further, a forum state has a significant interest in asserting jurisdiction over a defendant who causes tortious injury within its borders. *Ticketmaster*, 26 F.3d at 211.

Here, both propositions provide the Commonwealth with an interest in this case. The forum state has an interest in giving KPM's confidentiality and non-compete agreements full effect. In addition, Massachusetts has an interest in asserting jurisdiction over the Corporate

Defendants for tortuously interfering with KPM's employer-employee relationships and consequently causing injury to KPM inside the Commonwealth. Thus, this factor also tilts in favor of asserting jurisdiction.

*(iii) Remaining Factors*

The Corporate Defendants do not challenge this Court's jurisdiction based on the remaining gestalt factors.

KPM's allegations are sufficient to establish specific personal jurisdiction over the Corporate Defendants. Accordingly, this Court's exercise of jurisdiction over Corporate Defendants comports with Constitutional Due Process. Given that KPM's allegation are also sufficient to satisfy the Massachusetts long-arm statute, the Corporate Defendants' 12(b)(2) motion to dismiss is *denied.*

## B. Failure to State a Claim

The Corporate Defendants assert that KPM has failed to state a claim on all six counts brought against them: violation of the Defend Trade Secrets Act (Count I); violation of the Massachusetts Uniform Trade Secrets Act (Count II); tortious interference with contractual relations (Count VII); conversion (Count VIII); unjust enrichment (Count IX); and violation of M.G.L. 93A, §11 (Count X).

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

Counts I and II assert that Corporate Defendants misappropriated KPM's trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA") and the Massachusetts Uniform Trade Secrets Act ("MUTSA"), M.G.L. c. 93, § 42.

The DTSA and MUTSA are nearly equivalent. *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 386 F. Supp. 3d 89, 94 (D. Mass. 2019) (citing *Optos, Inc. v. Topcon Medical Sys., Inc.*, 777 F. Supp. 2d 217, 238 (D. Mass. 2011)). To establish a claim for misappropriation of trade secrets under either statute, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007). The DTSA also requires that the trade secret be "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. §1836(b)(1).

*(a) Whether the Information at Issue Constitutes a Trade Secret*

The Corporate Defendants argue that KPM has failed to sufficiently allege that the information at issue qualifies as a trade secret because some of the data in its calibration database is collected from customer samples rather than KPM's own data. KPM retorts that the calibration data sets are trade secrets because they represent decades of investment of time and resources, that customer data is only one element of the database, and that customer contributions to the calibration data sets are not disqualifying.

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *T.H. Glennon Co., Inc. v. Monday*, No. 18-30120, 2020 WL 1270970, at *14 (D. Mass. Mar. 17, 2020) (quoting *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736, 260 N.E.2d 723 (1970)). "[G]enerally, a compilation of information which is used in a business can be a trade secret," including equipment service manuals that contain information provided by component manufacturers and which are publicly

available for purchase, where the manuals were produced for employee use only and also contained the plaintiff's proprietary information. *Picker Int'l Corp. v. Imaging Equip. Servs., Inc.,* 931 F. Supp. 18, 38 (D. Mass. 1995), *aff'd sub nom. Picker Int'l Inc. v. Leavitt*, 94 F.3d 640 (1st Cir. 1996); *Data General v. Digital Computer Controls, Inc.,* 297 A.2d 433, 359 (Del.Ch.1971); J.*T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736, 260 N.E.2d 723, 729 (1970); RESTATEMENT OF TORTS § 757, comment b. Even a compilation of publicly available information is protected if the business has combined it in a unique way. *Id.* (citing *ISC–Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1321–22 (N.D.Ill.1990); *Anacomp, Inc. v. Shell Knob Services, Inc.*, 1994 WL 9681, at *8 (S.D.N.Y.1994).

Like the equipment service manuals in *Picker*, KPM's calibration data sets constitute protected trade secrets. While the calibration datasets do include information from customer samples, KPM's investment of time and resources to collect, organize, and compile that information into datasets for particular constituents that can be utilized in conjunction with its NIR spectroscopy equipment renders them protected. Furthermore, KPM has not made its database of customer-contributed information publicly available. These allegations are sufficient, for purposes of R. 12(b)(6), to establish that the calibration datasets at issue are trade secrets.

*(b) Reasonable Steps to Secure the Trade Secret's Confidentiality*

The Corporate Defendants alternatively claim that KPM did not take reasonable steps to maintain the calibration datasets' secrecy, again relying on the fact that KPM's data was sourced from KPM's customers.

"A trade secret must be secret; '[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.'" *FabriClear, LLC v. Harvest Direct, LLC*, 481 F. Supp. 3d. 27, 35 (D. Mass. 2020) (citing *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d

449, 452 (D. Mass. 2017) (quoting *J.T. Healy & Son, Inc.*, 357 Mass. at 736, 260 N.E.2d 723)).

In *FabriClear*, the defendant argued that because the plaintiff had published the names of the four ingredients in its pest repellent, the formula was no longer protected. *Id.* I disagreed, finding that without publishing the proportion of each of the four ingredients in the final product, the formula could not be considered public knowledge and was a protected trade secret. *Id.* Accordingly, the formula was protected. *Id.*

Like the pest repellent formula in *FabriClear*, KPM's calibration datasets are protected. While some values of the datasets may be known to the individual KPM customers who submitted them to KPM, neither the customer nor the public have knowledge of the many remaining values from multiple sources that go into creating each dataset. (Docket No. 50 at 18). Therefore, despite the partial customer sourcing, KPM's calibration datasets constitute protected trade secrets.

### (c)  Improper Means of Obtaining the Trade Secret

The Corporate Defendants posit that KPM cannot bring a trade secrets claim against them unless the alleged disclosures violated a confidential relationship between KPM and the Corporate Defendants. *See Burten v. Milton Bradley Co.*, 763 F. 2d 461, 463 (1st Cir. 1985) ("In order to successfully establish a cause of action for misappropriation, therefore, a plaintiff must show that he or she shared a confidential relationship with the defendant…."). Under their reading of the trade secret statutes, no trade secret claim against the Corporate Defendants is viable since the only confidential relationships alleged are between KPM and the Individual Defendants (KPM's former employees).

The Court takes issue with such a narrow reading of the DTSA and MUTSA. "Under Massachusetts trade secret law, a third party who knowingly benefits from a trade secret which a

person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for the misappropriation of that trade secret." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 795 F. Supp. 501, 507 (D. Mass. 1992), *aff'd,* 36 F.3d 1147 (1st Cir. 1994). In an oft-cited case dating back to 1980, the Supreme Judicial Court held that a corporation which received and used a competitor's trade secrets from a third party could be liable for misappropriation under state law even though the corporation had no confidential relationship with the competitor, so long as the information claimed to be a trade secret was in fact secret and the corporation who received it had notice that the third party had disclosed it in violation of a legal duty to keep it secret. *Curtiss-Wright Corp. v. Ede-Brown Tool & Die Co.*, 381 Mass. 1, 5-6 (Mass. 1980) (citing Third Restatement of Torts § 757).

Furthermore, the plain text of both statutes implies that a defendant can be liable for inducing a third party to disclose confidential information in breach of a confidential relationship. MUTSA creates a private right of action for misappropriation of trade secrets by improper means and defines improper means broadly to include the use or disclosure of another's trade secret if the recipient knew or had reason to know that the knowledge was derived from or though a person who had a duty to limit its use, disclosure, or acquisition. M.G.L. 93A § 42. DTSA contains very similar language. 18 U.S.C. § 1839(5).

The Corporate Defendants' citation to *Craft Beer Seller* is inapposite, as the defendant in that case, a company which hosts anonymous reviews of major employers for prospective job hunters, was not in a position the same position to have notice of the plaintiff's trade secrets before they were posted online. *See Craft Beer Seller, LLC v. Glassdoor, Inc.*, 2018 WL 5505247 (D. Mass. Oct. 17, 2018).

KPM has sufficiently pled that Blue Sun had notice that at least 11 of the 34 application notes it published on its website to advertise its Phoenix analyzers were derived from KPM's calibration database which are protectible trade secrets. As KPM has also sufficiently pled that it took reasonable steps to protect that confidential information, Corporate Defendants' motion to dismiss Counts I and Count II for trade secret misappropriation under the DTSA and MUTSA is *denied*.

### 2. Tortious Interference with Contractual Relations (Count VII)

Count VIII asserts that the Corporate Defendants tortiously interfered with Confidentiality and Nondisclosure Agreements between KPM and certain Individual Defendants. Under Massachusetts law, a claim for tortious interference with contractual relations requires a plaintiff to show that: "(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Harrison v. NetCentric Corp.*, 433 Mass. 465, 476, 744 N.E.2d 622 (2001).

The Corporate Defendants challenge the sufficiency of KPM's allegations regarding the third element. They argue that KPM has merely alleged that Blue Sun communicated with and hired former KPM employees. According to the Corporate Defendants, the alleged conduct does not constitute improper motive. The Corporate Defendants rely on *Pembroke Country Club, Inc. v. Regency Savings Bank*, *F.S.B*, 62 Mass. App. Ct. 34, 39 (Mass. App. Ct. 2004), to support their argument. (Docket No. 21 at 16–17). In *Pembroke*, the court decided that when the defendant's purpose is the legitimate advancement of its own economic interest, that motive is not improper for purpose of a tortious interference claim. *Id.*

KPM suggests a different characterization of the Corporate Defendants' motive in communicating with and hiring its former employees. KPM argues that the improper motive element is satisfied by the allegations regarding the Corporate Defendants' misappropriation of KPM's trade secrets. Specifically, KPM cites the allegation that the Corporate Defendants provided certain Individual Defendants with Blue Sun email accounts while they were still employed by KPM. KPM also points to the email containing the remote file copying software that Gregory Israelson sent from his Blue Sun email address to his KPM email account. Further, KPM emphasizes its allegation that Blue Sun posted KPM's confidential data on its website in the form of application notes after receiving it from Mr. Gajewski.

These allegations make it plausible that the Corporate Defendants were not merely engaged in permissible employee recruiting in a competitive market. Rather, the allegations plausibly establish that the Corporate Defendants' motive was to encourage KPM employees to provide confidential information to Blue Sun. This Court finds that motive sufficiently improper to satisfy the third element. *See Optos, Inc. v. Topcon Medical Sys.*, 777 F. Supp. 2d 217, 241 (D. Mass. 2011) (concluding that a defendant likely to succeed on the merits of a misappropriation of trade secrets claim was also likely to prevail on its tortious interference with contractual relations claim). Corporate Defendants' motion to dismiss Count VII is *denied*.

### 3. Conversion (Count VIII)

The Corporate Defendants claim that KPM has failed to state a claim for conversion because under Massachusetts law a viable conversion claim can only be based on tangible chattels, while KPM argues that the disputed trade secrets, software, and its customer information can be suitable chattels to support a conversion claim.

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *United States v. Peabody Const. Co., Inc.*, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)).

The Corporate Defendants rely on *Blake* to support their argument but misconstrue the court's conclusion in that case. *Blake v. Professional Coin Grading Service*, 898 F. Supp. 2d 365, 386 (D. Mass. 2012). The *Blake* court granted the defendant's motion to dismiss plaintiff's claim for conversion for sales proceeds, intellectual property, royalties and trade secrets noting that generally, Massachusetts law limits conversation claims on intangible property to property which has merged with some sort of document, and conversion claims for trade secrets are further limited to the extent that the owner has taken steps to assert his property right by protecting the intellectual property from disclosure. *Id.* at 386. Where the plaintiff's coin grading system was already available for public use and known in the coin collecting industry, there could be no conversation claim because he had not taken steps to shield his purported trade secret from disclosure. *Id.* Here, having already concluded that the disputed trade secrets are not public knowledge and finding nothing to indicate voluntary dissemination, *Blake* is not relevant.

Intangible property can be the subject of a conversion claim in certain circumstances. (Docket No. 50 at 21). Under the merger doctrine discussed in *Blake*, intangible property that is in some way merged with or contained in a physical object can be converted. *Sentient Jet, LLC*

*v. Apollo Jets, LLC*, No. 13-CV-10081, 2014 WL 1004112, at *11 (D. Mass. Mar. 17, 2014).

For example, a viable conversion claim exists where a plaintiff has plausibly alleged that its confidential information, including customer information, was transmitted to the defendant's computer system; although plaintiff did not specifically allege that the confidential information was downloaded onto a physical device such as a flash drive, the court decided that such an inference was reasonable and denied defendant's motion to dismiss, as determining the manner in which the customer information was transmitted could be resolved through discovery. *Id.*

Somewhat like *Sentient*, KPM has not specially alleged that Blue Sun downloaded the calibration datasets, software, and confidential customer information onto a physical device, like a computer hard drive or flash drive or printout. However, KPM does claim that its calibration datasets and UCAL software were used to generate the application notes that Blue Sun uploaded to its website, and that Blue Sun used KPM's confidential customer information to poach KPM sales opportunities. (Compl. ¶¶ 82–86). Given those allegations and the *Sentient Jet* precedent, it is reasonable to infer at the motion to dismiss stage that at some point KPM's trade secrets were transmitted between electronic devices or were converted to a physical format, especially as pertaining to the information KPM alleges Robert Gajewski diverted from his KPM laptop to produce the application notes. Accordingly, the calibration datasets, software, and customer information do constitute property that can be converted at this stage, though information learned in discovery may later invalidate this and related conversion claims in the case. *See Governo Law Firm LLC v. Bergeron,* 166 N.E.3d 416, 422 (Mass. 2021) (concluding that databases that were downloaded onto a removable electronic device were property that could be converted). Thus, the Corporate Defendants' motion to dismiss Count VIII is <u>*denied*</u>.

*4. Unjust Enrichment (Count IX)*

To state a claim for unjust enrichment, the Plaintiff must demonstrate: (1) a benefit conferred on the Defendant by the Plaintiff; (2) an appreciation or knowledge of the benefit by the Defendant; and (3) the acceptance or retention of the benefit by the Defendant under circumstances which make the acceptance or retention inequitable. *Steven v. Thacker*, 550 F. Supp. 2d 161, 165 (D. Mass. 2018). Unjust enrichment serves as an "equitable stopgap for inadequacies in contractual remedies at law." *Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 234 (1st Cir. 2009) (citing *Fox v. F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 672 N.E.2d 547, 552 (1996)). Accordingly, the First Circuit has held that "a party with an adequate remedy at law cannot claim unjust enrichment." *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017) (citing *ARE-Tech Square, LLC v. Galenea Corp.*, 91 Mass.App.Ct. 1106, 2017 WL 634771 (Mass. App. Ct. 2017)).

The Corporate Defendants claim that KPM has failed to state a claim for unjust enrichment for two reasons. First, they argue that the claim fails because Massachusetts law prohibits plaintiffs with an adequate remedy at law from maintaining a parallel unjust enrichment claim. Alternatively, the Corporate Defendants assert that KPM has not sufficiently alleged that it conferred a benefit on Blue Sun.

I find that the second ground for dismissal is sufficient. Unlike trade secrets law, which will allow recovery against a defendant who received the plaintiff's trade secret from a third party, unjust enrichment requires that the plaintiff directly bestowed a benefit on the defendant. No cause of action lies where a plaintiff discloses the trade secret to a third party, who then disclosed the trade secret to defendant. *See Blake* at 391 (rejecting plaintiff's unjust enrichment claim against Professional Coin Grading Inc., which had received plaintiff's trade secrets from

Numismatic and used them, while upholding plaintiff's unjust enrichment claim against Numismatic).

Corporate Defendants' Motion to Dismiss Count IX is _granted_.

### 5.. Massachusetts General Laws Chapter 93A § 11 (Count X)

The Corporate Defendants argue that KPM's 93A claim for unfair or deceptive business practices should be dismissed for failure to allege that the disputed conduct occurred primarily and substantially within Massachusetts, as the statute requires. KPM replies that it is improper to make the factual determination about where the complained-of conduct occurred at the Rule 12(b)(6) stage. This Court agrees.

M.G.L. c. 93A § 11 requires that "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the Commonwealth." It further provides that "the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth." _Id._ The Supreme Judicial Court has explained:

> "Section 11 suggests an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."
>
> _Kuwaiti Danish Computer Co. v. Digital Equip. Corp.,_ 781 N.E.2d 787, 799 (Mass. 2003).

In accordance with _Kuwaiti_, courts commonly decline to dismiss § 11 claims on center of gravity grounds. _See, e.g._, _Sentient Jet, LLC_, 2014 WL 1004112, at *13; _Back Bay Farm, LLC. v. Collucio_, 230 F. Supp. 2d 176, 179 (D. Mass. 2002); _Workgroup Tech. Corp. v. MGM Grand Hotel, LLC_, 246 F. Supp. 2d 102, 118 (D. Mass. 2003). Further, courts have concluded that a § 11 cause of action should survive a center of gravity challenge at

the motion to dismiss stage if the complaint alleges that the plaintiff is located and claims an injury within Massachusetts. *Sentient Jet* at *12 (quoting *Back Bay Farm* at 179 (D. Mass. 2002).

KPM has sufficiently alleged that it is based in Massachusetts and that its injury occurred within the Commonwealth, where the disputed trade secrets are electronically stored. Corporate Defendants' motion to dismiss Count X is *denied*.


## II. Individual Defendants

### A. Robert Gajewski

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007). The DTSA also requires that the trade secret be "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. §1836(b)(1).

KPM's allegations that Robert Gajewski misappropriated its trade secrets are substantial: KPM has plausibly alleged that while was employed by KPM, Gajewski used the calibration data sets from KPM's database and KPM's UCAL software to produce at least 13 of the 34 application notes published on Blue Sun's website to attract new customers, and that he serviced KPM equipment on behalf of Blue Sun, which would have required him to use KPM's proprietary technology on Blue Sun's behalf. As discussed in the context of the Corporate Defendants' motion to dismiss, *see supra* Part I.B.1(a), the calibration datasets and KPM's

UCAL software are clearly protected trade secrets. KPM also took reasonable steps to prevent Gajewski from disclosing this confidential information: on September 25, 2008, at KPM's request Gajewski executed a Confidentiality and Non-Competition Agreement in which he committed not to disclose, make use of, or copy any KPM company or client confidential information *during or after* his employment with KPM without KPM's express, written consent. (Docket No. 1-6 at 8-9). Because Gajewski used KPM's calibration datasets and UCAL software to benefit another company at the expense of his unwitting employer, the allegations also show an improper purpose.

Gajewski objects that KPM's allegations against him are innuendo because there are no allegations about "when or how" he misappropriated the application notes. However, KPM's internal investigation revealed the specific date and time that Gajewski accessed and modified the same KPM skim milk data replicated in Blue Sun's application note on his KPM laptop, and that he had accessed that data on the same date that Blue Sun published its skim milk application note. Because KPM's calibration datasets are not publicly available and KPM can track which users access them (and when), it has more than sufficiently stated a claim for trade secret misappropriation against Gajewski based on the data used to assemble the Blue Sun application notes attributed to "robga" alone.

Gajewski's motion to dismiss Counts I and II is *<u>denied</u>*.

### 2. Breach of Contract (Count III)

To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

The parties dispute whether the KPM Confidentiality and Non-Competition Agreement that Gajewski signed on September 25, 2008 still bound Gajewski at the time of his alleged misconduct, which occurred between July 18, 2019 and April 5, 2021.  Under that contract, Gajewski agreed, during and after his employment with KPM, to maintain the confidentiality of KPM's corporate and client information.  (Docket No. 1-6 at 1-9).  However, Gajewski points out that he left KPM in February 2019 to work as an independent contractor, and when he returned to KPM as an employee in May 2019, he did not sign a new confidentiality agreement.

I find that KPM has sufficiently pled that the 2008 contract binding Gajewski to maintain company and client confidentiality with KPM (whether KPM was his current or former employer) remained in force during the events set out in the complaint, and that KPM has also alleged that Gajewski breached that contract to KPM's detriment.  KPM provided an executed contract which contains a confidentiality clause and alleged that that contract remained in force after Gajewski left KPM, and when he returned.  (Compl. ¶ 37; Docket No. 1-6).  It has also credibly alleged that Gajewski breached the 2008 Agreement by, among other acts, using KPM's client data to produce application notes to sell Blue Sun analyzers without KPM's consent.

Gajewski emphasizes that he never signed a new confidentiality agreement when he was rehired in 2019, but his opposition does not allege that Gajewski was unable or willing to enter into the contract in 2008 or explain why the post-termination provisions in the 2008 Agreement would be presumptively invalid in February 2019 when Gajewski briefly worked as an independent contractor, or why the current employee provisions would be presumptively invalid when Gajewski was rehired and resumed working for KPM as an employee in May 2019.  In short, he has provided no reason the Court should discredit the 2008 Agreement at the motion to dismiss stage.

Gajewski's motion to dismiss Count III is _denied_.

### 3. Violation of Good Faith and Fair Dealing (Count IV)

"To prevail on an implied duty of good faith and fair dealing claim, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *Boyle v. Douglas Dynamics, LLC*, 292 F.Supp.2d 198, 209-10 (D. Mass. 2003). "[T]he implied covenant of good faith and fair dealing governs conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached." *Massachusetts Eye & Ear Infirmary*, 412 F.3d at 230. "Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage." *Christensen v. Kingston Sch. Comm.*, 360 F.Supp.2d 212, 229 (D. Mass. 2005).

Gajewski has recycled the same arguments to dismiss Count III as he did for the breach of contract claim: that KPM has not adequately pled that the particulars of how or when Gajewski actually used or disclosed confidential information, and that KPM has not adequately alleged that any action he took had the effect of destroying or injuring KPM's rights under the contract. I have previously rejected those arguments, and reiterate my prior finding that the 2008 Agreement remained in force and barred Gajewski from using KPM's confidential client or company information at the time of his alleged misconduct, including using KPM's calibration datasets and UCAL software to prepare application notes for Blue Sun. Furthermore, the fact that KPM has credibly pled that Gajewski collected a salary from KPM while he diverted business to Blue Sun (the $900 purchase order that KPM customer Post Consumer Foods placed with Blue

Sun, after Gajewski provided a reference quote) and used KPM's trade secrets to boost the sales of KPM's competitor provides the additional factual allegations that *Christensen* requires to plead a good faith and fair dealing claim.

Gajewski's motion to dismiss Count IV is *denied*.

### 4. Breach of Duty of Loyalty (Count V)

KPM further alleges that Gajewski's disclosure of confidential information breached his duty of loyalty to KPM.

A duty of loyalty only attaches to employees who occupy positions of trust and confidence, which includes corporate officers, executives, partners, directors, and extends to certain rank and file employees who are given access to confidential information, such as law firm associates. *TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 265-66 (D. Mass. 2008). Here, KPM has alleged that Gajewski owed it a duty of loyalty arising out of the 2008 Agreement, in which he promised to keep KPM's confidential client and corporate information secret, and that he breached that duty when he disclosed confidential information on at least two occasions: using KPM's trade secrets to generate application notes for Blue Sun, and using KPM's client information to steer a $900 purchase order to Blue Sun while employed by KPM. As KPM's Business Director working directly under KPM's North America President and an employee who could access the calibration datasets on his employer-issued laptop, Gajewski was clearly an executive with access to confidential information to whom the duty of loyalty attaches.

Gajewski argues that an at-will employee can change employers freely and "may properly plan to go into competition with his employer . . . while still employed . . . without violating any duty to his employer." *See Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 172 (1991). However, the facts alleged against him—actively using KPM trade secrets to help Blue Sun

market its competing products and steering at least one customer towards Blue Sun—go far beyond the permissible bounds of job hunting or planning to go into competition with one's present employer. Gajewski's motion to dismiss Count V is *denied*.

*5. Conversion (Count VIII)*

KPM also alleges that Gajewski converted KPM's propriety datasets, calibration models, and software when he disclosed them to Blue Sun by using the information to generate at least 11 of the 34 application notes published on its website, which Blue Sun attributed to "robga." Gajewski argues that KPM has not alleged what property he converted or what damage KPM suffered because of his conduct.

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *United States v. Peabody Const. Co., Inc.*, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)).

Here, KPM has sufficiently alleged that Gajewski had access to KPM's intellectual property through his KPM-issued laptop, including data sets, calibration models, and software; that he accessed that property; and that he used that intellectual property to produce at least 11 of the application notes attributed to Mr. Gajewski and published on Blue Sun's website. As previously articulated, *see supra* Part I.B.1(a)., KPM's data sets, calibration models, and software constitute property that can be converted under the merger doctrine despite their

intangibility, and it is reasonable to assume at the motion to dismiss stage that this intellectual property was transferred using a physical device, although the manner in which the data was transmitted must be determined through discovery. Gajewski's motion to dismiss Count VIII is *denied*.

### 6. Unjust Enrichment (Count IX)

To state a claim for unjust enrichment, a plaintiff must demonstrate: (1) that the plaintiff conferred a benefit on the defendant; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make the acceptance or retention inequitable. *Steven v. Thacker*, 550 F. Supp. 2d 161, 165 (D. Mass. 2018).

KPM has failed to state a claim for unjust enrichment against any of the Individual Defendants. KPM has not clearly stated what benefit any Individual Defendant—including Robert Gajewski—derived from the disclosure of KPM's confidential or client information. (Compl. ¶¶ 127-30). As Gajewski observes, Count IX of the Complaint lumps all the Individual Defendants together and asserts conclusorily that they "benefitted" from disclosing KPM's trade secrets, without saying how. While KPM has alleged that five of the Individual Defendants now work for Blue Sun, it has not alleged that they earned those positions or any other consideration from Blue Sun because of any disclosures of KPM confidential information.[3] In the absence of any allegations that any of the Individual Defendants received any kind of benefit for their disclosures, Count IX fails as to all Individual Defendants.

Gajewski's motion to dismiss Count IX is *granted*.

---

[3] KPM filed this Complaint on April 5, 2021, the same date that it terminated Robert and Michelle Gajewski, so whether or not either Gajewski was subsequently employed by Blue Sun was not an available fact.

<u>B. Michelle Gajewski</u>

*1. Motion to Dismiss for Improper Venue*

Michelle Gajewski moves to dismiss all claims against her for improper venue because KPM brought this case in the District of Massachusetts despite the fact that § 11 of her 2013 Non-Disclosure Agreement with KPM provides that any dispute arising out of the Agreement or the parties' relationship "shall be mediated, arbitrated or litigated solely within the state of Connecticut." (Docket No. 1-7).

KPM does not dispute that its tort and contract claims against Gajewski arise out of the Agreement or Gajewski's relationship with KPM, and so are subject to § 11's mandatory forum selection clause. Instead, KPM argues that the Court should not enforce the forum selection clause in the interest of judicial economy; because of Massachusetts' strong interest in adjudicating the case in the Commonwealth, where the alleged injury occurred; and because severing the claims against a single Defendant and requiring KPM to re-file them in the designated forum would "dramatically delay and inconvenience KPM's pursuit of relief," especially considering that the Court has already ordered expedited discovery and a hearing on KPM's preliminary injunction. (Docket No. 51 at 19-20).

The First Circuit "treat[s] a motion to dismiss based on a forum selection clause as a motion alleging the failure to state a claim for which relief can be granted under Rule 12(b)(6)." *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009). Forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). There are only four grounds for a court to set aside a mandatory forum selection clause whose scope covers the plaintiffs' claims: "(1) the clause was the product

of "fraud or overreaching;" (2) "enforcement would be unreasonable or unjust;" (3) proceedings

"in the contractual forum will be so gravely difficult and inconvenient that [the party challenging

the clause] will for all practical purposes be deprived of his day in court;" or (4) "enforcement

would contravene a strong public policy of the forum in which the suit is brought, whether

declared by statute or by judicial decision." *Claudio-De Leon v. Sistema Universitario Ana G.*

*Mendez*, 775 F.3d 41, 49 (1st Cir. 2014).

KPM has not met its "heavy burden" to show why the forum selection clause should not

be enforced under any of the four grounds set forth in *Claudio-De Leon*. *See Bremen* at 17. Its

protests that enforcing the clause would inconvenience KPM by delaying relief and adding to its

litigation costs are inadequate because "[m]ere inconvenience or additional expense is not the

test of unreasonableness since it may be assumed that the plaintiff receive under the contract

consideration for these things." *In re Mercurio*, 402 F.3d 62, 66 (1st Cir. 2005) (citation

omitted). Nor has KPM furnished a factual record establishing that dismissing the claims against

Gajewski would effectively deprive KPM of its day in court. *See Fireman's Fund Am. Ins. Cos.*

*v. Puerto Rican Forwarding Co.*, 494 F.2d 1294, 1297 (1st Cir. 1974). Furthermore, it has not

identified a strong Massachusetts public policy that would be injured by enforcement other than

the Commonwealth's general interest in adjudicating claims that arose in Massachusetts and

injured Massachusetts citizens within its borders. The First Circuit has acknowledged that to the

extent the selected forum does not recognize a unique Massachusetts statutory claim, such as a c.

93A or a Massachusetts Wage Act claim, a forum selection clause can be set aside, but KPM has

made no showing that any of its claims against Gajewski cannot be pursued in Connecticut to the

extent that dismissal would violate a strong Massachusetts public policy. *See Atlas Glass &*

*Mirror, Inc. v. Tri-North Builders, Inc.*, 997 F.3d 367, 377 (1st Cir. 2021) (upholding a

Wisconsin forum selection clause where plaintiff failed to show how enforcement could violate a Supreme Judicial Court policy against transferring 93A claims to states which do not recognize such causes of action). Finally, KPM has not cited any authority which allows a federal court to ignore a valid and mandatory forum selection clause based on judicial economy.

Gajewski's Rule 12(b)(6) motion to dismiss all claims against her for improper venue in light of the forum selection clause in her KPM contract is _*granted*_. This includes the dismissal of all remaining counts against Gajewski for misappropriation of trade secrets (Counts I and II); breach of contract (Count III); breach of the implied covenant of good faith and fair dealing (Count IV); breach of the duty of loyalty (Count V); conversation (Count VIII); and unjust enrichment (Count X).

### C. Arnold Eilert

KPM has alleged five acts concerning Eilert: 1) that he had access to KPM's confidential information and he signed a Non Disclosure Agreement agreeing to maintain confidentiality on September 24, 2008; 2) that on January 11, 2019, he emailed Michelle Gajewski at her KPM email address and rob@bluesunscientific.com to inform them that KPM client UC San Diego Medical Center was dissatisfied with the human breast milk analyzer application that KPM was planning to "de-emphasize," that "it might make sense for someone" to contact the client to discuss how Blue Sun could "continu[e] where Unity left off," and to provide the client's name and phone number; 3) that on January 20, 2020, another KPM client, A&L Canada, forwarded Eilert a long email with its plan to transition from KPM analyzers to Blue Sun analyzers, and Eilert did nothing to alert KPM or prevent the loss of business; 4) that he forwarded the A&L Canada email from his KPM work email account to his personal email account on January 21,

2020; and  5) that he left KPM on December 31, 2020, and is now an employee of Blue Sun. (Docket Nos. 1-8, 1-13, 1-14).[4]

    *1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

    To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

    KPM has stated a claim for trade secret misappropriation based on the 2019 email to Blue Sun regarding UC San Diego Medical Center, but not the 2020 email regarding A&L.  Eilert was a passive recipient of the 2020 email and there are no allegations that he provided any KPM trade secrets to Blue Sun or A&L which would facilitate A&L's transition plan from KPM analyzers to Blue Sun analyzers.  Therefore, Eilert cannot be said to have "acquire[d]" or "use[d]" KPM's trade secrets, as required under the DTSA and MUTSA.  The 2019 email, when read in the light most favorable to KPM, suggests that Eilert reached out to Blue Sun by emailing

---

[4] On May 19, 2021, KPM submitted a letter informing the Court that after the hearing on its motion for expedited discovery, it learned that in August 2020 Eilert and Michelle Gajewski arranged for KPM client Disney to renew its NIR spectroscopy contract with Blue Sun instead of KPM by misrepresenting that KPM had changed its name to "Blue Sun."  (Docket No. 43).  The attached documentation included emails between a Disney representative and Eilert, as well as internal corporate emails within KPM discussing their very recent phone call with Disney.  KPM asks that we consider the additional allegations contained therein against Eilert and Michelle Gajewski.  Courts may not consider any documents that fall outside of the complaint, or which are not expressly incorporated into a complaint, except "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint" when deciding a motion to dismiss.  *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33-34 (1st Cir. 2001).  Because Disney was not referenced in the complaint and none of the documents fall under any of the exceptions set forth in *Alternative Energy*, the new evidence concerning Disney does not form part of the record for the pending motions to dismiss.

rob@bluesunscientific.com to inform KPM's competitor that there was an opportunity to poach UC San Diego Medical Center because KPM had decided to stop investing resources into its human breast milk application.

Under Massachusetts law, non-technical confidential information such as customer or supplier lists can qualify as a protected trade secret. *FrontRunner HC, Inc. v. Waveland RCM, LLC*, 202 WL 7321161 at *9 (D. Mass. Dec. 11., 2020) (citing *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass 835, 840 (1972)). Massachusetts courts consider six relevant factors when determining whether the information sought to be protected is confidential: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Jet Spray* at 840 (citing RESTATEMENT OF TORTS § 757).

The scope of information defined as confidential in the Agreement implies that the information Eilert shared constitutes a trade secret, and that KPM had made substantial efforts to protect it. At the time that he emailed rob@bluesunscientific.com to provide the name, phone number, and reason why KPM's client might be open to an overture from Blue Sun, Eilert's Non-Disclosure Agreement was still in force and specifically barred him from disclosing confidential information, including the names and contact persons of KPM's clients and technologies and developments or any information relating to the KPM's business. (Docket No. 1-1 at 3).

Eilert objects that he was "simply trying to help an existing customer" and that he was not diverting business from KPM because KPM no longer planned to support the product application that its customer was interested in. That argument is a fact issue which cannot be resolved here at the motion to dismiss stage.

Eilert's motion to dismiss Counts 1 and II is *denied*.

### 2. Breach of Contract (Count III)

To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

KPM alleges that Eilert violated his 2008 Confidentiality and Non-Competition Agreement by disclosing KPM's confidential information. Eilert raises no argument that the Agreement is unenforceable. The 2008 Agreement defines confidential information broadly as, among other information, "names, addresses, contact persons, purchasing histories and prices, credit standing and other information relating to [KPM's] clients or prospective personnel;" and "business expansion plans, including business development;" "technologies, developments, inventions, or improvements; and any other information relating to the business of [KPM] or its clients . . ." (Docket No. 1-1 at 3). While KPM did not allege that its decision to "de-emphasize" the human breast milk application was a trade secret, a term which carries a specific legal definition, that information appears to be confidential under the terms of the Agreement. By alleging that Eilert disclosed that information to a Blue Sun email address, KPM has stated a claim for breach of contract. Furthermore, providing Blue Sun with the client's phone number is also a breach of the contractual provision protecting the identities and contact information of

KPM's clients. Eilert objects that he was merely trying to assist a customer obtain a service that KPM could not provide, but on a motion to dismiss, the Court construes the evidence in the light most favorable to the nonmovant.

Eilert's motion to dismiss Count III is *denied*.

*3. Violation of the Implied Covenant of Good Faith and Fair Dealing (Count IV)*

"To prevail on an implied duty of good faith and fair dealing claim, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *Boyle v. Douglas Dynamics, LLC*, 292 F.Supp.2d 198, 209-10 (D. Mass. 2003). "Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage." *Christensen v. Kingston Sch. Comm.*, 360 F.Supp.2d 212, 229 (D. Mass. 2005).

As discussed above in the context of the breach of contract claim against Eilert, Eilert's January 11, 2019 disclosure to Blue Sun that KPM planned to discontinue or stop developing a certain application that a KPM client wanted, as well as that client's name and contact information, violated Eilert's 2008 Confidentiality and Nondisclosure Agreement. KPM has also alleged that Eilert leveraged the violation for undue economic advantage by gaining employment with Blue Sun sometime after December 31, 2020. Eilert's act of forwarding the 2020 email memorializing A&L's plan to transition from KPM to Blue Sun analyzers reinforces the theory that Eilert was collecting clients for an eventual move to Blue Sun. Two years passed between the January 2019 Email and Eilert's subsequent employment with Blue Sun and Eilert's hiring

could be wholly unconnected to the 2019 email, but at the motion to dismiss stage KPM has scraped together enough plausible allegations to move the claim forward.

Eilert's motion to dismiss Count IV is *denied*.

### 4. Breach of Duty of Loyalty (Count V)

A duty of loyalty only attaches to employees who occupy positions of trust and confidence, which includes corporate officers, executives, partners, directors, and extends to certain rank and file employees who are given access to confidential information, such as law firm associates. *TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 265-66 (D. Mass. 2008). As an Applied Technology Manager whose position involved "designing software and programming," Eilert's work provided him access to enough of KPM's prized confidential information—particularly its calibration database—for the duty of loyalty to attach. (Docket No. 1-1 at 1). Eilert promised to keep KPM's confidential client and corporate information secret, and KPM has plausibly alleged that he breached that duty on January 11, 2019, as discussed previously.

Eilert's motion to dismiss Count V is *denied*.

### 5. Conversion (Count VIII)

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *United States v. Peabody Const. Co.,*

*Inc.*, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)).

The 2019 and 2020 email exchanges show that Eilert was in possession of KPM customer information.  (Compl. ¶¶ 42, 49).  Additionally, the January 11, 2019 email to rob@bluesunscientific.com credibly alleges that he used confidential customer information to lure KPM customers to Blue Sun while employed by KPM.  However, KPM fails to allege that Eilert's conduct harmed KPM.  Unlike the allegations against Rachael Glenister, KPM has no allegations that it lost sales or business opportunities with either UC San Diego Medical Center or A&L, the two clients connected to Eilert, due to any action of Eilert's.  *See infra* Sec. II.d.vi. Without pleading damages resulting from Mr. Eilert's use of customer information, KPM has failed to plausibly establish a conversion claim.  *See Peabody*, 392 F.Supp.2d at 37.

Eilert's motion to dismiss Count VIII is <u>*granted*</u>.

### 6. Unjust Enrichment (Count IX)

Eilert's motion to dismiss Count IX is <u>*granted*</u>.


<u>D. Rachael Glenister</u>

KPM alleges that Glenister diverted three sales to Blue Sun while she was employed by KPM, and that her current employment violates the terms of her August 23, 2015 Confidentiality and Non-Competition Agreement.  (Docket No. 1-2).

On September 4, 2019, Glenister generated a $61,000 sales opportunity from Texas A&M AgriLife, but she closed the opportunity on June 9, 2020, reporting that the customer had "No Budget/Lost Funding."  (¶ 83).  KPM has learned that Blue Sun received an order from Texas A&M AgriLife on April 20, 2020 and amended it on July 20, 2020, either on the day that

Glenister left KPM, or ten days later.[5] (*Id.*).  Glenister also created a sales opportunity with

Panhandle Milling while employed by KPM, but after Glenister left KPM, Panhandle placed an

order with Blue Sun in late 2020.  (¶ 84).  Finally, Glenister created a sales opportunity with

Agri-King, Inc. before she left KPM, but Agri-King Inc. ultimately placed an order with Blue

Sun.  (¶ 85).

### 1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)

To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1)

the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the

secrecy of the information," and (3) "the defendant used improper means, in breach of a

confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488

F.3d 46, 52 (1st Cir. 2007).

Weighing the six *Jet Spray* factors, I find that KPM has stated a claim that Glenister's

diversion of the three sales from KPM to Blue Sun violated the DTSA and the MUTSA by

disclosing confidential information.   See *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass 835, 840

(1972).  Glenister's Confidentiality and Non-Competition Agreement barred her from disclosing

any information relating to KPM's prospective clients, including potential or prospective prices

or products during or after her employment with KPM.  (Docket No. 1-2).  According to the

allegations against her, three prospective clients that she unsuccessfully solicited for KPM—

AgriLife, AgriKing, and Panhandle Milling, became Blue Sun clients shortly before or after she

left KPM for Blue Sun on July 10 or 20, 2020.  KPM and Blue Sun sell similar types of NIR

analyzers.  Taking the facts alleged in the light most favorable to KPM, it is plausible that

---

[5] The Complaint provides that two different end dates for Glenister's employment at KPM: July 10, 2015 (¶ 33) and July 20, 2020 (¶ 83).  Therefore, Blue Sun either amended its purchase order from AgriLife the day that Glenister left KPM, or ten days later.

Glenister used the confidential information she learned during her solicitation of the three companies at KPM to diver their business to Blue Sun, especially given KPM's allegations that Glenister left KPM for Blue Sun. While KPM has not identified any specific instances of solicitation, there is no requirement to do so without the benefit of discovery at such an early stage of the litigation.

Glenister's motion to dismiss Counts I and II is _denied_.

## 2. Breach of Contract (Count III)

KPM's first breach of contract claim against Glenister alleges that she violated the terms of her 2015 Confidentiality and Non-Competition Agreement with KPM by disclosing confidential information. To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

For the same grounds provided in my decision concerning the trade secret claims (Counts I and II) against Glenister, I decline to dismiss the breach of contract claim. Glenister has argued that the Agreement's restrictive covenant is invalid, *see supra* Part II.D.5, but not that the remainder of the Agreement between her and KPM is unenforceable. Therefore, where KPM has plausible pled that a valid contract existed, and Glenister breached the confidentiality requirement of that contract to divert sales away from KPM to Blue Sun, and KPM was injured, KPM has sufficiently pled breach of contract. In particular, KPM's allegation that Glenister informed KPM in July 2020 that the $61,000 sales opportunity to AgriKing she had been pursuing for the past ten months had lapsed because AgriKing had lost funding or had no budget is curious, for if Glenister had truly been courting AgriKing on KPM's behalf for ten months it

seems likely she would be aware of AgriKing's April order with Blue Sun, and would have informed KPM.

Glenister's motion to dismiss Count III is *denied*.

### 3. Violation of Good Faith and Fair Dealing (Count IV)

Under Massachusetts law, "the covenant of good faith and fair dealing is implied in every contract," *UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004), and provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471–72 (1991).

While there are other explanations for AgriKing, AgriLife, and Panhandle Milling's decisions to purchase analyzers from KPM rather than BlueSun, the coinciding timing of their decisions with Glenister's transition from KPM to Blue Sun, and the fact that Glenister had solicited all three on behalf of KPM, creates a plausible allegation that Glenister used the confidential information she was barred from disclosing for Blue Sun's benefit to poach those three customers. At the motion to dismiss stage, KPM has pleaded, albeit barely, enough to state a claim.

Glenister's motion to dismiss Count IV is *denied*.

### 4. Breach of Duty of Loyalty (Count V)

A duty of loyalty only attaches to employees who occupy positions of trust and confidence, which includes corporate officers, executives, partners, directors, and extends to certain rank and file employees who are given access to confidential information, such as law firm associates. *TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 265-66 (D. Mass. 2008).

Glenister joined KPM as an entry level field sales representative. (Docket No. 1-2 at 2). Because she was not an executive, officer, or director of KPM, an employee's duty of loyalty does not apply unless she occupied "a position of trust and confidence." *Advanced Micro Devices, Inc. v. Feldstein*, 951 F.Supp.2d 212, 220 (D. Mass. 2013). Nevertheless, as a sales representative, it is likely that Glenister had access to KPM's confidential information, including customer lists and product information, which is supported by the fact that the Confidentiality and Non-Competition Agreement that KPM required her to sign as a condition of her employment barred her from disclosing any customer information. (Docket No. 1-2 at 5). Since KPM is "a high-tech business that generates much of its revenue from intellectual property" it is likely that Glenister, who was tasked with selling this equipment, "had access to confidential information of substantial value." *Feldstein* at 220. While at summary judgment KPM will have to prove that a fiduciary duty did attach to Glenister, Count V survives the motion to dismiss.

Glenister's motion to dismiss Count V is *denied*.

### 5. Breach of Contract (Count VI)

KPM's second breach of contract claim against Glenister alleges that she violated the restrictive covenant in her 2015 Non-Disclosure and Non-Competition Agreement by competing with her former employer. Glenister argues that the restrictive covenant is invalid under Connecticut law, which governs the Agreement, because it prevents her from practicing her occupation, is impermissibly overbroad in temporal and geographic scope, and exceeds what is necessary to protect KPM's legitimate interests.

For a period of two years following the end of her employment with KPM, § 2 of the Agreement bars Glenister from, directly or indirectly: 1) competing with KPM or its affiliates; 2) consulting or advising, owning, managing, operating, financing, joining, controlling, or having

any connection, in any manner, with any business related to KPM's NIR spectroscopy business; 3) any contact, solicitation, or consulting business with any KPM client or affiliate she worked with or solicited, <u>including any active KPM prospects that she worked with or solicited in the 12 months prior to her departure from KPM</u>; 4) inducing any KPM customer or employee to leave KPM; and 4) interfering with any KPM contracts or relationships with KPM's customers or suppliers. (Docket No. 1-2 at 6) (emphasis added). These restrictions apply within any geographic area in which KPM and its affiliates conduct business, though the contract does not define the scale of a geographic area or list the geographical areas where KPM operates. (*Id.*). Significantly, the provision permits Glenister to work in the NIR industry in a role which would not directly or indirectly compete with KPM's NIR business. (*Id.*).

The Connecticut Supreme Court has specified five criteria for evaluating the reasonableness of a restrictive covenant:

> "(1) the length of time the restriction is to be in effect; (2) the geographical area covered by the restriction; (3) the degree of protection afforded to the interest of the party in whose favor the covenant is made; (4) the restrictions imposed on the employee's ability to pursue his occupation; and (5) the potential for undue interference with the interests of the public."

*Scott v. General Iron & Welding Co.*, 368 A.2d 111, 114–15 (Conn. 1976). This five-prong test is disjunctive, meaning that a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable. *New Haven Tobacco Co., Inc. v. Perrelli*, 528 A.2d 865, 867 (Conn. App. Ct. 1989). The party challenging the covenant bears the burden of proving that the restriction is not enforceable. *Fairfield County Bariatrics and Surgical Associates, P.C. v. Ehrlich*, 2010 WL 1375397 (Conn. Super. Ct. 2010).

*(a) Temporal and Geographic Restrictions*

Time and geographic restrictions in a covenant not to compete are enforceable if they are "reasonably limited and fairly protect the interests of both parties." *Robert S. Weiss & Associates, Inc. v. Weiderlight*, 546 A.2d 216, 220 (Conn. 1988). "[T]ime and geographical restrictions are to be reviewed as intertwined considerations when a determination is made on the reasonableness of the limitations of an employee's post-termination activities." *Van Dyck Printing Co. v. DiNicola*, 648 A.2d 898, 902 (Conn. Sup. Ct. 1993) (citing *Weiderlight*, 546 A.2d at 546). A restriction with a large geographic scope with a short duration may be reasonable, while one that covers a small area for a longer duration may be reasonable. *Id.* Generally, the application of a restrictive covenant must be confined to a geographical area and length of time which are reasonable in view of the *particular* situation. *See Scott*, 368 A.2d at 115 (emphasis added). Often facts beyond what are available at the motion to dismiss stage are required to determine the reasonableness of time and geographic limitations. *See, e.g.*, *Southern Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of Southern Connecticut*, 2014 WL 12756150 at *3 (D. Conn. 2014) ("[F]uther factual development is required to determine the import of the lack of express time and geographical limitation in the Agreement."). I find that to be the case here.

The Agreement prohibits Glenister from competing with KPM or its affiliates within "any geographic area" in which KPM and its affiliates do business. (Docket No. 1-2 at 6). In the absence of information that more precisely defines that geographic area, its breadth cannot be determined. Given the interconnectedness of the geographic and temporal restrictions, the validity of the two-year restriction is also an open question. Accordingly, further fact finding is required to reach a conclusion on the reasonableness of the Agreement's geographic and temporal restrictions.

*(b) Protection of KPM's Legitimate Interests*

Connecticut courts have invalidated restrictive covenants that bar former employees from having *any connection* to businesses that may compete with their former employer. *See, e.g.*, *DeLeo v. Equale & Cirone, LLP*, 202 Conn.App. 650, 679-83, n.15 (Conn. App. Ct. Feb. 23, 2021); (*Sylvan R. Shemitz Designs, Inc. v. Brown*, 2013 WL 6038263, at *8 (Conn. Super. Ct. Oct. 23, 2013) ("The court finds particularly problematic that the noncompetition clause specifically prohibits any employment by a "Specialized Lighting Business," regardless of the importance of the position or its relatedness to those duties which the employee held with the plaintiff.").

§ 2 effectively precludes Glenister from working as a sales representative in the NIR spectroscopy industry, which has been her occupation for the past five years. Under § 2, she cannot work for any NIR spectroscopy company in any capacity if that company competes indirectly or directly with KPM, even if she only solicits clients that she had no contact with during her time at KPM. Because the *Scott* factors are disjunctive, the unreasonableness of the protection afforded to KPM by this provision is sufficient to render the restrictive covenant of the Agreement unenforceable. *Perrelli*, 528 A.2d at 867.

Glenister's motion to dismiss Count VI is *granted*.

*6. Conversion (Count VIII)*

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of

right, the plaintiff's demand for its return was refused." *United States v. Peabody Const. Co., Inc.*, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)). Following the legal analysis in *Sentient Jet, LLC v. Apollo Jets*, LLC, 2014 WL 1004112 at *2 (D. Mass. March 17, 2014), I decline to dismiss KPM's conversion claim that Glenister misappropriated KPM's confidential information under the merger doctrine. KPM did not allege the specific means by which Glenister transmitted this customer information to Blue Sun. Because discovery will reveal how any confidential information was transmitted to Blue Sun, dismissing the claim now would be premature. *Id.*

Glenister's Motion to Dismiss Count VIII is *denied*.

### 7. Unjust Enrichment (Count IX)

Glenister's motion to dismiss Count IX is *granted*.


### E. Gregory Israelson

KPM has alleged scant facts about Israelson. In sum, Israelson: 1) worked for KPM as a Sales Engineer from March 2016 to March 2021 (Compl. ¶ 34); 2) had access to KPM's confidential information and trade secrets, including its valuable datasets, source code and/or customer files (*Id.*); 3) is now employed by Blue Sun (*Id.*); and 4) sent an email from a Blue Sun email address bearing his first name (greg@bluesunscientific.com) to his KPM email address on July 29, 2020 containing a link to a software tool used for remote copying of files, with a request "to join a session." (Docket No. 1-9). Per KPM, Israelson's "sole purpose in sending this software copying tool to himself at his kpmanalytics.com email address was to permit the copying of files from KPM to Blue Sun without KPM's authorization." (¶ 43).

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

KPM has plausibly alleged that Israelson had access to its confidential information or trade secrets, but it has not alleged that Israelson ever actually acquired and used any trade secrets. It has not alleged that Israelson responded to the greg@bluesunscientific.com email or used the copying tool to take files without KPM's knowledge or connected any information Blue Sun now possesses to information that within Israelson's reach in July 2020.

Moreover, KPM's report of its internal investigation into Robert Gajewski shows that KPM has the ability to digitally track whenever its employees access or modify electronic files within its calibration database. (*See* Compl. ¶¶ 70, 72). If KPM knows the date that Israelson received the invitation to "join a session" of the software copying tool, then the Court presumes based on the pleadings that KPM should also know whether Israelson accessed or modified any confidential files related to its calibration database on that same date. If Israelson worked in a sales capacity like Glenister rather than in a technical capacity with the calibration database like Robert Gajewski, then there should be allegations about his contacts with KPM clients to substantiate the trade secrets claim, as there were with Glenister. The offer letter he received from KPM indicates that he might have done both technical and sales-oriented work. (Docket No. 1-3 at 2). KPM's silence in both regards is conspicuous.

The additional fact that an individual with the same first name as Israelson possessed a Blue Sun email address while Israelson was employed by KPM does not compensate for the lack of evidence that Israelson ever acquired and used a KPM trade secret.

Israelson's motion to dismiss Counts I and II is *granted*.

### 2. Breach of Contract (Count III)

Just as the Complaint contains no allegations that Israelson used and acquired a KPM trade secret, it contains no allegations no allegations that Israelson committed any conduct which breached the terms of his March 2016 Confidentiality and Non-Competition Agreement. Israelson's motion to dismiss Count III is *granted*.

### 3. Violation of Good Faith and Fair Dealing (Count IV)

For the reasons previously provided, Israelson's motion to dismiss Count IV is *granted*.

### 4. Breach of Duty of Loyalty (Count V)

For the reasons previously provided, Israelson's motion to dismiss Count V is *granted*.

### 5. Breach of Contract (Count VI)

KPM also claims that Israelson's current employment with Blue Sun violates the restrictive covenant in his 2016 Confidentiality and Non-Competition Agreement with KPM. Israelson's noncompete agreement is identical to the provision in Glenister's agreement, which I have already held is invalid under Connecticut law. *See supra* Part II.D.5. Accordingly, Israelson's Motion to Dismiss Count VI is *granted*.

### 6. Conversion (Count VIII)

For the reasons previously provided, Israelson's motion to dismiss Count V is *granted*.

### 7. Unjust Enrichment (Count IX)

Israelson's motion to dismiss Count IX is *granted*.

## F. Irvin Lucas

KPM alleges that Lucas disclosed KPM's confidential information after he left KPM in May 2019 and began working for Blue Sun..

Lucas worked for KPM in an undefined capacity from January 5, 2015, to May 7, 2019, during which time he had access to KPM's trade secrets and confidential information; he became employed by Blue Sun at some point between May 2019 and January 2020 and is now Blue Sun's President. (Compl. ¶ 35; Docket No. 1-4). When Lucas left KPM, he "wiped clean" his company-issued computer. (*Id*.).

On January 17, 2020, KPM client Olam sent an email to Robert Gajewski's KPM email address (Gajewski was still employed by KPM) and Lucas at irvin@bluesunscientific.com to troubleshoot an issue with Olam's KPM analyzer. (Docket No. 1-12 at 8). The Olam contact, Dr. Fong, noted that he had received Gajewski and Lucas' contact information from a colleague, but did not explain why Olam would be reaching out to KPM and an employee of its competitor for help with a KPM analyzer. Gajewski responded to Dr. Fong privately, removing Lucas from the ensuing email chain. (*Id*. at 2-7).

On March 30, 2020, a manager for KPM distributor ProAnalytics emailed Gajewski and Lucas an order form for $900 worth of analyzer replacement parts. (Docket No. 1-15). The manager sent the order form directly to Gajewski, but she copied Lucas as a secondary recipient, and the email salutation reads: "Hi Rob/Irvin, Hope you are both well. Please find attached new order for lamps . . ." (*Id*. at 2). The purchase order identifies Blue Sun as the supplier, and lists a phone number with a Maryland area code and info@bluesunscientific.com as the supplier contact. (*Id*.). The order description notes that Rob Gajewski provided the reference quote for the order. (*Id*. at 6).

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

The Court is mindful that "trade secret misappropriation may be demonstrated by circumstantial evidence, such as access to the trade secret by the misappropriating party and similarity between the secret and the defendant's design . . ." *Contour Design, Inc v. Chance Mold Steel Co., Ltd*., 693 F.3d 102, 109-110 (1st Cir. 2012). To be sure, Lucas' act of wiping his KPM-issued company computer blank together with the knowledge that seven months later Lucas became Blue Sun's President, raises the Court's suspicion. But KPM has alleged no information about what files Lucas had access to on his company computer, and whether information from any of those files subsequently appears to have ended up in the hands of Blue Sun.

As to the Olam email, KPM alleges that there is no "legitimate reason" why one of its customers would email a KPM employee and anyone else at Blue Sun about KPM equipment, as Dr. Fong did when he emailed Robert Gajewski and Irvin Lucas at irvan@bluesunscientific.com to ask for help with his KPM analyzer, implying that Lucas had been working behind the scenes to poach Olam from Blue Sun, and that work must necessarily have involved Lucas' disclosure of KPM trade secrets. But Lucas never responded, and there is no evidence in the email itself which indicates any bad acts on Lucas' part.

Wiping his KPM computer and his subsequent employment at Blue Sun alone do not state a claim for trade secret misappropriation, but the March 2020 email from a KPM customer to Gajewski and Lucas submitting an order for Blue Sun equipment is evidence that Lucas used confidential KPM information he learned from Gajewski or during his time at KPM for an improper purpose—here, to divert a $900 sale that would otherwise go to KPM to Blue Sun.

In a somewhat similar case, another court in this District denied injunctive relief for trade secret misappropriation against the plaintiff's consultant, who had downloaded what the court determined were likely trade secrets from the plaintiff's cloud-based DropBox electronic storage system onto his personal computer and then "delinked" his personal computer so that the plaintiff could not retrieve the client files that the consultant had downloaded. *Maine Pointe, LLC v. Collins*, 2018 WL 5303038 at *5-6 (D. Mass. Oct. 25, 2018). The plaintiff argued that the act of "delinking" was overwhelming circumstantial evidence that the consultant intended to use its trade secrets for the benefit of his new employer and merited injunctive relief, just as KPM has emphasized Lucas' act of wiping his KMP computer. *Id*. In *Maine Pointe* the district court denied injunctive relief, noting that the plaintiff had not established a likelihood of success in proving that the consultant intended to convert the trade secrets for his own use where there was no evidence that the consultant had made copies or used the files beyond the scope of his consultancy agreement. *Id*. at 6. Not only does KPM have a lower burden to proof opposing a motion to dismiss than the aggrieved corporation in *Maine Pointe*, it has evidence through the ProAnalytics correspondence and the order that the defendant seeking dismissal actually used the confidential information he had access to.

Construing the ProAnalytics email, Lucas' act of wiping his computer clean before leaving KPM to obscure the transfer or taking of any confidential information, and his

subsequent employment with Blue Sun in the most favorable light possible to KPM, there is enough circumstantial evidence to state a claim for misappropriation.

Lucas' motion to dismiss Counts I and II is *denied*.

### 2. Breach of Contract (Count III)

KPM alleges that Lucas breached the confidentiality terms of his January 2015 Confidentiality and Non-Competition Agreement (Docket No. 1-4) with KPM by disclosing its trade secrets or confidential information, as confidential information is defined within the Agreement. To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

Lucas has not argued that the Agreement is invalid, but instead objects that KPM has not alleged the circumstances of the alleged breach. I find that the 2015 Agreement was still in place in March 2020, when KPM has credibly alleged that Lucas was involved in diverting a sale of replacement parts or equipment from a KPM customer to Blue Sun. KPM has credibly alleged that to divert the sale, Lucas would have needed to use confidential information shielded by the Agreement, including information about KPM's customers, prices, and technology.

Lucas' motion to dismiss Count III is *denied*.

### 3. Violation of Good Faith and Fair Dealing (Count IV)

"To prevail on an implied duty of good faith and fair dealing claim, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *Boyle v. Douglas Dynamics, LLC*, 292 F.Supp.2d 198, 209-10 (D.

Mass. 2003). "[T]he implied covenant of good faith and fair dealing governs conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached." *Massachusetts Eye & Ear Infirmary*, 412 F.3d at 230. "Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage." *Christensen v. Kingston Sch. Comm.*, 360 F.Supp.2d 212, 229 (D. Mass. 2005).

As with the breach of contract claim (Count III), I find that the March 2020 emails do state a claim that Lucas violated the duty of good faith and fair dealing which he owed to KPM, his former employer, under the 2015 Agreement. That he (together with Robert Gajewski) successfully diverted the ProAnalytics order to Blue Sun shows that he leveraged the confidentiality terms of his agreement for undue economic advantage by causing the exact harm that KPM sought to prevent when it attained his consent to enter into the agreement in 2015. Lucas' motion to dismiss Count IV is *denied*.

### 4. Breach of Duty of Loyalty (Count V)

Because KPM did not provide Lucas' title or scope of work, it is unclear whether he was an executive, officer, or director to which a fiduciary duty attaches. However, the fact that KPM required Lucas to enter into a Confidentiality and Non-Competition Agreement demonstrates that he likely occupied "a position of trust and confidence" or had such access to confidential information that the duty does attach. *See Advanced Micro Devices, Inc. v. Feldstein*, 951 F.Supp.2d 212, 220 (D. Mass. 2013). Since KPM is "a high-tech business that generates much of its revenue from intellectual property" it is likely that like the other Individual Defendants, Lucas "had access to confidential information of substantial value." *Feldstein* at 220. While at

summary judgment KPM will have to prove that a fiduciary duty did attach to Lucas, KPM has alleged enough to allow the claim to move forward.

Lucas' motion to dismiss Count V is _denied_.

### 5. Breach of Contract (Count VI)

KPM also claims that Lucas' current employment with Blue Sun violates his January 2015 Confidentiality and Non-Competition Agreement with KPM. The restrictive covenant in Lucas' Agreement is identical to the provisions in Glenister and Israelson's agreements, which I have already held are invalid under Connecticut law. See _supra_ Part II.D.5. Accordingly, Lucas' motion to dismiss Count VI is _granted_.

### 6. Conversion (Count VIII)

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." _United States v. Peabody Const. Co., Inc._, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing _Evergreen Marine Corp. v. Six Consignments of Frozen Scallops_, 4 F.3d 90, 95 (1st Cir. 1993)).

Pursuant to _Sentient Jet, LLC v. Apollo Jets_, LLC, 2014 WL 1004112 at *2 (D. Mass. March 17, 2014), I decline to dismiss KPM's conversion claim that Lucas misappropriated KPM's confidential information concerning its client relationship with ProAnalytics under the merger doctrine. Although KPM did not allege the specific means by which Lucas transmitted

customer information to Blue Sun, dismissing the claim would be premature before discovery on the mechanics of the exchange. *Id.*

For the reasons previously stated, Lucas' motion to dismiss Count VIII is *<u>denied</u>*.

### *7. Unjust Enrichment (Count IX)*

Lucas' motion to dismiss Count IX is *<u>granted</u>*.

### <u>G. Philip Ossowski</u>

KPM has asserted eight claims (Counts I, II, III, IV, V, VI, VIII, and IX) against Philip Ossowski despite an utter absence of allegations against him. Ossowski began working for KPM on March 26, 2019, at which time he executed a Non-Competition, Non-Solicitation and Confidentiality Agreement. (Docket No. 1-5). KPM claims that during Ossowski's employment, he had access to KPM's trade secrets and confidential information. (Compl. ¶ 36). Finally, KPM states that Ossowski left KPM on January 29, 2021 and now works for Blue Sun. (*Id.*). Missing are any claims about any act or omission on the part of Ossowski during or after his KPM employment connected to Blue Sun or any KPM trade secret, confidential information, or customer.

### *1. Counts I, II, III, IV, VI, VIII, and IX*

I agree that the facts alleged are entirely insufficient to state any contract or statutory claims based on Ossowski's use, disclosure, or misappropriation of KPM's trade secrets or confidential information. KPM has not alleged whether or how Ossowski violated his non-disclosure agreement or acted on behalf of Blue Sun while employed by KPM, or after his departure from KPM. Ossowski was not party to any of the email communications between certain Individual Defendants and KPM customers detailed in the Complaint, and there are no

allegations tying him to Blue Sun's Application Notes published on Blue Sun's website or lost customers and sales opportunities. Simply put, there is nothing connecting Ossowski to the use of KPM's trade secrets and confidential information by himself or any other party. Accordingly, Ossowski's motion to dismiss is *granted* as to Counts I, II, III, IV, VI, VIII, and IX.

## 2. Breach of Contract (Count VI)

KPM alleges that Ossowski's current employment with Blue Sun breaches his April 10, 2019 Non-Competition, Non-Solicitation and Confidentiality Agreement with KPM. (Docket No. 1-5). Unlike Glenister, Lucas, and Israelson's agreements, Ossowski's contract contains materially different terms and is governed by Massachusetts law.

As KPM appeared to concede at the hearing, Ossowski's Agreement violates the Massachusetts Noncompetition Agreement Act, M. G. L. c. 149, § 24L. The Act sets out eight requirements for a noncompetition agreement to be legally binding: Ossowski's Agreement violates the first and seventh conditions. The first requirement mandates that the agreement "expressly state that the employee has the right to consult with counsel prior to signing." *Id.* § 24L(b)(i). The seventh requirement mandates that the agreement be supported by "a garden leave clause or other mutually-agreed upon consideration between the employer and the employee." *Id.* § 24L(b)(vii). Ossowski's agreement does not expressly state that Mr. Ossowski has the right to consult with counsel prior to signing, and it does not contain a garden leave clause or another mutually agreed upon form of consideration. *Id.*

Ossowski's motion to dismiss Count VI is *granted*.

## Conclusion

For the reasons set forth above:

- Corporate Defendants' motion to dismiss (Docket No. 20) for lack of personal jurisdiction is ***denied***; their motion to dismiss for failure to state a claim is also ***denied*** except as to the claim for unjust enrichment (Count IX), which is ***granted***.
- Robert Gajewski's motion to dismiss (Docket No. 27) is ***denied in part and granted in part***.
- Michelle Gajewski's motion to dismiss for improper venue (Docket No. 25) is ***granted***.
- Rachael Glenister's motion to dismiss (Docket No. 29) ***is denied in part and granted in part.***
- Arnold Eilert's motion to dismiss (Docket No. 23) is ***denied in part and granted in part.***
- Gregory Israelson's motion to dismiss (Docket No. 31) is ***granted.***
- Irvin Lucas' motion to dismiss (Docket No. 33) is ***denied in part and granted in part***.
- Philip Ossowski's motion to dismiss (Docket No. 35) is ***granted***.


**SO ORDERED.**

***/s/ Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

**Appendix**

| Corporate Defendants | | |
|---|---|---|
| **Count** | **Claim** | **Order** |
| | 12(b)(2) - Personal Jurisdiction | Deny |
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| VII | Tortious Interference w/ Contr. Rel. | Deny |
| VIII | Conversion | Deny |
| IX | Unjust Enrichment | Grant |
| X | M. G. L. c. 93A, § 11 | Deny |

| Robert Gajewski | | |
|---|---|---|
| **Count** | **Claim** | **Order** |
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| III | Breach of Contract | Deny |
| IV | Good Faith and Fair Dealing | Deny |
| V | Duty of Loyalty | Deny |
| VIII | Conversion | Deny |
| IX | Unjust Enrichment | Grant |

| Michelle Gajewski | | |
|---|---|---|
| **Count** | **Claim** | **Order** |
| I | Defend Trade Secrets Act | Grant |
| II | Misappropriation of Trade Secrets | Grant |
| III | Breach of Contract | Grant |
| IV | Good Faith and Fair Dealing | Grant |
| V | Duty of Loyalty | Grant |
| VIII | Conversion | Grant |
| IX | Unjust Enrichment | Grant |

| Arnold Eilert | | |
|---|---|---|
| **Count** | **Claim** | **Order** |
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| III | Breach of Contract | Deny |
| IV | Good Faith and Fair Dealing | Deny |
| V | Duty of Loyalty | Deny |
| VIII | Conversion | Grant |
| IX | Unjust Enrichment | Grant |

| Rachel Glenister | | |
|---|---|---|
| Count | Claim | Order |
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| III | Breach of Contract | Deny |
| IV | Good Faith and Fair Dealing | Deny |
| V | Duty of Loyalty | Deny |
| VI | Breach of Contract | Grant |
| VIII | Conversion | Deny |
| IX | Unjust Enrichment | Grant |

| Gregory Israelson | | |
|---|---|---|
| Count | Claim | Order |
| I | Defend Trade Secrets Act | Grant |
| II | Misappropriation of Trade Secrets | Grant |
| III | Breach of Contract | Grant |
| IV | Good Faith and Fair Dealing | Grant |
| V | Duty of Loyalty | Grant |
| VI | Breach of Contract | Grant |
| VIII | Conversion | Grant |
| IX | Unjust Enrichment | Grant |

| Irvin Lucas | | |
|---|---|---|
| Count | Claim | Order |
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| III | Breach of Contract | Deny |
| IV | Good Faith and Fair Dealing | Deny |
| V | Duty of Loyalty | Deny |
| VI | Breach of Contract | Grant |
| VIII | Conversion | Deny |
| IX | Unjust Enrichment | Deny |

| Philip Ossowski | | |
|---|---|---|
| Count | Claim | Order |
| I | Defend Trade Secrets Act | Grant |
| II | Misappropriation of Trade Secrets | Grant |
| III | Breach of Contract | Grant |
| IV | Good Faith and Fair Dealing | Grant |
| V | Duty of Loyalty | Grant |
| VI | Breach of Contract | Grant |
| VIII | Conversion | Grant |
| IX | Unjust Enrichment | Grant |