1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    KPM Analytics North America    )
     Corporation,                   )
5                       Plaintiff,  )
                                     )
6                                    )
     vs.                            )    Case No. 21cv10572-TSH
7                                    )
                                     )
8    Blue Sun Scientific, LLC,      )
     et al.,                        )
9                       Defendants.  )

10

11   BEFORE:  The Honorable Timothy S. Hillman

12

13                      Remote Motion Hearing

14

15

16                              United States District Court
                                Courtroom No. 2
17                              595 Main Street
                                Worcester, Massachusetts
18                              July 16, 2021

19

20

21

22

23              Marianne Kusa-Ryll, RDR, CRR
                   Official Court Reporter
                 United States District Court
24               595 Main Street, Room 514A
                   Worcester, MA 01608-2093
25             508-929-3399 justicehill@aol.com
               Mechanical Steno - Transcript by Computer

```
 1    APPEARANCES (remotely):

 2    Cesari and McKenna
      John T. Gutkoski, Esquire
 3    1 Liberty Square, Suite 310
      Boston, Massachusetts 02109
 4    on behalf of the Plaintiff

 5    Morse Barnes-Brown & Pendelton, PC
      Scott R. Magee, Esquire
 6    Paige K. Zacharakis, Esquire
      480 Totten Pond Road, Fourth Floor
 7    Waltham, Massachusetts 02451
      on behalf of the Plaintiff
 8
      Gordon Feinblatt LLC
 9    George Faulkner Ritchie, IV, Esquire
      1001 Fleet Street, Suite 700
10    Baltimore, Maryland 21202
      On behalf of the Defendant
11
      Seyfarth Shaw, LLP
12    William L. Prickett, Esquire
      Dallin R. Wilson, Esquire
13    Two Seaport Lane, Suite 300
      Boston, Massachusetts 02210
14    on behalf of the Defendant

15

16

17

18

19

20

21

22

23

24

25
```

1                        P R O C E E D I N G S

2                (The following proceedings were held remotely before

3       the Honorable Timothy S. Hillman, United States District Judge,

4       United States District Court, District of Massachusetts, on

5       July 16, 2021.)

6                THE CLERK:  Case No. 21-10572, KPM Analytics North

7       America Corporation versus Blue Sun Scientific.

8                Counsel, please note your appearance for the record.

9                MR. GUTKOSKI:  Your Honor, this is John Gutkoski of

10      Cesari and McKenna.  I'm here representing the plaintiff, KPM;

11      and with me from Morse, LLP, are Scott McGee and Paige

12      Zacharakis.

13               In addition from KPM itself, both their vice president

14      of engineering, Mr. Olson, and their CEO, Mr. Mitchell, are

15      joining the call.

16               THE COURT:  And good afternoon.

17               MR. GUTKOSKI:  Good afternoon to you.

18               MR. PRICKETT:  Good afternoon, your Honor.  William

19      Prickett, Seyfarth Shaw.  With me is Dallin Wilson.  We

20      represent the remaining four individual defendants in the case.

21               I also see that based on the identification on some of

22      the boxes, some of our current and -- our current clients are

23      also on the line.

24               THE COURT:  Good afternoon, Mr. Prickett.

25               MR. RITCHIE:  Good afternoon, your Honor.  George

1    Ritchie, Gordon Feinblatt, from Baltimore, Maryland.  I'm here

2    on behalf of Innovative Technologies Group Co. and Blue Sun

3    Scientific.

4         And with me on the line, your Honor, from my firm are

5    Mr. Roy Craig and Ms. Lauren Lake as well.

6         THE COURT:  And good afternoon and welcome.

7         All right.  Mr. Gutkoski, I think this is your party.

8    Why don't you start.

9         MR. GUTKOSKI:  Thank you, your Honor.

10        Just ground rules, I see you've set this for an hour.

11        Are you looking at half an hour per side or any other

12   view as to time?

13        THE COURT:  That would be good.

14        MR. GUTKOSKI:  Okay.  Then I'll -- I'll look to take

15   about 20 minutes.

16        THE COURT:  You don't have to use it -- you don't have

17   to use it all.

18        MR. GUTKOSKI:  Thank you.  Thank you.  I'll keep that

19   in mind.

20        I'll look to speak for 15 or 20 minutes, then, your

21   Honor, and reserve a little bit of time for rebuttal if

22   necessary.

23        THE COURT:  Sounds good.

24        MR. GUTKOSKI:  Your Honor, since your -- since the

25   Court ordered expedited discovery we have gone forward and

1    conducted both written discovery in terms of document

2    production and conducted the five depositions.

3         In that process, we have learned that beginning in

4    early 2018, ITG, one of the corporate defendants, came out on

5    the marketplace with a new near infrared analyzer; and that

6    during 2018, Defendant Lucas, who at that time was a KPM

7    employee and remained a KPM employee throughout 2018 and up

8    until May 20th of 2019, approached ITG and offered to create

9    Defendant Blue Sun as a separate entity and marketing arm for

10   ITG and its new analyzer.

11        And that over the course of almost a year while still

12   working at KPM, Mr. Lucas stood up that business, created

13   marketing materials for it, and began designing a way to

14   compete with his then employer, KPM, in the near infrared

15   analyzer business.

16        He did so by, in part, recruiting KPM employees; and

17   today, 100 percent of Blue Sun's employees are former KPM

18   employees that Mr. Lucas at least had a hand in bringing over,

19   both technical people and salespeople.

20        Now, as we explained in the complaint, and the Court

21   noted in its order, in order for these machines to work, in

22   order for them to analyze any substance, you don't just need

23   the machine, you need to calibrate the machine with data from

24   previous measurements.

25        If I'm measuring a new sample of milk, I need my

1    analyzer calibrated with prior milk sample data in order to

2    measure the new sample.

3           As we set forth in the complaint, KPM has been

4    building its library of such calibration data from various

5    sources around the -- around the world for 20 years.  Blue Sun

6    does not have 20 years of this.  They have -- at this point

7    three.

8           Instead, what they did in early 2020 was to have

9    Mr. Gajewski, who was then a full-time employee of KPM, use his

10   KPM laptop with KPM calibration data and KPM interpreting and

11   reporting software, the proprietary UCAL software.  And he

12   created these application notes, one of which we had attached

13   to the complaint and described in the complaint at Exhibit 17.

14          Blue Sun used these notes in order to represent what

15   its analyzers could do and, in fact, represented that the

16   thousands of data points in these application notes had been

17   taken and measured on a Phoenix analyzer, which is the name

18   that Blue Sun created for the ITG analyzer, said that they were

19   all done using that analyzer, using Blue Sun's Alligator --

20   Alligator calibration software.  Alligator's the name of it,

21   and that they were collected from many different global

22   locations.

23          Blue Sun has now admitted that none of that is true.

24   In fact, none of these results, none of these individual pieces

25   of data, none of these measurements were taken on a Blue Sun

1    machine.  These are all generated by Mr. Gajewski using KPM's

2    trade secret data and trade secret -- trade secret software.

3         And they remained up on the Blue Sun website for all

4    of 2020 and up until early 2021 when we brought this lawsuit.

5         As a result, KPM has been in the position of needing

6    to compete with itself and its own calibration capabilities for

7    at least that period of time.

8         Now, not only did Mr. Gajewski do this using his KPM

9    computer and the data and the software that he had at the time,

10   but he still has that software and at least some of that KPM

11   data in his possession.  He admits in his deposition that he

12   still is in possession of a thumb drive that -- that

13   information along with additional KPM property, that when he

14   was terminated on or about April 5th, he was asked to return

15   all KPM property.  He returned the computer, but not the thumb

16   drive.  We had asked for that thumb drive to be returned to us,

17   and as of -- as we sit here today, it has not been.

18        And so Mr. Gajewski still has the resources or at

19   least some of the resources to recreate those application

20   notes.

21        In addition, Blue Sun has not returned the application

22   notes or produced them in discovery.  The only ones that we

23   have are the ones that we obtained prior to filing the lawsuit.

24        Now, the problem that is presented with the misconduct

25   of the defendants is not limited to just competing with the

1    analyzers themselves.

2           THE COURT:  So, hold -- let me just.  Let me just ask

3    you this, Mr. Gutkoski.  Did Mr. Gajewski provide calibration

4    data?  Do you have any information that he provided calibration

5    data for any other products besides the 34 application notes?

6           MR. GUTKOSKI:  For -- for products beyond those 34 --

7           THE COURT:  Yeah.

8           MR. GUTKOSKI:  -- or -- no, no, we -- we don't.

9           We are hamstrung a bit here, your Honor, in that

10   apparently in moving over from KPM to Blue Sun, at least three

11   of the KPM employees, Mr. Gajewski, Mr. Eilert, and

12   Mr. Israelson, were given Blue Sun email accounts, and

13   that's -- they used those for some period of time; in

14   Mr. Gajewski's case, several years before leaving the employ of

15   KPM.

16          We had asked for certain categories of emails to be

17   produced, and we were told that a few weeks before we filed the

18   complaint in April of this year that Blue Sun had migrated its

19   email, and in doing -- to a new platform; and in doing so, did

20   not preserve, download, maintain the email accounts for -- the

21   initial email accounts for those three former KPM employees;

22   and as a result those emails, we are told by Blue Sun, have

23   been lost and destroyed.

24          And so while I don't have any evidence beyond those

25   34 products, I also don't have a full historical story due to

1    the loss of the contents of those emails and email accounts.

2            Mr. Gajewski not only created the application notes so

3    that Blue Sun could misrepresent what its analyzers could do;

4    but in February of 2019, he resigned from KPM and became an

5    independent contractor.  For a period of months, from

6    February 1st until the middle of May of 2019, he acted as an

7    independent contractor doing work for an association with Blue

8    Sun and also in association with KPM.

9            In May of 2019, he returned to KPM as a full-time

10    employee; however, he continued to work for Blue Sun and work

11    with Blue Sun; and what he did was, first of all, he didn't

12    tell anyone at KPM management that he was also working for the

13    competitor Blue Sun, but he began a practice in conjunction

14    with Mr. Lucas where either Mr. Gajewski would reach out to a

15    customer who -- a KPM customer, who had a KPM analyzer.  And

16    these machines oftentimes require service on a periodic basis,

17    oftentimes every year.  Mr. Gajewski, or one of the other

18    defendants, would reach out to customers, letting them know

19    that it was time for their new yearly maintenance, or a

20    customer would reach out to KPM and inquire about scheduling

21    their yearly maintenance.  And either Mr. Gajewski, or in some

22    cases Ms. Glenister, would refer the customer to Mr. Gajewski's

23    Blue Sun email.  And Mr. Gajewski would then begin a

24    correspondence with that customer telling some version of

25    a -- of the story that he was acting independently; that he was

1    no longer with KPM, which again after May of 2019 was not true.

2    He was an employee of KPM and/or that he was actually working

3    at Blue Sun and working for Blue Sun.

4         He would encourage the customer to do their service

5    with him, because he had done it in the past, and because he

6    understood their KPM systems, and their KPM -- their

7    relationship with KPM for these analyzers.  He would then ask

8    Mr. Lucas at Blue Sun, who at this point had moved on to Blue

9    Sun, to generate a price quote in each of the servicing that's

10   done to these analyzers on an annual basis is -- the charge for

11   that is several thousand dollars, three to $5,000 in many

12   cases, and that he would -- then once the quote was approved,

13   Mr. Gajewski would go out representing himself as working in

14   association with Blue Sun, perform the servicing; and then Blue

15   Sun would invoice the customer, and the customer paid Blue Sun.

16        KPM not only didn't receive the money for the

17   servicing that their employee Mr. Gajewski was doing, but that

18   he -- but they also were over time losing the customer

19   relationship because Mr. Gajewski was in effect diverting it to

20   Blue Sun so now the customers in many cases were looking to

21   Blue Sun in order to have any questions with the machines

22   answered, have any servicing done, et cetera.

23        Now, how many customers did this type of conduct occur

24   for?

25        Again, we don't have a full record due to the -- the

1    deletion of these email accounts.  However, from emails that

2    were produced, we know that there were upwards of 30 different

3    customers, who were serviced in -- in this fashion.

4         About nine Mr. Gajewski reached out to; about another

5    nine folks at Blue Sun who had come from KPM had connections

6    with the customers, and they directed those KPM customers to

7    Mr. Gajewski at Blue Sun, and somewhere between seven and nine.

8    It's a little unclear from the email strings and

9    Ms. Glenister's involvement.

10        As a result the defendants not only were competing in

11   terms of the analyzers, but they were siphoning away KPM's

12   customer relationships as well as the -- as well as the service

13   revenue over time with, it appears, the ultimate goal being

14   able to leverage those relationships in order to sell them a

15   new analyzer.  These -- these analyzers often have a shelf life

16   of five to ten years and need to be replaced, and we have

17   evidence of -- for at least two customers, where Mr. Gajewski

18   has now -- in conjunction with Blue Sun and Mr. Lucas and the

19   others defendants have now offered to sell new analyzers, this

20   time Phoenix Blue Sun analyzers, to these customers completing

21   the process of migrating the customer relationship beginning

22   with service to actual product sales.

23        Now, these Blue Sun analyzers use a different

24   calibration software and a different operating software than

25   KPM's analyzers do.  However, they have represented to

1    customers that they can migrate their current KPM machine

2    calibrations to the Blue Sun analyzer in several cases, and

3    also that the -- they -- they have -- they have told us that

4    the Alligator software, the calibration software that Blue Sun

5    uses and the Blue scan software that is the operating system on

6    the Phoenix analyzer they claim is not in any way based on or

7    has -- had anything taken from the KPM software.  But we don't

8    know that.  We asked for -- we don't know if that's true and to

9    what extent if it's not true any of our software has been used.

10   Because we asked Blue Sun to -- and ITG to produce a copy of

11   the source code of the two software platforms so we could

12   compare them, and we're told that Blue Sun does not have copies

13   of that -- of those software platforms.  Excuse me.

14        THE COURT:  Mr. -- Mr. Gutkoski, let me just ask you

15   this.  So, is -- is it your -- is it your position that Blue

16   Sun's business model is based solely on KPM's data or are -- is

17   there any evidence that they created their own calibration

18   data?

19        MR. GUTKOSKI:  They tell us that they have not created

20   their own calibration data; that they have worked with

21   customers to use a customer's own data.  If a customer has been

22   analyzing breakfast cereal and the protein in the breakfast

23   cereal and feels that its calibrations are drifting out of

24   alignment they have -- they have asked Blue Sun to recalibrate

25   those -- recalibrate those -- those machines using just the

1    customer's own data.  Blue Sun says when it does this for a KPM

2    machine, it has used only KPM data -- I'm sorry.  It has used

3    only customer data and not KPM data.

4         When it has sold its own machines, it claims that it

5    is not offering any sort of calibration libraries at this point

6    and instead is providing an analyzer and getting it up and

7    running using the customer's own, say, 20 to 50 samples.

8         That is what they have told us.  We don't have any

9    evidence to the contrary; however, we do know that for at least

10   two customers, Mr. Gajewski did adjust their calibrations for

11   their KPM machine using our UCAL software, and so he was

12   misusing that software, which he had access to at the time as a

13   KPM employee, not for KPM's business, but rather for Blue Sun's

14   business.

15        The situation, therefore, that we're -- we find

16   ourselves in is Blue Sun having represented and misrepresented

17   what their analyzers can do by using our trade secrets

18   servicing upward of 30 different customers and diverting their

19   service revenue and those relationships over to Blue Sun and

20   deteriorating, if not destroying, KPM's relationship with those

21   customers and its ability to continue to provide service,

22   continue to sell service, and eventually, we fear, our ability

23   to sell them their next analyzer.

24        As a result, we ask that the Court enter a preliminary

25   injunction against Blue Sun and the individual defendants

1    prohibiting them from making these type of representations,

2    making any use of our software and our data and directing the

3    return by Mr. Gajewski and anyone else at Blue Sun that has it

4    of the thumb drive and our trade secrets.

5            We will, with the briefing that the Court has ordered,

6    include a proposed order, slightly modified in light of the

7    motion to dismiss, the order yesterday, as well as to reflect

8    the evidence that has come to light during the period of

9    expedited discovery when we submit our papers next week.

10            THE COURT:  Thank you.  Thank you, Mr. Gutkoski.

11            Who wants to go first, Mr. Prickett or Mr. Ritchie?

12            MR. PRICKETT:  Your Honor, William Prickett.  I think

13    I'll go first --

14            THE COURT:  Okay.

15            MR. PRICKETT:  -- only because I think that not

16    withstanding what I just heard about a minute ago, I think the

17    thrust of the motion, at least the briefing that was submitted

18    with the complaint, really goes towards the individuals, my

19    clients, but I'd like to reserve some of the time obviously for

20    the two entity defendants to be heard as well.

21            THE COURT:  Sure, and in your -- and both yourself

22    and --

23            MR. PRICKETT:  Yes.

24            THE COURT:  -- and Mr. Richie, if you would talk to me

25    about these missing emails.  I -- I'm a little troubled by

1      that.

2             So go ahead, start, please.

3             MR. PRICKETT:  Yes, I'm going to -- that's really Blue

4      Sun's issue, the company's issue, so that I'm going to defer to

5      Mr. Ritchie on that.  He can explain the migration process.

6             So, your Honor, let me just begin by saying that in

7      the 20 minutes of argument I just heard, I didn't hear a single

8      assertion that had anything to do with irreparable harm.  Not

9      one.  Much less ongoing irreparable harm since these employees

10     have left the company.

11            The first thing that -- and, in fact, if anything, and

12     we disagree with it, but if anything, if there's any liability

13     on the -- on the part of any of the individuals we're talking

14     about a money damages remedy; and accordingly, there cannot be

15     an injunction issue in this case on this record.

16            Let me begin with the first point that Mr. Gutkoski

17     raised, and that is with the application notes appearing on

18     Blue Sun's website.  I'm a little bit surprised that

19     Mr. Gutkoski did not represent the facts, as revealed in

20     discovery as to what happened here; and once the Court hears

21     those facts, I think it will conclude that it cannot find fault

22     with what Mr. Gajewski did.

23            Mr. Gajewski, at the time -- and by the way, the

24     complaint has a typographical error.  It suggests that these

25     notes appeared in 2021, early 2021, on the Blue Sun website.

1    It's actually early 2020.

2            In late 2019, early 2020, Mr. Gajewski, as a KPM

3    employee, was in communications with Blue Sun for purposes of

4    selling them a KPM license to the UCAL software.  Mr. Gajewski,

5    as a consultant, had been shown the Alligator in its earlier

6    form and did not think much of it and felt that Blue Sun would

7    be better off using UCAL on its analyzers rather than the

8    Alligator software that it ultimately is using today.

9            And so in an effort to get revenue for KPM, to make a

10   sell for KPM, he was discussing with Blue Sun the benefits of

11   UCAL and what its application notes can show.

12           And in that connection, the unrebutted testimony is

13   that Blue Sun asked Mr. Gajewski to demonstrate what UCAL can

14   do for purposes of trying to persuade them to purchase a UCAL

15   license.

16           So Mr. Gajewski did exactly what the complaint

17   describes.  He, as a KPM employee, went into the KPM software,

18   accessed data, and created applications and sent only those

19   application notes to KPM to prove his point.

20           Your Honor raised a question a minute ago about was

21   there any other data provided.  In fact, your Honor, no data

22   was provided and has never been provided to Blue Sun.  The only

23   thing provided to Blue Sun was the application note or notes,

24   which are by KPM's own concession not confidential and not

25   trade secrets.  They are marketing materials designed to

1   demonstrate to a customer the ability of the -- of the device

2   to do what the -- KPM says it does.

3          That's the only thing that Mr. Gajewski ever sent to

4   Blue Sun with respect to the application notes.

5          And importantly, the -- the notion that KPM -- excuse

6   me -- the notion that Blue Sun made a puffery, inaccuracy on

7   its website about the fact that it had run these notes through

8   its own software, yes, it's inaccurate, but this case is not a

9   false advertising case.  It is a trade secret case, and there

10  was no trade secret of confidential information provided to

11  Blue Sun in connection with the application notes.

12         The balance of the case, your Honor, is really another

13  category of allegation, and that is essentially competing,

14  approaching customers; and although it wasn't specifically

15  argued just now, I believe KPM will in its briefing assert that

16  the identity of the customer itself is somehow confidential or

17  trade secret, and that's simply nonsense in this case.

18         In the context of this case, these are customers, some

19  30 or so, that Mr. Gajewski and the other individual defendants

20  that remain in the case have worked for for in some cases

21  almost 30 years, including even before Unity.  Mr. Gajewski had

22  several jobs before Unity.  He knows these customer intimately;

23  and, therefore the notion that the identity of a customer's

24  name is somehow a confidential trade secret is simply malarky

25  in this case.

1    And as your Honor knows, in the context where an

2    employee over decades learns the trade, learns customers and

3    works with customers, the -- the customer's identity itself or

4    contact information is simply not a confidential item that that

5    employee surrenders to the employer.  And, therefore, if we can

6    assume that those identities are not confidential and we know

7    that there is no restrictive covenant in this case that is

8    enforceable; in Mr. Gajewski's case, there is no restriction

9    whatsoever on competing, at least by contract; and in terms of

10   reaching out to customers, that was not misuse of confidential

11   or trade secret information.

12        With respect to reaching out to these customers while

13   he was still employed at KPM, there's an implication that

14   there's some sort of duty breach here.  I would submit to your

15   Honor that even those maintenance assignments for KPM customers

16   on behalf of Blue Sun were not even competitive, and they need

17   to be competitive to be actual.

18        Those were machines, older Unity machines, still fully

19   functional, but ones that KPM had determined internally that it

20   no longer wanted to maintain.  It wanted to maintain -- focus

21   its business on newer machines.

22        Yes, KPM will argue that the document that was

23   provided to customers said essentially we can no longer

24   guarantee service on those machines.  Again, that's sort of

25   lawyer careful language crafted to make a record, but Mr. Irvin

1    Lucas's testimony was uncontroverted that internally at KPM the

2    direction is very clear.  Do not waste our resources focusing

3    on old customer machines.  Mr. Gajewski had a relationship with

4    nearly 30 years with these customers, and he wanted to make

5    sure they had their machines fixed; and, therefore, I would

6    submit that even while he was at KPM, acting as an independent

7    contractor through Blue Sun, that was not competitive.

8         And, again, your Honor, as I mentioned at the outset,

9    all of this, all of this is ancient history.  There is no

10   ongoing activity that KPM can point to; and if anything, if

11   there's any liability here, we're talking about a damages

12   remedy, lost revenue for servicing, and even sales if

13   there -- if they can show that there was a sale made by Blue

14   Sun that KPM otherwise would have secured, which we submit that

15   never will be able to do so.

16        The other point I want to emphasize, your Honor, is

17   that it is absolutely true that to the extent we are servicing

18   former KPM customers, or Mr. Gajewski is servicing them on

19   their older machines or on machines or in fields in which KPM

20   no longer provides service, such as breast milk, we use solely

21   the customer data.  There has never been an instance where we

22   have used any KPM data.  We don't have access to KPM's data,

23   and we do not want KPM's data.

24        And with respect to the hard drive that Mr. Gajewski

25   had in his possession, and I emphasize it's in the past tense,

1    had, he no longer has it.  Counsel, Seyfarth Shaw, has that

2    drive.  Mr. Gutkoski didn't explain what happened there, and

3    when you hear the facts you'll know that there is nothing

4    nefarious.

5           Some months before Mr. Gajewski was fired by KPM, he

6    received a new computer at KPM, and working with KPM's IT team,

7    he in order to move the data from the old computer to the new

8    computer, the old computer's data was moved to a hard drive, a

9    separate hard dive, and then that hard drive data was copied

10   onto the new computer.

11          And Mr. Gajewski forgot all about the hard drive.

12   Some months later when he was fired, he was asked to return his

13   computers, which he did, and simply forgot that he had the hard

14   drive.  And in connection with the complaint being filed and

15   direction from counsel not to destroy any evidence, he

16   maintained that hard drive and ultimately provided it to

17   counsel for safekeeping.

18          He has represented to us that he has not provided any

19   data from that hard drive to anybody, including anybody at Blue

20   Sun, and the Blue Sun witnesses have corroborated that.  It's

21   uncontroverted.  And in the event, you know, when asked on --

22   point blank on deposition why he had not provided anything from

23   that hard drive to Blue Sun, Mr. Gajewski said quite candidly,

24   because it's KPM's property.  So there is no objection to

25   returning that to KPM ultimately when the dust settles here.

1          Your Honor, I think that covers -- unless there are

2     any questions the Court has, I'll turn it over to Mr. Ritchie.

3          THE COURT:  Not at this moment, Mr. Prickett.  Thank

4     you.

5          Mr. Ritchie, why don't you tell me, please.

6          MR. RITCHIE:  Thank you, your Honor.

7          Good afternoon.  And let me start, your Honor, with

8     the question that your Honor raised about the emails and

9     Mr. Gutkoski's comments, which I think are unfair and do not

10    reflect the testimony in this case.

11         There was a migration, and I'm looking -- your Honor

12    can't see it, but I'm looking at the testimony of Irvin Lucas

13    on this point to make sure I understood and have the testimony

14    correct for your Honor.

15         In March of this year, and as Mr. Gajewski admitted,

16    before the lawsuit was filed, that before any duty arose to

17    preserve anything, there was a migration.  Blue Sun used two

18    different platform products:  One, something called G Suite,

19    which hosted their emails and another product called Zoho,

20    Z-O-H-O, that was utilized to do accounting functions; and in

21    the first week of March, approximately March 5th, Blue Sun

22    decided to migrate the emails from G Suite over to Zoho so that

23    they didn't have to continue to pay for a product that was

24    obsolete because Zoho could do the same thing.  So this was not

25    in connection with the lawsuit.  There was no evidence that

1    this is an attempt to find anything.

2            And additionally, Mr. Irvin testified that the only --

3    Mr. Lucas testified that the only account that didn't make it

4    over was Mr. Israelson's email, that didn't for some reason

5    make it into the migration to the new platform.

6            So, Mr. Gajewski's email did, in fact, move over as

7    did others.  It's simply untrue, and quite frankly, you know,

8    sort of -- it has a foreboding sound when it comes out of

9    Mr. Gutkoski's mouth that, in fact, there's something they

10   don't know and has been hidden from them.  Nothing has been

11   hidden from them.  There's no other evidence that there was

12   something other than the 34 application notes that -- that KPM

13   has complained about here, and there's no attempt by Blue Sun

14   to hide emails, not preserve emails.  We went back and searched

15   every possible platform and share site we could do, including

16   Dropbox, Zoho, a number of others, and we produced everything

17   we had, your Honor.  So I take issue with the characterization

18   that there was some effort to hide things from KPM.

19           In terms of the other issues, your Honor, I think

20   Mr. Prickett summarized the defense position well.  The only

21   thing I think I would like to amplify, and I think your Honor

22   referred to it is there is a suggestion here that the theme I

23   think I heard from the plaintiff is that, well, you know, Blue

24   Sun and ITG can't do any business as a result of the complaint

25   that KPM has lodged here.  And I went back and looked at what

1    the order was that KPM had proposed to this Court.  KPM can't

2    stop Blue Sun and ITG from selling machines that ITG

3    manufacturers.  And there's nothing in the law that prevents

4    Blue Sun and ITG from fairly competing for customers with KPM.

5    We don't think that we're using the IT -- the KPM proprietary

6    data.  We're using the customer data.  I understand that's the

7    crux of the issue before the Court with respect to trade

8    events, and we think our briefing will support that position.

9    But I want to be clear that there shouldn't be an argument,

10   there can't be an argument that this lawsuit on a preliminary

11   basis has the right and ability to shut down entirely the

12   business of ITG and Blue Sun.

13         ITG makes their own machines, utilizes its own

14   software; and notwithstanding the ominous suggestion to the

15   contrary, there's no relationship with Alligator and UCAL.  We

16   don't have -- we don't -- we don't own Alligator.  We didn't

17   create it.  We didn't write the code.  We don't have the source

18   codes for it.  It's created by an individual in Europe, and we

19   have a license and deal with him, but we don't have access to

20   that source code either.

21         So I just wanted to make that last point, your Honor,

22   which is that the relief that the plaintiff seemed to be

23   hinting at is awfully broad giving the allegation which we

24   dispute in any event; but, you know, fundamentally, we think

25   we're not using their proprietary data.

1        As your Honor has pointed out, the noncompete

2   agreements that are -- that were signed by the various

3   individual defendants are not enforceable; and as long as we're

4   not using the proprietary data, we should be allowed to go our

5   way and sell our machines and service customers.

6        And with that, your Honor, unless you have any further

7   questions I'll stand down.

8        THE COURT:  I don't.  Thank you.

9        So let me ask you all this.  Is there any value in me

10  setting you up with a magistrate judge for a mediation at this

11  point?

12       Mr. Gutkoski, what do you say?

13       MR. GUTKOSKI:  The conversation is always valuable,

14  your Honor.  I -- I haven't had a chance to talk with the

15  clients specifically about that; however, I think a referral to

16  a magistrate to at least have a conversation has no harm or

17  foul.

18       THE COURT:  Mr. Prickett, what do you say?

19       MR. PRICKETT:  I see no -- no downside to it, your

20  Honor, and particularly if the Court does, as we think it will,

21  which is to deny the requested injunctive relief, at least at

22  this stage.

23       THE COURT:  Nice try.

24       MR. PRICKETT:  I think this case -- I think this case

25  should settle.  I don't see there being any real serious issue

1    in this case.

2             THE COURT:  Mr. Ritchie, how about your client?

3             MR. RITCHIE:  We would -- we would willingly

4    participate in mediation, your Honor.

5             THE COURT:  Okay.  So let me ask you this.  Rather

6    than have you throw good money after bad, do you want me to

7    check and see whether we can get a mediation in the next

8    several weeks and then hold off?

9             You've got briefs due in a week, and if you would

10   rather funnel that energy into a mediation, I'm happy to push

11   that out a bit, but I -- I -- if you tell me.

12            Let me start with the plaintiff, Mr. Gutkoski.

13            MR. GUTKOSKI:  Your Honor, I -- I think the -- the

14   current schedule has significant value to KPM.  We would like

15   to go forward with the briefing and as scheduled and ask the

16   Court to rule on the motion.

17            That said, we can -- we can pursue a mediation in

18   tandem on a dual-track approach.

19            THE COURT:  Mr. Prickett.

20            MR. PRICKETT:  That -- that, either way is fine, your

21   Honor, either delaying the briefing or dual -- dual tracking is

22   fine.

23            THE COURT:  Thank you.

24            MR. PRICKETT:  One question I do have, your Honor,

25   though, is the Court currently has a framework where the

1   plaintiff's brief and the defendants' briefs are due at the

2   same time.  And I would wonder whether the Court might have a

3   more focused presentation or record if the defendants respond

4   to the supplemental brief rather than guess as to what the

5   plaintiff is going to argue based on today's argument.

6          THE COURT:  I'm guessing you already know, but I'm

7   fine with staggering that.

8          MR. PRICKETT:  Okay.

9          THE COURT:  Mr. Ritchie, what do you say?

10         MR. RITCHIE:  Your Honor, likewise, fine either way.

11  I think the staggering makes sense in either way.

12         THE COURT:  Okay.  All right.  Good.

13         All right.  Thank you, all.  Nice job.  I think I

14  will -- I will see about a quick referral, and then we will

15  adjust the briefing schedule.

16         Great.  Nice job.  Stay safe.  And we'll talk to you

17  all soon.

18         MR. GUTKOSKI:  Thank you, your Honor.

19         MR. PRICKETT:  Thank you, your Honor.

20         MR. RITCHIE:  Thank you, your Honor.

21         (At 3:15 p.m., Court was adjourned.)

22

23

24

25

1                        C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and accurate

5    transcription of my stenographic notes before the Honorable

6    Timothy S. Hillman, to the best of my skill, knowledge, and

7    ability.

8

9

10        /s/ Marianne Kusa-Ryll                        7/19/21

11        Marianne Kusa-Ryll, RDR, CRR                  Date

12        Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25