## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **KPM ANALYTICS NORTH AMERICA CORPORATION,** **Plaintiff,** **v.** **BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, ROBERT GAJEWSKI, RACHEL GLENISTER, and IRVIN LUCAS** **Defendants.** | **CIVIL ACTION NO.  4:21-CV-10572-TSH** |

## ORDER AND MEMORANDUM ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Docket No. 7)

**August 23, 2021**

**HILLMAN, D.J.**

This is a trade secret and breach of contract case brought by KPM Analytics North America Corporation ("KPM") against Blue Sun Scientific, LLC ("Blue Sun"); The Innovative Technologies Group & Co., Ltd. ("ITG") (collectively, "Corporate Defendants"); Robert Gajewski; Arnold Eilert; Rachel Glenister; and Irvin Lucas (collectively, "Individual Defendants").[1]

After limited expedited discovery and supplemental briefing, the Court now turns to KPM's motion for preliminary injunction.  (Docket Nos. 7, 75-1).  For the reasons set forth below, the motion for preliminary injunction is ***granted in part and denied in part*** .

---

[1] Gregory Israelson, Phillip Ossowski, and Michelle Gajewski were dismissed from the case by prior order, leaving four Individual Defendants.  (Docket No. 64).

1

**Factual Background**

*KPM*

KPM's Unity Scientific division manufactures and sells near infrared ("NIR") analyzers, devices which measure the diffraction of light to determine the chemical composition of common substances found in consumer products, such as the amount of moisture, oil or protein in flour, agricultural ingredients, chocolate, or processed foods.[2]  (Compl. ¶¶ 1, 3, 18-19, 21; Docket No. 1).  They are typically used in industrial or research settings to perform on-demand, rapid quality control testing.  Each analyzer contains the measuring apparatus and a computer which can report the measurements from each measurement to KPM for chemical analysis. KPM earns revenue from selling analyzers and related equipment, licensing its proprietary UCAL software,[3] and performing yearly preventive maintenance ("PM") and other repair services.  KPM's analyzers are sold under the SpectraStar brand name.

Using UCAL and USCAN, the raw data collected by KPM analyzers must be referenced against the data in KPM's calibration database, which contains calibration datasets to match the measurements reported by the analyzer to the properties associated with certain chemicals (water, oil, protein) based on samples and reference values in the database.  (¶ 24).  Per KPM, each calibration dataset in its calibration database is drawn from as many as 50-100 samples that KPM has collected over the past twenty years, some from its own customers, and the database includes tens of thousands of samples and over 500,000 reference chemistry values. (¶ 26).

---

[2] For the purposes of this motion, any reference to a Unity product or employee is a reference to KPM.

[3] There are two types of software on a KPM analyzer.  "UScan is the application that runs on the embedded computer inside a [KPM analyzer] . . . it takes the data from the internal hardware and does all of the calibration processing, data management, the graphical user interface presentation to a user and does the data management for running tests on the SpectraStar. UCal is a tool that is sold for customers to use to create calibrations."  (KPM Dep. 35:7-24, Docket No. 75-55).

KPM's proprietary UCal software, which many of its analyzer customers license, allows customers to design their own calibrations.

KPM ensures that only its employees and consultants that work with its confidential information can access it.  (¶ 31).  KPM's IT procedures require management sign-off and have access-control processes to access calibration data; the calibration database is stored on a protected, confidential Windows File Server.  (*Id.*).  KPM's UCAL software must be licensed, and UCAL's source code is stored in secure software vault called GitHub.  KPM also maintains non-disclosure arrangements and confidentiality agreements with its employees to prevent dissemination of its technical and non-technical confidential information.  (*Id.*).

*ITG and Blue Sun*

ITG was formed in 2007.  It manufactures NIR analyzers, including the M5 analyzer.  In fact, ITG designed and manufactured all KPM analyzers and many of their components preceding the SpectraStar XL in 2014.  In 2008, ITG sold its partial ownership interest in Unity Scientific, KPM's predecessor in interest, and its SpectraStar patents to Westco Scientific, which was acquired by Union Park Capitol in 2015.  Union Park Capital then combined Westco with other companies to form KPM.

While he was employed by KPM as a sales representative in April 2018, Irvin Lucas approached ITG about forming a separate sales arm to market and sell its M5 analyzer as a replacement for the FOSS system 2 analyzers, a popular analyzer produced by competitor FOSS which had been discontinued.  (Blue Sun Dep. 32:16-20, Docket No. 75-5; Gajewski Dep. 26:18-21, Docket No. 75-6).  ITG agreed, formed Blue Sun in July 2018, and rebranded its M5 analyzers under the Phoenix brand name.  Lucas left KPM in May 2019 to work for Blue Sun.

Lucas began recruiting his former colleagues to work for Blue Sun while he was still employed by KPM.  In August 2018, he approached Robert Gajewski to perform preventive maintenance for Blue Sun. Gajewski worked for KPM from 2003 until January 13, 2019 as an employee; from February 1, 2019 to May 13, 2019 as an independent contractor; and from May 13, 2019 to April 5, 2021 as an employee.  In February 2019, Gajewski agreed to start performing annual preventive maintenance ("PM") on KPM SpectraStar analyzers for Blue Sun as an independent contractor, and he began using a Blue Sun email address, Rob Roberts (rob@bluesunscientific.com).  Lucas estimates that since that time, Gajewski has serviced about 45 KPM analyzers for approximately 10 customers.  (Lucas Dep. 30:5-8).  Since Gajewski serviced certain analyzers in 2019, 2020, and 2021, he has likely serviced about 140 total KPM analyzers for Blue Sun. (29:25-32:8)  Only 7-8 of those analyzers were serviced after his termination from KPM in April 2021.  (31:11-15).  Until May 2021, the customers Gajewski serviced paid Blue Sun for his work; Gajewski claims he did not seek compensation because he still had an income from KPM.  (Gajewski Dep. 55:20-57:8).  Lucas maintains that Gajewski was trying to establish his own independent consulting business.  (Lucas Dep. 28:12-29:17).  He never told KPM about his work for Blue Sun prior to his termination, but maintained at deposition that he never diverted any KPM customer to Blue Sun or refused KPM assignments in favor of Blue Sun work.  (Gajewski Dep. 57:5-8, 90:14-20).

The new evidence uncovered through expedited discovery does not support Gajewski's account.  Although Lucas often communicated pricing and invoiced former KPM customers for Gajewski's SpectraStar PM work for Blue Sun, on at least three occasions Gajewski advised Lucas what prices to offer to undercut or equal KPM's fees based on his knowledge of what KPM had charged that customer the prior year.  On January 30, 2019, Gajewski prompted Lucas

to generate a service quote for Lindt Chocolate based on the price he knew KPM had previously charged Lindt, indicating to Lucas that he planned to reach out to Lindt.  (127:22-129:24; Docket No. 75-14).  Gajewski then serviced Lindt in 2020 and 2021 for Blue Sun.  On January 15, 2019, he solicited KPM customer Jungbunzlauer for PM on 3 KPM analyzers, writing in an e-mail that he hoped the customer would find the quote "more attractive."  (167:14-168:11; Docket No. 75-17).  Gajewski admitted that the customer had previously called him at KPM to complain about the cost of KPM's service.  *Id*.  On February 25, 2019, Gajewski emailed Lucas the prices that KPM had charged its customer LambWeston for services the prior year, and again suggested a discounted price to ensure Blue Sun would get the PM contract.  (Docket No. 75-20).  Furthermore, contrary to Gajewski's claim that he only did maintenance on older SpectraStar XL analyzers that KPM was no longer guaranteeing service on, discovery uncovered that he solicited orders for and then serviced newer SpectraStar XT analyzers, or older models that he knew KPM was still supporting.  (Docket No. 75-16; 143:1-16 (agreeing that KPM still supported LambWeston's KPM analyzer when he serviced it for Blue Sun in 2019)).

Gajewski's Blue Sun work while he was employed or an independent contractor for KPM was not limited to PM on KPM analyzers: he also performed calibration services, offered UCAL training, and helped customers convert their library databases so the years of data they had collected could be transferred between different manufacturers' analyzers.  At deposition, he testified that when he was a KPM employee he performed calibration services for Blue Sun on KPM analyzers for KPM customers using UCAL, KPM's proprietary software, about four or five times, including once for Post.  (Gajewski Dep. 86:7-89:23.).  In order to do this, he accessed the UCAL software using his KPM employee credentials.  *Id*.  Blue Sun collected payment for these calibration services.  *Id*.  Gajewski clarified that the calibration data he

converted between platforms only used the customer's data as opposed to any calibration datasets from KPM's database.  *Id.*  Gajewski also maintains that the UCAL trainings use the customer's licensed UCAL software, and do not involve any KPM trade secrets or confidential information.  (Gajewski Aff. ¶ 23, Docket No. 83-1).

While employed by KPM in late 2019 to early 2020, Gajewski used UCAL and KPM calibration data to generate application notes he says were meant to market UCAL's new features and encourage Blue Sun to license UCAL from KPM as their calibration development tool.  However, Blue Sun actually repurposed the application notes to sell its own Phoenix analyzers.  (Lucas Dep. 97:15-18; 99:10-14).  Application notes are a marketing tool that NIR vendors use to show how accurately an NIR analyzer measures particular sample substances compared to traditional, slower wet chemical analysis.  Gajewski stresses that he provided only the application note charts, not the underlying calibration data, to Blue Sun, but per KPM he has not produced the application notes in discovery to verify this claim.  *Id.*  At any rate, Blue Sun posted the application notes on its website, misrepresenting to potential customers that the notes reflected data from samples that were run on Phoenix NIR analyzers using calibration data developed using Blue Sun's Alligator software.  (209:8-210:4).  The false application notes remained on Blue Sun's website from January 2020 to April 2021.  (207:10-22).

When KPM terminated Gajewski, he was required and directed to return any KPM confidential information and material.  However, he "forgot: to return a thumb drive which  is "essentially a backup" of all his KPM work and contains KPM confidential information.  (Gajewski Dep. 91: 14-93:17).  The thumb drive and a copy of its contents have been turned over to Gajewski's attorney, and may by this point have been returned to KPM.  (Letter from Atty. Prickett to Atty. Gutowski, Docket No. 83-4).

Before and after his termination from KPM, Gajewski leveraged the customers he transferred from KPM to Blue Sun over the past two years for PM to try to sell Phoenix analyzers.  In February 2021 (prior to Gajewski's termination), when KPM customer Post Consumer Brands emailed Gajewski's Blue Sun email address for a quote for a new analyzer to replace an old SpectraStar XL analyzer, Gajewski offered to provide a quote for a Phoenix analyzer and assured the customer that their database could be moved from KPM's platform to Blue Sun's. (Docket No. 75-48).  In May 2021 (after Gajewski's termination), LambWeston emailed Gajewski at a non-Blue Sun email address and asked Gajewski for a quote to replace their SpectraStar analyzer.  In response, Gajewski asked the customer to use his Blue Sun email address and provided a $35,000 quote for a Phoenix 500 Food Analyzer.  (Docket No. 75-44). Per Lucas, Gajewski is now an independent contractor for Blue Sun who services and provides support on KPM analyzers and does presales and postsales for Blue Sun's Phoenix analyzers. (Lucas Dep. 26:4-7).

Lucas next approached Rachel Glenister, another KPM sales representative, in either August 2018 or early 2019, to work for Blue Sun.  Before she left KPM in July 2020, Glenister referred two KPM customers to Blue Sun that KPM could not help: Ingredion and Texas A&M. (122:12-123:22).  She was also copied on a March 19, 2020 email to Lucas from KPM client Idahoan about a trial Phoenix analyzer.  (Docket No. 75-11).  After her departure from KPM, she reached out to KPM clients Ingredion (Docket No. 75-25), Blommer Chocolate (Docket No. 75-41), and Miller Milling (Docket No. 75-49) to arrange for Blue Sun to conduct the PM on their SpectraStar analyzers, and she provided price quotes for a Phoenix analyzer to GrainCraft (Docket No. 75-42) and LambWeston (Docket No. 75-44) and Post Foods (Docket No. 75-48). She also received a purchase order from Disney. (Docket No. 75-38).

KPM alleges that Glenister caused KPM to lose at least three sales opportunities to Blue Sun, either while she was employed by KPM or in violation of her agreement not to disclose its confidential information.  On September 4, 2019, Glenister generated a $61,000 sales opportunity from Texas A&M AgriLife for KPM, but she closed the opportunity on June 9, 2020, reporting that the customer had "No Budget/Lost Funding."  (Compl. ¶ 83).  KPM has learned that Blue Sun received an order from Texas A&M AgriLife on April 20, 2020 and amended it on July 20, 2020, the date that Glenister left KPM. [4] (*Id.*).  Glenister also created a sales opportunity with Panhandle Milling while employed by KPM.  After Glenister left KPM, Panhandle placed an order with Blue Sun in late 2020.  (¶ 84).  Finally, Glenister created a sales opportunity with Agri-King, Inc. before she left KPM, but Agri-King Inc. ultimately placed an order with Blue Sun.  (¶ 85).

In September 2020, Lucas told Arnold Eilert, KPM's Applied Technology Manager, that if he moved to Blue Sun, he would be able to focus on his passion for NIR.  Eilert accepted the offer in December 2020, resigning from KPM shortly thereafter.  Although Blue Sun claims that Eilert did not perform any work on their behalf before he quit KPM, since December 2020 he has done PM for former KPM clients, including Ingredion, Olam Species, and Omega Protein.  (Lucas Dep. 152:13-18).  At Eilert's request, several weeks before Eilert began working at Blue Sun (it is unclear if he had already left KPM), Blue Sun created the email address Don Donaldson (Don@bluesunscientific.com), which Eilert used to communicate with Blue Sun clients.

---

[4] The Complaint provides two different end dates for Glenister's employment at KPM: July 10, 2020 (¶ 33) and July 20, 2020 (¶ 83).  Therefore, Blue Sun either amended its purchase order from AgriLife the day that Glenister left KPM, or ten days later.

Based on evidence submitted prior to the expedited discovery (but which could not be considered as part of the motion to dismiss), Eilert may have referred KPM customers to Blue Sun much earlier.  On January 11, 2019, Eilert sent an email from his personal email account to rob@bluesunscientific.com (Gajewski) informing him that UC San Diego Medical Center was not satisfied with KPM's human breast milk application, suggesting that Blue Sun may be able to develop a better system, musing that "someone" should reach out to the customer, and providing the customer's phone number.  (Docket No. 1-8)  In a similar vein, in January 2020 Eilert learned that KPM customer A&L Canada was planning to move its business from KPM to Blue Sun and forwarded the email chain to his personal email account rather than take any action within KPM to prevent the loss of the customer.  (Docket No. 1-14)  KPM's Sales Director learned from its client Disney that Eilert serviced its KPM analyzers in November 2020 as he always had, but billed the cost to Disney for Blue Sun (Disney apparently paid it under the mistaken belief that Blue Sun was KPM's new name for its analyzer business line).[5]

KPM also believes that Eilert has improperly retained a large collection of KPM analyzers and components and firmware that stores "instrument wavelength calibration" information at his home rather than returning them following his resignation.  (Olsen Decl. ¶ 13, Docket No. 75-2)  KPM has attached its most recent inventory of Eilert's KPM material, which dates back to 2017 (Ex. C, 75-2 at 22-68)  According to Eilert, who believes that KPM has a more recent 2020 inventory prepared at the time of his resignation, many of the items at his home were personal eBay purchases or older material set to be discarded by KPM which he removed with KPM's consent.  Nonetheless, Eilert has agreed to return any hardware or

---

[5] A court may rely on otherwise inadmissible evidence, such as hearsay, in deciding a motion for preliminary injunction. *See Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir.1986).

firmware in his possession that belongs to KPM, and to allow KPM to inspect his collection for any items it wants returned. (Eilert Aff., Docket No. 83-3).

*Confidentiality and NonCompetition Agreements Between KPM and Individual Defendants*

During their employment with KPM and before any involvement with Blue Sun, Lucas, Eilert, and Glenister each signed "Confidentiality and Non-Competition Agreements" in which they agreed, among other things, not to disclose KPM's confidential information or trade secrets. (Docket Nos. 1-1, 1-2, 1-4, 1-6).  The agreements defined confidential information broadly, including: 1) names and contact information, purchasing history and prices, and other information relating to KPM's clients or prospective clients; 2) trade secrets; 2) information about prices, products, innovations, business plans, internal practices and procedures, technologies, developments, inventions, and "any other information relating to KPM's business or its clients." *Id.*  The agreements exclude any information generally known to the public, unless that knowledge was obtained by the employee's act or omission, and they are not time-limited to the term of employment. They also required employees to return any KPM information, including confidential information, upon termination.[6]

Lucas contends that Brian Davies, the President of KPM North America, informed KPM staff in a meeting which Lucas attended in February 2018 that any KPM employment agreement prior to August 2015, when KPM purchased Unity, was unenforceable, though this was never confirmed in writing.  (Lucas Dep. 64:3-65:10).  Davies vehemently denies this.  (Davies Decl.

---

[6] Whereas Eilert, Glenister, Gajewski, and Lucas' agreements with KPM contained identical confidential information nondisclosure provisions, they contained different non-solicitation and non-competition agreements.  Because I previously dismissed KPM's claims for breach of the non-competition and non-solicitation agreements against Glenister and Lucas as unenforceable under Connecticut law and KPM did not assert breaches of those provisions against any other remaining Defendants, the non-compete provisions are not before the Court.  (*See* Compl., Count VI; Docket No. 44).

¶¶ 3-5, Docket No. 75-3).  ITG maintains that it did not ask and was not aware that any of the Individual Defendants had any confidentiality agreements with KPM when they did work for Blue Sun.  (Wilt Dep. 74:5-81:5).

### Procedural History

KPM filed this action against seven of its former employees and two corporate competitors on April 5, 2021.  (Compl., Docket No. 1).  The following day, KPM filed a motion for preliminary injunction and a motion for expedited discovery.  (Docket Nos. 7 & 8).  The complaint alleged violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, misappropriation of trade secrets, conversion, and unjust enrichment against all Defendants.  KPM also alleged breach of a non-competition agreement, breach of a nondisclosure agreement, violation of the covenant of good faith and fair dealing, and breach of the duty of loyalty against the Individual Defendants.  KPM further alleged tortious interference with contractual relations and violation of M.G.L. 93A (unfair or deceptive trade practices) against the Corporate Defendants.  The Court granted KPM's motion for expedited discovery in part, but limited its scope to: (1) ten requests for production of documents per side; (2) one R. 30(b)(6) deposition of each of the Corporate Defendants and one deposition of Robert Gajewski for KPM; (3) one deposition for the Corporate Defendants; and (4) one deposition for the Individual Defendants.  (Docket No. 44 at 3). (Docket No. 44).

While expedited discovery was underway, the Court heard arguments on Defendants' various motions to dismiss.  (Docket Nos. 20, 23, 25, 27, 29, 31, 33, & 35). On July 15, 2021, the Court dismissed: (1) all claims against Michelle Gajewski, Gregory Israelson, and Philip Ossowski; (2) the unjust enrichment claims against all remaining Defendants; (3) the conversion

11

claim against Mr. Eilert; and (4) the breach of contract claims against Ms. Glenister and Mr. Lucas premised on violation of their non-competition agreements. (Docket No. 64 at 70–71).

Following that ruling and the close of expedited discovery, the Court held a hearing on KPM's motion for preliminary injunction and provided the parties an opportunity to supplement their earlier briefing.  (Docket No. 68).

## **Legal Standard**

In evaluating a motion for preliminary injunction, courts consider four factors: (1) the likelihood the movant will succeed on the merits; (2) whether the movant is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor, and (4) that an injunction is in the public interest.  *Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011).  While all four factors must be weighed, the moving party's likelihood of success on the merits is "the touchstone of the preliminary injunction inquiry."  *Phillip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998).  "[I]f the moving party *cannot* demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *Maine Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)) (emphasis added).  The movant bears the burden of proof of each of these four factors.  *Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).

**<u>Discussion</u>**

**<u>Proposed Preliminary Injunction</u>**

Following expedited discovery and supplemental briefing, KPM moves for a preliminary injunction which would:

1. Prohibit Defendants from using or disclosing any of KPM's "Confidential Information" and trade secrets, with "Confidential Information" including "documents and data concerning research and development activities; data sets and calibration data; source code; all copies of UCAL, USCAN, or other software; technical specifications; show-how and know-how; marketing plans and strategies; pricing and costing policies; customer lists and information and accounts and nonpublic financial information."
2. Require Defendants to account for and return any KPM materials and information which belong to KPM, including any Confidential Information and trade secrets, including: 1) any USB or similar computer drives in the possession of Robert Gajewski; and 2) any KPM NIR instruments, materials, equipment, supplies, components, parts, calibrations, electronic files in the possession of Arnold Eilert.
3. Require Individual Defendants to abide by the terms of their KPM non-disclosure agreements;
4. Prohibit Defendants from offering, providing, or selling any services or products (including but not limited to maintenance, hardware, software, or data) relating to KPM NIR analyzers for the duration of this case; and
5. Prohibiting Defendants from offering, providing, or selling any Phoenix NIR analyzers to any party for which Defendants have offered, provided, or sold services or products relating to any KPM NIR analyzer sold for the duration of this case.

(Docket No. 75-1).

KPM also asks that the Court to issue the Order without requiring a security bond.

## I.     <u>Likelihood of Success on the Merits</u>

"The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.,* 287 F.3d 1, 9 (1st Cir. 2002). Considering the complaint and the additional evidence obtained through expedited discovery, I find that KPM has shown a reasonable likelihood of success on the merits

13

on its trade secret, breach of contract, tortious interference, and 93A claims, if not its conversion claims.

The Court will impose a modest adverse inference against Blue Sun due to its spoliation of evidence.  Specifically, on March 5, 2021 Blue Sun changed email providers and migrated its emails from GSuite (Gmail) to Zoho.  During the migration, which was performed by Lucas and another Blue Sun employee, GSuite deleted emails sent or received from Eilert (don@bluesunscientific.com), Gajewski (rob@bluesunscientific.com), and a third former KPM employee's accounts before March 5, 2021, because they were independent contractors without Zoho employee accounts.

Defendants argue that a Rule 37 sanction is inappropriate because "[t]he duty to preserve evidence arises when litigation is reasonably anticipated" and Blue Sun had no cause to anticipate KPM's suit before it was filed on April 5, 2021, a month after the migration, and they were able to cobble together some of the missing emails.  *Gordon v. Dreamworks Animation SKG, Inc.*, 935 F. Supp. 2d 306, 314 (D. Mass. 2013) (internal quotation marks and citation omitted).  There is nothing nefarious in changing email providers to save costs,  and no direct evidence of intentional conduct.  Yet given the context—the increasing amount of sales staff that Blue Sun had recruited from KPM, the increasing amount of KPM business Blue Sun was taking, and the fact that some of its independent contractors used emails with pseudonyms to conduct business on Blue Sun's behalf while employed by KPM—Blue Sun could have reasonably anticipated litigation and taken greater care to preserve the lost emails.  Ultimately, the adverse inference applied is not powerful enough to tip the balance of the motion for equitable relief—the weight of the additional evidence from discovery played a more decisive role.

A. *Defend Trade Secrets Act/Massachusetts Uniform Trade Secrets Act Claims (Counts 1, 2) (All Defendants)*

To establish a claim for misappropriation of trade secrets, the plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

KPM has demonstrated a likelihood of success on the merits based on Defendants' disclosure and use of its technical and non-technical trade secrets.  As to KPM's technical trade secrets, Gajewski admits that while he was employed by KPM, he used UCAL, which was licensed by KPM on his KPM-issued laptop, to perform calibration adjustments for KPM customers for which he direct payment to Blue Sun. He also generated application notes that Blue Sun used to market its own analyzers.  However, KPM has no evidence any Individual Defendant accessed GitHub, the digital vault where UCAL's source code is stored, and downloaded any data, let alone disclosed it to Blue Sun.  The only record that KPM has on GitHub shows that Gajewski created a ticket in GitHub in 2018, likely to flag a glitch or bug. (Ex. E, Docket No. 83-4).  GitHub only preserves six months of transactional history, but KPM was able to determine that no Defendant tried to clone the source code within the six months prior to April 2021.  (KPM Dep., 71:13-75:20).  Further, KPM has not established why offering UCAL training classes misappropriates a trade secret when Defendants have clarified that they rely on the customer's valid UCAL license to conduct the training.  Nor has KPM presented a cogent argument that third party repair or adjustment of a KPM analyzer's hardware violates its trade secrets, especially where ITG claims that it has manufactured component parts for KPM or serviced KPM analyzers since 2008.

Under Massachusetts law, non-technical confidential information such as customer or supplier lists can qualify as a protected trade secret. *FrontRunner HC, Inc. v. Waveland RCM, LLC*, 2020 WL 7321161 at *9 (D. Mass. Dec. 11., 2020) (citing *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass 835, 840 (1972)). There is no bright line, but Massachusetts courts consider six relevant factors when determining whether information is confidential: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Jet Spray* at 840 (citing RESTATEMENT OF TORTS § 757).

In order to persuade KPM clients to get their annual PM done by Blue Sun, Blue Sun leveraged Gajewski and Glenister's knowledge about KPM's clients, including identifying the respective client employee responsible for arranging for PM or NIR servicing, when their analyzers were due for servicing or replacement, the prices that KPM had charged clients for past servicing, the clients' prior relationship with the Individual Defendants or their faith in Gajewski and Eilert's expertise on older KPM analyzers, and how to convert a client's repository of collected data onto other manufacturers' platforms.  While the last two may not be confidential information per *Jet Spray*, it is reasonably likely that KPM will be able to establish that the client names, past purchasing and pricing information, and analyzer replacement and repair needs and timing are trade secrets.  Both Gajewski and Glenister sent emails to clients promising "more attractive" servicing prices, and at Blue Sun, together with Lucas, they crafted their price list to underbid KPM.  KPM took reasonable steps to protect that information by including client

purchasing history and prices, business plans, and product information within each Individual Defendant's non-disclosure agreement and establishing internal procedures to ensure that any KPM information or material was returned to KPM upon an employee's separation.

The Individual and Corporate Defendants maintain that such "remembered knowledge" about a former employer's clients is not an actionable trade secret. *See Oxford Global Resources, LLC v. Hernandez*, 2017 WL 2623137 (Mass. Sup. Ct. June 9, 2017) ("An employee is free to carry away his own memory of customers' names, needs, and habits and use that information, even to serve or to solicit business from those very customers."). However, the bare facts about the alleged information at issue and the Superior Court's holding that the mere identity of customers is not confidential" in *Oxford* suggests that the Blue Sun and the Individual Defendants were working with much more client information. *Id.* at 3. Unlike in *Oxford*, the record confirms that Defendants were not operating on memory alone: Gajewski sent Lucas a copy of KPM's 2018 invoice to LambWeston when he advised Lucas what prices to offer Lamb Western for Blue Sun to perform LambWeston's 2019 maintenance. (Docket No. 75-20 at 2-3). Since Gajewski was working as an independent consultant for Blue Sun and KPM simultaneously, he had access to all of KPM's records concerning client information. After his termination, the KPM thumb drive he kept and "forgot about" could also have been a source of client information beyond his personal recollection.

Applying the six-factor *Jet Spray* test, I find that the KPM client information used by Defendants was confidential. While the identity of KPM's clients may be generally known with the NIR industry, Defendants do not allege that Defendants' servicing or analyzer prices or repair and replacement schedules and anticipated needs were public knowledge, beyond one identical sentence in their affidavits. (Docket Nos. 83-1, 83-2, 83-4). Given that KPM has at

17

least 27 clients and some clients have multiple analyzers, it would be difficult for its competitors to duplicate or acquire that information for each analyzer.  *See Optos, Inc. v. Topcon Medical Systems, Inc.*, 777 F.Supp.2d 217, 239 ( D. Mass. 2011).

   B.   *Breach of Contract Claims (Count 3) (Individual Defendants)*

KPM alleges that Eilert, Gajewski, Lucas, and Glenister's work on behalf of Blue Sun violated their respective nondisclosure agreements with KPM.  To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

As discussed *supra*, § I.A.Trade Secrets, it is reasonably likely that KPM will be able to prove that the manner in which the Individual Defendants solicited KPM clients for Blue Sun using KPM's confidential client information breached their contractual obligations to KPM.  At this point KPM has not produced enough evidence to show a reasonable likelihood of success on the merits that either Lucas, Eilert, and/or Gajewski improperly used their knowledge about UCal to help Blue Sun develop Alligator (Glenister had no involvement), that Gajewski's thumb drive or Eilert's personal KPM inventory violated their agreements with KPM, or that any Individual Defendant accessed UCal's source code.  However, it is highly likely that Gajewski's use of his KPM UCal software to develop calibration equations for KPM clients on Blue Sun's behalf violated his contractual obligations to KPM, as KPM limits access to UCal by licensing it.

   C.   *Breach of Duty of Loyalty and Breach of Covenant of Good Faith and Fair Dealing (Counts 4, 5) (Individual Defendants)*

In order to recover on an implied duty of good faith and fair dealing claim, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the

defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *Boyle v. Douglas Dynamics, LLC*, 292 F.Supp.2d 198, 209-10 (D. Mass. 2003). A duty of loyalty only attaches to employees who occupy positions of trust and confidence, which includes corporate officers, executives, partners, directors, and extends to certain rank and file employees who are given access to confidential information, such as law firm associates. *TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 265-66 (D. Mass. 2008).

Assuming that KPM can prove at trial that its customer information is confidential, then KPM has a reasonable likelihood of success on the merits of its good faith and fair dealing claims and breach of duty of loyalty claims because all four Individual Defendants had access to that information and have used it to help Blue Sun to KPM's detriment.

D.  *Tortious Interference with Contractual Relations Claims (Count 7) (Corporate Defendants)*

To prevail on a tortious interference claim, a plaintiff must show that: "(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract [by inhibiting the third party's or the plaintiff's performance thereof, depending on the theory]; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *O'Donnell v. Boggs*, 611 F.3d 50, 54 (1st Cir. 2010) (quoting *Harrison v. NetCentric Corp.*, 744 N.E.2d 622, 630 (Mass. 2001)).

Defendants concede that Lucas, the President of Blue Sun, was aware of the Confidentiality and Non-Competition Agreements binding himself, Gajewski, Eilert, and Glenister from disclosing KPM's confidential information during or after their employment. His testimony that KPM's North America President announced the agreements were unenforceable in a 2018 meeting was flatly contradicted by the purported speaker, and further undercut because

19

the record shows that KPM sought to enforce the agreement against Glenister in an October 5, 2020 letter.  (Docket Nos. 75-3, 75-52).  Furthermore, it was not reasonable for Lucas to rely on such a statement when the plain terms of his own agreement (and the others' agreements) state that any amendment must be made in writing.  (¶ 7, Docket No. 1-4).  The fact that Blue Sun provided Blue Sun email addresses for Gajewski and Eilert using fake names (Rob Roberts and Don Donaldson) while they were employed by KPM also creates a clear inference that Blue Sun was aware the interference was improper.  Given that Lucas accepted information that could be categorized as confidential from Glenister and Gajewski and used that information to solicit KPM's customers, KPM has shown a likelihood of success on its tortious interference claim against Blue Sun, if not ITG.

     E. _Conversion Claims (Count 8) (Gajewski, Glenister, Lucas, Corporate Defendants)_

     To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." _United States v. Peabody Const. Co., Inc._, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing _Evergreen Marine Corp. v. Six Consignments of Frozen Scallops_, 4 F.3d 90, 95 (1st Cir. 1993)).  As the Court previously acknowledged, Massachusetts law regarding conversion claims for trade secret theft is fuzzy.  However, the Commonwealth appears to have adopted the merger doctrine, under which a viable conversion claim exists where intangible property has merged with or been contained in a physical object which _can_ be converted. _See Sentient Jet v. Apollo Jets, LLC_, No. 13-CV-10081, 2014 WL 1004112, at *11 (D. Mass. Mar. 17, 2014); _Governo Law Firm LLC v. Bergeron,_ 166 N.E.3d 416,

422 (Mass. 2021) (concluding that law firm's electronic databases that were downloaded onto a removable electronic device were property subject to conversion claim).

At this preliminary stage, Plaintiff has not established a likelihood of success on the merits as to conversion.  When I denied all but Eilert's motion to dismiss the conversion claim, I observed that discovery might reveal that either Corporate Defendants, Gajewski, Lucas, or Glenister transferred or downloaded KPM's confidential client information onto a physical object. Expedited discovery has not unearthed any such evidence as to Lucas, Glenister, ITG, or Blue Sun. However, expedited discovery did reveal that Gajewski transferred a "back-up" of all of his KPM work onto a thumb drive that he did not return to KPM upon his termination.  While this thumb drive could, hypothetically, support a conversion charge, Gajewski has offered an unrebutted explanation that he created the drive at the request of KPM's managed services provider to assist in transferring data to a new KPM work computer, and forgot to return it, negating any intentional act.  (Docket No. 83-1 ¶ 10).  Furthermore, there is no evidence that Gajewski used the information on the thumb drive to harm KPM.

    *F. 93A (Count 10) (Corporate Defendants) (Lucas)*

For the reasons previously discussed, the Court finds that KPM has established a reasonable likelihood of success on the merits against Blue Sun.

**II.**    **Irreparable Harm**

No preliminary injunction should issue absent "a real threat of harm" because they are "strong medicine" that "should not issue merely to calm the imaginings of a movant."  *Matos ex rel. Matos v. Clinton School Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).  But irreparable harm is presumed "[w]hen a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim."  *Optos, Inc. v. Topcon Medical Systems, Inc.*, 777 F.Supp. 2d 217, 241 (D. Mass. 2011) (collecting cases).

Even if that special presumption did not apply, there is still evidence of irreparable harm here.  Some of KPM's damages can be easily quantified, such as the amount that of revenue that Blue Sun earned performing PM, calibration services, or UCal classes to KPM customers it diverted using KPM's confidential information obtained by the Individual Defendants in the course of their own work for KPM.  There seems to be no imminent danger that Defendants will use UCal to perform calibration adjustments or create more application notes to market Phoenix analyzers because UCal can only run on a computer for which KPM has issued a license key, and none of the Defendants has such a key.  (KPM Dep. 153:20-23).  However, the record shows that Defendants' actions to divert KPM customers are ongoing, suggesting a high possibility of future harm, and that they have caused customer confusion and alarm, which likely affects KPM's goodwill.  For example, KPM customer Disney emailed Eilert and two other KPM employees at their KPM email addresses asking for a SpectraStar PM quote asking, "Are you still blue sun scientific?" (Docket No. 75-2 at 10).  Furthermore, loss of market share and business relationships may independently constitute irreparable harm.  *Schwabel v. Conair Corp.*, 122 F.Supp.2d 71, 84-85 (D. Mass. 2000).  KPM has lost 47.5% of its NIR-based service revenue and 42.7% of its entire NIR-based revenue over the prior three years; some of that loss may be due to factors beyond Blue Sun's conduct, making damages more difficult to precisely measure. KPM stands to lose future PM and analyzer sales opportunities as a result of Defendants' actions.

### III.  **Balance of the Hardships**

I find that the balance of hardships weighs in KPM's favor, but not as to the full scope of its proposed preliminary injunction.

KPM's requests that Eilert and Gajewski return KPM material in their possession, that Defendants refrain from using or disclosing KPM's confidential information, and that the

Individual Defendants abide by the terms of their non-disclosure agreements with KPM concerning the treatment of confidential information would restore a fair playing field and do not impose undue hardship on the Individual Defendants or Corporate Defendants because compliance with trade secret law is no hardship.  There can be no doubt that allowing the Individual Defendants to continue to leverage their confidential information about KPM to steal its customers while this case pends presents a serious hardship for KPM.  However, ordering ITG to cease servicing or selling any hardware, software, or data related to any KPM analyzer is overbroad and would substantially impact ITG's business. ITG manufactured all the SpectraStar analyzers prior to 2016 and has been in the business of supplying replacement parts and servicing KPM analyzers, without any objection by KPM, since before the formation of Blue Sun and the advent of this dispute.

Unlike ITG, Blue Sun did not service or sell SpectraStar services or products before this dispute.  Furthermore, Blue Sun maintains that the sale of Phoenix analyzers are its core business, their business is focused on replacing obsolete Foss analyzers, and that they have only sold one Phoenix analyzer to a former KPM customer.  (Lucas Dep. 183: 16-21).  Enjoining Blue Sun from selling Phoenix analyzer products or servicing KPM SpectraStar analyzers during this lawsuit would not result in severe hardship.  *Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 244 (D. Mass.), *aff'd*, 731 F.3d 6 (1st Cir. 2013) (injunction justified where imposition would only prevent Defendant from soliciting "a fairly tiny slice of the total market").

IV.   **Public Interest**

In this case, the public interest supports enforcing the Individual Defendants' contractual obligations and protecting KPM's right to its confidential information. Blue Sun's President was

well aware of these issues when he leveraged the Individual Defendants' confidential information about KPM to convert KPM customers into Blue Sun customers.

The Individual Defendants argue that barring them from servicing KPM analyzers during this suit would deny the public much-needed service on their older KPM analyzers, in light of their claims that KPM no longer guarantees service on its older SpectraStar analyzers.  But there is contradictory evidence in the record about the extent of this KPM policy.  Its main proponent is Gajewski, who cannot show that any of the KPM clients he serviced for Blue Sun would have been turned away by KPM because he serviced those clients secretly through his consultancy rather than inform KPM.  Therefore, there is no evidence on the record that KPM ever refused to service any of the customers Defendants moved to Blue Sun.  (Blue Sun Dep. 85:22-25, 86:1-3; Gajewski Dep. 211:13-22; Olson Dep. 51:22-25, 52:2-8, 53:21-24, 54:2-9.).  Given that reality, such a public interest seems speculative.

## V.    **Motion to File Reply Brief**

KPM's motion for leave to file a reply brief (Document No. 89) is ***denied***.  When the Court set the expedited discovery and briefing schedule, its goal was to condense consideration of the preliminary injunction order, which has been pending more than four months due to the request for expedited discovery, not extend it.  Some of the new evidence in the proposed reply, such as the declaration from KPM Vice President that KPM would never license UCal to a direct competitor like Blue Sun, could have been submitted in KPM's first supplemental brief because Defendants made the underlying argument KPM seeks to rebut through that corporate officer during the preliminary injunction hearing.

### Conclusion

For the reasons set forth above KPM's motion for preliminary injunction is ***granted in part and denied in part***.  KPM shall post a $70,000 bond as security with the Clerk of Court. A separate order setting forth the terms of the injunction shall follow.

**SO ORDERED.**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**