# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KPM ANALYTICS NORTH AMERICA CORPORATION,<br><br>*Plaintiff.*<br><br>V.<br><br>BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, MICHELLE GAJEWSKI, ROBERT GAJEWSKI, RACHAEL GLENISTER, GREGORY ISRAELSON, IRVIN LUCAS, AND PHILIP OSSOWSKI,<br><br>*Defendants.* | Civil Action No. 21-10572-MRG |

## JOINT PRETRIAL MEMORANDUM

Pursuant to the Court's April 12, 2023 Order amending pre-trial deadlines  (ECF No. 179), Plaintiff, KPM Analytics North America Corporation ("KPM" or "Plaintiff"), and the Defendants, Blue Sun Scientific, LLC ("Blue Sun"), The Innovative Technologies Group & Co., Ltd. ("ITG"), Arnold Eilert, Robert Gajewski, Rachael Glenister, and Irvin Lucas (together, the "Individual Defendants") hereby submit this Joint Pretrial Memorandum. Where possible, the parties have submitted agreed-upon documents and sections, and separate documents or sections where the parties did not reach agreement.  By submitting this Joint Pretrial Memorandum, the parties do not intend to waive any arguments, or otherwise indicate agreement with the positions or contentions unless explicitly stated.

1.  **Concise Summary of the Evidence**

The following are the parties' respective summaries of the evidence that each party anticipates will be presented at trial. They are not intended to be a complete statement of every fact that will be adduced at trial, and each side reserves the right to submit additional evidence, based on, among other things, the manner in which the case unfolds at trial.

A.  *Plaintiff*

KPM is a Massachusetts company located in Westborough, and a global leader in scientific instrumentation focused on analyzing critical quality parameters in the food, agricultural, industrial, environmental, and clinical industries. Particularly relevant for this case, KPM manufactures, sells, and services a line of machines known as near-infrared ("NIR") analyzers named the "SpectraStar". NIR analyzers perform spectrographic analysis of the substances that comprise many common products, including human and pet food. Spectroscopy is a scientific technique that measures the diffraction of light through a given substance to help determine the composition of that substance. These analyzers are used to determine the composition of a wide variety of substances and their attributes including, for example, the amount of moisture, oil, or protein found in products such as flour, agricultural ingredients, chocolate, and processed foods.

Unity Scientific, Inc. ("Unity")—now a division of KPM— was founded in 2001 to better address customers' needs with an easier to use, more reliable, and more accurate NIR analyzer at a competitive price point. In 2001, Unity introduced the SpectraStar 2200 Spinning Drawer, the first truly standalone NIR multi-constituent measuring device that eliminated the need for an external computer. Since then, Unity has introduced improved and advanced models, including the SpectraStar 2500, and XL series. Starting in 2016, Unity introduced its SpectraStar XT series,

the best performing NIR instrument on the market today in terms of modern feel and ease of operation.

All of these NIR analyzers utilize KPM's proprietary technologies and know-how, which are based on mathematical models that allow the user to measure the contents of a sample material with a high level of accuracy. KPM's NIR analyzers can analyze several samples in less than one minute, compared to reference laboratory results that can take three-to-five days and at a higher cost. To achieve such performance, KPM's products measure the substance(s) being analyzed and integrate those observed results with calibration data in order to perform specific analyses for specific samples. Building calibration data is a complex process that is completed by chemometricians who are trained to extract information from chemical systems using data collection techniques and tools like signal processing, pattern recognition, mathematical modeling, and statistical analysis. Calibration data development requires significant time and investment to ensure accuracy, especially when analyzing organic materials that vary according to many factors, including the season, geography, grain type, spectroscopic scatter and temperature.

Over the years, KPM has developed extensive calibration databases applying these collection techniques and tools to many years of crop testing, season after season. KPM's database contains tens-of-thousands of samples, collected over several decades, geographies, droughts, rainy seasons, crop diseases, recoveries, etc. These data sets were collected over long-time frames by partnering with KPM's customers for over 20 years. By way of example, the KPM standard library today has over 500,000 reference chemistry values, and that standard library represents only roughly 50% of the data in KPM's database library. It would require decades of effort and significant investments, partnering with an extensive host of customers over several harvest seasons, for a competitor to replicate such a database library asset.

In utilizing an NIR analyzer, once the spectroscopy is performed and referenced to the appropriate calibration library dataset(s), the results are reported out to the customer utilizing KPM's proprietary software called UCAL.  The UCAL software has been in a continuous mode of development for over 14 years.  This continued development has required the support of software developers, contractors, testers, and mathematicians.  The UCAL software has been developed through extensive investment and is a critical tool needed to support KPM's NIR analyzers.  A significant investment and several years of effort would be required to replace or replicate UCAL from the ground up.

KPM takes very seriously the need to safeguard its trade secrets and confidential information, which include research and development activities, data sets and calibration data, source code, proprietary software, technical specifications, marketing plans and strategies, pricing and costing policies, customer lists and product usage information, and accounts and non-public financial information.  This includes the source code KPM uses to create calibrations and execute them on their analyzers as well as the information from its customers with whom KPM has with over the years.  All calibration datasets and reference values are stored on a protected, confidential Windows File Server. Source code for applications that run KPM's analyzers and create its calibrations are stored in secure vaults using GitHub.

Only specific employees and consultants that work with this information and these materials are granted access to the protected locations where they are stored.  Users that must work with the data or software on a local computer have backup agents installed to protect the data. There are procedures in place with KPM's managed IT provider that require management sign-off for permissions and has access-control processes.  KPM treats this information as highly protected and does not share it with anyone else unless pursuant to strict non-disclosure arrangements.

Similarly, non-disclosure and confidentiality agreements are also maintained for KPM's employees and personnel.

The Individual Defendants—Arnold Eilert, Robert Gajewski, Rachael Glenister, and Irvin Lucas—each were contractually obligated to maintain as confidential and not disclose KPM's trade secrets and confidential information as conditions of their employment with KPM in addition to their statutory and common law obligations to maintain the secrecy of KPM's trade secrets. Each of the Individual Defendants breached their contractual obligations to KPM by misusing and disclosing KPM's trade secrets and confidential information to assist a competitor—Defendant Blue Sun Scientific, LLC ("Blue Sun")— and its corporate parent in competing with KPM.

Blue Sun was created in 2018 by Robert Wilt and his company—Defendant The Innovative Technologies Group & Co., Ltd. ("ITG")—at Irvin Lucas' urging.  Mr. Lucas was still employed at KPM during this time, and continued to work for KPM for almost a year, until May of 2019, before resigning from KPM to become the president of Blue Sun.  At the time of its creation and since, all of Blue Sun's employee hires were former employees of KPM. This was no coincidence, because Mr. Lucas began recruiting his KPM colleagues to work for Blue Sun while he and they were still employed at KPM.  In order to poach these KPM employees, Blue Sun established pseudonymous email accounts for Mr. Gajewski, Mr. Eilert, and others, which they subsequently failed to preserve on the eve of the filing of this lawsuit.[1]

Along with Irvin Lucas, Individual Defendants Arnold Eilert, Robert Gajewski, and Rachael Glenister all became employees of Blue Sun.  Blue Sun, and in particular Irvin Lucas and

---

[1] This destruction of the secretive email accounts led Judge Hillman to determine that an adverse inference against Blue Sun was warranted when ruling on the preliminary injunction.  *See* ECF No. 93 at 14 ("The Court will impose a modest adverse inference against Blue Sun due to its spoliation of evidence.").  Nothing subsequently learned in completing discovery in this case has changed that determination.

Robert Gajewski misappropriated and misused KPM's proprietary, confidential and trade secret calibration data libraries and UCAL calibration software to generate Application Notes showing the capabilities of KPM's SpectraStar analyzers. They then passed them off as Blue Sun's own Application Notes purporting to show the capabilities of Defendants' competing "Phoenix" analyzer.  Despite the fact that none of the analysis and data in any of these fraudulent Application Notes had ever been performed or measured on a Phoenix analyzer, Defendants used these Application Notes on Blue Sun's website for over a year to claim that the Phoenix can perform and analyze substances in the exact same way as KPM's SpectraStars.  Using this misappropriated and misused proprietary and confidential information, Defendants then unfairly competed with KPM by seeking to move KPM's customers from KPM and the SpectraStar to Blue Sun/ITG and their Phoenix. They also sought new customers for the Phoenix with these misrepresented capabilities.

Defendants misappropriated, misused and disclosed KPM's trade secrets and confidential information, including customer pricing information, details about the customers' use of SpectraStar analyzers, KPM's calibration data sets, and other competitively sensitive business information, to solicit existing KPM customers and divert them away from KPM and to Blue Sun. Indeed, when KPM's customers needed annual servicing, "Preventative Maintenance" and/or adjustments to the calibrations for their SpectraStars the Defendants took those service calls and diverted them to Blue Sun, then traveled to and performed the servicing with the customers, and had Blue Sun bill and collect approximately $3,000-5,000 per analyzer each year, all without KPM's knowledge.  Defendants, in several cases, also then sought to sell the customers new Phoenix analyzers manufactured by ITG and sold by Blue Sun.  Much of this activity occurred while the Individual Defendants were still employed at KPM and were still collecting paychecks

6

every month from KPM.  In fact, in the case of Robert Gajewski, for the entire period of May 2019 through April 2021 he was working for both Blue Sun and KPM at the same time without KPM's knowledge or consent. All of this occurred despite Blue Sun's knowledge of the Individual Defendants' contractual agreements with KPM.

KPM brings claims against all Defendants collectively, against the Individual Defendants, and against the entity defendants (Blue Sun and ITG).  KPM's first two claims are against all Defendants for misappropriating KPM's trade secrets under state and federal law.  KPM next brings claims for breach of contract, breach of the duty of loyalty, and breach of the duty of good faith and fair dealing against each of the Individual Defendants for misusing and disclosing KPM's trade secrets and confidential information to aid a competitor. Finally, KPM brings claims for tortious interference with contractual relationships and unfair and deceptive trade practices against Blue Sun and ITG, for which both are directly liable and for which ITG is liable as the alter ego of Blue Sun.  The actions of each Defendant, collectively and individually, caused damage to KPM in the amount of $ $6,526,452,[2] and the harm have they caused to KPM, its NIR analyzer business, and its customer relationships is ongoing.

---

[2] This figure comprises the amount calculated by KPM's damages expert as owed by the Entity Defendants, with both ITG and Blue Sun liable for that amount jointly and severally due to the combined damages caused and received by each of them, and with each of the Individual Defendants jointly and severally liable for different sub-portions thereof as detailed in the Report of Mr. Zoltowski.  It represents the actual past damages figure prior to any addition of ongoing damages, pre- and post-judgment interest, potential trebling, and any award of attorneys' fees, and is based upon financial information produced by Defendants to-date in discovery.  KPM has requested, and Defendants have promised but have yet to produce, update financial information to allow for this figure to be updated through time of trial.  KPM will update this figure as soon as Defendants complete their promised supplementation under Fed. R. Civ. P. 26.

**B.** *Defendants*

The evidence at trial will show that the Individual Defendants have acted lawfully and have not misappropriated any trade secret or confidential information of KPM while working on behalf of Blue Sun and that the Entity Defendants have not knowingly benefited from any use of any alleged trade secret or confidential information of KPM.  With respect to KPM source code, the evidence will show that only Mr. Gajewski even had access to the source code, which is retained in a secure online depository called GitHub, which tracks each user's access and activity.  KPM has admitted that it has no evidence that Mr. Gajewski even accessed GitHub in the years prior to his termination from KPM, let alone any evidence that he or any of the other Individual Defendants have disclosed any source code to Blue Sun.  Moreover, Blue Sun does not even have access to the source code of its Alligator software; Alligator was created and is owned by a German software developer.  In addition, ITG has never utilized any trade secret of KPM's in its design and manufacture of its NIR analyzers.  In fact, ITG and its President and CEO, Robert Wilt, designed, patented, and manufactured the Unity SpectraStar NIR Analyzers in whole or in part, a predecessor to KPM's NIR analyzer, and are intimately familiar with their hardware and operation and are under no direct non-compete agreement nor have any confidentiality obligations to KPM.

KPM has also alleged that the Individual Defendants misappropriated so-called "calibration datasets" owned by KPM and shared them with Blue Sun.  But the evidence will show that the Individual Defendants have never provided any data to Blue Sun, nor is that data even property of KPM.  First, Blue Sun does not even provide calibration datasets to its customers.  Throughout its entire existence, Blue Sun has never sold a single calibration to any customer of KPM or otherwise.  Second, KPM does not own the data it claims is a KPM trade secret.  That data is the property of customers that pay to have it created.  Customers create so-called "samples"

by having certain materials (in this case, often food materials) analyzed through a process known as "wet chemistry," which the customer pays for.  The customer then uploads the results of those analyses to its NIR analyzer (again, a device owned by the customer).  Occasionally, the customer will request KPM's assistance in creating a "calibration," which is nothing more than a computer file that "calibrates" the machine to ensure that its predictions match up with the more-accurate wet chemistry results that the customer previously provided.  When a customer requests this assistance from KPM, KPM retains the underlying customer data.

The data (*i.e.*, the samples) on KPM's SpectraStar analyzers is stored on the machine in a .svf file.  The calibration on a SpectraStar is known as a .prd file.  The .svf file contains data that is entirely owned by the customer.  And the data from a .svf file can be transferred from a SpectraStar to NIR analyzers manufactured by other companies.  There is no evidence that any of the Individual Defendants have ever provided a calibration to Blue Sun, nor would Blue Sun have any need for a KPM calibration.  Blue Sun (like other manufacturers, including KPM), is able to transfer the customer's data from their prior analyzer to a new analyzer, where a new calibration file is generated to operate on the new analyzer.  And Blue Sun has only transferred data from one customer's SpectraStars; the vast majority of its business comes from replacing analyzers manufactured by other companies.

KPM has pointed to an instance where Mr. Gajewski created so-called "application notes" using KPM software, UCal, and then provided the application notes to Blue Sun.  While it is true that Mr. Gajewski used his copy of UCal to create the application notes, the evidence will show that Mr. Gajewski was attempting to convince Blue Sun to adopt UCal as the software for its Phoenix NIR device, which would yield substantial revenue to KPM in the form of runtime licenses on every Phoenix sold.  In any event, the application notes themselves are not trade secrets,

and Mr. Gajewski never shared any calibration data with Blue Sun.  The application notes merely contain a scatterplot graph that any UCal user could create.  In other words, no actual data was shared with Blue Sun, so Blue Sun could not have unlawfully used or benefited from the use of any such information.

KPM has also claimed that Mr. Gajewski breached his fiduciary duty/duty of loyalty to KPM and disclosed confidential information and trade secrets to Blue Sun by performing service on SpectraStars while employed by KPM.  But the evidence will show that Mr. Gajewski did not owe a fiduciary duty to KPM.  He was not an officer or director of KPM, nor did he have any real management responsibility.  He was, at best, a mid-level employee.  And even if he did owe such a duty, KPM cannot show that it suffered any damage as a result of his service work.  KPM decided to no longer guarantee service of older SpectraStar models and instructed Mr. Gajewski to not pursue service of such models so that the customer would be forced to buy a new model.  In other words, KPM was not interested in servicing many of the analyzers Mr. Gajewski was servicing in his spare time.  Moreover, KPM's damages expert has not attempted to quantify the profits that KPM lost out on by Mr. Gajewski's service work (which if calculated, would likely be less than the jurisdictional limit for damages in a federal court diversity action).

The evidence will also show that the Defendants have not misappropriated any "customer information" that qualifies as a trade secret.  None of the Individual Defendants downloaded or otherwise took any customer information with them, including any customer lists or pricing information.  Mr. Gajewski inadvertently retained an external hard drive that was previously used to transfer data from one KPM computer to another, but there is no evidence that Mr. Gajewski used any of that information and it has been returned to KPM (and KPM has since made no

allegations that Mr. Gajewski misused that information).[3]  Otherwise, any information that the Individual Defendants, and through them Blue Sun, know about KPM's customers is publicly available or information that could easily be obtained from the customer, which cannot qualify as a trade secret.  This includes information such as KPM pricing (which information is commonly shared by customers in the industry to obtain better pricing from competitors), the number of NIR analyzers owned by the customer, and the customer's servicing needs.  Indeed, the Individual Defendants collectively have decades of experience in the NIR industry (much of which occurred before they even joined Unity/KPM) and they are allowed to use that information on behalf of a competitor.

Moreover, KPM cannot show that ITG ever had access to or accessed any "customer information" from KPM.  ITG has been a designer and manufacturer of NIR analyzer equipment for decades.  In 1997, ITG created a company called Unity Scientific, which designed and patented the original "Spectrastar" brand which is now sold by KPM.  KPM got into the NIR business by acquiring a company called Westco Scientific (which had earlier acquired Unity).  ITG designs and manufactures the NIR analyzer machines, and sells them to Blue Sun.  Blue Sun in turn sells the machines to its customers, and remits 65% of the machine price to ITG.  Blue Sun has full authority to hire and fire employees, pursue its sales strategy, and set its own pricing. While ITG is the sole LLC member of Blue Sun, there has been no intermingling of activity between ITG and Blue Sun, or any ambiguity about the manner and capacity in which the two entities and their representatives were acting.  ITG was not aware that the Individual Defendants had employment agreements with KPM that contained noncompete and confidentiality obligations prior to Blue

---

[3] KPM also has no evidence to show that ITG had knowledge that any of the Individual Defendants were in possession of any alleged KPM trade secrets, assuming *arguendo* that the "customer information" was a trade secret.

Sun's hiring of these individuals and never asked Mr. Lucas nor any other Blue Sun employee or potential employee about any restrictions from or contractual obligations to KPM. Also, ITG has never assisted Blue Sun in its efforts to service a KPM Spectrastar machine and does not receive any revenue for preventative maintenance work Blue Sun performs for its customers, including any customers who own KPM machines.

KPM will not be able to establish any damages resulting from any of the Individual Defendants' or Entity Defendants' conduct. KPM cannot identify a single sale that KPM would have received but for the Individual Defendants' or Entity Defendants' conduct. Nor can KPM offer any evidence that the Individual Defendants or Entity Defendants used any KPM confidential information or trade secrets to sell any analyzers. Indeed, it is common in the industry for a customer to own analyzers manufactured by multiple companies, yet KPM unreasonably claims that it is entitled to the profits from every Blue Sun analyzer sale, effectively presuming that the customer would have otherwise purchased from KPM, rather than several other manufacturers that have much larger shares of the NIR market. KPM does this, despite the fact that Blue Sun only sold NIR analyzers to one customer that replaced its SpectraStar analyzer with a Blue Sun Phoenix. And, as stated above, KPM has not even attempted to quantify any lost profits resulting from any servicing work performed by Mr. Gajewski.

Ultimately, the evidence will show that each of the Individual Defendants was permitted to leave KPM and to join a competitor. Blue Sun's success in providing sales and service to customers is based on those customers' preference to work with Blue Sun and the Individual Defendants, not due to any KPM trade secrets or confidential information the Individual Defendants allegedly misappropriated. ITG had no knowledge of any Blue Sun's employees'

contractual obligations to KPM, and has never had access to or accessed any KPM trade secrets or confidential information nor benefited from Blue Sun's alleged use of KPM's trade secrets.

**2.   Statement of Facts Established by the Pleadings, by Admissions, or by Stipulations**

1.      KPM is a corporation formed under the laws of the State of Delaware with a principal place of business located at 8 Technology Drive, Westborough, Massachusetts.  Unity Scientific, Inc., now a division of KPM, is also headquartered in Westborough, Massachusetts.

2.      Blue Sun is a limited liability company organized under the laws of the State of Maryland, with a principal office located at 8017 Dorsey Run Road, Suite H, Jessup, Maryland.

3.      ITG is the parent corporation of Blue Sun and is incorporated under the laws of the State of Maryland with a principal office also located at 8017 Dorsey Run Road, Suite H, Jessup, Maryland.

4.      Defendant Arnold Eilert is an individual residing in Wauconda, Illinois.

5.      Defendant Robert Gajewski is an individual residing in North Aurora, Illinois.

6.      Defendant Rachael Glenister is an individual residing in Colorado Springs, Colorado.

7.      Defendant Irvin Lucas is an individual residing in North Hollywood, California.

8.      Plaintiff and Defendants are citizens of different states.

9.      KPM now operates a business unit which was previously known as Unity Scientific, which makes and markets instruments known as SpectraStars.  SpectraStars are near-infrared ("NIR") analyzers, that perform spectrographic analysis to analyze the composition of various substances found in many common products, including human and pet food products.

10.     Spectroscopy is a scientific technique that measures the diffraction of light or other electromagnetic radiation propagated through a given substance to help determine the composition

of that substance.  NIR spectroscopy specifically uses a portion of the infrared electromagnetic spectrum (infrared light) to determine the composition of a wide variety of substances.

11.     NIR spectroscopy is a non-destructive spectroscopic method that uses NIR light to measure molecular overtone and combination bands. These bands are broad and create a complex spectrum in which it can be difficult to assign specific features to specific chemical components. Therefore, building calibrations is completed by chemometricians that are trained to extract information from the chemical systems using data collection techniques and tools like signal processing, pattern recognition, mathematical modeling, and statistical analysis.

12.     KPM manufactures, and has manufactured, a variety of SpectraStar NIR analyzers that are used in this sort of spectroscopy.

13.     Unity Scientific was founded in 2001 to better address customers' needs with an easier to use, more reliable and more accurate NIR analyzer, at a competitive price point.  Designed to measure substances and their attributes such as moisture, oil, or protein found in products such as flour, agricultural ingredients, chocolate and processed foods.

14.     KPM's SpectraStar analyzers integrate observed results with calibration data in order to perform specific analyses for clients and customers.

15.     Arnold Eilert became an employee of Unity Scientific, now KPM, in January of 2003 and his last day of employment with KPM was December 31, 2020.  Mr. Eilert is now an employee of Blue Sun.

16.     Mr. Eilert signed a confidentiality and non-competition agreement with KPM on September 30, 2008 (the "Eilert Agreement").

17.     Mr. Eilert had access to KPM's datasets, source code, other technical information and certain customer information, of KPM which was not otherwise known to him aside from in his capacity as a KPM employee.

18.     Rachael Glenister became an employee of KPM in August of 2015 and her last day of employment with KPM was July 10, 2020.  Ms. Glenister is now an employee of Blue Sun.

19.     Ms. Glenister had access to certain customer information of KPM in her capacity as a KPM employee.

20.     Ms. Glenister signed a confidentiality and non-competition agreement with KPM on August 23, 2015 (the "Glenister Agreement").

21.     Irvin Lucas became an employee of KPM in January of 2015 and his last day of employment with KPM was on May 20, 2019.  Mr. Lucas is now the president of Blue Sun.

22.     Mr. Lucas had access to certain customer information, and at least through the other defendants, technical information, of KPM, which was not otherwise known to him aside from in his capacity as a KPM employee.

23.     Mr. Lucas signed a confidentiality and non-competition agreement with KPM on January 5, 2015 (the "Lucas Agreement").

24.     Robert Gajewski became an employee of Unity Scientific, now KPM, in 2003 and his last day of employment with KPM was January 31, 2019.  Mr. Gajewski subsequently became an independent contractor from February 1, 2019 until May 13, 2019.  Mr. Gajewski then resumed employment with KPM on May 13, 2019.  KPM terminated Mr. Gajewski's employment on April 5, 2021.

25.     Mr. Gajewski had access to KPM's datasets, source code, other technical information and certain customer information, which was not otherwise known to him aside from in his capacity as a KPM employee.

26.     Mr. Gajewski signed a confidentiality and non-competition agreement with KPM on September 25, 2008 (the "Gajewski Agreement").

27.     Each of the Individual Defendants entered into a contract with KPM to maintain as confidential and not use or disclose KPM's trade secrets after leaving KPM's employ.

28.     On January 11, 2019, KPM's then employee, Arnold Eilert, sent an email from his personal email account to KPM employee Michelle Gajewski at her unityscientific.com email address and also to the address "rob@bluesunscientific.com", operated by Robert Gajewski, who at that time was an employee of KPM.

29.     On July 18-19, 2019, Robert Gajewski, then a full-time employee of KPM, traveled to long-time KPM customer Post Foods in Battle Creek, Michigan to service thirteen pieces of equipment. The machines that Mr. Gajewski was servicing were KPM's NIR analyzer machines. The documentation (the "Post Documentation") supporting that visit, however, appears on Blue Sun letterhead and identifies Mr. Gajewski as the "Blue Sun Service Engineer."

30.     On August 14, 2019, KPM customer Lamb Weston sent an email to then KPM employees Robert Gajewski at the "rob@bluesunscientific.com" email address, and his wife Michelle Gajewski at her unityscientific.com email address.

31.     On January 17, 2020, KPM customer Olam sent an email to Robert Gajewski at his kpmanalytics.com email account and also to Irvin Lucas, who was then employed at Blue Sun, about questions regarding existing KPM analyzer equipment at Olam.

32.     In January 20, 2020, KPM customer A&L Canada Laboratories forwarded to then KPM employee Arnold Eilert an email dated January 14, 2020, which discussed transitioning from KPM to Blue Sun.  Mr. Eilert forwarded the email chain from his KPM email account to his personal email account.

33.     Beginning on February 6, 2020 through March 30, 2020, Robert Gajewski exchanged emails concerning NIR analyzer replacement parts with KPM customer ProAnalytics Pty Ltd., a distributor of KPM's products in Australia, and with Irvin Lucas, then working at Blue Sun.  Some of these emails were sent to and from Mr. Gajewski's Blue Sun email address, and others were sent to and from his KPM email address.  ProAnalytics ultimately purchased the replacement parts from Blue Sun rather than KPM.

34.     On March 26, 2020, KPM's customer Post Consumer Brands sent an email to Robert Gajewski at his unityscientific.com email address stating: "Attached you will find the [purchase order] for the NIR curve calibrations."  The purchase order attached to the email identifies the Supplier as "Blue Sun Scientific LLC." The attachment also references a quote given to Post by Mr. Gajewski on March 23, 2020, while he was employed by KPM, to perform work for Blue Sun on the KPM analyzer equipment located at KPM's customer Post property.

35.     Blue Sun received an order from Texas A&M AgriLife on April 20, 2020 and amended it on July 20, 2020.

36.     As of March 29, 2021, Blue Sun has published 34 application notes on its website about its NIR products.  The author of these application notes is identified as Robert Gajewski.

37.     For each data point shown in an application note there is a unique sample that has been measured using NIR spectroscopy and simultaneously measured on a reference method.  Reference methods can vary depending on the product that is being analyzed.

38.    Blue Sun sells an NIR analyzer known as the Phoenix NIR Analyzer.

**39.**    KPM's source code was stored using GitHub at the time the Individual Defendants were KPM employees.

## 3.  Contested Issues of Fact

### A.  *Plaintiff*

#### i.  *As previously found by this Court:*

1.    KPM ensures that only its employees and consultants can access KPM confidential information. KPM maintains non-disclosure arrangements and confidentiality agreements with its employees to prevent dissemination of its technical and non-technical confidential information.

2.    KPM's implements access-control processes with respect to its calibration data, which is stored on a protected, confidential Windows File Server.

3.    KPM's UCAL software must be licensed, and the UCAL source code is stored in secure software vault called GitHub.

4.    While individual defendant Irvin Lucas was employed by KPM as a sales representative, he approached ITG in April of 2018 about forming a separate sales arm to market and sell a competing NIR analyzer, then called the M5.

5.    ITG formed Blue Sun in July of 2018, and rebranded its M5 analyzers under the Phoenix brand name.

6.    Mr. Lucas left KPM in May of 2019 to work for Blue Sun, which was formed by Robert Wilt at Mr. Lucas' urging.

7.    Mr. Lucas continued to work for KPM for almost a year, until May of 2019, before resigning from KPM.

8.      At the time of its creation and shortly thereafter, all of Blue Sun's employee hires were former employees of KPM.

9.      Mr. Lucas began recruiting his KPM colleagues to work for Blue Sun while he and they were still employed by KPM.

10.     Individual defendant Robert Gajewski worked for KPM from 2003 until January 13, 2019 as an employee; from February 1, 2019 to May 13, 2019 as an independent contractor; and from May 13, 2019 to April 5, 2021 as an employee.

11.     In August of 2018, Mr. Lucas approached Mr. Gajewski to perform preventive maintenance for Blue Sun and its customers.

12.     In February of 2019, while still employed at KPM, Mr. Gajewski agreed to start performing annual preventive maintenance on KPM SpectraStar analyzers for Blue Sun as an independent contractor, and he began using a Blue Sun email address under the alias "Rob Roberts".

13.     Mr. Lucas estimated that Mr. Gajewski has likely serviced approximately 140 total KPM analyzers for Blue Sun, only 7-8 of which were serviced after his termination from KPM in April of 2021.

14.     Until May of 2021, the customers that Mr. Gajewski serviced paid Blue Sun for his work and not KPM.

15.     Mr. Gajewski never told KPM about his work for Blue Sun prior to his termination from KPM.

16.     Mr. Lucas typically communicated the pricing and sent invoices to former KPM customers for Mr. Gajewski's SpectraStar preventive maintenance work for Blue Sun though, on at least three occasions, Mr. Gajewski advised Mr. Lucas as to what prices to offer customers to

undercut or match KPM's pricing based on his knowledge of what KPM had charged that customer the prior year.

17. On at least 3 occasions while Mr. Gajewski was still employed by KPM, Mr. Lucas and Mr. Gajewski worked to divert customers away from KPM and to Blue Sun.

18. Mr. Gajewski also performed calibration services, offered UCAL training, and helped customers convert their library databases to be transferred between different manufacturers' analyzers.

19. In order to perform the calibration services using KPM's proprietary UCAL software, Mr. Gajewski accessed the UCAL software using his KPM employee credentials.

20. Between 2019 and 2020, used UCAL and KPM calibration data to generate application notes that were then used to sell Blue Sun's Phoenix analyzer.

21. Blue Sun posted the application notes on its website, falsely misrepresenting to potential customers that the notes reflected data from samples that were run on Phoenix NIR analyzers using calibration data developed using Blue Sun's Alligator software.

22. Before and after his termination from KPM, Mr. Gajewski leveraged the preventive maintenance customers he transferred from KPM to Blue Sun to try to sell Phoenix analyzers to those customers.

23. Mr. Lucas also approached individual defendant Rachael Glenister, another KPM sales representative, sometime between August of 2018 and 2019 to work for Blue Sun.

24. Before she left KPM in July 2020, Ms. Glenister referred at least two KPM customers to Blue Sun.

25.     After Ms. Glenister left KPM, Ms. Glenister contacted at least three KPM customers for preventative maintenance work, at least seven KPM customers for analyzer purchases.

26.     Mr. Lucas also approached individual defendant Arnold Eilert, KPM's Applied Technology Manager, to move from KPM to Blue Sun.

27.     While Mr. Eilert was still employed at KPM, he began using a Blue Sun email address under the alias "Don Donaldson", which he used to communicate with Blue Sun customers.

28.     Before leaving KPM, Mr. Eilert aided Blue Sun in attempting to divert at least three KPM customers to Blue Sun.

29.     Eilert accepted the offer in December of 2020, resigning from KPM shortly thereafter.

30.     Since December of 2020, Mr. Eilert has performed preventative maintenance for at least three former KPM customers.

31.     During their employment with KPM and before any involvement with Blue Sun, Mr. Lucas, Mr. Eilert, and Ms. Glenister each signed "Confidentiality and Non-Competition Agreements" in which they agreed, among other things, not to disclose KPM's confidential information or trade secrets.

32.     The agreements defined confidential information broadly, including names and contact information, purchasing history and prices, and other information relating to KPM's clients or prospective clients; trade secrets; information about prices, products, innovations, business plans, internal practices and procedures, technologies, developments, inventions; and "[A]ny other information relating to KPM's business or its clients."

33.     The agreements required employees to return any KPM information, including confidential information, upon termination.

34.     Robert Wilt, the President and CEO of ITG, is the Manager of Blue Sun.

35.     Mr. Wilt's wife, Cathy Wilt, is an employee only of ITG but provides accounting services for Blue Sun, pays Blue Sun's bills, and has signing authority on Blue Sun bank accounts.

36.     ITG controls Blue Sun's bank accounts and pays Blue Sun's salespeople for the sales they make.

37.     ITG and Blue Sun prepare consolidated financial statements and joint tax returns.

38.     ITG approves Blue Sun's sales literature, and ITG's counsel provide advice for both ITG and Blue Sun on their sales materials.

39.     ITG knew Blue Sun was transitioning some KPM customers to Blue Sun.

40.     On March 5, 2021 Blue Sun changed email providers and migrated its emails from GSuite (Gmail) to Zoho. During the migration, which was performed by Mr. Lucas and another Blue Sun employee, Blue Sun lost emails sent or received from Mr. Eilert (don@bluesunscientific.com), Mr. Gajewski (rob@bluesunscientific.com), and a third former KPM employee's accounts before March 5, 2021 that were deleted in violation of Blue Sun's duty to preserve evidence.

### ii.   As KPM will further prove at trial:

1.     KPM's proprietary software, calibration data, and competitively sensitive customer information are trade secrets belonging to KPM.  KPM's proprietary software includes the UCAL software, specifically UCAL version 3 and 4, used to formulate and depict the data for application notes and to formulate and make calibration adjustments for customers. The calibration data includes the data Defendants used with customers and the data used to create the application notes that were then used by the Defendants.  With respect to customer information, the trade secrets include:  customer  names  and  contact  information;  details  of  customers'  account(s)  with

KPM/Unity and use of NIR systems (including SpectraStars); identity and timing of purchases and preventative maintenance services; pricing (both historical and contemplated) for instruments, consumables, instrument repair, and preventative maintenance service; and in depth knowledge of specific strengths and weaknesses, customer needs, and customers' stated and anticipated future needs.

2.      KPM's proprietary software, calibration data, and competitively sensitive customer information constitute confidential information belonging to KPM.  KPM's proprietary software includes the UCAL software, specifically UCAL version 3 and 4, used to formulate and depict the data for application notes and to formulate and make calibration adjustments for customers. The calibration data includes the data Defendants used with customers and the data used to create the application notes that were then used by the Defendants.  With respect to customer information, the confidential information includes: customer names and contact information; details of customers' account(s) with KPM/Unity and use of NIR systems (including SpectraStars); identity and timing of purchases and preventative maintenance services; pricing (both historical and contemplated) for instruments, consumables, instrument repair, and preventative maintenance service; and in depth knowledge of specific strengths and weaknesses, customer needs, and customers' stated and anticipated future needs.

3.      KPM took and continues to take active measures to protect and keep confidential its trade secrets and confidential information, including, but not limited to, the following: establishing confidentiality requirements for employees as set forth in KPM's Employee Handbook, employee offer letters, and termination letters; executing mandatory non-disclosure agreements with employees as part of contracts for employment; restricting employee access to trade secrets and confidential information to only specific employees and consultants on a need-

to-access basis with access-control processes and procedures in place requiring KPM management sign-off for access permissions; upon termination, cutting off a former employee's access to company email and information, including requiring that employees return company property and information and that an exit checklist be completed and filled out; storing all calibration datasets and reference values on a protected, confidential Windows File Server; and storing all source code for applications that run KPM's analyzers and create its calibrations in secure vaults using GitHub.

4.      Blue Sun, ITG, and the Individual Defendants misappropriated KPM's trade secrets.

5.      Individual Defendant Robert Gajewski executed valid non-disclosure and non-compete agreements with KPM.

6.      The Individual Defendants misused and disclosed KPM's confidential information and trade secrets in violation of their non-disclosure obligations.

7.      One or more of the Individual Defendants failed to return all KPM property, confidential information or other trade secrets that they had in their possession after their employment with KPM ended.

8.      The violations of the Individual Defendants' respective non-disclosure obligations constitute breaches of the duty of loyalty.

9.      The violations of the Individual Defendants' respective non-disclosure obligations constitute breaches of the duty of good faith and fair dealing owed to KPM.

10.     Blue Sun and ITG knew of the Individual Defendants' contractual non-disclosure and non-compete obligations to KPM.

11.     Blue Sun and ITG intentionally interfered with those contracts by hiring or working with the Individual Defendants and misusing KPM's trade secrets and confidential information.

12.     The actions of Blue Sun and ITG, collectively and individually, constitute tortious interference with KPM's contractual relationships.

13.     The actions of Blue Sun and ITG, collectively and individually, constitute unfair and deception trade practices in violation of M.G.L. ch. 93A.

14.     The actions of Blue Sun, ITG, and the Individual Defendants, collectively and individually, caused quantifiable damage to KPM in the amount of $6,526,452,[4] and the harm have they caused to KPM, its NIR analyzer business, and its customer relationships is ongoing.

### B. *Individual Defendants*

1.     Whether any of the information KPM claims is a "trade secret" qualifies as a trade secret under either the DTSA or MUTSA.

2.     Whether any of the Individual Defendants misappropriated any KPM trade secrets and/or disclosed any KPM confidential information.

3.     Whether KPM can establish that the Individual Defendants' misappropriation of trade secrets proximately caused KPM any lost profits.

4.     Whether any of the Individual Defendants owed KPM a fiduciary duty or duty of loyalty.

5.     Whether any of the Individual Defendants breached a fiduciary duty or duty of loyalty owed to KPM.

6.     Whether any of the Individual Defendants breached any contractual obligations to KPM.

7.     Whether the Individual Defendants' breach of any contractual obligations to KPM proximately caused KPM any damage.

---

[4] *See, supra*, footnote 2.

8.      Whether KPM breached its obligation to pay severance to Mr. Eilert and Mr. Gajewski that KPM promised to pay as consideration for Mr. Eilert and Mr. Gajewski's compliance with their respective noncompetition restrictive covenants.

9.      As this Court previously determined, that the noncompetition restrictive covenants in Ms. Glenister's and Mr. Lucas's employment agreements were not enforceable under Connecticut law.

### 4.  Jurisdictional Questions

#### A.  *Plaintiff*

None.

#### B.  *Defendants*

None.

### 5.  Questions Raised by Pending Motions

The parties' respective motions *in limine* are the sole pending motions and motions to be filed before trial.  The parties' motions *in limine* will be filed on April 25, 2023 per this Court's Order amending pre-trial deadlines (ECF No. 179).

### 6.  Issues of Law

#### A.  *Plaintiff*

No additional legal issues beyond **(i)** whether the facts that will be adduced at trial satisfy the elements of the claims that KPM has brought against each of the defendants, and **(ii)** those presented in the parties' respective motions *in limine* to be filed on April 25, 2023, and **(iii)** those presented in the parties' objections to proposed exhibits and testimony set forth below.  To the extent the contested issues of fact above include contested issues of law, KPM incorporates those here by reference.  KPM also incorporates by reference

26

the legal issues in all currently pending motions and objections to evidence, to the extent not additionally specified below.

With respect to the issues raised by Defendants:

1.      Under the DTSA and MUTSA, KPM's trade secrets and information that were misappropriated and misused by the Defendants were in fact trade secrets. *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2021 WL 6275214, at *7 (D. Mass. Aug. 23, 2021) (Hillman, J.) (rejecting Defendants' arguments that KPM's alleged trade secrets were not in fact trade secrets and granting KPM's request for preliminary injunction); *Frontrunner HC, Inc. v. Waveland RCM, LLC*, 2020 WL 7321161, at *9 (D. Mass. Dec. 11, 2020); *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 238-40 (D. Mass. 2011); *Jet Spray Cooler, Inc., v. Crampton*, 361 Mass. 835, 840 (1972).

2.      Disgorgement of Defendants' unjust enrichment as a measure of KPM's damages is properly presented to and decided by the jury because that is one of the measures of damages permitted under, inter alia, the federal Defend Trade Secrets Act. 18 U.S.C. § 1836(b)(3)(B)(i)(II) (permitting "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss"). The same is true under Massachusetts law. *T.H. Glennon Co., Inc. v. Monday*, 2020 WL 1270970, at *16 (D. Mass. Mar. 17, 2020) ("Similarly, under Massachusetts Law, a tortfeasor is liable for 'all damages' resulting from a violation, which typically consists of lost profits or unlawful gains.") (citing M.G.L. Ch. 93 § 42 (2017); Jet Spray Cooler, 377 Mass. at 169). *See also Knox Trailers, Inc. v. Maples*, 2023 WL 2570970, at *6 (E.D. Tenn. Feb. 14, 2023) (letting the jury determine the quantum of unjust enrichment damages under the DTSA).

### B. *Defendants*

1.      Whether KPM has identified the trade secrets it alleges the Individual Defendants misappropriated with the necessary particularity under the DTSA and MUTSA.  *See* Mass. Gen. Laws ch. 93, § 42D(b) (MUTSA requires that a plaintiff "alleging trade secrets misappropriation . . . state with reasonable particularity the circumstances thereof, including the nature of the trade secrets and the basis for their protection."); *Sutra, Inc. v. Iceland Exp., EHF*, 2008 WL 2705580, at *3 (D. Mass. July 10, 2008) ("It is hornbook law that the parties and the court cannot accurately decide the question of whether a trade secret exists without first understanding what precisely is asserted as a secret.").  The Defendants contend that KPM's vague and broad description of the "trade secrets" above fail to state any trade secrets with particularity and that KPM should be required, prior to trial, to specifically identify the precise trade secrets they allege the Defendants have misappropriated.

2.      The Court (rather than the jury) decides whether KPM is entitled to unjust enrichment/disgorgement damages if KPM can prove the Defendants misappropriated KPM trade secrets.  *See In re PHC, Inc. Shareholder Litigation*, 894 F.3d 419, 435 (2018) ("Disgorgement is an equitable remedy" and "[t]he availability of an equitable remedy presents a question of law"); *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics America, Inc.*, 895 F.3d 1304, 1320 (Fed. Cir. 2018) (plaintiff has no right to jury decision on disgorgement of its competitor's profits as remedy for misappropriation of trade secret). The Defendants' position is that disgorgement of Blue Sun profits generated from the sale and service of NIR analyzers owned by non-KPM customers would be patently inequitable.

**7. Requested Amendments to the Pleadings**

    **A.** *Plaintiff*

None.

    **B.** *Defendants*

None.

**8. Additional Matters to Aid in the Disposition of the Action**

    **A.** *Plaintiff*

None.

    **B.** *Defendants*

None.

**9. Probable Length of Trial**

The parties believe that a jury trial on the remaining disputed issues in this case may be completed within 8 days, inclusive of jury selection.

**10. Names and Addresses of Witnesses and Whether the Testimony of Any Witness is Intended to be Presented by Deposition**

1. **William Brown**, fact witness, by deposition. Mr. Brown resides at 8276 64th Court, Pleasant Prairie, Wisconsin 53158.

2. **Brian Davies**, fact witness, by deposition if necessary. Mr. Davies resides at 10 Powder House Terrace, Unit 2, Somerville, MA 02144.

3. **Arnold Eilert**, fact witness. Mr. Eilert resides at 405 High Street, Wauconda, IL 60084.

4. **Douglas Evans**, fact witness, by deposition. Mr. Evans resides at 11457 Washington Plaza West, Reston, Virginia 20190.

5. **Luigi Faustini**, fact witness, by deposition. Mr. Faustini current address is not presently known to KPM.

6. **Michelle Gajewski**, fact witness, by deposition. Mrs. Gajewski at 2728 Leonard Lane, North Aurora, IL 60542.

7. **Robert Gajewski**, fact witness.  Mr. Gajewski resides at 2728 Leonard Lane, North Aurora, IL 60542.

8. **Ronald Geis**, fact witness, by deposition if necessary.  Mr. Geis resides at 52 Hardy Road, Londonderry, New Hampshire 03053.

9. **Rachael Glenister**, fact witness.  Ms. Glenister resides at 4745 Picturesque Circle, Colorado Springs, CO 80917.

10. **Irvin Lucas**, fact witness.  Mr. Lucas resides at 6835 Laurel Canyon Boulevard, North Hollywood, CA 91605.

11. **Christopher McIntire**, fact witness, by deposition if necessary.  Mr. McIntire resides at 16 Robin Hill Road, Danvers, MA 01923.

12. **Brian J. Mitchell**, fact witness.  Mr. Mitchell resides at 51 Islington Street, Apt. 407, Portsmouth, NH 03801.

13. **Eric Olson**, fact witness.  Mr. Olson resides at 80 Baldwin Hill Road, Phillipston, MA 01331.

14. **Carey Ross**, fact witness.  Mr. Ross resides at 104 Boxwood Lane, Dover, NH 03820.

15. **Robert A. Schumann, Jr**, fact witness.  Mr. Schumann resides at 11562 Wooded Knoll Drive, Walton, KY 41094.

16. **Michael Smith**, fact witness.  Mr. Smith resides at 321 Princeton Road, Sterling, MA 01564.

17. **Eric Weinstein**, fact witness, by deposition.  Mr. Weinstein's present address is not currently known to KPM.

18. **Robert Wilt**, fact witness.  Mr. Wilt resides at 22189 Bay Shore Road, Chestertown, MD 21620.

19. **Yuegang Zhao**, fact witness.  Mr. Zhao resides at 7 Coventry Lane, Unit 1201, Andover, MA 01810.

20. **Neil Zoltowski**, expert witness.  Mr. Zoltowski resides at 1 Spruce Lane, Duxbury, MA 02332.

21. **Bill Kennedy**, expert witness.  Mr. Kennedy resides in Wellesley, Massachusetts.

## 11. Uncontested exhibits

*See* Exhibit A (list of uncontested exhibits).

**12. Contested Exhibits**

*See* Exhibit B (list of contested exhibits, including the opposing parties'

objections and the proffering parties' responses).

**13. Positions on Remaining Objections to Evidence**

The parties' objections and responses to proposed trial exhibits are listed in Exhibit B.  The

parties' objections and responses to proposed deposition designations are listed in Exhibit C.  The

parties are willing and able to provide excerpted deposition transcripts containing the contested

testimony should the Court desire them.

In addition to the above, the parties reserve the right to make additional objections based

on Federal Rules of Evidence 402 or 403 and FRCP 26(a)(3)(B).

**Dated:** April 24, 2023                              Respectfully submitted,


**PLAINTIFF,**                                         **DEFENDANTS,**
**KPM Analytics North America, Corp.**                **Blue Sun Scientific, LLC and The**
                                                      **Innovative Technologies Group & Co.,**
                                                      **Ltd.**


By its attorneys,                                     By its attorneys,


*/s/ John T. Gutkoski*                                */s/ George R. Ritchie*
John T. Gutkoski (BBO# 567182)                        George R. Ritchie (*pro hac vice*)
Kevin R. Mosier (BBO# 703739)                         Royal Craig (*pro hac vice*)
Sunstein LLP                                          Lauren Lake *(pro hac vice)*
100 High Street                                       Gordon Feinblatt, LLC
Boston, MA 02110                                      1001 Fleet Street, Suite 700
Tel: (617) 443-9292                                   Baltimore, MD 21202
jgutkoski@sunsteinlaw.com                             Tel: (410) 574-4000
kmosier@sunsteinlaw.com                               Fax: (410) 576-4246


Scott R. Magee (BBO# 664067)                          Christopher R. O'Hara (BBO# 548611)
Paige K. Zacharakis (BBO# 699108)                     Maria T. Davis (BBO# 675447)
Morse, Barnes-Brown, and Pendleton, P.C.              Todd & Weld, LLP
480 Totten Pond Road, 4th Floor                       One Federal Street
Waltham, MA 02451                                     Boston, MA 02110
(781) 622-5930                                         Tel: (617) 720-2626
smagee@morse.law                                      Fax: (617) 227-5777
pzacharakis@morse.law                                 cohara@toddweld.com
                                                      mdavis@toddweld.com


**DEFENDANTS,**
**Arnold Eilert, Robert Gajewski,**
**Rachael Glenister, and Irvin Lucas**

*/s/ William L. Prickett*
William L. Prickett (BBO# 555341)
Dallin R. Wilson (BBO# 676662)
Dawn Mertineit (BBO# 669988)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Tel: (617) 946-4800
Fax: (617) 946-4801
wprickett@seyfarth.com
drwilson@seyfarth.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 24th day of April, 2023, a true and exact copy of the foregoing was served on all counsel of record through the Court's ECF system.

/s/ *Kevin R. Mosier*