# Exhibit 1

HIGHLY CONFIDENTIAL

Page 1

1

2           UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

3     -----------------------------------------X

   KPM ANALYTICS NORTH AMERICA CORPORATION,

4

                              Civil Action No.

5               Plaintiff,   21:-10572

6          - v. -

7   BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE

   TECHNOLOGIES GROUP & CO., LTD., ARNOLD

8   EILERT, MICHELLE GAJEWSKI, ROBERT GAJEWSKI,

   RACHAEL GLENISTER, GREGORY ISRAELSON, IRVIN

9   LUCAS AND PHILIP OSSOWSKI,

10               Defendants.

   -----------------------------------------X

11

12            HIGHLY CONFIDENTIAL

13            30(b)(6) DEPOSITION

14         VIA ZOOM VIDEOCONFERENCING

15                 OF

16     KPM ANALYTICS NORTH AMERICA CORPORATION

17             BY AND THROUGH

18               ERIC OLSON

19         Wednesday, July 7, 2021

20

21

22

23   Reported By:

24   LINDA J. GREENSTEIN

25   JOB NO. 4695539

HIGHLY CONFIDENTIAL

Page 15

1        HIGHLY CONFIDENTIAL - ERIC OLSON

2        A.     As understood at this point, I

3    would consider that that's all being

4    discovered and understood.

5        Q.     You characterize the trade

6    secrets as including:  "KPM Analytics

7    precise datasets, calibration model sets

8    and software tools."

9               There's nothing in that

10   characterization that reflects on the sales

11   of the actual NIR spectroscopy machines.

12               Is there anything about the

13   machines themselves that contain trade

14   secrets?

15       A.     Could you restate that again,

16   please?

17       Q.     I'll add context.

18               Blue Sun is selling NIR

19   spectroscopy machines.  They are also

20   providing services.

21               Is there anything inherently

22   unfair about their sales of machines?

23       A.     No, there's none.

24       Q.     And so those machines are

25   primarily hardware, not software.

Page 16

1        HIGHLY CONFIDENTIAL - ERIC OLSON

2            Is it fair to say that there is

3    no trade secret embodied in the hardware?

4            MR. MAGEE:   Objection.

5            You can answer.

6        A.    There are many trade secrets

7    embedded inside of the hardware.

8        Q.    Can you be specific and identify

9    them?

10       A.    It would be several types of

11   signal processing, electronics, circuit

12   design, data handling techniques.   There

13   are protected, patented mechanical designs

14   for the system itself.

15       Q.    Okay.  And these mechanical

16   designs and circuit designs, are they in

17   the SpectraStar XL?

18       A.    Some are in the XL.  Some are in

19   XT.  It has been a continuation of

20   development of that platform for -- since

21   its existence.

22       Q.    And does KPM sell the XL or the

23   XT to customers?

24       A.    KPM sells XTs currently to

25   customers.

1           HIGHLY CONFIDENTIAL - ERIC OLSON

2           Q.     Have you seen that?

3           A.     Can you say that again?

4           Q.     Have you seen, personally seen

5      that agreement with Mr. Wilt?

6           A.     Yes.

7           Q.     Why didn't you produce it in

8      response to our document requests?

9                  MR. MAGEE:  Objection.

10          Q.     You characterize KPM's trade

11     secrets as including datasets, calibration

12     model sets or software tools in the

13     complaint; is that correct?

14          A.     Yes.

15                 (Reporter clarification.)

16     BY MR. CRAIG:

17          Q.     Mr. Olson, can you take a look

18     at paragraph 99 of the complaint.

19          A.     Okay.  I see it.

20          Q.     You characterize KPM's trade

21     secrets as including but not being limited

22     to datasets, software tools, technical

23     knowledge and customer information; is that

24     correct?

25          A.     Yes.

HIGHLY CONFIDENTIAL

Page 32

1      HIGHLY CONFIDENTIAL - ERIC OLSON

2      Q.    Can you explain what those

3    datasets are?

4      A.    For this particular discussion,

5    datasets would include various items, one

6    it would be datasets of any technical

7    information during development, statistical

8    data collected on system performance,

9    operation of system underlying algorithms

10   that are used inside of the system and how

11   they performed, technical documentation,

12   verification and validation of system

13   performance, hardware performance.

14          Studies, data collection around

15   hardware components, replacement

16   components, design and test experiments

17   that were completed with hardware.

18          Datasets would also include the

19   work product of our technical account

20   managers, application specialists,

21   chemometricians, scientists that were

22   related to any products measured, samples

23   collected, samples analyzed.

24          The process for analyzing the

25   samples, process for determining the best

HIGHLY CONFIDENTIAL

Page 33

1           HIGHLY CONFIDENTIAL - ERIC OLSON

2    methods for sample preparation, sample

3    delivery to the spectrometer or systems,

4    results of the data, the value of the data,

5    how it connected to the system performance.

6              Those datasets in their direct

7    connection to product output, what we call

8    constituents, a calculation of the

9    constituents, the effect of the

10   constituents with regards to any and all

11   variables that could be determined during

12   testing, including scans of product and

13   sample supplied to Unity, KPM, as part of a

14   development or test of applications or

15   calibrations in part with customers,

16   representatives, agents, and internal

17   discovery.

18              The digestion of that data,

19   signal processing of that data, the

20   preconditioning of that data, the

21   connection of how that data relates to the

22   end constituent products.

23              The formation of that data into

24   multiple sets of data tied to calibrations,

25   calibration matrices to specific products

Page 34

1        HIGHLY CONFIDENTIAL - ERIC OLSON
2   and the delivery of those through the
3   mathematical calculations to create a
4   calibration or a product and output that
5   you would run under our SpectraStar NIR
6   systems.
7        Q.      That's quite a long list.
8                But the paragraph in question
9   accuses defendants of having wrongfully
10  misappropriated, disclosed and/or used
11  Plaintiff's proprietary and confidential
12  information and trade secrets.
13               Are you contending that the
14  defendants have misappropriated that entire
15  laundry list of trade secrets?
16       A.      It's still under discovery.
17       Q.      What are the software tools?
18       A.      As part of our business, we have
19  applications that we develop, particularly
20  in this would be UScan or UCalibrate or
21  ULock, as well, these are our main
22  applications that run with our system.
23               We have several scripts, VB
24  code, Excel-driven VB manipulations, Excel
25  sheets for service and maintenance.

Page 35

1          HIGHLY CONFIDENTIAL - ERIC OLSON

2                There are these tools that are

3     used that have been created for support of

4     our products.

5          Q.     Which of those tools does KPM's

6     customers use?

7          A.     KPM customers would use UScan

8     and UCalibrate.

9          Q.     Can you explain what UScan does?

10         A.     UScan is the application that

11    runs on the embedded computer inside of a

12    SpectraStar XT.  UScan is -- it takes the

13    data from the internal hardware and does

14    all of the calibration processing, data

15    management, the graphical user interface

16    presentation to a user and does the data

17    management for running tests on the

18    SpectraStar.

19         Q.     And can you explain UCalibrate?

20         A.     So UCal, different than

21    UCalibrate, UCal is a tool that is sold for

22    customers to use to create calibrations.

23    It creates an output that is then used by

24    UScan to run those created calibrations.

25         Q.     How do you know that Blue Sun

Page 36

1          HIGHLY CONFIDENTIAL - ERIC OLSON

2     repairs, calibrates and monitors KPM NIR

3     analyzers using KPM datasets, calibration

4     model sets or software tools?

5               MR. MAGEE:   Objection.

6               You can answer.

7       A.      The materials that have been

8     provided as part of this Verified Complaint

9     go through several different cases of seen

10    usage of our datasets.

11      Q.      Can you be specific and explain

12    what those seen usages are?

13      A.      If we look at the complaint

14    starting at paragraph 68, subsequently

15    through 68 through at least 80, discusses

16    in-depth the use of one specific example of

17    a calibration dataset that was shown to be

18    used by Blue Sun Scientific on their

19    website.   This directly...

20      Q.      You're referring to the

21    application now; correct?

22      A.      Correct.

23      Q.      Are there any other examples of

24    Blue Sun repairing, calibrating or

25    monitoring KPM NIR analyzers using KPM

Page 37

1      HIGHLY CONFIDENTIAL - ERIC OLSON

2    datasets, calibration model sets or

3    software tools?

4              I'm sorry, Mr. Olson, I heard

5    something and I'm not sure what it was?

6              For the record, can you verify?

7        A.    I've not made a response.  I was

8    still reviewing the complaint to find the

9    specific item I was looking to talk about.

10             Can you restate the specific

11   question again too, please?

12       Q.    Are there any other examples,

13   aside from the one application in the

14   complaint, that you know of in which Blue

15   Sun repaired, calibrated or monitored KPM

16   NIR analyzers using KPM datasets,

17   calibration model sets or software tools?

18       A.    In the Verified Complaint, we

19   discuss in paragraph 44 of the usage at

20   Post Foods in Battle Creek, where software

21   tools were used and possibly datasets.

22       Q.    Paragraph 44 describes how Mr.

23   Gajewski traveled to Battle Creek, Michigan

24   to service a NIR spectrometer.

25             It does not allege that he used

Page 38

1        HIGHLY CONFIDENTIAL - ERIC OLSON

2    KPM datasets.

3        A.    Correct, it does not.  The post

4    documentation -- and you asked about

5    software tools as well.

6        Q.    Yes.  Do you contend that when

7    he went to Battle Creek, Michigan, he used

8    KPM datasets or software tools?

9        A.    Yes.

10       Q.    How do you know that?

11       A.    The documentation that we had

12   from Mr. Gajewski's computer, it showed

13   copies of KPM software tools that were

14   relabeled "Blue Sun Scientific."

15       Q.    What KPM software tools were

16   relabeled "Blue Sun Scientific"?

17       A.    It was a series of PM checklist

18   tools and a service reporting tool.

19       Q.    What is the PM checklist tool?

20       A.    It is a document and checklist

21   for performing maintenance on a

22   SpectraStar.  Depending upon the version,

23   there are different:  XT, XL, 2400.  There

24   are several different versions of these.

25       Q.    Are you saying these are

```
                                        Page 39

 1        HIGHLY CONFIDENTIAL - ERIC OLSON
 2   forms --
 3        A.     These are tools, yes, they are a
 4   form.
 5             (Reporter clarification.)
 6   BY MR. CRAIG:
 7        Q.     Mr. Olson, you used the word
 8   tool.  Are you referring to forms?
 9        A.     Yes, I would consider "forms"
10   tools.
11        Q.     Do you contend that KPM has a
12   trade secret proprietary interest in these
13   forms?
14        A.     Yes.
15        Q.     What efforts does KPM make to
16   keep these forms secret?
17        A.     These forms are used internally
18   by KPM employees and certified
19   distributors.
20        Q.     Are KPM employees and certified
21   distributors warned not to use these forms
22   externally?
23        A.     KPM employees/distributors are
24   all warned about trade secrets, tools,
25   documents, in several...
```

Page 104

1          HIGHLY CONFIDENTIAL - ERIC OLSON

2      theft of a trade secret?

3               MR. MAGEE:  Objection.

4               Calls for a legal conclusion.

5               MR. CRAIG:  Actually, that's a

6          factual conclusion.

7               Numerous times in the

8          complaint -- we can go back and read

9          some of these paragraphs -- Mr. Olson

10         accuses Ms. Glenister and the other

11         individuals of unlawfully running away

12         with trade secrets and using them to

13         usurp customers.

14              MR. MAGEE:  I'm standing by my

15         objection.

16     BY MR. CRAIG:

17         Q.   Mr. Olson, do you consider

18     Ms. Glenister's customer relationships to

19     be the property of KPM?

20         A.   Yes.

21         Q.   What makes them the property of

22     KPM?

23         A.   Employees of KPM, when they are

24     working with our customers, are building

25     information and knowledge about them, which

HIGHLY CONFIDENTIAL

Page 105

1      HIGHLY CONFIDENTIAL - ERIC OLSON

2   is part of how KPM does business.

3   Understanding our customers' needs, what

4   they are requiring for hardware and units.

5          It's all part of the protected

6   materials for selling our unique offering.

7      Q.    Is that true of all of KPM sales

8   representatives?

9      A.    That may not be true for all of

10  KPM employees globally.

11     Q.    What's the difference?

12     A.    We have several different

13  business units that have different

14  structures for selling and want Unity

15  Scientific or KPM North America.

16     Q.    When a sales representative in

17  America leaves KPM, how long is that

18  customer relationship KPM's property?

19          MR. MAGEE:  Objection.

20     A.    The terms should be consistent

21  with the employment agreements made prior

22  to employment in post-employment, based

23  upon contracts that are signed and NDAs.

24     Q.    Okay.

25                  (Exhibit 8 for

Page 186

1        HIGHLY CONFIDENTIAL - ERIC OLSON

2    preparation under the 30B, I believe is the

3    correct term, the areas for discovery.

4            And I spent time evaluating

5    those and trying to get as best the

6    information I could historically.

7        Q.    The complaint in this case was

8    filed on April 5, 2021; correct?

9        A.    Yes.

10        Q.    And in the verification at the

11    end of that complaint, you, as the

12    verifying person, stated under the pains of

13    perjury that the facts in the verifying

14    complaint are true and accurate to the best

15    of your knowledge; right?

16        A.    Yes.

17        Q.    What fact or facts did KPM have

18    as of April 5, 2021 to support the claim

19    that Rachael Glenister copied, disclosed or

20    used a trade secret of KPM?

21        A.    In the verified complaint, we

22    spoke about those opportunities, the

23    customer connections that Rachael Glenister

24    had.  We then have an understanding of our

25    information and belief that were then

Page 187

1        HIGHLY CONFIDENTIAL - ERIC OLSON
2    converted to Blue Sun Scientific orders.
3        Q.     What trade secrets did Rachael
4    Glenister take or use?
5        A.     The access to the customer
6    information, customer list, contact
7    information for the customer, understanding
8    of the application itself could all be
9    things.
10       Q.     I didn't ask you about what
11   could be.
12              As of April 5, 2021, what fact
13   did KPM have to claim that Rachael
14   Glenister took a trade secret from KPM?
15              MR. MAGEE:  Objection.
16              Asked and answered.
17       A.     William, are you waiting for me
18   for an answer?
19       Q.     I am.
20       A.     I believe I've already answered
21   the question.
22       Q.     What facts did KPM have as of
23   April 5, 2021 that Ms. Glenister
24   misappropriated trade secrets of KPM?
25       A.     As already stated in the

Page 192

1        HIGHLY CONFIDENTIAL - ERIC OLSON

2        A.    The possession of a competitive

3   e-mail address, the use of the Zoho tool,

4   e-mail correspondence.

5        Q.    Anything else?

6        A.    I believe that was all of the

7   time.

8        Q.    In those items you just

9   mentioned, what trade secret did Mr.

10  Israelson, in fact, use or take?

11             MR. MAGEE:  Objection.

12       A.    It is not clear.

13       Q.    You're not aware of any;

14  correct?

15       A.    I'm not aware of any.

16       Q.    What about Mr. Eilert, what fact

17  or facts did KPM have as of April 5, 2021

18  that Mr. Eilert either used or

19  misappropriated a KPM trade secret.

20       A.    I did not state in the

21  complaint.  There was nothing referenced in

22  the complaint.  Other than e-mails that had

23  been shared between -- as referenced in,

24  what, paragraph 42, conversations about UC

25  San Diego Medical Center in connection to

Page 193

1      HIGHLY CONFIDENTIAL - ERIC OLSON

2    the human milk application.

3        Q.    In that e-mail that you just

4    referenced, is there any specific trade

5    secret that's either being used or

6    misappropriated by Mr. Eilert?

7        A.    Sharing about the information

8    about a customer to an e-mail address

9    outside of the company, however, being sent

10   to a person who is still an employee of the

11   company.

12       Q.    Is that your answer?

13       A.    Yes.

14       Q.    So what is the trade secret

15   that's being used there?

16       A.    There was some discussion about

17   the specifics around the customer

18   engagement, that UC San Diego Medical

19   Center application.  It's internal to KPM

20   with contact and connection to an external

21   customer.  That would be a violation of our

22   agreements and IP for sharing that

23   information external of the business.

24       Q.    Okay.  Are you saying that that

25   is a misappropriation of the trade secret?

HIGHLY CONFIDENTIAL

Page 194

1          HIGHLY CONFIDENTIAL - ERIC OLSON

2          A.    Yes, it is.

3          Q.    Aside from that, does KPM have

4    any other evidence that Mr. Eilert either

5    used or misappropriated a trade secret?

6               MR. MAGEE:  Objection.

7          A.    Not that I can recall.

8          Q.    You're here testifying for KPM

9    so you don't have a chance to do this

10   again.  So either KPM knows or does not,

11   and you need to give an answer for the

12   company.

13         A.    As of the 5th, no, we do not.

14         Q.    How about Michelle Gajewski,

15   what fact or facts did KPM have as of

16   April 5, 2021 that she either used or

17   misappropriated a KPM trade secret?

18         A.    I would state that she was

19   involved in the same e-mail correspondence

20   referenced in paragraph 42, Arnold Eilert,

21   regarding the UC San Diego Medical Center.

22              She, in fact, resides with Rob

23   Gajewski and understands the actions that

24   he had been taking were done, work he had

25   completed.

Page 205

1          HIGHLY CONFIDENTIAL - ERIC OLSON
2     Sun is not aware of any confidential
3     information that Mr. Lucas has disclosed to
4     Blue Sun?
5               MR. MAGEE:  Objection.
6          A.    I couldn't speak to what Blue
7     Sun knows about what Blue Sun had provided
8     to itself.
9          Q.    I'm not asking that.
10               I'm asking you what Mr. Lucas
11     disclosed, what KPM confidential
12     information Mr. Lucas disclosed to Blue
13     Sun?
14          A.    That was not your question, sir.
15               It's stated in the article, in
16     the complaint.  Mr. Lucas was involved in
17     some e-mails, correspondence, connection
18     with KPM customers about KPM products and
19     potential future opportunities.
20          Q.    What KPM confidential
21     information did he disclose in those
22     communications?
23               MR. MAGEE:  Objection.
24          A.    Trade secrets of customer
25     accounts, service requests.  It was also

Page 206

1          HIGHLY CONFIDENTIAL - ERIC OLSON

2     reference to e-mails we had seen about

3     replacement parts in connection with

4     distributors, Pro Analytics Australia being

5     one, that were involved with Mr. Lucas.

6               These reps, agents with

7     discussion about our business, how we work

8     with customers would all be trade secrets.

9          Q.    What specific conversations are

10     you talking about now?

11          A.    If we go to paragraph 50 of the

12     complaint, they discuss about e-mails of

13     Pro Analytics limited, spare parts that

14     were ordered, replacement components.

15               It's just a version of customer

16     sales, representative sales to Blue Sun.

17          Q.    I don't see any confidential KPM

18     information discussed in paragraph 50.

19               Can you identify any?

20          A.    Can we share Exhibit 15?

21          Q.    I'm looking at 15.

22          A.    I am not, though.  I don't know

23     if it's in the tool to share about -- not

24     Exhibit 15 of the deposition, I'm sorry.

25     Exhibit 15 of the complaint.