|     |                                                                 |
| --- | --------------------------------------------------------------- |
| 1   | UNITED STATES DISTRICT COURT                                    |
|     | DISTRICT OF MASSACHUSETTS                                       |
| 2   |                                                                 |
| 3   |                                                                 |
| 4   | KPM Analytics North America         )                           |
|     | Corporation,                        )                           |
| 5   |             Plaintiff,              )                           |
|     |                                     )                           |
| 6   |                                     )                           |
|     | vs.                                 )   Civil Action No. 21cv10572-MRG |
| 7   |                                     )                           |
|     |                                     )                           |
| 8   | Blue Sun Scientific, LLC,           )                           |
|     | The Innovative Technologies         )                           |
| 9   | Group & Co., Ltd., Arnold           )                           |
|     | Eilert, Michelle Gajewski,          )                           |
| 10  | Robert Gajewski, Rachael            )                           |
|     | Glenister, Gregory Israelson,)                                  |
| 11  | Irvin Lucas, and Philip             )                           |
|     | Ossowski,                           )                           |
| 12  |             Defendants.             )                           |

BEFORE: The Honorable Margaret R. Guzman

Trial Day 9

United States District Court
Courtroom No. 2
595 Main Street
Worcester, Massachusetts
May 15, 2023

Marianne Kusa-Ryll, RDR, CRR
Kristin M. Kelley, RPR, CRR
Official Court Reporters
United States District Court
595 Main Street, Room 514A
Worcester, MA 01608-2093
508-929-3399 justicehill@aol.com
Mechanical Steno - Transcript by Computer

**EXHIBIT 1**

```
 1   APPEARANCES:

 2   Sunstein LLP
     John T. Gutkoski, Esquire
 3   Kevin R. Mosier, Esquire
     100 High Street
 4   Boston, Massachusetts 02110
     on behalf of the Plaintiff
 5
     Morse Barnes-Brown & Pendelton, PC
 6   Scott R. Magee, Esquire
     Paige Zacharakis, Esquire
 7   480 Totten Pond Road
     4th Floor
 8   Waltham, Massachusetts 02451
     on behalf of the Plaintiff
 9
     Gordon Feinblatt LLC
10   George Faulkner Ritchie, IV, Esquire
     Lauren Lake, Esquire
11   1001 Fleet Street
     Suite 700
12   Baltimore Maryland 21202
     On behalf of the Defendant, Blue Sun Scientific, The Innovative
13   Technologies Group & Co., Ltd.

14   Seyfarth Shaw LLP
     Dallin R. Wilson, Esquire
15   World Trade Center East
     Two Seaport Lane
16   Suite 1200
     Boston Massachusetts 02210
17   on behalf of the Defendants, Arnold Eilert, Robert Gajewski,
     Rachael Glenister, and Irvin Lucas
18

19

20

21

22

23

24

25
```

```
 1                              INDEX
 2
 3   WITNESS                                                    PAGE
 4   Neil Zoltowski
 5
     Continued Direct Examination                                  7
 6       By Mr. Gutkoski
         Cross-Examination                                        25
 7       By Mr. Ritchie
         Cross-Examination                                        55
 8       By Mr. Wilson
         Redirect Examination                                     58
 9       By Mr. Gutkoski
         Recross-Examination                                      67
10       By Mr. Ritchie
         Further Redirect Examination                             69
11       By Mr. Gutkoski
12   Irvin Lucas
13   Direct Examination                                           80
         By Mr. Ritchie
14       Cross-Examination                                        84
         By Mr. Gutkoski
15
     G. William Kennedy
16
     Direct Examination                                           85
17       By Mr. Ritchie
         Cross-Examination                                       100
18       BY MR. GUTKOSKI
         REDIRECT EXAMINATION                                    107
19       BY Mr. Ritchie
20
21
                              E X H I B I T S
22
23   Exhibit No.       Description                          Received
24
                              None.
25
```

```
 1                    P R O C E E D I N G S

 2

 3           (The following proceedings were held in open court

 4   before the Honorable Margaret R. Guzman, United States District

 5   Judge, United States District Court, District of Massachusetts,

 6   at the Donohue Federal Building & United States Courthouse, 595

 7   Main Street, Worcester, Massachusetts, on May 15, 2023.)

 8           THE CLERK: All rise.

 9           Court is now open. You may be seated.

10           THE COURT: Thank you. We're going to be bringing the

11   jurors out in just a minute. I just wanted to let you all know

12   over the weekend we have been working through both -- all that

13   we had from both parties regarding instructions and verdict

14   slips.

15           What we have created is a starting point for

16   discussion. Attorney Foley is creating copies for everyone

17   now. We'll provide it to your desk. They'll have someone give

18   them to you in the back. And then when we have a break, you

19   can start looking at it. And even if we -- oh, good -- and

20   even if we don't finish today, you'll have it so that we can

21   start talking, having whatever discussions we're going to have

22   about contrary positions on it. All right. And that will give

23   you some idea.

24           I have created the jury -- the verdict slips. I'll

25   hear you on argument. And then you can take a look at them,
```

1  but I anticipate that we'll have a vigorous and spirited and
2  respectful discussion about the verdict slips. Okay?
3          All right. Are we ready?
4          MR. GUTKOSKI: Just in terms of timing today, are we
5  expecting just to go to 1:00 if we finish the evidence by then?
6          THE COURT: Yes, we've already told the jurors. Now
7  if we are short by an hour or so, I would like to finish the
8  testimony today, and we can probably ask the jurors just to
9  stay until we finish the testimony. And then you can do
10 arguments, and we can do the charge in the morning. So really
11 do make an estimate. If it's close, I'm sure the jurors will
12 accommodate us.
13         MR. GUTKOSKI: I -- I -- I am hopeful, if anything,
14 we'll run short and not long of one o'clock.
15         THE COURT: Okay.
16         MR. RITCHIE: Your Honor, the other thing is, I
17 think -- I believe some of the defendants will be making a
18 motion for judgment at the end of plaintiff's case. I
19 obviously don't want to do that in front of the jury.
20         THE COURT: Well, We can always -- you know, we can
21 always give them a break, and we have plenty of time. I think
22 that's good. We will do that as soon as -- as soon as the
23 testimony is done. We'll -- we'll -- I think the jurors would
24 be really flexible with us if they knew by being here until
25 2:30 they would be able to finish the evidence. So -- but we

won't inform them until we get to that point that that's where we are at. It would be nice to start fresh with arguments and charge. That would be a really nice thing to do, but, you know, we're flexible.

And I appreciate all your efforts and thoughts, and we will work in whatever breaks we have.

And, Attorney Foley, you have made copies for the parties?

MR. FOLEY: I'll have copies in just a moment, Judge.

THE COURT: All right. What we'll do is we'll provide them to the -- at the break, we can give it to you at the break or -- you wouldn't be able to be looking at them in the middle of testimony anyways so.

Okay. Let's bring the jury in.

(At 9:07 a.m., the jury entered the courtroom.)

THE CLERK: Court is now open. You may be seated.

THE COURT: All right. Good morning, ladies and gentlemen. Let me just ask you -- I'm going to assume you all had an nice weekend. So I don't have to ask you about it, were you able to abide by all my rules, no internet search and no investigation?

(No response.)

THE COURT: Thank you very much.

We're going to get right back into the case. Can the plaintiff call their witness back up.

1            MR. GUTKOSKI: We can. Good morning, ladies and
2    gentlemen. The plaintiff recalls Neil Zoltowski to the stand.
3            THE COURT: All right. Good morning, Mr. Zoltowski.
4            THE WITNESS: Good morning.
5            THE COURT: I'm going to remind you you're still under
6    oath, sir. Please have a seat.
7            And, counsel, you may inquire.
8            MR. GUTKOSKI: Thank you.
9                        DIRECT EXAMINATION
10   BY MR. GUTKOSKI:
11   Q.   Good morning, Mr. Zoltowski.
12   A.   Good morning.
13   Q.   I'm going to put back up on the screen where we were
14   in your presentation, your demonstratives, which I believe
15   was slide 7.
16        And, if you recall, we were talking about your calculation
17   of unjust enrichment damages.
18        Do you recall that testimony?
19   A.   I do.
20   Q.   And I believe you testified that this is the measure
21   of trade secret damages under both the federal and state
22   allegations for trade secret misappropriation, correct?
23   A.   That's correct.
24   Q.   And that this was one of two different ways of
25   measuring damages, correct?

1  A.  Correct.

2  Q.  And that this measured the damages received by the

3  defendants, the amount that they were unjustly enriched

4  assuming liability under those counts; is that fair to say?

5  A.  That's fair.

6  Q.  Okay. And I think where we left off was that you had

7  allocated the $2,071,974 number for profits received unjustly

8  by Blue Sun?

9  A.  Correct.

10 Q.  And then an addition $1,143,127 of additional profits

11 unjustly received by ITG?

12 A.  That's correct.

13 Q.  Okay. For the total of 3.2 -- $3,215,101?

14 A.  Correct.

15 Q.  All right. Now, having brought us back to where we left

16 off. Regarding the additional individual defendants, were you

17 able to or did you undertake to allocate unjust enrichment

18 damages amongst the individual defendants?

19 A.  I did. I was asked to do so.

20 Q.  And how did you do that?

21 A.  It was different depending on the individual, but I can go

22 through them one by one. For Mr. Lucas, given that he was the

23 one who originally came up with the idea of Blue Sun and

24 approached Mr. Wilt was really the architect of the business.

25 He recruited all of the individuals from KPM to join him. I

1  allocated the hundred percent of the Blue Sun damages here, the
2  $2.1 million to Mr. Lucas. So $2,071,974 was to Lucas.
3  Q.    Okay. What about Mr. Gajewski?
4  A.    For Mr. Gajewski, given that he was -- really
5  introduced the -- the service side of the business for Blue
6  Star -- Blue Sun, sorry, and, really, that was their business
7  model was to go in and service customers and then develop
8  relationships to then sell analyzers and other consumables.
9  You know, he kind of facilitated that for -- for Ms. Glenister
10 to come into the market and start selling as the North America
11 sales director and then also for Mr. Eilert to do service for
12 various customers.
13        And so given his role and also publishing the application
14 notes or providing the application notes to Mr. Lucas, I
15 allocated a hundred percent of the sales of Blue Sun to Mr.
16 Gajewski as well. So $2,071,974.
17 Q.    Because that profit number for Blue Sun includes both
18 profits from servicing KPM units, as well as their profits
19 derived from their 35 percent of the revenue that they get from
20 the sale of the Phoenix analyzers?
21 A.    Correct, any consumables as well.
22 Q.    Okay. What about Ms. Glenister?
23        A.    For Ms. Glenister, given that now the market had kind of
24 been facilitated by Mr. Gajewski, and she joined Blue Sun
25 in -- I don't remember the date exactly, but we used her start

1  date, given that she is the North American sales director and
2  every sale in North America will follow under her purview, we
3  took every sale of North America from the date she started
4  forward. And that was about 73 percent of the sales. That
5  number is about 1.5 million. I think the exact million is
6  $1,508,666.
7  Q.   Thank you. And this isn't a memory test. Again, we have
8  your reports like on Friday in front of you. If you feel the
9  need to take a look at them, feel -- if you have the need to
10 look at them, feel free to do so.
11      And then Mr. Eilert, what of that 2 million --
12 2,071,974, if any, did you allocate to liability for
13 Mr. Eilert?
14 A.   For Mr. Eilert, we allocated any dollars that were related
15 to the servicing that he did on behalf of customers. So just
16 any -- any transaction where he was the one who was servicing
17 the analyzer.
18 Q.   And what did that number compute out to?
19 A.   That was a little less than $42,000. I'll confirm, but I
20 believe the number was $41,734. $41,728.
21 Q.   Okay. Now to be clearer, KPM's not asking for multiple
22 recoveries here, correct?
23 A.   That's correct.
24 Q.   And so while you've allocated the 2,071,974, that would be
25 recoverable against Blue Sun itself, correct?

1  A.   That's correct.
2  Q.   And then each of the numbers for the individual defendants
3  are the amount that KPM could pursue against each of those
4  defendants according to your analysis, correct? Not sum them
5  all and get 2 million multiple times?
6  A.   They're not active sales. The 2,071,974 is the maximum.
7  Q.   Okay. Now, you said that all of this under trade secret,
8  the trade secret counts, was one measure of measuring and
9  determining damages suffered by KPM of unjust enrichment.
10       What was the other measure?
11 A.   It's actual loss by the plaintiff, and that was measured
12 by lost profits, KPM's lost profits on its lost sales.
13 Q.   Okay. And how did you go about doing any analysis of
14 KPM's actual lost profits?
15      A.   So given we had transactional data for both Blue Sun as
16 well as KPM, we looked at all of the sales made by Blue Sun and
17 matched up any sales by geographic location and customer name,
18 where there was a match with KPM, and by doing that process,
19 I -- we matched up about $3 million of the $5 .4 million in
20 total Blue Sun sales.
21 Q. Okay.
22 A.   That number is, to be exact, $3,041,457 in lost KPM sales
23 through that analysis.
24 Q.   Okay. And you did that again, you said, by matching up
25 transactional data. Just so we're all clear, what's the

1  transactional data?
2  A.  Sure. It's the invoice data we had. So we had -- we
3  looked at it on Friday for Blue Sun, which was the line-by-line
4  data which was invoice number, date, what was purchased, the
5  price that was paid, the customer name, the customer location,
6  address, et cetera.
7  Q.  I see. And then if you found parallel information with
8  KPM, you included that in your count?
9  A.  Correct.
10 Q.  Okay. And is it, therefore, your opinion that KPM lost
11 profits of the full $3 million in revenue?
12 A.  No. Obviously to get to profits, you need to deduct the
13 applicable costs.
14 Q.  I see. And what was the method, if any, that you applied
15 to your analysis to subtract costs from that 3 million plus
16 revenue number in order to obtain a result?
17 A.  So we had data from the specific division, for NIR sales
18 within KPM, and within that division, for those sales, we took
19 the cost of goods sold, which would be the cost of actually
20 manufacture itself of the product, and then we took the selling
21 the distribution expenses as well in total. Even though it was
22 likely -- we likely took more costs than necessary, but to be
23 conservative we included the entire line item.
24 Q.  I see. And did that result in a total number of -- total
25 amount of costs or percentage or what?

1   A.   It was --
2   Q.   What was the next step in the process?
3   A.   It was 30.2 percent profit margin, which we then used
4   to calculate the profit in dollars.
5   Q.   Okay. So if we could put up slide 8.
6        Is this a summary of what you were just describing?
7   A.   Yes, that's correct. So you can see the lost sales of
8   $3,041,457, multiplied by the KPM profit margin of
9   30.2 percent, and that results in lost profits of $918,520.
10  Q.   And did you perform a similar allocation process to
11  each of the individual defendants as you described
12  previously regarding unjust enrichment?
13  A.   I did. Using the same methodology that I discussed of the
14  unjust enrichment analysis.
15  Q.   You didn't apply a percentage on the unjust
16  enrichment analysis.
17       Were costs already included there or did they
18  not count in terms of the unjust enrichment analysis?
19  A.   So for the data we have for Blue Sun, there was on the
20  invoice data, the line item data we looked at on Friday, there
21  was cost information within that schedule, within that
22  financial data; and then we also had for ITG, we had their
23  financial statements. So we used their information to quantify
24  the profits for the ITG portion.
25  Q.   So in both cases is it fair to say, both your unjust

```
 1   enrichment analysis and your lost profits analysis, that you're
 2   dealing with the profits of the respective companies
 3   respectively and have already accounted for the full costs
 4   involved in making those sales?
 5   A.    Based on the information available, yes.
 6   Q.    And then I was asking you about allocation of lost profits
 7   among the different defendants.
 8         Did you do that analysis?
 9   A.    Yes. As I stated previously, I allocated 100 percent of
10   the damages to Mr. Lucas and Mr. Gajewski, and I did the same
11   here in the lost profits analysis. So for each of them I
12   allocated $918,520.
13   Q.  Okay.
14   A.    For Ms. Glenister, again the same analysis, looking at the
15   date she started and taking all of the sales that were made in
16   North America from the date she started forward, given she's
17   the North American sales director. That amount totaled
18   $624,456.
19   Q.    And then for Mr. Eilert.
20   A.    And for Mr. Eilert, I looked at just those instances where
21   he actually serviced the analyzer for those transactions, and
22   that number is $15,353.
23   Q.    Okay. And once again, as we saw with the unjust
24   enrichment way of measuring trade secret damages, the
25   allocations that you're talking about are not additive,
```

1  correct?
2  A.    Correct, they're not additive.
3  Q.    Okay. All right. So that's the questions that I have for
4  trade secret misappropriation.
5        Let's talk about the additional counts in this case
6  for various breaches by the defendant -- defendants. Okay?
7  A.    Sure.
8  Q.    There are three counts and allegations that KPM makes
9  against the defendants for breaches, a breach of contract, I
10 guess the individual defendants -- sorry, breach of contract,
11 breach of good faith and fair dealing, and breach of the duty
12 of loyalty.
13       What measure of damages do you understand did you use for
14 your analysis as being available for each of those three types
15 of breaches by the individual defendants?
16 A.    My understanding is, based upon those claims or causes of
17 action, that the available damages remedy would be the harm to
18 the plaintiff, so the actual loss. Really trying to put the
19 plaintiff back in the place it would have been had the
20 wrongdoing not happened.
21 Q.    And that's true for breach of contract?
22 A. Correct.
23 Q.    And for breach of covenant of good faith and fair dealing?
24 A. Correct.
25 Q.    And for the -- the breach of their duty of loyalty to KPM?

```
 1  A.  Correct.
 2  Q.  So all three of those are measured by the harms suffered
 3  by KPM. Can we make use of your previous harm calculations
 4  under the trade secret counts for these three counts?
 5  A.  Yes, my lost profits analysis would apply here.
 6  Q.  Okay.
 7          MR. GUTKOSKI: And if we could put up slide 9.
 8  BY MR. GUTKOSKI:
 9  Q.  We see the same numbers we just saw on slide 8, correct?
10  A.  That's correct.
11  Q.  Because the total harm of loss suffered by KPM is the
12  total loss suffered by KPM whether we look at it under trade
13  secrets or the breaches?
14  A.  Correct. This would put the plaintiff back in the place
15  it would have been.
16  Q.  And did you allocate this amount amongst the four
17  individual defendants that would potentially be liable for
18  breaching the contract, the duty of good faith and fair dealing
19  and the duty of loyalty?
20  A.  I did. I'm just glad you didn't ask me to remember the
21  names of the tort claims.
22  Q.  They're harder than remembering the numbers, I'm sure.
23      So what if the jury were to award unjust enrichment as the
24  measure of trade secret damages, but lost profits under the
25  breaches of contract fair dealing and loyalty, how would
```

1  that -- how would that math work out?
2  A.    Sure. I think we may have chatted about this on Friday,
3  but the same -- the same would apply where it would be only a
4  maximum of the unjust enrichment of the 3.2 million. That
5  would be the maximum damages. They're not additive. So you
6  wouldn't take both of them.
7  Q.    If the jury were to decide between the 3.2 million and the
8  918,000 options under trade secrets, the 3.2 would predominate
9  over the breaches counts?
10 A.    Correct. Or even if both were found, you know, liable
11 under both counts, it would just -- not to say this would be
12 thrown to the side, but it just wouldn't be counted for as
13 damages, because the 3.2 million of the unjust enrichment
14 related to the misappropriation of trade secrets would be --
15 would take precedence.
16 Q.    And KPM isn't permitted and is not acting -- not asking to
17 double count here?
18 A.    No.
19 Q.    Okay. Let's talk about Count Seven, which is tortious
20 interference with contractual relations. You thought the last
21 ones were hard to say.
22       What's your understanding of interference with contractual
23 relations? First of all, which -- which defendants is KPM
24 making those allegations against?
25 A.    Against the individual defendants.

```
 1  Q.    For the tortious interference against the companies or
 2  the --
 3  A.    Oh, sorry, against the companies.
 4  Q.    So the entity defendants?
 5  A.    Yes, correct.
 6  Q.    Okay. And what is the measure of damages, as you
 7  understand it, available for Blue Sun and ITG's interference
 8  with the contracts of the individual defendants?
 9       A.    It would be similar to what I discussed related to trade
10  secret misappropriation. So a laundry list of items related to
11  unjust enrichment as well as the -- the actual loss to the
12  plaintiff, so increased costs, lost profits, harm to goodwill,
13  et cetera.
14  Q.    And so again, we have two potential measures of damages,
15  the unjust enrichment or the lost profits?
16  A.    Yes.
17  Q.    Okay. In terms of tortious interference, are there any
18  additional amounts that you calculated for tortious
19  interference unjust enrichment different from trade secret
20  misappropriation unjust enrichment?
21  A.    So the only difference is in this instance, there were
22  some additional costs that KPM incurred related to replacing
23  and finding replacements for the departed employees. So this
24  related to recruiting expenses. It could be, you know, hiring
25  firms. It could be posting job postings, and monitoring those
```

```
 1   job postings. It could be -- there was a various lists of
 2   expenses that were incurred to the total of approximately
 3   $211,000.
 4   Q.   Okay. So if we could take a look at slide 10.
 5        So you take the same total and include those increased
 6   costs?
 7   A.   Correct.
 8   Q.   So the total amount of damages available against the
 9   entity defendants for tortious interference is what amount?
10   A.   It's $3,426,792.
11   Q.   Okay. And I think you said lost profits, and that
12   approach was also available for tortious interference?
13   A.   Yes, correct.
14   Q.   Okay. If we look at your next slide, did you apply that
15   amount and include those additional increased costs that you
16   mentioned?
17   A.   Yes, you can see on the top line is my analysis we spoke
18   about for lost profits of $918,520. On the second line is the
19   increased costs, totaling $211,691. And that gives a total of
20   $1,130,211.
21   Q.   So in terms of tortious interference, both the 3.426792
22   or 3,426,792 number and the 1,130,211 number are available to
23   the jury to measure the KPM damages under that count?
24   A.   Correct.
25           MR. GUTKOSKI: May we approach?
```

```
 1              THE COURT: Yes.
 2              (Sidebar as follows:)
 3              MR. GUTKOSKI: Mr. Zoltowski has done a calculation for
 4   what the damages would be under 93A, just straight up, no
 5   doubling or trebling, but I don't know if your Honor is going
 6   to give instructions to the jury and ask for an advisory
 7   opinion on that; and therefore, I do not want to get into 93A
 8   if you weren't going to be including that in your instructions.
 9              THE COURT: I have it preliminarily included in the
10   instructions.
11              MR. GUTKOSKI: Okay. Then I'll --
12              MR. RITCHIE: We believe that is a calculation for the
13   Court, your Honor, not the jury, which is why Mr. Gutkoski was
14   asking for guidance from the Court in the first place.
15              THE COURT: All right. So how do you respond to the
16   calculation being within the purview of the Court versus the
17   jury?
18              MR. GUTKOSKI: I think the law is unsettled as to
19   whether it is a jury question or a court question.
20              THE COURT: I can only tell you that in the state
21   court when I have tried 93A actions, it is bifurcated prior
22   to the start of the trial.
23              MR. GUTKOSKI: And it wasn't bifurcated here, nor was
24   there a motion to do so. In a case that we cited to you
25   multiple times that was tried earlier this year in this
```