# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KPM ANALYTICS NORTH AMERICA CORPORATION, <br>      *Plaintiff.* <br><br>   v. <br><br> BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, MICHELLE GAJEWSKI, ROBERT GAJEWSKI, RACHAEL GLENISTER, GREGORY ISRAELSON, IRVIN LUCAS, AND PHILIP OSSOWSKI, <br><br>      *Defendants.* | Civil Action No. 21-10572-MRG |

**PLAINTIFF KPM ANALYTICS NORTH AMERICA CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF ON ITS CHAPTER 93A COUNT AND FOR PREJUDGMENT INTEREST ON ALL COUNTS**

Plaintiff KPM Analytics North America Corporation ("KPM") respectfully requests this Court enter an order in its favor on its Chapter 93A claim (Count X), awarding damages and attorneys' fees, including a finding that the Jury's Verdict that Defendants Blue Sun Scientific, LLC ("Blue Sun") and The Innovative Technologies Group & Co., Ltd. ("ITG", and collectively with Blue Sun, the "Entity Defendants") engaged in knowing or willful unfair or deceptive trade practices justifies the award of treble damages.  KPM further requests that the Court enter an order awarding prejudgment interest on all counts against all defendants in accordance with the Jury's Verdict.

## I.      Standard for Chapter 93A

To determine whether conduct violates Chapter 93A, the court considers "(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass 593, 596 (1975); *see also Biopoint, Inc. v. Andrew Dickhaut & Catapult Staffing, LLC*, 2023 WL 3071422, *7 (D. Mass. Apr. 25, 2023).  The record at trial establishes that both Entity Defendants engaged in conduct that met this standard, did so knowingly or willfully, and damaged KPM.

## II.     ITG and Blue Sun Engaged in Willful or Knowing Unfair or Deceptive Trade Practices

### A.      The Jury Made Predicate Findings for Entry of Judgment that Blue Sun and ITG Engaged in Willful or Knowing Unfair or Deceptive Trade Practices.

This Court asked the Jury two questions regarding the Chapter 93A count. The Jury answered affirmatively that both Blue Sun and ITG had engaged in unfair or deceptive acts and that both had done so willfully or knowingly.

1

*Unfair and Deceptive Trade Practices (Chapter 93A)*

**Question 14**: Did KPM prove, by a preponderance of the evidence, that either Blue Sun or ITG or both engaged in any competition, or any attempt at competition, using unfair or deceptive acts or unfair methods of competition in the conduct of trade or commerce?

As to Blue Sun:        YES ____✓____        NO _____

As to ITG:             YES ____✓____        NO _____

*Answering "Yes" indicates a finding for KPM.*

*Answering "No" indicates a finding for Defendant(s).*

**Question 15**: Did KPM prove, by a preponderance of the evidence, that either Blue Sun or ITG or both willfully or knowingly engaged in unfair methods of competition or unfair or deceptive acts or practices?

As to Blue Sun:        YES ____✓____        NO _____

As to ITG:             YES ____✓____        NO _____

*Answering "Yes" indicates a finding for KPM.*

*Answering "No" indicates a finding for Defendant(s).*

ECF No. 230.  The Jury was correct.  By answering question 14 in the affirmative for both ITG and Blue Sun, the Jury made factual findings justifying the imposition of Chapter 93A liability. By answering question 15 in the affirmative, the Jury found the facts necessary to warrant multiple damages.  This Court should adopt the Jury's correct findings on each of those issues.

**B.    The Trial Record Establishes That ITG and Blue Sun Engaged in Knowing or Willful Unfair or Deceptive Conduct that Supported the Jury's Findings.**

The findings by the Jury are well-supported by the overwhelming weight of the evidence. This Court should adopt the Jury's findings and, to the extent necessary, make its own additional factual findings in entering judgment in favor of KPM that both Entity Defendants willfully or knowingly engaged in unfair methods of competition or unfair or deceptive trade acts or practices. *Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir. 1987) (finding that the district court was not required to make specific findings of fact as to a Chapter 93A claim where the jury verdict "resolved all material, factual issues relating to the 93A claim.").

The Jury concluded, properly, that both ITG and Blue Sun engaged in tortious interference, ECF No. 230, which by itself is sufficient to establish an unfair or deceptive act under Chapter

93A.  ECF No. 165 at 6 n. 4 (summary judgment order explaining that a finding of tortious interference by ITG can support a Chapter 93A finding against ITG); *Biopoint, Inc. v. Andrew Dickhaut & Catapult Staffing, LLC*, 2023 WL 3071422, *7 (D. Mass. Apr. 25, 2023); *People's Choice Mortg., Inc. v. Premium Capital Funding, LLC*, 2010 WL 1267373, *18 (Mass. Super. Ct. Mar. 31, 2010) ("Topdot's actions constituted a tortious interference with an advantageous business relationship. Thus, Topdot's actions were within a concept of unfairness established at common-law. For this reason, the court concludes that Topdot's actions merit relief under G.L. c. 93A, § 11").  The Jury also concluded, properly, that Blue Sun misappropriated KPM's trade secrets, ECF No. 230, which is also sufficient to establish an unfair or deceptive trade practice under Chapter 93A.  *Biopoint*, 2023 WL 3071422 at *7; *see also Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 243 (1st Cir. 2005).

      1.     **The Trial Record Supports the Jury's Findings That ITG Engaged in Knowing or Willful Unfair or Deceptive Conduct.**

The specific facts of this case demonstrate that ITG engaged in unfair or deceptive trade practices.  ITG set up Blue Sun as the sales arm of ITG.  Day 5, Tr. 27:20-22.  When ITG, through its sole owner and CEO Bob Wilt, engaged Irvin Lucas to set up Blue Sun, Wilt never asked whether Lucas or any other former KPM employees that Lucas would then hire had any contracts or nondisclosure obligations to KPM.  Day 8, Tr. 74:4-12; 76:8-16.  In fact, he affirmatively said he did not want to know anything.  Day 5, Tr. 147:17-23.  After Lucas joined Blue Sun, Wilt did not take any steps to ensure that Lucas was living up to his confidentiality obligations to KPM and he placed no restrictions on Lucas as to who Lucas could hire for Blue Sun. Day 8, Tr. 75:3-8.  Wilt never put any restrictions on who Lucas could hire (or contract with) to work for Blue Sun.  Day 8, Tr. 75:6-8.  Wilt himself interviewed KPM employee Philip Ossowski before he was hired by Blue Sun, but Wilt never asked Ossowski if he had any contract or non-disclosure obligations

with KPM.  Day 8, Tr. 73:14-74:12; Tr. Ex. 89.  ITG never placed any restrictions on what Blue

Sun could do in selling ITG's analyzers, despite owning 100% of Blue Sun and taking 65% of the

revenue of every analyzer sold by Blue Sun and despite Wilt being the Manager of Blue Sun.  Day

8, Tr. 58:14-17; 59:8-13; 80:17-22. This tortiously interfered with the contractual relationships

that KPM had with each of its employees, including Irvin Lucas, by poaching them to start the

new entity Blue Sun to compete with KPM using KPM's confidential information and violated

Chapter 93A.[1]  *Angiodynamic, Inc. v. Bioletic AG*, 991 F.Supp.2d 299, 304, 306 (D. Mass. 2014)

(finding tortious interference and a violation of Chapter 93A by parent company where parent set

up subsidiary to insulate parent from responsibility for breaches of contract with a third party).

Similarly here, ITG violated Chapter 93A when it set up Blue Sun and Blue Sun then promptly

hired KPM employees and through them engaged in business using KPM's confidential

information and trade secrets, willfully permitting and assisting those employees to breach their

obligations with KPM.

      ITG's defense, rejected by the Jury, that it didn't know, and didn't want to know, about the

contractual obligations owed to KPM by each of the former KPM employees who it and Blue Sun

poached from KPM and their repeated actions to violate those obligations does not insulate ITG

from a finding of knowing or willfulness under the law.  To the contrary, willful blindness is not

a basis for denying multiple damages.  A finding of willfulness to justify multiple damages only

requires that the defendant acted with recklessness.  *Kattar v. Demoulas*, 739 N.E.2d 246, 259

(Mass. 2000) ("We have said that a finding of 'wilful' conduct within the meaning of c. 93A is

---

[1] Bob Wilt's testimony that he intended to compete with FOSS and not KPM, Day 8, Tr. 75:12-15, is not credible given that all of the employees hired by Blue Sun were former KPM employees who had relationships with KPM customers and knew how to service KPM analyzers; knowledge and abilities that Blue Sun repeatedly leveraged in seeking to sell ITG's analyzers. Day 8, Tr. 76:2-4.

satisfied where the defendant has acted recklessly.")  Recklessness does not require that ITG actually knew that Lucas and others he hired had non-disclosure obligations to KPM with which ITG interfered by establishing and operating Blue Sun as it did; it merely requires that ITG should have known. *Id.*  Wilt testified that it was not his "expectation" that the former KPM employees would have had contracts with KPM and did not ask whether they had contracts.  Day 8, Tr. 76:7-16.  Yet, Wilt has been a businessowner of ITG for over 25 years. Day 8, Tr. 86:13-17.  ITG has 6 full-time and 4 part-time employees, with its own office and machine shop. Day 8, Tr. 84:3-9.  Wilt was one of the original creators and owners of another company, Unity, in late 2001/early 2002. Day 8, Tr. 95:3-7.  Unity was sold to WestCo Scientific in 2008. Day 8, Tr. 98:11-13. As part of the sale of Unity, Wilt entered into a non-competition agreement prohibiting him from selling NIR machines for a period of five year. Day 8, Tr. 98:14-22.  Therefore, based on Wilt's business experience over the past 25 years, which included the creation of both ITG and Unity, the sale of Unity to another corporation, and a 5-year noncompetition agreement that he entered into and abided by as part of the sale of Unity, Wilt should have known that Lucas and the other former KPM-employees would have had confidentiality agreements that they were obligated to comply with, or at the very least should have known to ask about any confidentiality agreements based on his prior business experience. *Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co.*, 381 Mass. 1, 6 (1980)) ("A defendant cannot insulate himself by studious ignorance of pertinent warning facts.") (quotations omitted).

ITG's unfair and deceptive conduct also notably continued once ITG and Wilt learned that Blue Sun was using KPM's trade secrets, including UCAL software, confidential customer information, and application notes.  Wilt, as the sole owner of ITG, which solely owned Blue Sun, and as the Manager of Blue Sun, had the ability to terminate Lucas when he learned new facts

about Blue Sun's nefarious conduct no later than the filing of the lawsuit.  Day 8, Tr. 106:24-107:2.  But he did not.  He took no action to fire Lucas or any of Lucas's hires, and he took no action to alter their conduct.  Day 8, Tr. 106:24-107:14.  Wilt took no action when sued, when more facts were revealed during discovery, nor when the defendants were preliminary enjoined by this Court.  *Id.*  That repeated failure to terminate the unfair or deceptive conduct when ITG learned about it is a continuing violation of Chapter 93A by ITG.  *Trenwick Amer. Reinsurance Corp. v. IRC, Inc.*, 764 F.Supp.2d 274, 305 (D.Mass. 2011) ("while there is considerable debate about whether litigation tactics alone can rise to the level of a Chapter 93A violation, there is little doubt that a course of conduct beginning before litigation and continuing unabated, thereafter may do so.") (citing *Commercial Union Ins. Co. v. Seven Provinces*, 217 F.3d 33, 41 n. 5 (1st Cir. 2000)) (emphasis removed).

### 2. Blue Sun Engaged in Knowing or Willful Unfair or Deceptive Conduct that Supported the Jury's Findings.

Blue Sun's conduct also falls squarely within the type of knowing or willful unfair or deceptive trade practices prohibited by Chapter 93A.  Because a company can only act through its agents and employees, the actions of all of the people employed by Blue Sun are relevant – its sole manager Bob Wilt, its president Irvin Lucas, as well as consultants and employees Robert Gajewski, Rachael Glenister, Arnold Eilert, Philip Ossowski, Gregory Israelson, Joshua Sarver and William Brown.

Unlawfully diverting customers from KPM to Blue Sun was a core pillar of Blue Sun's business model from the beginning, all in violation of Chapter 93A.  When KPM customers sought to schedule service calls with KPM, including for preventative maintenance, KPM employee Michelle Gajewski redirected their inquiries to Blue Sun, and to her husband Rob Gajewski in particular.  Day 7, Tr. 48:5-49:11; Tr. Exs. 102, 112, 114, 302.  Rob Gajewski and others working

on behalf of Blue Sun would then perform services, invoice the customer on behalf of Blue Sun, and the customer would pay Blue Sun, not KPM, for the services provided.  To further support this diversion of business, Blue Sun gave Michelle Gajewski control of an email address at Blue Sun (info@bluesunscientific.com) while she was employed by KPM.  Day 4, 147:22-148:3; Day 7, Tr. 50:4-15.  *BioPoint* is particularly instructive here.  The parties in *BioPoint* were in the business of staffing placements in the life sciences industry.  After the defendant was created, it began to compete with the plaintiff by having one of its employees provide proprietary information about clients and staffing candidates from plaintiff's database to her boyfriend, who worked for the now competing defendant. 2023 WL 3071422 at *3.  Like Blue Sun here, the defendant in *BioPoint* violated Chapter 93A.  *Id.*

Blue Sun's unlawful diversion of business was successful.  When KPM customer Jungbunzlauer needed annual maintenance on its Spectrastar machines, Rob Gajewski emailed the Jungbunzlauer contact from his Blue Sun email address and offered then a "more attractive" quote than what KPM offered, and ultimately performed the maintenance on behalf of Blue Sun. Day 5, Tr. 134:18-135:11.  Rob Gajewski actively solicited KPM customer Lamb Weston's business by informing Lucas of the prices KPM offered in previous years (including discounts provided) and instructed Lucas to offer a similar discount to get Lamb Weston's business. Day 6, Tr. 147:1148:9. As for KPM-customer Omega Protein, Rob Gajewski simply informed the Omega Protein contact that he would be coming out to service the Spectrastars as Blue Sun, only explaining that he had "moved from Unity and [is] now at Blue Sun" and ultimately performed service at three different Omega Protein plants on their Spectrastars on behalf of Blue Sun. Day 7, Tr. 14:2-22; Trial. Ex. 113.  At one point during the scheduling of the Omega Protein Spectrastar annual service, a contact at Omega Protein reached out to Michelle Gajewski at her KPM email address stating that the

service has been approved and was looking to schedule service. Day 7, Tr. 15:18-16:4.  Rob Gajewski then sent the message to Lucas stating that he was "hoping that this was a mistake" considering Rob Gajewski planned to perform the service on Omega Protein's Spectrastars on behalf of Blue Sun. Day 7, Tr. 16:12-13.  In the end Rob Gajewski performed the annual service on the Omega Protein machines on behalf of Blue Sun, as planned.  Day 7, Tr. 14:2-22. Rob Gajewski also reached out to KPM customer Saputo in 2019 to perform servicing on its Spectrastar machines. Trial Ex. 102.  A year later, in 2020, when the annual service on the Spectrastar machines were due, Saputo had sent a message to Michelle Gajewski at her KPM email address to schedule servicing, however Rob Gajewski emailed Saputo from his Blue Sun email account to schedule the annual servicing and performs the service on behalf of Blue Sun. Day 7, Tr. 48:5-49:11.

Blue Sun also stole KPM's data by copying computer files.  On behalf of Blue Sun, Rob Gajewski copied and took with him three external hard drives of data, eventually returning two and keeping one.  Tr. Exs. 94; 484.  KPM, in investigating the Defendants' conduct, obtained screenshots showing Rob Gajewski copying customer data from his KPM issued hard drive to a Lexar thumb drive that also contained Blue Sun information. Day 3, Tr. 113:11-116:3; Tr. Ex. 94. That Lexar thumb drive was never returned to KPM.  Day 3, Tr. 121:15-24.  The other two hard drives on which Rob Gajewski had copies of KPM material from his entire career at KPM were not returned upon his termination, but only later when demanded by KPM in this litigation.  Day 3, Tr. 120:2-17; Tr. Ex. 484.  When Rob and Michelle Gajewski were terminated on April 6, 2021, Rob Gajewski immediately began to archive his entire email account from his KPM computer to preserve it, which included the customer communications and related trade secrets and confidential information he maintained within his email account.  Day 3, Tr. 117:14-118:20.

Rachael Glenister also secreted away KPM's information for the benefit of Blue Sun while she was still working at KPM by funneling it through non-KPM email accounts, including forwarding customer information to her personal email address 22 minutes before the close of business on her last day at KPM. Day 6, 35:21-41:18, 43:5-50:2; Tr. Exs. 161, 164, 165, 166, 167, 306, 400, 401.  Blue Sun's Irvin Lucas and Josh Sarver both received certain of this information. Tr. Ex. 161, 164, 306, 400. Blue Sun, through at least Lucas, Gajewski and Glenister, used KPM's confidential pricing information to formulate lower quotes for Blue Sun to use in poaching KPM customers.  Day 6, 147:10-24; Day 7, Tr. 18:1-19:18; Tr. Ex. 112, 115.  Such misappropriation of KPM's customer data and price lists was a violation of Chapter 93A.  *BioPoint*, 2023 WL 3071422 at *5.

Blue Sun's misappropriation of KPM's proprietary and long-developed UCAL calibration software separately violated Chapter 93A.  Rob Gajewski repeatedly used his KPM-issued UCAL license to service customers on Blue Sun's behalf.  Day 6, Tr. 126:4-15; 127:3-8; Day 7, Tr. 34:12-13; 36:1-4; 92:21-93:7.  Arnold Eilert also kept a copy of UCAL software on his computer, Day 7, Tr. 146:25:147:6, despite being instructed to return all Company information and being instructed upon his departure from KPM that he cannot use it and being under a contractual obligation not to use it.  Tr. Exs. 333, 346.  He then proceeded to use KPM's proprietary software for Blue Sun's benefit once he was employed by Blue Sun. Day 8, Tr. 14:20-25; 17:20-18:19; Tr. Exs. 65, 155.

Misappropriation of KPM's calibration data also violated Chapter 93A.  The record is replete with Blue Sun using KPM's calibration data to assist customers on Blue Sun's behalf. *See, e.g.*, Tr. Ex. 65, 155 184, 186, 201; Day 6, Tr. 129:11-130:4; 130:19-25; 141:17-22; 142:24-143:17; Day 8, Tr. 9:16-11:1; 14:17-15:2; 17:20-18:19; 20:8-10; 20:15-17.  Having and using

9

KPM's calibration data obtained over KPM's working side by side with customers for two decades provided a competitor like Blue Sun a "head start" to compete immediately in the marketplace without having to invest the time, effort and costs of two decades worth of work in the day to day specifics of running a near infra-red spectroscopy business.  Day 2, Tr. 40:10-17.  Obtaining this sort of unfair head start through trade secret misappropriation is squarely within the conduct prohibited by Chapter 93A.  *BioPoint*, 2023 WL 3071422 at *6, *8.

Blue Sun also violated Chapter 93A by copying KPM's documents for use with customers, including the preventative maintenance ("PM") checklists.  Blue Sun used copies of KPM's checklists for preventative maintenance when Blue Sun started to service KPM Spectrastars, with the sole material difference being the branding and letterhead.  The substance of the checklists was identical in all substantive respects, even to the prominent detail of green lettering stating "The undersigned certified that your Unity Instrument meets factory standards, both mechanical and optical." Day 3, Tr. 99:23-100:14; Tr. Exs. 110, 395, 446, 479.  At a minimum, using these copies with customers is confusing to them about which company was providing them service and, thus, immoral in violation of Chapter 93A.[2]

Blue Sun also violated Chapter 93A by telling lies and half-truths to KPM customers in order to benefit Blue Sun and harm KPM. Rob Gajewski, acting on behalf of Blue Sun, told or assisted in many of these fairy tales.  Tr. Ex. 443 (On February 8, 2019, "As I mentioned, I have officially left Unity and am now working with Blue Sun Scientific.  We can continue to provide all of the support for the NIR instruments…"); Tr. Ex. 104 (On February 11, 2019, a contact at

---

[2] Wilt's testimony claiming without support that he created the checklists before he sold the original Unity business to KPM's predecessor Westco Scientific is a red herring.  When he sold the business, he sold the entire Unity Business, which would include the PM checklists. Day 8, Tr. 98:11-13.

Kellogg's stated, "Rob has moved from his position at Unity and has started a new company, Blue Sun, that will focus on developing and supporting NIR instruments" and Rob did not correct them (*see*, Day 6, Tr. 140:8-10)); Tr. Ex. 119 (On February 28, 2019, "there have been many changes at Unity from the investment group that owns the company.  From this, a new company, Blue Sun Scientific, has been created to provide the service and support for the NIR units. I am now part of this company. So, same people supporting, just a different name on the door."); Tr. Ex. 105 (On March 4, 2019, "This is my new e-mail address.  Please use this one going forward.  I am with Blue Sun Scientific (contracting some with Unity) now and will still be the main contact for providing support for the NIR units.  So, please contact me here if you need something); Tr. Ex. 302 (On March 8, 2019, Rob messages, "I am now at Blue Sun Scientific and can still do the PM on your SpectraStar." and the customer responded, stating that "Josh [Sarver] had perfect timing, I had just gotten Blue Sun contact information from Michelle." (*see also*, Day 7, Tr. 21:6-11; 21:17-21)); Tr. Ex. 118 (KPM-customer Lamb Weston states, "This is from Rob – there has been a name change for the department that he is in – now called Blue Sun Scientific – " and Rob does not correct them ); Tr. Ex. 331 (On July 21, 2020, Blue Sun sends a quote for annual service on a Spectrstar system owned by Disney to a Disney contact, prompting Disney to ask "[o]nly potential problem – with your new name and likely banking information – are you a Disney vendor?" and "Were you guys under the name KPM analytics last year?").

Blue Sun's conduct in pursuing PM servicing opportunities for KPM Spectrastar units and customer not only wrongfully diverted service revenue from KPM to Blue Sun, it also led to much greater damages for subsequent analyzer sales by Blue Sun and ITG.  Witnesses from both sides agreed that developing relationships with customers for PM servicing is done in part to obtain the lucrative analyzer sales that can be made at the end of the so-called "service-to-sales" pipeline.

Day 3, Tr. 49:13-50:11 (Olson); Day 5, Tr. 52:11-14 (Lucas); Day 6, Tr. 64:15-65:1 (Glenister); Day 7, Tr. 43:6-8 (Gajewski); *see also* Tr. Ex. 11 at 3, ("Service is integral to our business.").  For example, when KPM customer Post contacted Rob Gajewski, who had performed both multiple years of PM servicing and calibration adjustments for Post on behalf of Blue Sun while he was simultaneously working for KPM, to purchase a new Spectrastar, Blue Sun instead sold Post a Blue Sun Phoenix analyzer and went on to sell them at least 15 or 16 more analyzers for about $50,000 each.  Day 7, Tr. 42:3-43:14; Tr. Ex. 14.

All of this conduct was unfair and deceptive, willfully done, and knowingly so.  Blue Sun set up pseudonymous email addresses as they poached employees to help them in their subterfuges with customers, calling Rob Gajewski "Rob Roberts", Day 6, Tr. 133:16-134:9; 142:16-23; Tr. Exs. 105, 109, 477, calling Greg Israelson "Greg Gregory", Day 6, Tr. 122:6-15, Tr. Ex. 478, and calling Arnold Eilert "Don Donaldson."  Day 6, Tr. 62:6-14; Tr. Ex. 11.[3]

Blue Sun's deceptive conduct also was not limited to misuse of customer connections, data, information and documents for servicing KPM analyzer customers and, eventually, migrating them to buying ITG/Blue Sun analyzers.  Blue Sun also posted on its website KPM's calibration data for multiple constituent products taken by Blue Sun contractor (later employee) Gajewski from KPM's calibration data libraries, processed using KPM's UCAL software, all to create Blue Sun Application Notes, falsely claiming that they reflected data produced on ITG/Blue Sun Phoenix

---

[3] The only excuse Defendants proffered for using these pseudonymous email addresses was Eilert's claim that the fake email address was necessary to set up employee benefits information with Blue Sun and was used for internal communications between himself and Blue Sun.  Day 8, Tr. 30:23-31:13.  That is not credible, given that he already had a personal email address (aeilert@att.net) making any other new one superfluous. Tr. Ex. 477; Day 8, Tr. 39:24-40:5.  In addition, at Trial Ex. 11, Ms. Glenister uses the don@bluesunscientific.com email address to connect Eilert with KPM-customer, Blommer Chocolate, which Eilert admitted was an example of the use of the don@bluesunscientific.com email address to not set up his employee benefits. Day 8, Tr. 40:6-17.

Analyzers.   Tr. Ex. 24; Day 5, 76:20-79:17 (Lucas); Day 6, Tr. 127:15-128:2 (Gajewski). Misleading advertisement like this itself separately constitutes unfair and deceptive trade practices. *Dumont v. Reily Foods Company*, 934 F.3d 35, 40 (1st Cir. 2019).

If Blue Sun's conduct, taken individually or as a whole, was as innocent as Defendants contended it was, there would have been no need for lying to customers, lying to KPM, secretly copying data onto hard drives, secretly misusing KPM's UCAL software, using fake email addresses, and generating completely fraudulent Application Notes.  Blue Sun's repeated efforts to lie and hide its conduct further shows that it affirmatively knew that what it was doing was wrong.  *See, e.g.,* Tr. Ex. 111 (Rob Gajewski writing to a third party "Please, please, please be careful where you are sending emails to me.  You can't send Blue Sun emails to my Unity address.").  If this case is not one in which the unfair and deceptive conduct has been willful and knowing, as the Jury so found, there will never be such a case.  For all of their misconduct and all of these reasons, this Court should award KPM the maximum exemplary damages available under Chapter 93A by trebling the actual damages against ITG and Blue Sun.

### C.    Blue Sun and ITG Engaged in Unfair and Deceptive Conduct by Violating the Preliminary Injunction In Addition to the Evidence Heard By the Jury.

Beyond the copious evidence of unfair and deceptive trade practices heard by the jury, this Court has the additional evidence before it that the defendants ***violated the Preliminary Injunction*** based on the uncontested admissions of defendants at trial.  They did so not once, but repeatedly, with multiple customers. Their violations provide an additional basis for a finding of Chapter 93A liability and multiple damages. *Auto Placement Center, Inc. v. Clemmey's, Inc.*, 2001 WL 881685, *1 (Mass. App. Ct. Aug. 6, 2001) (Rule 1:28 Decision) (finding a violation of an injunction constituted a violation of Chapter 93A, § 11).  The Preliminary Injunction entered, both originally and as modified, states in relevant part:

> Defendants are prohibited for the duration of this Action from offering to
> sell or selling any Phoenix Near-Infrared analyzer product to any party for
> which any Defendant has previously offered to provide or provided or
> offered to sell or sold any services or products related to any Near Infra-Red
> analyzer manufactured or sold by KPM or its predecessors in interest,
> including but not limited to analyzers manufactured or sold by Unity
> Scientific or Process Sensors Corporation from July 2, 2018 to the present.

ECF No. 94, ¶ 6 (entered August 23, 2021); ECF No. 120, ¶ 6 (entered December 17, 2021).

Defendants violated this paragraph of the injunction by selling Phoenix Analyzers to R&R

Machine.  Prior to the lawsuit being filed, KPM had sold a Spectrastar analyzer to R&R Machine

and Glenister was the KPM employee responsible for the sale. Day 6, Tr. 51:9-20; Trial Ex. 162,

383.  Thus, R&R was a "party for which any Defendant has previously offered to provide or

provided or offered to sell or sold any services or products related to any Near Infra-Red analyzer

manufactured or sold by KPM," making it a prohibited customer for defendants and for any

Phoenix analyzer.  *See* ECF No. 120, ¶ 6. Nonetheless, the undisputed evidence at trial showed

that Blue Sun then sold multiple Phoenix NIR analyzers (and other products) to R&R Machine

after the injunction was entered – on at least February 11, 2022 (Trial Ex. 474), March 18, 2022,

and August 3, 2022, (Trial Ex. 475); Day 6, Tr. 51:24-52:15; 113:18-114:3.[4]  Thus, Blue Sun and

Glenister sold more than one "Phoenix Near-Infrared analyzer product" to R&R, a prohibited

customer, after the injunction was ordered, and did so repeatedly.

Blue Sun also violated the injunction by selling to Idahoan.  Idahoan was a customer of

KPM and its business unit Process Sensors Corporation.  Day 4, Tr. 23:18-24; Day 6, Tr. 111:3-

10.  KPM's Unity business unit also offered to sell a Spectrastar to Idahoan and provided them

---

[4] Blue Sun and ITG cannot legitimately claim that they did not violate the injunction on the
specious argument that sales to R&R were for resale as an "OEM Sale."  Tr. Ex. 474. First,
Glenister admitted they were sales of Phoenix analyzers to R&R. Day 6, Tr. 113:18-114:3. Second,
the injunction prohibits the sale of any "Phoenix Near-Infrared analyzer product" to R&R without
regard to what use R&R would put it.

with a loaner Spectrastar analyzer as a trial, but eventually purchased a Phoenix from Blue Sun. Day 5, Tr. 158:9-16; Day 6, Tr. 111:17-21. Glenister and Gajewski were the defendants who offered to sell a Spectrastar analyzer to Idahoan in 2019 and provided Idahoan the loaner model from KPM. Declaration of Eric Olson, filed herewith, ¶¶ 5-10 & Exhibits A through D; Tr. Ex. 9; Day 5, Tr. 136:17-137:1 (Lucas testifying that Idahoan had obtained spectral data on Spectrastar prior to March 16, 2020 email to Lucas at Blue Sun and Glenister at KPM). Thus, Idahoan was a prohibited customer because it was a "party for which any Defendant [Glenister and Gajewski] has previously offered to provide or provided or offered to sell or sold any services or products related to any Near Infra-Red analyzer manufactured or sold by KPM." By subsequently making Phoenix analyzer sales to Idahoan on January 26, 2022 (Tr. Ex. 474) and June 2, 2022 (Tr. Ex. 475), Blue Sun violated the preliminary injunction. *See also* Day 6, Tr. 53:16-24.

Blue Sun's violation of the preliminary injunction demonstrates that its conduct was unfair and deceptive even beyond what the jury concluded because the jury was unaware of the existence of the injunction. *Auto Placement Center.*, 2001 WL 881685 at *1. There can be no doubt that these violations of the injunction were willful and knowing because they all occurred while Blue Sun was represented by counsel who could interpret the injunction, meaning Blue Sun knew or should have known that the sales to R&R and Idahoan were prohibited. This is a further reason why the Chapter 93A damages against Blue Sun should be trebled.

## III.   Blue Sun's and ITG's Unfair and Deceptive Conduct Damaged KPM

The tortious interference that the Jury found the Entity Defendants engaged in collectively resulted in $3.3 million in damages. ECF No. 230. This Court should determine that KPM was damaged by no less than that amount for the unfair or deceptive trade practices. The Jury found that ITG damaged KPM in the amount of $1.8 million for its tortious interference with contract. *Id.* at Question 13. The Jury also found that Blue Sun damaged KPM in the additional amount of

$1.5 million for its misappropriation of trade secrets and tortious interference. *Id.* at Questions 4, 13. The underlying misconduct leading to both of these damage awards also constitutes the same evidence in the record that supports the Jury's finding of unfair and deceptive practices and its finding that such practices were willful or knowing. Thus, the damages that arise from all of this unfair and deceptive misconduct should be no less than what the Jury awarded as damages for the same conduct in terms of misappropriation and tortious interference. In this regard, this Court should do as Judge Stearns did in *BioPoint* and adopt the Jury's damages assessment as part of the Chapter 93A claim. 2023 WL 3071422 at *8 (adopting jury's findings on Chapter 93A), *10 n. 5 (using the jury's award of lost profits for tortious interference and misappropriation of trade secrets as to one relationship defendant harmed), *10 n. 6 (using the jury's award for tortious interference as single damages under the Chapter 93A count as to a second relationship defendant harmed). The *BioPoint* Court then trebled both damages amounts. *Id.* at *10 n. 5 & 6.

The damage from the Entity Defendants' conduct, in fact, is even more egregious and harmful than that of the defendants in *BioPoint* and that which the Jury found because this case involves the Defendants' additional unfair and deceptive conduct in violating the preliminary injunction by selling to R&R Machine and Idahoan. Thus, the Court should add additional damages on account of the sales by the Entity Defendants in violation of the Preliminary Injunction. Specifically, this Court should add to the 93A award the damages arising from the violation of the injunction, specifically the disgorgement of any sales to Idahoan and R&R Machine. The total sales to Idahoan after the injunction was ordered is $210,165 and to R&R Machines is $372,599.50. Tr. Exs. 474, 475.[5] As described, these amounts should also be trebled.

---

[5] These sales should be added above and beyond the Jury Verdict award because the Jury was not permitted to know of the Preliminary Injunction, its violation, and that the specific sales to Idahoan or R&R Machine that damaged KPM. To the extent that Defendants claim there should be any

In sum, this Court should find on Count X: (i) ITG directly liable for $1,800,000, trebled to $5,400,000, (ii) Blue Sun directly liable for $1,500,000, trebled to $4,500,000, (iii) ITG and Blue Sun jointly and severally liable for the violation of the preliminary injunction in the amount the sales to Idahoan in the amount of $210,165, trebled to $630,495, and (iv) ITG and Blue Sun jointly and severally liable for the violation of the preliminary injunction in the amount of the sales to R&R Machine in the amount of $372,599.50, trebled to $1,117,798.50.  As set forth below, the Court should also pierce Blue Sun's corporate veil and hold ITG indirectly liable for all damages awarded against Blue Sun.

## IV.    KPM Is Entitled to Its Attorneys' Fees and Costs Pursuant Under Chapter 93A

This Court should also award KPM its attorneys' fees and costs for the Entity Defendants' violation of Chapter 93A.  Attorneys' fees and costs are mandatory after a finding of liability.   "If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner _**shall**_, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action."  Mass. Gen. L. c. 93A, § 11, para. 6 (emphasis added).  KPM is filing, simultaneously with this motion, a separate fee petition setting forth the reasonable attorneys' fees and costs it has incurred in this action.

## V.    This Court Should Additionally Hold ITG Liable for Not Only Its Measure of Damages but Also Blue Sun's Based on a Joint and Several Basis Because ITG is Blue Sun's Alter Ego

This Court should enter the full trebled damages amount jointly and severally by piercing the veil.  When ITG moved for summary judgment seeking an order that KPM is not entitled to pierce the corporate veil and hold ITG responsible for Blue Sun's conduct, KPM set forth a litany

---

offset for their costs of these sales, it is their burden to prove under Chapter 93A.  *BioPoint*, 2023 WL 3071422 at *7. They did not, however, offer any of that evidence at trial for any sale at all.

of facts justifying veil piercing.  ECF No. 156 at 16-19.   KPM respectfully incorporates by reference both the legal argument and facts and record set forth therein.  Judge Sorokin denied ITG's motion for summary judgment.  ECF No. 165.  KPM proved at trial the facts set out in the summary judgment briefing justifying veil piercing both on the basis that ITG pervasively controlled Blue Sun and on the theory that there was a confused intermingling between those entities, even though KPM need only show pervasive control *or* confused intermingling to justify veil piercing.  ECF No. 156.

At trial, KPM also proved the following facts:

- ITG created Blue Sun in 2018 and owns it entirely. Day 8, Tr. 59:2-3.

- There have never been any members of Blue Sun other than ITG. Day 5, Tr. 146:1-4.

- Robert Wilt is and has been the CEO and President of ITG and the sole manager of Blue Sun. Day 8, Tr. 59:6-13.

- ITG markets the M5 analyzer as the Phoenix 5000 only through Blue Sun and has done so since late 2019. Day 8, Tr. 63:14-19.

- ITG and Blue Sun maintain the same place of business with the same mailing address. Day 8, Tr. 60:19-21.

- Cathy Wilt, the wife of ITG CEO Robert Wilt, had access to the Blue Sun bank accounts and had signing authority on Blue Sun bank accounts, even though she was only employed by ITG.  Day 8, Tr. 59-60:19; Tr. Ex. 88.

- Ms. Wilt, who is employed by ITG and not Blue Sun, does the accounting for Blue Sun, but is paid by ITG and takes direction from Blue Sun's President Irvin Lucas. Day 5, Tr. 157:14-158:6; Day 8, Tr. 60:16-61:6.

- Cathy Wilt of ITG has signing authority on Blue Sun bank accounts. Day 8, Tr. 60:11-12.

- Blue Sun and ITG consolidate their balance sheets. Day 8, Tr. 61:24-62:3.  Blue Sun and ITG file taxes jointly under ITG.  Day 8, Tr. 62:4-6.

- Gajewski, the employee who, unbeknownst to KPM, was working simultaneously for Blue Sun and KPM wrote to Mr. Wilt and ITG's purchasing specialist at their ITG emails, copying Mr. Lucas and Doug Evans of Blue Sun at their Blue Sun emails, about "one main way we are transitioning SpectraStar customers into Blue Sun/ITG customers," (Tr. Ex. 77), treating the companies as one in the same.

- Externally, ITG and Blue Sun also confusingly and purposefully blurred the lines between ITG and Blue Sun. Most prominently, they repeatedly held out Blue Sun as

the manufacturer of the original Unity SpectraStar NIR Analyzer, when in fact it was ITG. Day 5, 45:15-46:16, Tr. Ex. 76.

- Blue Sun's website stated as of August 5, 2020 and October 23, 2020, that "Blue Sun is the original instrument designer for many respected instrumentation brands including NIR companies Unity Scientific and Process Sensors Corp." Day 5, Tr. 81:21-25; Tr. Ex. 470.

- In its marketing presentations, Blue Sun stated that it, Blue Sun, "has been manufacturing and supporting NIR instruments since 1996," when in fact that is approximately when ITG started manufacturing analyzers. Day 5, Tr. 27:10-13; Day 8, Tr. 64:17-21, Tr. Ex. 311.

- Blue Sun publicly declared that it had the original engineers for the SpectraStar, which coupled with its claims that it, and not ITG, was the manufacturer of the SpectraStar analyzers, shows repeated efforts to blur the lines between the companies. Tr. Ex. 471.

- ITG employee Luke Gilbertson used both ITG and Blue Sun email addresses, purposefully changing between them depending on which customer he was communicating with. Tr. Ex. 79, 90.

All of these facts showing confused intermingling and pervasive control have a direct nexus to the defendants' alleged wrongdoing. The obvious purpose of falsely promoting Blue Sun, and not ITG, as the original manufacturer of the SpectraStar machines was to make ITG money, given that ITG received 65% of the value of every sale of a new analyzer to KPM customers, Day 8, Tr. 102:4-8. The entire purpose of establishing Blue Sun was to compete in the NIR marketplace and pursue customers who used a KPM SpectraStar analyzers that ITG/Blue Sun's staff knew so well to move their business to ITG/Blue Sun. Because ITG had sold the SpectraStar business to KPM, ECF No. 93 at 3, and because it knew that the employees nominally hired by Blue Sun, beginning with Robert Wilt luring Irvin Lucas away from KPM, it is evident that Blue Sun was purposefully established to benefit ITG through Blue Sun's use of trade secrets, customer information, and other proprietary information obtained from KPM. That improper purpose, combined with the facts set forth above, justify having this Court pierce Blue Sun's corporate veil and allow KPM to recover from ITG the damages assessed against Blue Sun in addition to the damages for which ITG is directly liable.

**VI.      KPM Is Entitled to Prejudgment Interest**

KPM is entitled to statutory interest at a rate of 12% from the date of the filing of the complaint on the single damages component of its Chapter 93A damages, but not on the exemplary component.  Mass. Gen. L. c. 231, § 6B; *McEvoy Travel Bureau, Inc. v. Norton Company*, 563 N.E.2d 188, 197 (Mass. 1990).  Prejudgment interest also runs at a rate of 12% on the tortious interference and misappropriation of trade secret counts. Mass. Gen. L. c. 231, § 6B. Prejudgment interest runs at an annual rate of 10% because the contracts are governed by Connecticut law.  Tr. Exs. 158, 346, 349, 353; C.G.S.A. § 37-3a; *ITyX Solutions AG v. Kodak Alaris, Inc.*, 952 F.3d 1, 13 (1st Cir. 2020) (in diversity cases, prejudgment interest on contract claims is governed by the law that applies to the contract).

The interest that has accrued on each claim as of the date of the filing of this motion is set forth in the chart in KPM's motion.  Prejudgment interest will continue to accrue until final judgment is entered.  Where damages are not duplicative, neither is prejudgment interest.

<u>**Conclusion**</u>

For the reasons set forth above, KPM respectfully requests that this Court enter judgment in its favor on Count X, plus treble damages and attorneys fees, as well as assess prejudgment interest as to all counts.

4884-7262-5256, v. 4

**Date:** June 21, 2023

Respectfully submitted,

KPM Analytics North America Corporation,

By its attorneys,

*/s/ Scott R. Magee*
John T. Gutkoski (BBO No. 567182)
Kevin R. Mosier (BBO No. 703739)
Sunstein LLP
100 High Street
Boston, MA 02110
Phone: (617) 443-9292
jgutkoski@sunsteinlaw.com
kmosier@sunsteinlaw.com

**AND**

Scott R. Magee (BBO No. 664067)
Paige Zacharakis (BBO No. 699108)
Morse, Barnes-Brown & Pendleton, P.C.
480 Totten Pond Road, 4th Floor
Waltham, MA 02451
Phone: (781) 622-5930
Fax: (781) 622-5933
smagee@morse.law
pzacharakis@morse.law

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of June 2023, a true and correct copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Scott R. Magee*
Scott R. Magee