UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KPM ANALYTICS NORTH AMERICA CORPORATION,<br>     *Plaintiff.*<br><br>   V.<br><br>BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, MICHELLE GAJEWSKI, ROBERT GAJEWSKI, RACHAEL GLENISTER, GREGORY ISRAELSON, IRVIN LUCAS, AND PHILIP OSSOWSKI,<br><br>     *Defendants.* | Civil Action No. 21-10572-MRG |

**PLAINTIFF'S PARTIAL OPPOSITION TO THE DEFENDANTS' MOTIONS TO ALTER OR AMEND JUDGMENT OR FOR REMITTUR (ECF NOS. 250, 251)**

Plaintiff, KPM Analytics North America Corporation ("KPM"), by and through its counsel, hereby opposes in-part both the Motion to Alter or Amend Judgment or, in the Alternative, For Remittitur (ECF No. 250), by Entity Defendants, Blue Sun Scientific LLC ("Blue Sun") and The Innovative Technologies Group & Co., Ltd. ("ITG"), and the Motion to Alter or Amend Judgment (ECF No. 251) by the Individual Defendants, Arnold Eilert, Robert Gajewski, Rachael Glenister, and Irvin Lucas (together, the "Motions"). Because the subject matter of the Motions substantially overlap and, in some instances, is copied verbatim across them, KPM sets forth its partial opposition to the Motions here in one document for efficiency and for the Court's convenience.

## I. INTRODUCTION

The Motions ask this Court to alter or amend the pending judgment against each of the Defendants to avoid double counting, *i.e.* the recovery of damages across multiple claims that

remedy the same injury to KPM.  *See* ECF Nos. 250, 251.  KPM does not seek any double recovery or double counting; however, KPM is entitled to maintain the Jury's Verdict as entered, establishing liability for each of the claims notwithstanding the resolution of any double counting as to the total damages for those claims.

The Entity Defendants' motion also requests that, in the alternative, the Court remit the damages allocated to ITG down to $1,248,127 and, in doing so, shift $105,000 of ITG's damages to Blue Sun such that Blue Sun's liability for tortious interference with KPM's contractual relationships totals $1,605,000.[1]  ECF No. 250 at 5-6.  Though not expressly stated, the Entity Defendants also seek to remit the $3,300,000 total award for tortious interference down to $2,853,127.  *Id.* at 6.

There is no legitimate basis to remit or alter the Jury's damages award – neither the total nor the amounts allocated to ITG and Blue Sun.  Thus, damages should be entered against ITG in the amount of $1,800,000 and Blue Sun in the amount of $1,500,000, plus any enhancements pursuant to Chapter 93A and/or state and federal trade secret law, consistent with the Jury's Verdict.  Additionally, the doctrine of veil piercing independently supports ITG's joint and several liability for any and all of the damages awarded against Blue Sun, regardless of the allocation.

In sum, this Court should enter damages consistent with the Proposed Form of Final Judgment filed herewith, which includes the exemplary damages and additional damages proven at trial based on the Entity Defendants' violation of Mass. Gen. L. ch. 93A, §§ 2, 11.

---

[1] The Entity Defendants' requested allocation of the $211,000 of additional damages awarded for the tortious interference claim appears to be short by $1,000.  A 50% split of the $211,000 would result in $1,605,500 as to Blue Sun and $1,248,627 as to ITG under the Entity Defendants' formula for the proposed remittitur.  The $211,000 itself is inexact, as the actual figure presented to the jury was $211,691.

## II. ARGUMENT

A party seeking remittitur, as the Entity Defendants do here, "bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Currier v. United Techs. Corp.*, 393 F.3d 246, 256 (1st Cir. 2004) (internal citations and quotations omitted). "Because jurors exercise great leeway in evaluating claims and assessing damages," challenges to damages awards are "seldom successful." *Dopp v. Pritzker*, 38 F.3d 1239, 1249 (1st Cir. 1994). The First Circuit has cautioned that "[a] district court should only grant such motions if the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368, 375 (1st Cir. 2004) (internal citations and quotations omitted). In applying this high bar for remittitur, the First Circuit has cautioned:

> We do not reverse a jury verdict for excessiveness except on the strongest of showings. The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive, or as clearly exceeding that amount *any* reasonable man could feel the claimant entitled to.

*Nydam v. Lennerton*, 948 F.2d 808, 811 (1st Cir. 1991) (emphasis in original, internal citations and quotations omitted). Importantly, "[t]he jury is free to select the highest figure for which there is adequate evidentiary support." *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344, 363 (1st Cir. 2007) (internal quotations omitted).

**A.    The Entity Defendants Have Not Met Their "Heavy Burden" Needed to Support Any Remittitur.**

The Entity Defendants in their Motion do not even come close to meeting this heavy burden, and do not offer any explanation or analysis to support remitting the $3,300,000 total damages award. The singular argument advanced by the Entity Defendants in support of remitting the Jury's damages award is that KPM and its expert, Mr. Zoltowski, suggested allocating $1,143,127 of the $3,215,101 in unjust enrichment damages (for various claims) to ITG, but the Jury instead allocated $1,800,000 of its $3,300,000 total award for tortious interference to ITG. *See* ECF No. 250 at 5-6.

The Entity Defendants are not entitled to remittitur because they fail to explain, let alone establish, how or why both the Jury's total award and its particular allocations are "entirely disproportionate to the injury [KPM] sustained" and "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit [them] to stand." *Nydam*, 948 F.2d at 811; *Currier*, 393 F.3d at 256. The Entity Defendants seemingly attempt to craft a bright-line rule that a jury must apply the damages allocation precisely as requested by the prevailing party, but no such rule exists. In reality, "translating legal damage into money damages…is a matter peculiarly within a jury's ken." *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 236 (1st Cir. 2006) (quoting *Nydam*, 948 F.2d at 811). Because damages are expressly within the purview of the jury, courts within the First Circuit "rarely will override the jury's judgment on the appropriate amount of damages to be awarded." *Id.*; *O'Brien v. Papa Gino's of Am., Inc.*, 780 F.2d 1067, 1076 (1st. Cir. 1986) ("If the jury award has a rational basis in evidence, we must affirm it."); *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 34 (1st Cir. 1999) ("We will not disturb an award of damages because it is extremely generous or because we think the damages are considerably less.").

### 1. The Jury's total damages award and its allocation between the Entity Defendants are logical in view of, and are supported by, the trial record.

ITG's liability for unjust enrichment damages was well established at trial. The Jury heard testimony and saw evidence that ITG is the corporate parent of Blue Sun, a wholly owned subsidiary of ITG, and that ITG takes 65% of all Blue Sun analyzer sales revenue. *E.g.*, Trial Tr. at 5–42:12-21, 81:17-20, 145:19-22 (Lucas testimony); 8–58:14-18, 65:22-25, 102:4-8 (Wilt testimony). The Jury also heard testimony that Robert Wilt, the founder and Chief Executive Officer of ITG, was the sole decision-maker with regard to launching Blue Sun to compete with KPM and hiring Irvin Lucas, and did so initially while Mr. Lucas was still employed by KPM. *E.g.*, Trial Tr. at 8–74:3-7 (Wilt testimony). In fact, Mr. Wilt and ITG have the sole authority to direct Mr. Lucas and Blue Sun. *E.g.*, Trial Tr. at 8–106:21-23 (Wilt testimony). Additionally, the jury heard testimony and saw evidence sufficient to support a finding that Mr. Wilt and ITG knew or should have known of Blue Sun's tortious actions and the contractual obligations that ITG and Blue Sun's employees owed to their former employer, KPM. *E.g.*, Trial Tr. at 8–74:8-80:22 (Wilt testimony); *infra* § II.A.2 (highlighting facts proved at trial with regard to relationship between ITG and Blue Sun). Finally, the jury heard testimony that Mr. Wilt and ITG knew of, or at least could and should have learned of, Blue Sun's actions and put a stop to them, but declined to do so. *See* Trial Tr. at 8–106:21-8-80:22-107:14 (Wilt testimony).

The Jury's total damages award is supported by the trial record. The Jury heard testimony and saw evidence that KPM's total compensable damages for tortious interference was $3,426,792 pursuant to the unjust enrichment calculation. *E.g.*, Trial Tr. at 9–19:8-10 (Zoltowski testimony); Tr. Exs. 474, 475 (Blue Sun NIR sales data showing $4,780,287 in analyzer sales and $5,438,077 in total revenue). This $3,426,792 total was comprised of $3,215,101 in unjust enrichment damages and $211,691 in additional costs incurred by KPM compensable under its tortious

interference claim.  *E.g.*, Trial Tr. at 9–18:6-19:10 (Zoltowski testimony).[2]  Mr. Zoltowski suggested an unjust enrichment allocation of this total ascribing $2,071,974 to Blue Sun and $1,143,127 to ITG, leaving it to the jury to allocate the $211,691 in additional damages. *E.g.*, Trial Tr. at 8–8:6-12 (Zoltowski testimony).  The Jury awarded KPM a total of $3,300,000 for tortious interference, choosing a round number that is a mere $126,792 short of the total amount KPM requested at trial.  *See* ECF No. 230 (Jury Verdict); *see also Harding*, 498 F. Supp. 2d at 363 ("The jury is free to select the highest figure for which there is adequate evidentiary support.").

The Jury's specific allocations are also supported by the trial record.  The Jury allocated $1,800,000 of the $3,300,000 to ITG and $1,500,000 to Blue Sun, which represents a 55-45% split amongst ITG and Blue Sun.  *Id.*  This allocation is logical given that ITG takes 65% of Blue Sun's sales revenue and the fact that ITG is the owner of Blue Sun, which Mr. Wilt manages directly. *E.g.*, Trial Tr. at 8–106:21-23 (Wilt testimony).  The nature of the claim itself, tortious interference with contractual relationships, separately supports such an allocation because ITG hired Mr. Lucas to set up Blue Sun as its sales arm, ITG has Blue Sun perform all of its sales, ITG directs Mr. Lucas and Blue Sun, and ITG has the ultimate authority over Blue Sun, including with regard to business and personnel decisions.  *E.g.*, Trial Tr. at 8–74:3-7, 106:21-8-80:22-107:14 (Wilt testimony).  While this allocation represents a modest difference from KPM's suggested allocation, the Jury is free to make its own allocation and is not bound to follow the suggestions or calculations of KPM's expert.  *See Azimi*, 456 F.3d at 236 ("[T]ranslating legal damage into money damages…is a matter peculiarly within a jury's ken.").

---

[2] To the extent that Defendants claim there should be any offset for their costs of these sales, it is their burden to prove under Chapter 93A.  *Biopoint, Inc. v. Andrew Dickhaut & Catapult Staffing, LLC*, 2023 WL 3071422, *7 (D. Mass. Apr. 25, 2023). They did not, however, offer any of that evidence at trial for any sale at all.

> **2. The doctrine of corporate veil piercing supports ITG's joint and several liability for all of the damages awarded against ITG and Blue Sun, regardless of the allocation.**

In addition to evidence supporting ITG's directly liability for damages exceeding the $1,248,127 that Defendants claim is the upper limit of the tortious interference claim, ITG is separately liable for all of the damages assessed against Blue Sun (regardless of amount) through the doctrine of veil piercing. KPM explained the legal and factual basis justifying imposing indirect liability on ITG for Blue Sun's conduct at summary judgment and as part of its post-trial motions. ECF No. 156 at 15-20 (summary judgment); ECF No. 253 at 17-19 (explaining that ITG is liable for all of Blue Sun's Chapter 93A damages). Those arguments apply equally here.

There is sufficient evidence in the record from which the Jury could have reasonably concluded, and this Court should conclude, that ITG is liable for Blue Sun's conduct as its alter ego because (a) the two companies engaged in sufficiently confused intermingling, and/or (b) ITG exercised sufficient control over Blue Sun to justify holding ITG liable for Blue Sun's conduct. *See Hewitt v. Bay State Gas Co*., 63 Mass. App. Ct. 1121, 2005 WL 1514343, at *2 (June 27, 2005) (explaining: "[i]n order to pierce the corporate veil, courts have focused on whether one corporation exercises (1) pervasive control…*or* (2) there is a confused intermingling of two corporations engaged in a common enterprise"). (emphasis added, internal quotations omitted). "Corporate formalities [] may be disregarded 'when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise *with substantial disregard of the separate nature of the corporate entities,* or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.'" *Scott v. NG U.S. 1, Inc.*, 450 Mass. 760, 767 (2008) (quoting *My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 619 (1968)) (emphasis in original).

There is considerable evidence showing a confused intermingling of ITG and Blue Sun and pervasive control by ITG over Blue Sun from which a jury could conclude that the acts of Blue Sun should be attributed to ITG through a veil piercing or alter ego theory. In evaluating whether there is confused intermingling or pervasive control, the Supreme Judicial Court ("SJC") has identified twelve factors for consideration, no one of which is decisive:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Scott*, 450 Mass. at 768. At trial, KPM proved the following facts:

- ITG created Blue Sun in 2018 and owns it entirely. Trial Tr. at 8–59:2-3. (common ownership).

- There have never been any members of Blue Sun other than ITG. Trial Tr. at 5–146:1-4. (common ownership, pervasive control, confused intermingling).

- Robert Wilt is and has been the CEO and President of ITG and the sole manager of Blue Sun. Trial Tr. at 8–59:6-13. (pervasive control, confused intermingling).

- ITG markets the M5 analyzer as the Phoenix 5000 only through Blue Sun and has done so since late 2019. Trial Tr. at 8– 63:14-19. (confused intermingling).

- ITG and Blue Sun maintain the same place of business with the same mailing address. Trial Tr. at 8–60:19-21. (pervasive control, confused intermingling).

- Cathy Wilt, the wife of ITG CEO Robert Wilt, had access to the Blue Sun bank accounts and had signing authority on Blue Sun bank accounts, even though she was only employed by ITG. Trial Tr. at 8–59-60:19; Tr. Ex. 88. (nonobservance of corporate formalities). *See Zimmerman v. Puccio*, 613 F.3d 60, 74 (1st Cir. 2010) (using employees interchangeably supports veil piercing).

- Ms. Wilt, who is employed by ITG and not Blue Sun, does the accounting for Blue Sun, but is paid by ITG and takes direction from Blue Sun's President Irvin Lucas. Trial Tr. at 5–157:14-158:6; Trial Tr. at 8–60:16-61:6. *See Zimmerman*, 613 F.3d at 74 (using employees interchangeably supports veil piercing).

- Cathy Wilt of ITG has signing authority on Blue Sun bank accounts. Trial Tr. at 8–Tr. 60:11-12. (nonobservance of corporate formalities). *See Zimmerman*, 613 F.3d at 74 (using employees interchangeably supports veil piercing).

- Blue Sun and ITG consolidate their balance sheets. Trial Tr. at 8–61:24-62:3. Blue Sun and ITG file taxes jointly under ITG. Trial Tr. at 8–62:4-6. Massachusetts Courts have recognized that filing joint tax returns and combining financials can support veil piercing based on a confused intermingling theory. *Cf. Supply Chain Assocs., LLC v. ACT Elecs., Inc.*, No. MICV200802214, 2012 WL 2381908, *10 (Mass. Super. Ct. Mar. 29, 2012) (refusing to find confused intermingling where, unlike here, the entities meticulously filed separate tax returns and did not combine their financial records). Furthermore, Courts in Maryland, where Blue Sun and ITG are located, do view the filing of joint tax returns as one factor in favor of treating a parent and subsidiary as the same. *Thomas v. Bet Sound-Stage Restaurant/BrettCo, Inc.*, 61 F. Supp. 2d 448, 465 (D. Md. 1999).

- Robert Gajewski, the employee who, unbeknownst to KPM, was working simultaneously for Blue Sun and KPM, wrote to Mr. Wilt and ITG's purchasing specialist at their ITG emails, copying Mr. Lucas and Doug Evans of Blue Sun at their Blue Sun emails, about "one main way we are transitioning SpectraStar customers into Blue Sun/ITG customers," (Tr. Ex. 77), treating the companies as one in the same. (confused intermingling, promoting fraud).

- Externally, ITG and Blue Sun also confusingly and purposefully blurred the lines between ITG and Blue Sun. Most prominently, they repeatedly held out Blue Sun as the manufacturer of the original Unity SpectraStar NIR Analyzer, when in fact it was ITG. Trial Tr. at 5–45:15-46:16, Tr. Ex. 76. (confused intermingling, nonobservance of corporate formalities).

- Blue Sun's website stated as of August 5, 2020 and October 23, 2020, that "Blue Sun is the original instrument designer for many respected instrumentation brands including NIR companies Unity Scientific and Process Sensors Corp." Trial Tr. at 5–81:21-25; Tr. Ex. 470. (confused intermingling, nonobservance of corporate formalities).

- In its marketing presentations, Blue Sun stated that it, Blue Sun, "has been manufacturing and supporting NIR instruments since 1996," when in fact that is approximately when ITG started manufacturing analyzers. Trial Tr. at 5–27:10-13; Trial Tr. at 8–64:17-21, Tr. Ex. 311. (confused intermingling, nonobservance of corporate formalities).

- Blue Sun publicly declared that it had the original engineers for the SpectraStar, which coupled with its claims that it, and not ITG, was the manufacturer of the SpectraStar analyzers, shows repeated efforts to blur the lines between the companies. Tr. Ex. 471. (confused intermingling, nonobservance of corporate formalities).

- ITG employee Luke Gilbertson used both ITG and Blue Sun email addresses, purposefully changing between them depending on which customer he was communicating with. Tr. Ex. 79, 90. (confused intermingling, nonobservance of corporate formalities). *See Zimmerman*, 613 F.3d at 74 (using employees interchangeably supports veil piercing).

There is significant evidence that supports findings of confused intermingling among the Entity Defendants and that ITG exercises pervasive control over Blue Sun and, in doing so, has caused injury to KPM. "A veil may be pierced where the parent exercises 'some form of pervasive control' of the activities of the subsidiary '*and* there is some fraudulent or injurious consequence of the intercorporate relationship.'" *Scott*, 450 Mass. at 767 (quoting *My Bread Baking,* 353 Mass. at 619) (emphasis in original).

The control exercised by ITG over Blue Sun was done for the purpose of engaging in conduct that was tortious, justifying application of the veil piercing/alter ego doctrine. The SJC is explicit that disregarding the corporate form only requires that the parent corporation used the subsidiary "for an improper purpose," and does not require a finding of fraud, which ITG has previously argued is required.[3] *Scott*, 450 Mass. at 768. The SJC is also specific that piercing the corporate veil is a proper remedy "for the defeat of fraud or wrong, or the remedying of injustice." *Id.* (quoting *Hanson v. Bradley*, 298 Mass. 371, 381 (1937)) (emphasis added). The disjunctive "or" repeatedly used in SJC case law and cases applying it in this District demonstrates that "fraud" is not a requirement. Indeed, in other cases courts have pierced the veil to remedy wrongs without express findings of fraud. *See, e.g.*, *Attorney General v. M.C.K., Inc.*, 432 Mass. 546, 557 (2000) (piercing the corporate veil without the existence of fraud in use of the corporate forms). So too here. The entire purpose of establishing Blue Sun was to compete more successfully in the NIR marketplace and convince customers who used a KPM SpectraStar analyzers, which ITG/Blue

---

[3] *See* ECF No. 186 at 4-5.

Sun's staff knew well, to move their business to ITG/Blue Sun. Because ITG had sold the Unity Scientific SpectraStar business to KPM, (Trial Tr. at 8–98:11-25), and because it knew that the Blue Sun employees, beginning with Robert Wilt hiring Irvin Lucas, were lured away from KPM, the record adequately established that Blue Sun was purposefully established to benefit ITG through Blue Sun's use of KPM trade secrets, customer information, and other proprietary KPM information. Thus, ITG is jointly and severally liable for any and all damages awarded against Blue Sun in addition to the damages awarded directly against ITG itself.

### 3. There is no need to remit the total award even if the Jury's allocations are altered.

If the Court rejects and decides to alter the Jury's allocations – though it should not – it should by no means remit the $3,300,000 total award because the Entity Defendants fail to meet their "heavy burden" to show that the *total* award is "entirely disproportionate to the injury [KPM] sustained" and "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to it to stand." *Nydam*, 948 F.2d at 811; *Currier*, 393 F.3d at 256. None of the Jury's numbers are excessive, shocking or in any way unsupported. *See Harding*, 498 F. Supp. 2d at 363 ("The jury is free to select the highest figure for which there is adequate evidentiary support."); *O'Brien*, 780 F.2d at 1076 ("If the jury award has a rational basis in evidence, we must affirm it."). The Jury could have allocated all of the $211,691 in additional damages for tortious interference to ITG. Instead, the jury allocated only $445,182 more to ITG than that which was suggested by KPM. KPM suggested that $1,143,127 of the unjust enrichment damages be allocated to ITG, which amounts to $1,354,818 total as to ITG under the tortious interference claim when the additional $211,691 in damages are included. Notably, the Jury awarded $571,974 less than KPM suggested as to Blue Sun – $1,500,000 rather than $2,071,974.

To the extent that the Court would act to remit ITG's damages allocation – for example by $445,182 – it should increase Blue Sun's damages allocation by a corresponding amount to preserve the Jury's reasonable $3,300,000 total award. But again, such a trespass into the province of the Jury is unwarranted on this record.[4] Defendants have not established otherwise.

**B.      KPM Has A Constitutional Right to A New Trial if Damages are Remitted.**

If the Court alters or remits the jury's damages award, KPM has a right under the Seventh Amendment to either accept the remitted damages figure or choose to hold a new jury trial. *See* 11 FED. PRAC. & PROC. CIV. (WRIGHT & MILLER) § 2815 (3d ed. 2023) (collecting cases and discussing the Seventh Amendment's impact on remittitur: "A remittitur gives the plaintiff a choice. The plaintiff can refuse to accept the reduced amount of damages and instead proceed to a new trial."); *Havinga v. Crowley Towing and Trans. Co.*, 24 F.3d 1480, 1489 (1st Cir. 1994) (remitting damages, but allowing the plaintiff to choose between a new trial or the remittitur); *Conjugal P'ship of Jones v. Conjugal P'ship of Pineda*, 798 F.Supp. 892, 901-03 (D.P.R. 1992) (same, specifically citing the Seventh Amendment). The First Circuit has explained that "[a] motion to alter or amend judgment pursuant to Rule 59(e) may not be granted where to do so would undermine the jury's fact-finding role and trample on the [other party]'s seventh amendment right to a jury trial." *Robinson v. Watts Detective Agency*, 685 F.2d 729, 742 (1st Cir. 1982). Remitting damages is precisely the type of situation contemplated in *Robinson* because "translating legal damage into money damages…is a matter peculiarly within a jury's ken." *See Azimi*, 456 F.3d at

---

[4] It should be noted that the Jury was attentive throughout the trial and reached its Verdict after lengthy deliberation, evidencing a high degree of care and thoughtfulness on issues of liability and damages. Indeed, the Jury's Verdict parsed out individual claims and damages amounts, reflecting the individualized consideration the Jury gave to each item.

236.  Thus, should the Court alter or remit any portion of the Jury's damages award, KPM should be afforded the opportunity to accept remittitur or have the Court hold a new damages trial.

### III.  CONCLUSION

For the reasons set forth above, KPM respectfully requests that this Court deny in-part the defendants' Motions to alter, amend, or remit damages and enter damages consistent with the Proposed Form of Final Judgment filed herewith.

**Dated:** July 12, 2023

Respectfully submitted,

**PLAINTIFF,
KPM Analytics North America, Corp.**

By its attorneys,

*/s/ Kevin R. Mosier*
John T. Gutkoski (BBO# 567182)
Kevin R. Mosier (BBO# 703739)
Sunstein LLP
100 High Street
Boston, MA 02110
Tel: (617) 443-9292
jgutkoski@sunsteinlaw.com
kmosier@sunsteinlaw.com

Scott R. Magee (BBO# 664067)
Paige K. Zacharakis (BBO# 699108)
Morse, Barnes Brown, and Pendleton, P.C.
480 Totten Pond Road, 4th Floor
Waltham, MA 02451
(781) 622-5930
smagee@morse.law
pzacharakis@morse.law

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of July, 2023, a true and exact copy of the foregoing was served on all counsel of record through the Court's ECF system.

/s/ *Kevin R. Mosier*