```
 1    `
                        UNITED STATES DISTRICT COURT
 2                       DISTRICT OF MASSACHUSETTS

 3

 4

 5    KPM Analytics North America   )
      Corporation,                  )
 6                    Plaintiff,    )
                                    )
 7    vs.                           )    Civil Action No. 21cv10572-MRG
                                    )
 8                                  )
                                    )
 9    Blue Sun Scientific, LLC,     )
      The Innovative Technologies   )
10    Group & Co., Ltd., Arnold     )
      Eilert, Michelle Gajewski,    )
11    Robert Gajewski, Rachael      )
      Glenister, Gregory Israelson,)
12    Irvin Lucas, and Philip       )
      Ossowski,                     )
13                    Defendants.   )

14

15    BEFORE:  The Honorable Margaret R. Guzman

16
                             Motion Hearing
17

18                                  United States District Court
                                    Courtroom No. 2
19                                  595 Main Street
                                    Worcester, Massachusetts
20                                  October 3, 2023

21

22
                      Marianne Kusa-Ryll, RDR, CRR
23                       Official Court Reporter
                       United States District Court
24                      595 Main Street, Room 514A
                        Worcester, MA 01608-2093
25                 508-929-3399 justicehill@aol.com
                   Mechanical Steno - Transcript by Computer
```

1    APPEARANCES:

2    Sunstein LLP
     John T. Gutkoski, Esquire
3    Kevin R. Mosier, Esquire
     100 High Street
4    Boston, Massachusetts 02110
     on behalf of the Plaintiff

5
     Morse Barnes-Brown & Pendelton, PC
6    Scott R. Magee, Esquire
     Paige Zacharakis, Esquire
7    480 Totten Pond Road
     4th Floor
8    Waltham, Massachusetts 02451
     on behalf of the Plaintiff

9
     Gordon Feinblatt LLC
10   George Faulkner Ritchie, IV, Esquire
     1001 Fleet Street
11   Suite 700
     Baltimore Maryland 21202
12   On behalf of the Defendant, Blue Sun Scientific, The Innovative
     Technologies Group & Co., Ltd.

13
     Seyfarth Shaw LLP
14   Dallin R. Wilson, Esquire
     World Trade Center East
15   Two Seaport Lane
     Suite 1200
16   Boston Massachusetts 02210
     on behalf of the Defendants, Arnold Eilert, Robert Gajewski,
17   Rachael Glenister, and Irvin Lucas

18

19

20

21

22

23

24

25

1

P R O C E E D I N G S

2            (The following proceedings were held in open court

3   before the Honorable Margaret R. Guzman, United States District

4   Judge, United States District Court, District of Massachusetts,

5   at the Donohue Federal Building & United States Courthouse,

6   595 Main Street, Worcester, Massachusetts, on October 3, 2023.)

7            THE CLERK:  All rise.

8            Court is now open.  You may be seated.

9            Case No. 21-10572, KPM Analytics North America

10  Corporation versus Blue Sun Scientific.

11           Counsel, please note your appearance for the record.

12           MR. GUTKOSKI:  Good morning, your Honor.  Good to see

13  you again.

14           THE COURT:  Good morning.

15           MR. GUTKOSKI:  John Gutkoski and Kevin Mosier from

16  Sunstein on behalf of plaintiff KPM.  And with us are our

17  cocounsel from the trial, Mr. Scott Magee and Ms. Paige

18  Zacharakis.  Also here is the head of KPM, the executive vice

19  president, Mr. Eric Olson.

20           THE COURT:  Good morning to all counsel.  Thank you.

21           MR. WILSON:  Good morning, your Honor.  Dallin Wilson

22  on behalf of the individual defendants, Arnold Eilert, Robert

23  Gajewski, Rachael Glenister, and Irvin Lucas.

24           MR. RITCHIE:  Good morning, your Honor.  George

25  Ritchie on behalf of the entity defendants, Blue Sun Scientific

1        and Innovative Technologies Group.

2                THE COURT:  And good morning to both of you.  It's

3        good to see all of you again.

4                We have -- I've received all of the filings, and I

5        have taken a significant amount of time reviewing them and

6        reviewing the -- the jury verdict slip and thinking about the

7        case.

8                So I'm going to -- I know that you -- I hope that you

9        did receive some information about the order of argument that

10       we'd like.  I will not limit your argument.  You may argue to

11       whatever extent you wish.  This is a very important piece, and

12       so let us start with if either party wants to make an opening

13       statement, you may do so, if you'd like.  It's completely up to

14       you.

15               MR. GUTKOSKI:  I don't know that we need a global

16       opening.  Instead of openings, I'd think we'd just move on

17       to argument.

18               THE COURT:  Very good.  Okay.  Thank you.  See,

19       win-win for both sides right now.

20               So let's hear regarding -- let's see, I've got that

21       little...

22               All right.  I've got it right here.  Thanks.  This is

23       regarding the permanent injunction, and on -- for KPM, and

24       that's Motion No. 1.

25               So let me hear you, please.

1          MR. GUTKOSKI:  Thank you, your Honor.

2          Again, John Gutkoski on behalf of KPM.

3          All the defendants agree that KPM is entitled to a

4    permanent injunction.  The only question that they raise in

5    their oppositions, their limited oppositions, is the scope of

6    that.  KPM seeks an injunction pretty much the same as the

7    preliminary injunction; and, your Honor, we did just note for

8    the record that we did file yesterday a corrected version of

9    our proposed order because we had copied the preliminary

10   injunction text over to the permanent injunction and hadn't

11   adjusted some of the terms in terms of the duration of the

12   action versus a permanency, et cetera.

13         So we did file that yesterday and would ask that the

14   injunction in the form as entered yesterday be entered.

15         The defendants want to carve out an entire category of

16   misappropriated trade secrets, misappropriation conduct that

17   violated the contracts of the individual defendants and that

18   the entity defendants tortiously interfered with as a result of

19   promoting and permitting that conduct.

20         KPM disagrees with that carve-out.

21         Specifically, the defendants say, we'll agree not to

22   use the software, the UCal software that generated the

23   application notes and the data that we used to create the

24   application notes and create the calibrations for the

25   individual customers, such as posts that Mr. Gajewski and

1    Mr. Eilert used the software and data to make those

2    calibrations.  We'll agree not to do that.  But don't hold us

3    to the third category that the jury found us responsible

4    for -- for misappropriating mainly all the customer

5    information.

6              That's a broad category, customer information.  The

7    evidence at trial included that within that category was the

8    identities of the individual customers, the individual people

9    at those customers that had the buying decisions that were the

10   contacts of the defendants when they worked for us at KPM and

11   then used those contacts and emails and connections, the

12   knowledge of the type of KPM instrument that they had, the type

13   of equipment, its timing, when it needed to be serviced, the

14   forms that were used in order to -- that the customers were

15   familiar with and comfortable with to have their -- their

16   machines serviced, the pricing, the revenue, the fact that they

17   used our pricing and tried to undercut it in order to set their

18   pricing.  All of that is within the bucket of customer

19   information that the jury found that they misappropriated.

20             The defendants, the individual defendants in Blue Sun

21   says, Don't hold us to that category.  And ITG says, Don't hold

22   us, ITG, responsible to any injunction at all.  You can

23   permanently enjoin the others as to the software and the -- the

24   data sets, but don't -- don't have it extend to ITG.

25             KPM finds no support in the record for any of the

1    carve-outs that the defendants seek.  And we should make no

2    mistake as to why we are here, why we have gone through three

3    years of litigation, why we had to all endure a long trial of

4    all this information, even after a preliminary injunction was

5    set, a relatively rare occurrence in trade secret cases.

6          We went through all of that, because the defendants

7    forced us to do so, because they are playing the long game

8    here.

9          It was clear and uncontested at trial that these

10   analyzers, this near infrared analyzer market is involved

11   with analyzers that last ten, 15 -- Mr. Wilt said even up to

12   20 years.  They are trying to play this out.  They made clear

13   at trial, their own admissions on this witness stand, that they

14   were pursuing a service-to-sale model.  The reason why they

15   tried to migrate and succeeded in migrating those customers

16   relationships, those connections, those contacts, those

17   opportunities of service was not to get $5,000 a pop for a

18   service visit, but to get to sell the 50, 60, $70,000 analyzer

19   when that customer, that unit needs to be replaced.

20         And we don't know when a given analyzer will need to

21   be replaced, when a customer will want to and need to make that

22   replacement.  They're hoping that yes, the jury found them

23   liable for the damages that were awarded for their -- their

24   misconduct to date, but they are hoping that there is an end

25   that you won't enjoin them and stop them from continuing to

1   misuse those relationships, and they will be able to satisfy

2   whatever judgment they have against them and then make the next

3   sale in three years, five years, ten years.

4        That's why they secretly diverted all that

5   servicing -- those servicing opportunities.  That's why they

6   hid what they were doing and lied about it, and that's why

7   they've dragged us through the -- through the trial that they

8   did.

9        In order for KPM to know, even if it was possible to

10  know and identify now when we will be harmed in the future, we

11  would have had to engage in hypotheticals.  We would have had

12  to interview or depose each customer.  We would have had to ask

13  them how do you feel about us now; how do you think you might

14  feel about us in the future; are you likely to buy a Phoenix,

15  because Mr. Gajewski or Mr. Eilert or Ms. Glenister handled

16  your account before and now they're over at Blue Sun.  When do

17  you see yourself anticip- -- when do you anticipate buying the

18  next unit?  Why don't you buy multiple units?  What are our

19  chances of convincing you to stay with us?  What are our

20  chances of convincing you not to say not epochs on both your

21  houses, we're not going to buy a SpectraStar or a Phoenix;

22  we're going to go with a Foss instrument; we're going to go

23  with another manufacturer.  Even if we could have gotten

24  answers to those questions, they would have been best been

25  hypothetical.

1        We presented the best evidence we had in terms of what

2   their misconduct was, but we cannot predict into the future

3   what their actions will bear in terms of fruit that they hope

4   to achieve down the line.  The only way to present that type of

5   nebulous harm, irreparable harm, it can't be solved by a

6   verdict at a defined point in time is with an injunction.

7        We arguably could have asked for an injunction now

8   based upon the evidence at trial to ban them from selling any

9   Phoenixes.  If your Honor recalls, the evidence at trial was

10  clear, they sell one unit, one Phoenix.  The only difference

11  between whether it's used for chocolate or whether it's used

12  for cereal or whether it's used for wheat or whether it's used

13  for flour is how it's calibrated, and they established in the

14  marketplace the only difference between their different uses of

15  their Phoenix machine for different constituents, for measuring

16  different constituents, was with our data interpreted by our

17  software in the application notes that they put out into the

18  world and used to market those.  We could have said we think

19  that infects all of their sales, don't let them sell this

20  product any more.  We're not asking for that.

21       We're asking for a permanent injunction of limited

22  scope that merely says don't leverage your relationships, don't

23  use our customer information to service our machines and

24  continue infecting those customer relationships going forward,

25  and don't sell your Phoenix analyzers for ITG and Blue Sun to

1    any of those customers that you previously had interaction with

2    in selling or attempting to sell for us at any time since you

3    created Blue Sun, July of 2018, going forward.

4         If you want to sell those machines anywhere else in

5    the marketplace, internationally, nationally, throughout North

6    America, as most of the testimony was focused on at trial,

7    Godspeed to you.  We're happy to compete with you.

8         We're only asking for an injunction that says because

9    we cannot determine now and won't be able to determine whether

10   or not any of our customers are buying your machine in the

11   future due to your misconduct or due to some sort of fair

12   competition in comparison between our units, stay away from

13   those customers.

14        THE COURT:  Even if they already are customers?  If

15   they are already -- if they have already had contacts prior to

16   the start of the suit or prior to the -- the issuance of the

17   injunction?  It's really very important, especially because

18   this going forward, it doesn't address a past wrong.  It's

19   trying to prevent a future wrong, which is, you know, fraught

20   with peril.  So we need to be as specific as possible, and by

21   that I need to know are you suggesting that if they had reached

22   out to someone and they mistakenly thought it was actually KPM,

23   they're having the servicing done, and then they continued to

24   have a relationship, and then they have a good relationship now

25   with whoever is the service provider, whether or not it is one

1    of the named individuals or someone working for Blue Sun,

2    should they -- should that company be prevented from -- if they

3    decide to further their relationship, at what point are we

4    stepping in and preventing a private enterprise from making a

5    business decision that they may wish to make even knowing all

6    of the information.  Maybe it requires a disclaimer, or maybe,

7    you know, this relationship is tainted by, you know, behavior

8    that was determined to be wrong and people are held accountable

9    in civil court for it.  I don't know.  But when you're talking

10   about the going forward, it becomes really important for us to

11   understand what it is that you're talking about, what is the

12   entire spectrum of people and entities that we should be

13   thinking about, and what is the specific behavior that we

14   should be trying to enjoin.

15        So I would like -- I think this is going to be a very

16   important issue, not just for both parties, but also for the

17   customers that already exist that may have had a relationship

18   with one or both.  So if you could be as specific as possible,

19   counsel.

20        MR. GUTKOSKI:  Directing the Court to the evidence at

21   trial.  The evidence at trial was that prior to the formation

22   of Blue Sun and the misconduct by Mr. Lucas in establishing

23   secretly Blue Sun while still taking a pay check from KPM and

24   recruiting the other individual defendants over.  The only

25   sales of the Phoenix, which was then called the M5 analyzer by

1    ITG was to the forage community, the agricultural uses that

2    Mr. Wilt testified when he brought his unit here out into the

3    center of the courtroom and showed it to the jury.  There were

4    no customers of ITG or that ITG was focused on that overlapped

5    with KPM until Mr. Lucas approached Mr. Wilt, came up with this

6    plan, and launched into it establishing Blue Sun as the

7    marketing arm for the M5.

8         And so the evidence at trial is that there is no set

9    of overlapping customers that your Honor suggests might be --

10   fall into a category that -- that the defendants had prior

11   relationships with separate and apart from the misconduct that

12   was presented at trial and -- and found liable by the jury.

13        Second of all, there is no evidence whatsoever that

14   any sort of disclaimer or disclosure would have any impact on

15   buying decisions or ameliorating any sort of harm, and so

16   there's nothing in the record that would support that type of

17   solution moving forward addressing the -- the established harm

18   to KPM.

19        Furthermore, it is inappropriate and a further breach

20   of their contracts for the individual defendants to even

21   contest the imposition of an injunction going forward.  Each of

22   their contracts was put into evidence.  In each of those

23   contracts they not only agreed not to misuse the trade secrets,

24   and not to misuse any confidential information, but expressly

25   agreed that any act of doing so would entitle KPM to injunctive

1    relief, and, therefore, the Court should not even entertain

2    their arguments that -- the individual defendants' arguments

3    that a permanent injunction against them for misusing the

4    category of customer information, which is included under the

5    broad definitions of confidential information and trade secrets

6    in those agreements should not be enjoined.

7         By extension, the corporate defendants, who were found

8    to tortiously interfere with those very same contracts should

9    not be heard to contest the agreed to use of injunctive relief

10   in order to prevent future harm.

11        THE COURT:  And what -- and then another -- a very

12   serious question that I have and can't -- don't -- because I

13   don't really -- excuse me -- I sort of understand the industry

14   from the perspective of as much as maybe the jurors understood

15   it, which was probably very -- not -- not the specifics of the

16   calculation formation, but there already are people who have

17   had contact with former employees of KPM, and these companies

18   have already done work with them.

19        Is there -- is there intended that -- that any, you

20   know, how do we -- we might be able to prevent future contact

21   by saying these -- these companies have a relationship with

22   KPM, and you cannot go from your former service and reach out

23   to them, but are there -- are there companies and are there

24   those in place where you can't separate the relationship that

25   the new comp- -- the company has made with the employee who was

1    a prior employee with KPM.

2           So are there any people who may be doing business or

3    have done business with both places that may themselves wish to

4    go out?  They may make a choice.  They may say we kind of like

5    the work that we've gotten out of Blue Sun and we're okay with

6    changing.

7           What is the limit on that company's decision-making as

8    to -- because you can't take any of these individuals and

9    literally, you know, like the men in black where they zipped

10   the memory, you know, just by wearing some funny glasses.

11   That's -- that's fantasy, and I think asking the employees to

12   wipe away their institutional knowledge is also sort of

13   fantasy.

14          So the question is what -- what do we do with the

15   companies that wish to do business that were prior?

16          Now, I understand you indicate that they only worked

17   with the forage community.  I cannot order somebody to only

18   work in a particular industry, but what if the industries -- you

19   know, what if the offshoot is that they still want to work with

20   Blue Sun?  They want to enhance their relationship.  They want

21   to buy things with them.  What -- what then with those people?

22          So these are vexing questions, and I'm asking because

23   I don't know the answer, and maybe no one in this room has the

24   exact answer, but it certainly is the realm of what the

25   injunction portends that we need to address.

1          MR. GUTKOSKI:  A couple of points on that from the

2    trial record, your Honor.

3          First of all, what's -- what -- what -- one way of

4    looking at -- at the question that your Honor proposes is -- is

5    under the balance of hardship prong of an injunction.  The

6    testimony at trial was that ITG and Mr. Wilt, who again owns

7    all of this, said that they don't need to go after KPM's

8    customers.  They don't need to sell to KPM's customers, because

9    they designed the M5 and marketed it as the Phoenix through

10   Blue Sun to go after competition from another competitor, FOSS,

11   and FOSS's customers.  And so they said at the time of the

12   injunction, the preliminary injunction, they said at the time

13   of renewing and when they challenged the preliminary injunction

14   and the Court left it in place, and they said here at trial,

15   we're interested in pursuing FOSS.  And so an injunction that

16   limited them from pursuing KPM's SpectraStar customers would

17   not -- would not burden them and not -- not harm them in any

18   way comparative to the damage to KPM.

19          Second of all, it is clear from the evidence at trial

20   that Blue Sun exists solely and is solely composed of former

21   KPM employees.  There are no Blue Sun employees that are not

22   out there working for Blue Sun with their KPM baggage, if you

23   will.

24          They know who they interacted with.  They know the

25   customers that they dealt with for KPM.  They're the ones in

1    the best position to say, okay, I can go pursue the entire

2    world of near infrared analyzer buyers.  I just need to stay

3    away from this narrow subset of the ones that me and my half a

4    dozen colleagues -- we're not talking about hundreds of people

5    here.  We're talking about a very set number of employees

6    dealing with a very set number of customers; however, one of

7    the proposals that the defendants object -- suggest is well, if

8    you're going to go do an injunction going forward, and you're

9    going to limit us to not use -- not approach those customers

10   and not continue to misuse the customer misinformation category

11   of trade secrets, for which we were found liable, just give us

12   a specific list, just give us a -- give us a list of the 40 or

13   so that came out at trial.

14           The problem with that specific list, your Honor, is

15   that we were unable to determine the full number of customers

16   that they had inappropriately reached out to and serviced

17   because of their spoliation of evidence, because of their

18   destruction of their email records, which is the primary way

19   that they communicated with these customers.  And so we think

20   it appropriate to have a similar definition of the limited

21   customer base that they are prohibited from approaching being

22   any of the people that they, that handful of employees, which

23   again is the entirety of Blue Sun and the entirety of ITG's

24   marketing efforts for the M5 Phoenix.  They know who they

25   approached, they know the people that they approached, and

1    they're in the best position to make sure that they stay away

2    from, again, just that set.

3            Now, in terms of the interests of the consumer of

4    the -- of the customer, there is no way, we think, on this

5    record due to their misconduct for them to continue

6    to -- certainly to service our units, but also to sell going

7    forward to those customers given the way they have contaminated

8    those relationships and given the way that they stole those

9    relationships and given the way that they hid the stealing of

10   those relationships.  That's on them.  That's -- that -- that

11   is a vexing question.  That is a level of challenge, but that

12   is -- the burden of that should be placed on the defendants,

13   because it is their willful conduct that -- and deliberative

14   conduct that finds us in this position.

15           If there is any doubt that an injunction is essential

16   here, it's their conduct after the preliminary injunction that

17   should definitively answer that.

18           As set forth in the briefing, there are two customers

19   to which defendants made sales of multiple analyzers, and those

20   customers were prohibited.  They are R&R Machine, and they are

21   Idahoan.  When we challenged them on this, the details of that

22   and the fact that they violated the preliminary injunction were

23   not allowed to be presented to the jury, because we weren't

24   able to tell them about the injunction; however, the record is

25   clear that those both in terms of what was presented at trial,

1   that those sales were made; and in the post-trial record, that

2   those were customers that -- that were prior KPM customers and

3   enjoined.  Defendants offer two different set of excuses.

4        With R&R Machine, they offer the testimony of

5   Mr. Lucas in an affidavit, and for the -- for the reasons that

6   we went through at length during the trial, KPM suggests that

7   the Court look at the very least askance at Mr. Lucas's

8   explanations and testimony.  However, it is clear that they

9   made the sales of Phoenix machines to R&R about a dozen of them

10  now.

11       Mr. Lucas claims now those weren't Phoenix machines,

12  those were Phoenix machines that we took the Phoenix name off

13  of.  We took the Blue Sun and ITG name off of and let R&R put

14  their own moniker on it, put their own name on it.  And yet at

15  deposition, he made clear when asked, when specifically asked,

16  when I asked him, What's the R&R analyzer?  His answer was, Oh,

17  so that's a Phoenix just with R&R's logo on it and R&R's

18  branding.  He had admitted at his deposition that they were

19  Phoenix machines and yet tries to tell this Court now oh, no,

20  they weren't.  The Court should reject that and find it to be a

21  violation of the preliminary injunction.

22       The same thing with Idahoan.  To make sure that the

23  understanding is clear, Judge Hillman initially set a -- his

24  preliminary injunction in August of 2021, and it said don't

25  sell to any customers that you previously sold to for KPM after

1    the July 2018 date, July 2nd, 2018.

2         Then there were some sales to the U.S. Government to

3    the Department of Agriculture.  And we raised that as a concern

4    with his Honor.  And defendants said, Well, wait a second.  The

5    Department of Agriculture, the U.S. Government, they're all

6    over the place.  They have hundreds, thousands of different

7    locations.  And so Judge Hillman revised the order in December

8    of 2021, that's ECF 120, where he said if there are different

9    locations, if they have independent buying decisions, in terms

10   of the people at that location making a decision, and they

11   haven't been in any way impacted by another location that you

12   sold to at KPM, you can still sell to that new location, that

13   untouched location.  That's the clarification that he made.

14        So they admit that Idahoan was one of our customers.

15   They made a bunch of sales to Idahoan after the injunction.

16   The excuse is, Oh, the decision-makers that we sold to were at

17   Idaho Falls, one location.  There were five other locations.

18   We sold to one of the other two so we're in Judge Hillman's

19   carve-out.

20        But the evidence at trial is clear, Trial Exhibit 163,

21   that the director of quality assurance located at Idaho Falls

22   is the one that had the ability to direct buying decisions for

23   the near infrared analyzers for all the others and specifically

24   sent the email that is Exhibit 163 putting a hold on their

25   buying decisions at each of those other locations, including

1    the two that they have sold to.  They knew, they know now as a

2    result of that being presented at trial, and yet they still

3    tried to say, oh, no, it was approp -- we could sell to them

4    because they were independent.  Clearly, not the case on the

5    face of the black and white record of that exhibit, your Honor.

6         They didn't stop.  They're not going to stop.  They're

7    going to look for every way to try to extend this out, benefit

8    from the extended timeline of these machines and buying cycle

9    of these machines.  They're going to continue to harm us.

10        Our only recourse, absent an injunction, is to sue

11   them again, go through this all again.  When they sell another

12   12 to another customer to then inquire, okay, why did you buy

13   that?  What did they tell you?  What did they use?  Did you

14   make that decision based upon the relationship that you had

15   through Ms. Glenister, Mr. Gajewski, Mr. Lucas, Mr. Eilert?

16   The prior understanding that you had of the capability of the

17   Phoenix through our -- the -- the -- the data points and the

18   measuring capabilities that they showed you using our data and

19   software.  We would have to get into all that as a matter of

20   factual debate, discovery, and another trial.

21        From an efficiency standpoint, from a justice

22   standpoint, the best way to rectify this irreparable harm and

23   the only fair way is with a permanent injunction as KPM has

24   proposed.

25        THE COURT:  Thank you, counsel.

1      All right.

2      MR. WILSON:  Your Honor, trade secrets don't last

3  forever, and listening to Mr. Gutkoski up here and reading the

4  briefing that KPM has submitted, they completely ignore the

5  relevant standard that the Court should consider in determining

6  whether to issue a permanent injunction, and that is what

7  amount of time would it take for a competitor in the industry

8  to become aware of the trade secret that's at issue.

9      There has been absolutely no evidence either at trial

10  or in support of KPM's motion about how long it would take any

11  competitor to learn this so-called customer information.  We've

12  had issues in the past about that claim -- that -- that trade

13  secret being a little amorphous, because it becomes really

14  important here, because what are we talking about?  We're

15  talking about the identities of their customers.  We're talking

16  about their preferences.  We're talking about how many machines

17  did they own, when did they buy them, things like that.  All of

18  those things could be discoverable by another competitor by

19  going to the customer and asking them.

20      Some period of time -- over some period of time,

21  whether it's Blue Sun or whether it's any other customer or any

22  other competitor, they would be able to learn this information,

23  and I would submit that there was absolutely no evidence at

24  trial about how long it took KPM to develop this information,

25  how long it would take another competitor to learn it.  In

1    fact, what we heard at trial is a lot of these customers, as

2    you mentioned previously, they have -- they do business with

3    all sorts of companies.  None of this is -- these relationships

4    are not owned by KPM.  They don't own these customers.  They

5    compete for these customers with all sorts of competitors in

6    the industry.

7              THE COURT:  But didn't they compete fairly?

8              MR. WILSON:  Even if they didn't they compete fairly,

9    but that was beside the --

10             THE COURT:  No, they -- they competed fairly, didn't

11   they?

12             I mean is there any allegation --

13             MR. WILSON:  You're talking about the other

14   competitors?

15             THE COURT:  I'm talking about when KPM started doing

16   business with people and selling what they have to sell, did

17   they steal the customer bases from other people, or did they

18   just -- did they just do what all the industry does, which is

19   go to these industrial -- well, you heard these industry fairs

20   and they -- you know, they talked to the fellow that came from,

21   I think Ohio and came -- lived in Milford, and he was a person

22   in the industry, and you get to know other people in the

23   industry, and you call.  That's what -- that's kind of what we

24   think people who are not in, you know, creation of goods, we

25   think that's what happens.  People -- it's word of mouth.  It's

1    reputation in a community.  It's all kinds of things.

2         What we -- I have a job, because it doesn't always go

3    that way.  Sometimes people use different means to get that.

4    The question is not whether or not the people that the Blue Sun

5    employees are going to to sell products aren't willing to buy

6    from them, the question is: Is the only way that those people

7    are being approached is because there's an advantage that the

8    Blue Sun employees had that others don't have, which is inside

9    information.  It's no different than buying and selling stocks

10   when it's supposed to be public.  And you do it because you're

11   gaining an advantage for yourself.

12        So Blue Sun should be able to compete, go to all of

13   those trade fairs, use their rep- -- use their -- to call

14   people and say, listen, if you know anybody in this business

15   who is looking for these, I'm willing to work with them.

16   That's not what has been happening, and the -- the issue that I

17   think is very important, which is that of the loss of an

18   accurate record of who is -- who was approached.

19        We know from the evidence that came in at trial that

20   it wasn't -- I think the most telling information came from a

21   couple of emails in which customers, who had been approached by

22   any one of the individual defendants through emails with their

23   new email came back and said, Wait a minute, is it still KPM?

24   I mean, we're -- oh, okay, so, and in some cases they were

25   directly responded with completely misinformation, oh, we're a

1   subsidiary, or yes, they've turned this, all of this, over to

2   us.  That is what the sin of the lost emails are, because if we

3   had a complete guide then they could carve out every one of

4   those people that were previously approached, but we can't.

5   And because of the subterfuge and the false names and

6   the -- and the -- and the dual employment, and all of those

7   things, the jury was -- was convinced that there was a harm

8   here and had the jury had the preliminary -- the injunction

9   information as well, it would have been -- I think it

10  would -- I think separating it out was a very important thing.

11  I think everyone had a better trial and a fairer trial because

12  of it, but I think the jury spoke extremely loudly.  What was

13  done can't be undone.  There's a -- there's a bell that got

14  rung, and it can't get unrung.

15          And the idea about the creation of a -- I mean we are

16  a nation that's founded on, you know, get out there and do it

17  yourself.  Sell yourself, sell your product, and, you know,

18  people will be jealous of you if you're successful, and they're

19  going to try and come at it, but so what.  That's what we do.

20          We -- we have an inventive and innovative spirit

21  that -- that makes us the leader in the world for that, but it

22  can't -- but when it's done -- when it's done unfairly how do

23  we find a way to let Blue Sun go and become successful if they

24  are intended to do so, but only fairly.  And this isn't

25  intended to label anybody, like, you know, as a permanently

1    bad.  This is intended to allow the efforts of a company to

2    maintain the advantage that they have obtained through lawful

3    means while also allowing Blue Sun to compete on a -- on

4    a -- compete on a level playing field.

5         I don't want to extend the preliminary injunction in

6    any way that is unfair.  These people aren't labeled anything.

7    They're just employ- -- they're now people who want to do work

8    for someone else, and they want to do -- they want -- but they

9    have to do it fairly.  And since we don't know how unfairly

10   their advantage was, that puts the Court in a very difficult

11   position as far as what the ask is.

12        And so I -- I completely understand that.  Now, I do

13   not intend to make this so onerous that Blue Sun is unable to

14   compete and be in business.  That's not what this is intended

15   to do.

16        So I appreciate that the trade secrets don't last

17   forever.  They don't.  I mean, Mr. Wilts is a -- he's testament

18   to that right.  He lost the right to continue to sell and

19   control a product that he made, which was an incredible

20   product.  He got paid for it.  So he created something else.

21   Excellent.  Good.  I mean that is the -- that is magic.

22        How do we, however, under the circumstance that we

23   have, Attorney Wilson, how do we narrow it so it doesn't hurt

24   your client's ability to go forward, but it doesn't continue to

25   penalize KPM because your clients did not retain the evidence

1    of their misdoings.

2              So that -- those are the balances --

3              MR. WILSON:  Sure.

4              THE COURT:  -- and I am not intending to use whatever

5    this preliminary injunction is to stifle competition or to

6    stifle commerce, but it has to be in a way that does recognize

7    some of the very unique facts that came out about this case.

8              MR. WILSON:  All right.  Let me try to tackle a few of

9    those things.

10             THE COURT:  Okay.  Good.

11             MR. WILSON:  But first is how -- you said how do we

12   deal with what's happened.  Well, we dealt with it because the

13   jury ordered a pretty substantial judgment against Blue Sun and

14   KPM and the individual defendants.  That addresses the past

15   wrong that you talked about.

16             And so the question going forward is how long does

17   this customer information maintain its trade secret status,

18   because really the issue here they're saying is you can't sell

19   to these customers without -- it's sort of like an inevitable

20   disclosure argument.  You inevitably will utilize these trade

21   secrets, this customer information; therefore, the only way to

22   prevent you from doing that is to cut you off from selling to

23   them at all.  And I think that's the real problem is because

24   that assumes this customer information maintains trade secret

25   status forever.  At some point it loses its trade secret

1    status, and I would submit that our clients have been enjoined

2    for over two years now from selling to these customers.  And so

3    to the extent there was some kind of unfair advantage, some

4    kind of harm to the relationship, KPM has had over two years to

5    go to those customers, explain what happened, explain -- and

6    they've done that.  You know, Mr. Gutkoski said, well, they

7    have to go and they'd have to depose all these customers.  No,

8    they wouldn't.  They would go call on their customers like

9    every other business does and explain to them and market to

10   them and say, yeah, our products and services are superior.

11   You should continue to buy from us.  It didn't come up in the

12   trial because of the injunction issue, but they did send a

13   letter to every customer saying we are not Blue Sun.  They are

14   not authorized to do these things.  And since the jury verdict,

15   they've widely publicized it.  I am convinced that there is not

16   a single customer in this industry that is unaware of this

17   lawsuit and unaware of the outcome.

18          So again, the question has to be how long do we cloak

19   this customer information as a trade secret.  I would submit

20   that it would be unprecedented.  There has been no case that

21   has been cited by KPM in any jurisdiction that has imposed a

22   lifelong injunction, a perpetual noncompete effectively based

23   on something like customer information.  Because again that

24   goes back to the point how long does the information stay a

25   trade secret.

1          And so, you know, Ms. Glenister, for example, I think

2    the evidence showed she has been in the industry working for a

3    few years.  Is she going to be banned from contacting these,

4    you know, some population of customers from the rest of her

5    career because of this?  I -- I would submit that this would be

6    the first time that any court has ever issued such an

7    injunction.

8          THE COURT:  Well, if she could tell us who she

9    contacted when she was in a dual employment or she was -- she

10   was exercising subterfuge, if she could tell us that then we

11   could -- it could be limited.

12         MR. WILSON:  But even that limitation, I think, would

13   be improper because it would say those people that you worked

14   with or you contacted, you can never speak to them again about

15   these products or services.

16         And again, the only way you could do that --

17         THE COURT:  Why?

18         MR. WILSON:  Well, if --

19         THE COURT:  If the information that she obtained was

20   not her own information, again --

21         MR. WILSON:  Yeah.

22         THE COURT:  -- trade shows, you know, contacts,

23   someone calls you up and says, hey, I know this guy kind of

24   does the same thing that -- you should give him a call.  I

25   think that -- you know, that's innovative.  That's -- that's

1    work ethic.  That's using your noggin and going at the business

2    that you have and becoming good at it.  That's not theft.

3    That's not subterfuge.  That's not cheating.  That -- what they

4    did was cheating, and since they were -- inadvertently

5    destroyed the complete record of their cheating, we don't know

6    to whom they contacted and made certain promises or maybe they

7    made -- maybe they said negative things about KPM.  Well, who

8    knows what they did.  You know why?  Only they know.  Only they

9    know why they were able to walk into this court empty-handed,

10   and that is -- so they put themselves in this position, not

11   KPM.  They put themselves in this position, because if we knew

12   who they had contacted you could narrow that field, completely

13   narrow that field.  It's not up to the KPM to call their

14   customers and say, Did you get a funny email from one of our

15   employees?  What the heck?  I mean how are they supposed to

16   maintain a business relationship with someone, and they sound

17   like they don't even know who's on first.

18           It is not -- I -- it is not intended to be a

19   punishment to Blue Sun.  It's intended to recognize a harm that

20   a jury found and a judge found and -- and so we want to do that

21   in the way that is most fair to all parties.  It's not fair if

22   they are unable or refuse to say who they already reached out

23   to.  To call what them -- you know, to say what we're doing is

24   preventing them from making a living is really fundamentally

25   opposite to what the jury found.  They found that they

1    were -- they were not making a living.  They were making -- they

2    were making money off somebody else's living.  And

3    that -- that's really -- that's really what's at heart here.

4            So, Attorney Wilson, I want to fashion this

5    preliminary injunction in the narrowest way that we can, even

6    if it's -- you know, I'm not certain whether or not it's

7    something that can be narrowed by years or decades.  And I

8    think that that's -- if that's possible, that's appropriate,

9    because this information doesn't last forever.  The technology

10   changes.  And then KPM has to continue to sell to their own

11   clients.  They have to give them a reason to stay with them

12   anyways.

13           So I'll work with you to the extent that we can to

14   fashion a remedy that is not intended to be just a harm.  It's

15   intended to address what the wrongs were litigated.  So -- and

16   I appreciate -- so we'll think about it in that -- in those

17   terms because, you know, this is a sort of unusual situation.

18   I guess every case has their own complexities, but we are

19   talking about people who -- you know, these are not like

20   defense contracts, you know, we're not -- this is a much bigger

21   industry.  This is much more mainstream.  These are companies

22   and not the federal government, which is that whole issue

23   regarding the federal government was -- we don't know if

24   they're going to be paying their bills in 45 days, so we might

25   not want to be thinking about using them for contracts.

1          So I'm sorry that I interrupted you, but I really want

2     you to give -- there's no doubt that there has to be -- there

3     has to be some ongoing control over this situation.  So for

4     your clients, what's your best -- what's your best request for

5     me --

6          MR. WILSON:  Sure.

7          THE COURT:  -- to narrow it so it doesn't harm them

8     permanently.

9          MR. WILSON:  So let me address two things.  There's,

10    you know, you're taking about the spoliation of evidence.

11    There were hundreds of exhibits in this trial, because Rob

12    Gajewski preserved all of his emails.

13         So any service that Rob Gajewski did, which really was

14    the focus of the trial, none of that was spoliated.  There's a

15    reason why there was hundreds of exhibits in this case, and

16    that's because Rob Gajewski did preserve his emails.  That's

17    why we had all of the discussion about what Rob was doing, what

18    he was saying.

19         And so we have submitted what I think your Honor was

20    asking for, which is a list.  Blue Sun's records show that

21    Mr. Gajewski serviced 30 customers.  And I think what's

22    important is, you know, getting back to this sort of service to

23    sales model that KPM keeps bringing up.  What the evidence at

24    trial showed that only a very small percentage of customers

25    actually received preventative maintenance service from these

1    companies.  I think that, you know, it was sort of like

2    20 percent was sort of the number.  Some people were a little

3    bit higher, some people were a little bit lower.  But a large

4    majority of these customers serviced their own machines.  I

5    think that was undisputed at trial.

6           And so what we offered as the alternative was an

7    injunction that limits Blue Sun, at least the individual

8    employees, from servicing or selling to those 30 customers for

9    another year.  So that would be a total of three years.

10          And again, I would submit, you know, the burden I

11   think is on KPM here to still show how long customer

12   information should be protected as a trade secret.  But there

13   has been no evidence that certainly it would take more than

14   three years for a competitor to learn this information and to

15   be able to go and to sell to these customers in a way that's

16   fair.

17          I think that -- again, I think the jury addressed the

18   past wrongs that were done.  This -- this issue is not about

19   that.  Again, it's not about punishing.  It's about going

20   forward and what's fair.  And I would submit that a perpetual

21   lifelong ban of any kind would be unprecedented.  I'm not aware

22   of any case where any judge has ever ordered a lifelong ban

23   from selling to customers based on this type of trade secret,

24   this type of customer information, which changes over time.

25          And so there has to be an end, and we think that three

1    years -- so we're tacking on another year -- is sort of the

2    outer edge of what would be fair here under the circumstances.

3    At some point these customers have to be able to decide who

4    they want to do business with.

5         And after three years, I think KPM would have had the

6    ability to shore up those relationships.  I agree they

7    shouldn't have to go to the customer and say, Did you receive a

8    weird email?  But I do think they should have to call on a

9    customer within three years and check in and say, hey, how come

10   we haven't been getting service from you, how come -- when are

11   you all interested in buying a new device?  You know, these are

12   things that every -- every business in every industry has to

13   do.  And what they're saying is no forever, for perpetuity, we

14   should not have to compete against Blue Sun because of this.

15        And again I would just submit that that would be

16   entirely unprecedented, and there's no support for it.  At the

17   some point the trade secret ends, and we think that three years

18   for this type of trade secret would be appropriate.  So that

19   would be our sort of alternative offer.  These 30 customers for

20   another year.

21             THE COURT:  Thank you very much.

22             MR. WILSON:  Thank you, your Honor.

23             THE COURT:  All right.  Attorney Ritchie.

24             MR. RITCHIE:  Yes, your Honor.

25             Your Honor, I think that later in this proceeding

1    we're going to hear from counsel for KPM that this Court should

2    give great deference to the jury's finding with respect to

3    other issues that your Honor will hear today.  So I want to

4    highlight that now, because I think it's important for ITG in

5    its separate opposition to this motion.

6         The jury found that ITG did not misappropriate trade

7    secrets, and I submit that is a significant finding that

8    deserves deference when this Court is considering what to do

9    with respect to permanent injunction.

10        Mr. Gutkoski gave your Honor a slightly abridged

11   version of the history of -- of ITG that went before the jury.

12   In fact, although it is true that the M5 was designed with ITG,

13   your Honor will recall that Mr. Wilt testified that he started

14   a company called Unity Scientific long before KPM was in this

15   industry.  He designed the first SpectraStar machine, and that

16   through a series of corporate transactions that business was

17   transferred to KPM.

18        I think it was Exhibits 147 and 148 were the sales

19   records of Blue Sun and ITG that were put into evidence, and

20   your Honor will recall that those records provided the backbone

21   of plaintiff's damage calculation, but those records also

22   contained two separate line items that we tried to explain to

23   the jury.  One was were any of these companies in the ITG

24   pipeline prior to the time a sale was made to them by Blue Sun.

25   And your Honor can go back and see there are a number of those

1    companies.

2          Secondly, did those companies even have a KPM machine

3    at the time that Blue Sun had made the sale, and your Honor

4    will see that virtually none of them had a KPM machine at that

5    time.  Mr. Wilt said -- and he rattled off a number of names,

6    and I don't have them in front of me -- eight or ten customer

7    names, all the same names that Mr. Olson and the records that

8    KPM introduced.  KPM said they were their customers.  Mr. Wilt

9    said, Oh, no, those were my customers back in the Unity days

10   when I developed the first SpectraStar machine.

11         So when you combine those undisputed facts with the

12   jury's finding that there was no misappropriation by ITG of the

13   trade secrets, what that means is the jury found -- the jury

14   was not happy and punished ITG for hiring these individuals

15   that had contracts.  The jury was not convinced by KPM that ITG

16   had the trade secrets, did anything appropriate with the trade

17   secrets, and it's fair to infer and there has been no evidence

18   otherwise that they're going to do anything with the trade

19   secrets.

20         The SpectraStar, Unity, which became the M5 business

21   existed before KPM got into this industry, and it can exist

22   afterwards without infringing on any KPM trade secrets or

23   rights.

24         Mr. Wilt said, I don't have the KPM trade secrets.  I

25   don't need them.  That's not how I design my machines.

1          So I'm not here to stand up and disagree with my

2     colleague.  I think that Mr. Wilson has submitted an order, a

3     draft order that appropriately reflects what ITG would agree

4     to, but if, in fact, the Court will not adopt that order, ITG's

5     position is there should be no injunction with respect to ITG.

6          Let's recall, ITG is a sale -- is a manufacturing and

7     sales business.  They sell machines, and there is nothing and

8     no reason to stop ITG independently from Blue Sun from selling

9     its machines in whatever markets it deems fit.  It didn't

10    misappropriate the trade secrets.  As long as it doesn't use

11    any enjoined employees or enjoined entities to make those

12    sales, there should be no harm to KPM, and I think that that

13    jury finding is significant, your Honor, and should be given

14    deference when the Court considers fashioning its injunctive

15    relief.

16         I -- the only thing I -- lastly, I'd say, and this

17    probably will come up in other things is that Mr. Gutkoski has

18    cleverly made reference to FOSS machines and foraging, and it

19    sort of seemed to be suggesting to the Court that, well, it's

20    okay if your Honor will exclude those FOSS and foraging

21    machines from the injunction.

22         Well, really, because if your Honor goes back to

23    Exhibits 147 and 148, the vast majority of those customers had

24    FOSS machines at the time Blue Sun made the sale.  So KPM

25    convinced this jury for an award of damages based on sales of

1    machines to FOSS customers; and yet now in order to placate the

2    Court's obvious and well-founded concerns about the scope of a

3    lengthy injunction wants to step back and say, oh, it's okay,

4    you can exclude the FOSS customers.  I don't think you exclude

5    anybody.  I mean I think that ITG should be fair to -- should

6    be free to sell to anybody.  But this idea of mixing and

7    matching and hiding the ball as to what KPM really wants is

8    evident in those comments.

9          And I don't have anything further to add, your Honor.

10   I'm happy to answer any questions your Honor has.

11         THE COURT:  Well, the jury clearly put the -- the onus

12   of the blame on the trade secrets manipulation or theft on the

13   individual people that actually did it, because that's where

14   the evidence was, but the jury was also not blind to but for

15   Mr. Wilts and ITG there would be no Blue Sun, period, and you

16   can't leave a match, you know, in a pile of wood and maybe some

17   gasoline and with a roomful of pyromanics and walk out and say,

18   oh, my gosh, there was a fire.  I'm shocked.  The -- that is

19   what Mr. Wilts created.  He literally created that.  He --

20   Mr. -- the Blue Sun creation may have come from an individual,

21   but the purpose of Blue Sun, the significance of employees from

22   a single company, a company that Mr. Wilts had a history with

23   over an industry of which he had a history with, the jury was

24   not blinded to that.  And they -- and they -- those people

25   they -- but for Mr. Wilts they could not and would not have

1    come together as a group.  And so to suggest that somehow he

2    gets to say what, what was going on?  I had no idea.  That's

3    not what the jury said with their verdict.  The jury -- I think

4    the jury was very fair to Mr. Wilts that, you know, what those

5    people did, they were grown-ups, individuals, who were -- who

6    were thinking, working individuals, and they made decisions on

7    their own to do things that were improper, and the jury made a

8    determination that they -- that had been proved.  But the jury

9    did not say that Mr. Wilts is of clean hands.

10        MR. RITCHIE:  I'm not disputing anything your Honor

11   has just said.  In fact, I agree with it.  I agree that that's

12   what the jury did.  But the jury did make a distinction between

13   what it viewed as tortious interference with a contract, which

14   is absolutely what they punished Mr. Wilt for, I get that.  And

15   misappropriation of trade secrets what they said did not happen

16   for ITG.

17        The issue with respect to the tortious interference

18   with contract, he has been punished.  That issue is to bed

19   absent appeals and whatever happens here today.

20        With respect to the trade secret issue, the Court has

21   to fashion an order that will prevent harm to KPM with respect

22   to its trade secrets while still I think the Court has

23   acknowledged balancing the right of Blue Sun and ITG and the

24   individual defendants from competing in this business, because

25   a flat out bar on competition just isn't warranted and is not

1     appropriate under the law.  But there is no reason to -- if you

2     take the jury at its word with respect to the tortious

3     interference count, I think we have to take the jury at its

4     word with respect to the -- the trade secret count, which is

5     there was no misappropriation.  And if there's no

6     misappropriation of this customer information by ITG, there

7     shouldn't be any reason why ITG independently of Blue Sun or

8     the individual employees, independently of those people and

9     that entity shouldn't be allowed to sell its machine just like

10    it did before Blue Sun came into existence.  And that's the

11    distinction I'm trying to draw.

12         I'm not arguing with your Honor about what the jury

13    did.  I agree with you, but I think that if you give the jury

14    credit on the one hand, you have to give them credit on the

15    other hand, and their finding with respect to the trade secrets

16    logically leads the position that ITG is advocating here.

17         Thank you.

18         THE COURT:  All right.  Thank you very much.

19         Anything further on this issue?

20         MR. GUTKOSKI:  Just briefly, your Honor.

21         The only breach of contract that was argued and found

22    and therefore could be the basis of the jury's verdict of

23    breaching of contract is the misuse of trade secrets and

24    confidential information.  Your Honor is completely correct,

25    this jury understood exactly what went on here.  They held the

1    actual misappropriators liable for trade secrets and

2    misappropriating trade secrets.  But they held ITG liable for

3    tortiously interfering with the contracts of those individual

4    actors and then unfairly and deceptively competing under 93A.

5    The underlying actions for both the 93A count and the tortious

6    interference count are the breaches of contract of these

7    individuals, and the only breach that was ever presented or

8    argued is the misuse of information.

9         A breach of a contractural provision which has no time

10   limit and so, therefore, future misuses and -- constitute

11   future breaches to the extent that they are inspired, funded

12   for the benefit of ITG and Blue Sun, then they are similarly

13   within the violations that the jury found them liable for.

14        We are entitled to an injunction for the 93A violation

15   and the tortious interference -- the tort -- of tortious

16   interference of those contracts just as much as we are for the

17   trade secret violation.

18        One additional point I would say is in terms of

19   Mr. Wilson's arguments that there was no evidence as to when

20   these trade secrets might expire, the defendants could have

21   presented that information.  The defendants could have said,

22   here's where we reached out to post and said, hey, cards on the

23   table.  I'm now at a new company.  We're completely separate.

24   We can do what we did before, but understand we are not KPM and

25   we are -- we are going to do this in a way that is completely

1    above board.  They didn't present that evidence, because as we

2    all know, that's not how they conducted themselves.

3            THE COURT:  But we do know based on the evidence that

4    KPM put on and was -- was reiterated by the defendants' case

5    that generally the machinery here -- first of all, we know that

6    the technology is continuing to evolve.  It's continuing to get

7    better and change.  We also know that there is a life span of

8    the -- of the equipment, the machines, and I think that we have

9    to recognize that -- that life span.  I think what may happen

10   now is that if there -- whenever the -- the injunction can't

11   live forever.

12           MR. GUTKOSKI:  No.

13           THE COURT:  And I think that -- I think the 15- to

14   20-year period that we've talked about the life span of the

15   machineries I think is an appropriate place to start.  I -- so

16   I do not intend on making a lifetime ban on using the

17   injunction for a lifetime period of time.

18           The free market means that everyone means to freely

19   and equally have access to selling their goods.  When someone

20   takes an advantage that they -- that they didn't earn, then

21   they -- that -- there is -- there is a penalty for that, at

22   least in the scope of the -- of the client base that KPM has.

23           And -- and I think that that is important.  It

24   recognizes the jury verdict, and I think it really is enforced

25   by the facts, but that has to -- that has to have an expiration

1    date at some point.

2         MR. GUTKOSKI:  I think -- I think your Honor

3    accurately reflects the evidence at trial that we're talking

4    about a 15- to 20-year time frame, and an injunction that

5    extended for that time frame I think would be acceptable to

6    KPM.

7         I would just lastly say that Mr. Wilson claimed that

8    we had all these -- we can limit ourselves to a -- the list of

9    customers that is in the trial record because we had hundreds

10   of exhibits and --

11        THE COURT:  We're going to -- the customer base is the

12   customer base that existed when the individual defendants were

13   fired.  They will no longer have had access to the database of

14   KPM from the point of their firing.

15        MR. GUTKOSKI:  Could --

16        THE COURT:  And that would be the start date of

17   whatever time limit there is.

18        MR. GUTKOSKI:  I think that's -- I think that's

19   appropriate.  I would just make -- make reference to the fact

20   that we put up the -- and spent an extensive time with

21   Mr. Gajewski on the stand with his -- his disk drives, his

22   thumb drive that was never returned --

23        THE COURT:  Right.

24        MR. GUTKOSKI:  -- and Exhibit 94, Trial Exhibit 94,

25   where we went through all of the different --

1          THE COURT:  Right, which is why whoever the customer

2    base is, and that will be a -- that will be a delineated base,

3    a going-forward period.

4          MR. GUTKOSKI:  As a particular point in time.

5          THE COURT:  Yes.

6          MR. GUTKOSKI:  I think that's appropriate, your Honor.

7          THE COURT:  And -- and then I would just say, both

8    parties, you should never discount on a customer always being

9    your customers.  You have to keep winning them over.  So it's

10   up to KPM and up to Blue Sun to find their way in these

11   industries and -- and, who knows, in 15, 20 years, you know,

12   whether or not either one of these companies will still be

13   doing business as their named company, but I do think

14   that -- that it is pretty clear.  I'm -- I'm going to take a

15   look.  If there is a going to be a going forward it's going to

16   be limited in time, and it's going to be delineated in

17   specifics, so.

18         MR. GUTKOSKI:  Thank you, your Honor.

19         THE COURT:  All right.  So that's one.

20         Do we need a break?  Are we ready to go into Count

21   Two?

22         Thank you.

23         All right.  So our next motion is -- let me see.  We

24   have the -- KPM's motion for a finding of willful malicious

25   appropriation of trade secrets and for exemplary damages.

1    Motion two.

2            MR. GUTKOSKI:  I get that one, too, your Honor.

3            THE COURT:  All right.

4            MR. GUTKOSKI:  During trial, the Court had concerns

5    with the -- perhaps the best said collateral effect that asking

6    the jurors and suggesting to the jurors in a specific question

7    might have on the overall verdict and determination of

8    liability in asking them whether or not if they found

9    misappropriation it should -- they should also find it to be

10   willful and malicious.

11           That does not -- that concern does not exist now that

12   the Court is the determiner of these issues.  Under both

13   the -- the federal and state trade secret acts, the Court has

14   the power to, based upon the evidence presented at trial, make

15   its own determination of willful and malicious, particularly

16   having chosen not to submit that question to the jury, and KPM

17   asked the Court to make such a finding now.

18           I don't believe that there is any debate, any real

19   debate anyway regarding willfulness.  Willfulness is a

20   voluntary act committed with an intent to create its results.

21   Even under the cases cited by the defendants, including the

22   *Timex* case from the First Circuit, willfulness includes acts of

23   fraud and similar other acts of misrepresentation.

24           The evidence was replete at trial of not only bad

25   actions but intentional bad actions that included acts of

1    hiding those actions and misrepresenting the truth to not only

2    KPM, who they were continuing to work for and take paychecks

3    from, but also to the customer base that we've been discussing

4    at length this morning.

5           The question is maliciousness, and in asking for the

6    jury question and the question to go to the jury, and an

7    instruction on it, we had a spirited debate and lengthy debate

8    as to the meaning of maliciousness.

9           In both the cases that we submitted at the time of

10   that instruction, in ECF 227, and those submitted in our

11   briefing, the concern that the Court expressed on the record

12   during the colloquy prior to instructing the jury that

13   maliciousness had a -- and requires an act of evil separate and

14   apart from a financial gain and financial injury to KPM is

15   simply not supported by the case law.

16          Defendants rely on the -- the Court's concerns, and on

17   the *Contour Design* case from the District of New Hampshire in

18   2011.  That Court found that the defendants in that case acted

19   maliciously on facts with a lot of parallels to those set forth

20   in the trial record and heard by the jury.  Exploiting

21   long-term relationships, obscuring the source of goods and

22   services, attempting to conceal that misappropriation, taking

23   as many customers as it could, and now violating a preliminary

24   injunction, all of those have parallels and equal support on

25   this trial record.

1          Moreover, their own case, the *Contour Design* case,

2     looks to the multifactor test from patent law noting that the

3     federal and state trade secret acts are based in part on patent

4     law.  The *Read versus Portec* decision sets out a series of

5     factors that says that if the jury finds willful infringement

6     in the patent context should the Court impose exemplary

7     damages.  And that's what we're talking about here.  We're

8     talking about whether or not there should be a punitive

9     component to the enhancement to the damages for trade secret

10    misappropriation, because their conduct was willful and

11    malicious.

12         Those same factors were applied by the *Contour*

13    *Design* -- by the Court, District of New Hampshire, in the

14    *Contour Design* case in order to find maliciousness.

15         Many of those are similarly met by the evidence here,

16    deliberate copying and use of property owned by the plaintiff,

17    by KPM; lack of a good faith belief in the propriety of their

18    conduct.  They hid it.  They lied about it.  They knew it was

19    improper.  They confessed to that on the stand.

20         The acts of litigation misbehavior, here the

21    violations of the preliminary injunction at the very least, it

22    not being a close case.  The evidence here was overwhelming in

23    favor of the defendants' misconduct -- in favor of KPM about

24    the defendants' misconduct, the long duration of that

25    misconduct, the fact that there was no remedial activity taken

1  on by the defendants once a complaint was brought.  Instead

2  they tried to make additional sales before they were enjoined,

3  and then as we saw with the R&R and Idahoan situations, even

4  after they were enjoined.

5          The motivation of -- of their conduct being financial

6  and for their own financial gain and for our financial harm,

7  and the attempts to conceal their own misconduct, all of those

8  are factors regularly considered under the *Read versus Portec*

9  factors in patent law, and all of them apply here in favor of a

10  finding of maliciousness.

11          Furthermore, the shortcut definition or terms

12  that -- that are included in maliciousness include ill will,

13  and the same acts of misconduct of taking a paycheck from us

14  for months, years, while they stood up this business, while

15  they then leveraged that business in order to take our

16  customers, lying about it, lying to their employers who asked

17  them about it, individuals.  I asked Mr. Gajewski:  You lied to

18  him?  And he didn't flinch.  He said, Yes, I did.  He was

19  almost proud about it.  All of that, all of that that -- that

20  activity, that testimony, the years of conduct, the years

21  of -- of hiding it all show ill will towards KPM, towards their

22  contracts with KPM and their obligations thereto.

23          Under their own case, and certainly under the cases

24  that we've cited with broader definitions of maliciousness, the

25  willful and malicious standard is met on this evidence.  We

1     understand the Court's concern in not presenting that to the

2     jury, but it's now on the Court and in your court and ability

3     to decide.  And we ask the Court to, based on the evidence that

4     it heard, to make a finding of willful and maliciousness and to

5     double the damages for trade secret misappropriation.

6              Thank you.

7              THE COURT:  Thank you.

8              Attorney Ritchie.

9              MR. RITCHIE:  The test that has to be met here, your

10    Honor, with respect to willful and malicious is by KPM's

11    admission a discretionary one with this Court.  And it frankly

12    requires a moral judgment, which is why I think the Court was

13    right to withhold that from the jury and to consider the issue

14    on its own.

15             The -- there really isn't a dispute about the standard

16    here.  I mean this requires and this comes out of the *Contour*

17    *Design* case, ill will, hatred, hostility or evil motive.  I

18    don't think -- recognizing that these individual defendants by

19    the jury's judgment have done things wrong, I don't think

20    anyone in this courtroom could have concluded that these

21    individuals acted with ill will, hatred, hostility, or evil

22    motive toward KPM or anyone else.

23             Were they confused about what their legal

24    responsibilities were?  They appear to have been.

25             Did they make mistakes with respect to their

1    relationships with customers and relationships with their

2    former employer?  Apparently they did.

3            But those mistakes do not rise to the level of

4    evilness or hatred or hostility that's required for a finding

5    of malice here.  That's a moral judgment, and your Honor had

6    the opportunity to see the demeanor of these witnesses, to see

7    the character of the evidence, including the cross-examination.

8    The factors relying just on a case and saying, well, this looks

9    like that case or that case doesn't nearly come close enough to

10   take into account the kind of evaluation the Court has to make

11   here.

12           There was no evidence submitted at trial that any of

13   these people were out to hurt KPM.  There was no evidence of

14   any kind of animosity towards any individual at KPM.  There was

15   no attempt to hurt KPM in the way that, for instance, in the

16   *Resman* case that we cited in our -- in our brief, there was an

17   email that said we're going to destroy the individual and the

18   company that I used to work for.  There was none of that.

19   These individuals to some extent -- well, these individuals

20   thought, perhaps mistakenly, that their way of life, their

21   ability to earn their living at KPM was disappearing, and they

22   were looking for other opportunities, but that doesn't rise to

23   hostility or evilness.

24           Now, there are questions about whether or not the

25   witnesses were being honest in their communications.  And yes,

1     in fact, the jury concluded, I think, it's at least an

2     inference that some of these communications were not honest.

3     But lack of honesty doesn't mean evilness or hostility.

4          These individuals were caught in embarrassing

5     situations, and they did what is unfortunately too human, but

6     not rising to the left of evilness.

7          I don't really have anything else to say, your Honor.

8     Your Honor has seen the demeanor of these witnesses.  Your

9     Honor understands the -- the standards here, the replay.  But

10    to argue that these witnesses acted in an evil fashion or in a

11    hostile fashion I think is grossly out of proportion to the

12    evidence.  And I think that your Honor had it right when we had

13    the discussion back when we discussed the jury instructions.

14    You said then pure greed, whatever it is, is not the intent to

15    bring about the likelihood of themselves with ill will, hatred,

16    hostility or evil motive.  Greed may be evil, but it's not an

17    evil motive.  And I would stand by those words and I would

18    encourage the Court to do the same and deny the KPM motion on

19    that point.

20          Thank you.

21          MR. WILSON:  No, go ahead.

22          MR. GUTKOSKI:  Just one point.  KPM is a corporation.

23    The only way to hurt it is to take away its business, its

24    customers, its market, its reason for existence.  The fact that

25    they gained from it financially as well, from my view, only

1   makes it worse, but doing so taking those customers, taking

2   those sales and lying about it is ill will because it is the

3   only way to hurt KPM, and it did.

4           THE COURT:  All right.  I'll just say when -- I agree

5   that greed in and of itself is -- to some people it's the

6   nicest attribute they have in their personal moral character,

7   but greed is not the same as evil, but people -- greed and

8   behavior that derives from it can be evil.  So they don't

9   necessarily equal in definition, but they certainly can

10  coexist, and it is the overall behavior of the individuals

11  that -- that must be taken into account.

12          The behavior of the individuals was not just greed.

13  They took something that they knew didn't belong to them.  They

14  weren't just -- they weren't just hogging, you know, their

15  sales figures.

16          So their entirety of the -- of the individuals and

17  the -- and the actions of each one of the entities in their

18  behavior is relevant as to whether or not a standard has been

19  met for the 93A.

20          So I will -- you know, what is malicious?  I'm no

21  Potter Stewart, but I do think you may find it hard to define

22  it, but I do think you know it when you see it.  I will review

23  the filings on that.  I've not yet made a determination on

24  that.  I do -- I -- I would say that there is no exact case on

25  point.  So we will have to take instruction from series of

1   cases from different jurisdictions to determine whether or not

2   the standard has been met.  Okay.

3           So that is our Motion No. 2.

4           Let's -- let's go on to the third motion.  And for us,

5   that is KPM's motion regarding damages and prejudgment

6   interest.

7           MR. MAGEE:  I believe this includes the 93A issues,

8   your Honor.

9           THE COURT:  It does, yes.

10          MR. MAGEE:  Good morning, your Honor.  Scott Magee on

11  behalf of the plaintiff.

12          With respect to the 93A claim, I think all the

13  relevant stakeholders agree that whether the jury in rendering

14  the jury verdict, certainly KPM and even the defendants in

15  their brief agree that the evidence at trial establishes that

16  there was unfair deceptive conduct by Blue Sun and by ITG, and

17  that that conduct was willful or knowing.

18          Nothing in the briefing by the defendants has

19  suggested otherwise.  The most that they've done in response is

20  to suggest that ITG's conduct is not so bad that it should

21  warrant treble damages, but they don't dispute -- it's a little

22  interesting in their briefing, but they don't dispute that

23  there's willful or knowing conduct and that mandatory double

24  damages exist at a minimum for that conduct.

25          So I think in terms of what the conduct was, did it

1    fit the standard of willful or knowing, unfair or deceptive

2    conduct.  There's no dispute at this point on that, and the

3    Court should find so.

4         The one, I'd say, large defense that the defendants

5    have put forward is this affirmative defense.  It is an

6    affirmative defense that they bear the burden of suggesting

7    that there is these -- this conduct was not primarily and

8    substantially in Massachusetts.  However, the cases that they

9    rely on, all of the cases that they rely on, point to

10   essentially one conclusion.  They say, all those cases hold in

11   one form or another that the mere cite of the loss is

12   insufficient.  We don't dispute that, but the SJC decision in

13   *Kuwaiti Danish* that established the center of gravity test, was

14   very clear that there was not a single formulaic test that

15   applies.  It is a very fashionably intense inquiry, and when

16   you look at the record here it's not just a question of was

17   there harm in Massachusetts.  There absolutely was.  In fact,

18   even in *Kuwaiti Danish*, the Court says that the status of the

19   loss is a relevant factor and that KPM is located in

20   Massachusetts and only in Massachusetts.  So this -- so that

21   factor lays heavily in favor of finding that this was primarily

22   and substantially in Massachusetts.

23        I would like -- I would also turn your attention, your

24   Honor, to Judge Sorokin's opinion in the -- it's the TLT

25   Construction case.  In that case, Judge Sorokin citing First

1    Circuit and SJC precedent spoke about the importance of looking

2    at was the deception directed at Massachusetts.  And here the

3    record was replete with deception directed at Massachusetts.

4    It was theft of trade secrets that were maintained in

5    Massachusetts.  It was theft of the calibration data sets that

6    Mr. Olson testified to that were maintained in a secure

7    location in Massachusetts that had to be checked out and then,

8    you know, if it was Mr. Gajewski servicing a customer what he

9    was supposed to do is check out the data set he needed for that

10   customer, check it back in in Massachusetts.

11          The instrumentalities of the deception, the emails,

12   the use of KPM's emails by Ms. Glenister forwarding KPM

13   proprietary information to her Gmail account or using the UCal

14   software that originated in and was housed in Massachusetts,

15   that is all deception that was directed at Massachusetts taking

16   away these trade secrets from Massachusetts.

17          Judge Sorokin's opinion in the TLT case again talked

18   about, okay, after that deception happens, what was the

19   response?  Was the response to that in Massachusetts?  And

20   again, the response to the deception was done in Massachusetts.

21   Mr. Olson again testified about how when they found out about

22   Mr. Gajewski using a -- you know, efforts to sell to other

23   people.  They put a tracker on his computer.  And that was done

24   from Massachusetts.  Mr. Olson was sitting in the Westborough

25   office when he did that.  That is another factor that lays

1    heavily in making the center of gravity of this issue in

2    Massachusetts.

3          And even the benefits that the defendants were trying

4    to get for themselves were about taking the goodwill from KPM

5    in Massachusetts.  If you look at, for instance, Trial

6    Exhibit 76, these were talking points created by Mr. Lucas, and

7    he said, and in that the talking points are Blue Sun is the

8    original manufacturer of the SpectraStar instruments and has

9    the original engineers and technicians.  That's false.  Blue

10   Sun was not the original manufacturer of the SpectraStar

11   instruments.  Everybody knows that KPM is the manufacturer of

12   the SpectraStar instruments.

13         Mr. Olson testified that all of those instruments are

14   made in Massachusetts, and so this is Blue Sun trying to go out

15   to customers and say we are this company that you know in

16   Massachusetts.  We are this KPM company.  And, in fact, as your

17   Honor mentioned earlier, there are emails from Disney.  There

18   are emails from Lamb Weston that say, Are you part of KPM?

19   There's an email where one of the customers says or Rob

20   Gajewski just says, this is, you know, the same people, just a

21   new sign on the door, suggesting, oh, we're not actually a new

22   company.  We're just changing our name.  So all of that is

23   directly related to Massachusetts and directly implicates

24   Massachusetts.

25         One of the cases that the defendant cited, the *Skyhook*

1      *versus Google* case, made it -- made it very clear that in that

2      case there was no primarily or substantially connection to

3      Massachusetts, because the wrongdoer, all of the wrongdoers,

4      all of the related companies, Google, Motorola, Samsung are not

5      in Massachusetts.  And most importantly, none of the

6      communications, electronic or otherwise, went through

7      Massachusetts.

8              Here all of the emails on KPM's email server, all of

9      the purchase orders, all of the Lamb Weston purchase orders

10     that said Milford, Massachusetts, on it, those all originated

11     in Massachusetts.

12             So when we talk about what the center of gravity of

13     the facts are here, the facts are that this was primarily and

14     substantially done in Massachusetts.

15             The response by the defendants is, well, you know,

16     Mr. Gajewski lived in Illinois; Ms. Glenister in Colorado; and

17     Mr. Lucas, I believe it was California; and Blue Sun is

18     headquartered in Maryland.

19             Well, if you take that argument to its logical

20     conclusion, what the response -- or the defendants are

21     suggesting is that a company could act with impunity under

22     unfair and deceptive trade practice law by just using remote

23     workers around the country.  And in this world where there are

24     a lot more workers who are working remotely, that becomes an

25     even bigger problem.  So this should not be an opportunity for

1    a defendant that everybody agrees has destroyed employment

2    relationships between Massachusetts employees and their

3    company, that has taken trade secrets from Massachusetts, this

4    should not be an opportunity for the defendants to create case

5    law but skirts a remedy for -- for a party that's harmed by

6    this.

7         The next point that -- of contention in the brief is a

8    question of whether or not the violation of the preliminary

9    injunction that Mr. Gutkoski spoke about earlier is something

10   that would constitute unfair and deceptive trade practices act.

11   The defendant's response primarily is, well, the only case

12   they've cited suggesting that violation of an injunction can be

13   a 93A violation is a Rule 128 decision from the Appeals Court

14   in Massachusetts.  We don't give those much weight and cite

15   that it's only one case.

16        Well, they never cited a contrary case; and in

17   preparing for the hearing, I did identify an additional case

18   which actually is particularly notable.  It was a case that

19   went to the Massachusetts Appeals Court twice, and I have

20   copies with me, and I'm happy to hand them up and distribute

21   them.  And what happened in 2007, there was a case where a

22   person was intending to buy a condo.  The Board of Trustees

23   said, okay, we'll enter a new agreement, buy the condo, and

24   then they backed out of that agreement, and they leased it to

25   someone else.  They got wrecked, the trustees did.  And there

1    was a bench trial in which the -- well, and then the Court had

2    entered -- and that was in violation of an injunction.  There

3    had been an injunction, a preliminary injunction saying that

4    the trustees cannot rent this out.  They need to sell the condo

5    unit to this individual.  Nevertheless, they violated the

6    injunction twice just like the defendants here.

7         After trial, the judge did not make a determination

8    about whether or not there was a violation of 93A.  The Appeals

9    Court remanded and sent it back and -- and said you need to try

10   this issue.

11        On a retrial, the judge, the trial judge concluded,

12   yes, the violation of the -- of preliminary injunction by the

13   trustees was a violation of 93A, and the award of damages

14   disgorging all of the rents and providing those to the

15   plaintiff.

16        On appeal, the Appeals Court not only affirmed that

17   that was a violation of 93A, but also affirmed that that

18   disgorgement was the proper remedy, that that was the proper

19   measure of damages, even if it was going to make the plaintiff

20   more whole because it wasn't based on lost profits or some

21   actual loss, which brings us to the next point, which is here

22   that is exactly what we are asking this court to do with

23   respect to damages.

24        The defendants have suggested that we are not

25   calculating damages properly because we have not established

1    actual loss, but, in fact, the statute as we've set forth in

2    our briefing allows for equitable relief as part of the 93A

3    damages.  That would include unjust enrichment.  That's exactly

4    what happened in the *Chamberlain* case.

5          Also that's exactly what happened earlier this year in

6    Judge Stearns' decision in the *BioPoint* case, which was the

7    trade secret case that is very similar to this case.

8          So in calculating the damages here, the proper measure

9    of damages is, in fact, what the jury concluded was the measure

10   of damages for the tortious interference and the trade secret

11   misappropriation, $1.5 million against Blue Sun, $1.8 million

12   against ITG; and then on top of that what the jury didn't hear,

13   the additional damages from the violation of the injunction and

14   the calculations we've set forth in our brief from trial

15   Exhibits 474 and 475 for the sales of the Idahoan and R&R

16   machines after the injunction was ordered.

17         Ms. Zacharakis will be able to walk you through the

18   map a little bit later as we wrap up.

19         So in terms of what the damages ought to be, the

20   damages, to be clear, and I hope we were clear about this in

21   our briefing, we are not trying to stack $1.5 million and 93A

22   damages on top of $1.5 million for trade secret damages.  What

23   we are trying to do is say there's $1.5 million for trade

24   secret damages against Blue Sun.  That is the same quantum of

25   harm that KPM suffered in the 93A context so we aren't going to

1    recover both of those cumulatively, but that $1.5 million

2    should be subject to trebling.

3            And then the final point on the damage calculation is

4    that ITG is and should be responsible for the damages that Blue

5    Sun is liable for under 93A.  That is for two separate reasons,

6    either one of which is a legitimate basis for finding that ITG

7    is responsible.

8            First is that the evidence at trial established that

9    Blue Sun was the sales arm of ITG.  It was the agent of ITG.

10   Under the -- and under the *BioPoint* case, which was citing the

11   SJC case in *Consolis*, vicarious liability attaches.  That's

12   why, as we tried to hopefully set forth in the calculations in

13   our filings, ITG is responsible for Blue Sun's portion of the

14   damages jointly and severally in addition to its own, but Blue

15   Sun as the agent is not jointly and severally liable for ITG's

16   1.8 million.  And that's where the distinction comes from.

17           And, finally, I don't want to belabor it because I

18   think we detail it in, you know, pretty seriously in our brief,

19   but the litany of facts, even if there was no vicarious

20   liability that attaches in the 93A context, despite the SJC's

21   saying it does, we'd still be able to pierce the veil, that ITG

22   was engaged in confused intermingling, created Blue Sun in

23   order to perpetrate the wrongdoing that the jury found that it

24   did do.

25           And so that, your Honor, is why we request that you

1    enter a judgment in our favor, 93A damages against both Blue

2    Sun and ITG trebled, and that trebling includes the damages for

3    the violation of the preliminary injunction.

4            THE COURT:  Can I ask --

5            MR. MAGEE:  Yes.

6            THE COURT:  -- just if you could -- I have a bit of

7    more experience on the state court with 93A claims.  I did

8    numerous of them.  It's preliminarily a consumer protection

9    statute.

10           So how does that -- how does that protect -- I mean,

11   we don't -- right now we're dealing with the players.

12           MR. MAGEE:  Right.

13           THE COURT:  And this is not an individual, and it's

14   generally the background is that, you know, if one person

15   sues the -- has to sue their insurance company because they

16   can't -- you know, prematurely canceled their policy and then

17   they, you know -- and it turns out that this is a pattern and

18   practice of a company against individuals, and so there's some

19   consumer protection there.  Sort of equal players here, if you

20   will, I mean certainly they're in the same -- they're both in

21   the same business.  So what is the -- how is the purpose of 93A

22   served by recognition in this case?

23           MR. MAGEE:  That's why the legislature adopted

24   Section 11.  Section 9 of Chapter 93A protects the consumers.

25   Section 11 protects the business-to-business interactions

1    between two companies such as KPM and Blue Sun or KPM and ITG.

2            And so the legislature has said, this is not merely

3    about consumer protection.  This is about protection of

4    business people, who are expected to see honesty within the

5    market; and, in fact, if you look at some of the cases that we

6    cited in our Judge Gants case on the CVS case or Judge

7    Hennessy's case that was a recommendation and -- report and

8    recommendation that was adopted by Judge Hillman.  In both of

9    those cases, the -- they were decided under Section 9, but

10   there's no reason it should not also apply under Section 11,

11   that the deterrent fact of having these punitive damages,

12   having the multiple damages on the full amount of damages that

13   does not permit a defendant who engages in the bad conduct the

14   willful and knowing unfair and deceptive conduct, that

15   deterrent effect is what the statute is designed to do.  And

16   that's one more reason why the full amount of damages, whether

17   it's based on lost profits or whether it's characterized as

18   unjust enrichment, neither of which the jury specifically

19   delineated, that's why the entire amount should be trebled,

20   because otherwise --

21           THE COURT:  There -- but there is also an element of

22   93A which provides for a remedy when there is an inadequate

23   remedy.  Sometimes the harm is $15,000, right, and that does

24   not adequately undo the harm that was perpetrated on an

25   individual or maybe even a company.

1         So there -- yeah, I understand that, but it is still

2    primarily intended to be a -- it is an unusual award

3    that's -- and it -- it should be for the most egregious of

4    cases and so -- and I mean that's why the treble damages, which

5    is an incredible amount of damage assessment is allowed, but

6    it's also -- it's not intended to be your everyday remedy.  It

7    really must be confined to those circumstances where it

8    is -- and I'm not suggesting this isn't one of those or it is.

9    I'm just saying there is a history to 93A that is different

10   than regular jury verdicts, which are based on particular facts

11   on particular circumstances.

12        MR. MAGEE:  Right, and in response to that, your

13   Honor, I would say the facts in this case of copying a thumb

14   drive, of using false emails, of lying to customers, of lying

15   to Bob Schumann about whether or not Arnold Eilert had ever

16   heard of Blue Sun when he clearly had for months, that is all

17   conduct that is much more egregious than the conduct in the

18   *BioPoint* case where Judge Stearns easily trebled the damages.

19        THE COURT:  Well, I know Judge Stearns.  And I'm not

20   saying I know how I'll rule, but I fully respect Judge Stearns,

21   and I appreciate that.

22        MR. MAGEE:  Right.  And my point, your Honor, is that

23   this is one of those exceptional cases.

24        THE COURT:  Thank you.

25        MR. MAGEE:  And even if it's not trebled, double

1   damages are mandatory.

2           THE COURT:  Thank you very much.

3           Attorney Ritchie.

4           MR. RITCHIE:  Thank you, your Honor.

5           I want to be clear about what the jury did award in

6   this case.  They gave KPM everything that KPM asked for.  KPM

7   asked for in total about $3.4 million, and I think the math

8   adds up.  It came out a little bit skewed, as I'll talk about

9   in a separate motion, but I think the award was in the range of

10  $3.3 million.  And it wasn't just the amount of money that KPM

11  was awarded.  It was the kind of money that KPM was awarded by

12  the jury.  KPM did not ask the jury to give it, at least not as

13  a primary means of compensation, its lost profits in this case.

14  KPM asked the jury to go back into Blue Sun and ITG and

15  disgorge every profit of every sale that had been made by ITG

16  or Blue Sun since Blue Sun's formation up to the date of trial.

17  And I referenced earlier Exhibits 147 and 148 because I think

18  they're important here.

19          I'm not -- I'm not suggesting the Court change the

20  jury's award, but when looking at the context of the treble

21  damages, the extra relief that KPM wants under 93A, it's simply

22  not warranted.

23          KPM -- the jury gave KPM the value of every sale that

24  ITG or Blue Sun made regardless of whether that customer had a

25  KPM machine at the time of sale, regardless of whether ITG had

1    previously sold to that customer or whether Unity Scientific

2    going back to the days before KPM had sold to that particular

3    customer.  They made no distinction there at all.  We asked

4    them to do that, and it was obviously the jury's decision not

5    to do that.  It is what it is, but KPM got every dollar and

6    cent that it asked for at this trial.

7         Now KPM comes in and says it's not enough.  We want

8    the Court to treble damages, and the math is astounding.  Not

9    my strong point, but it's astounding, six point -- $16 million

10   in damages KPM wants.  I submit that this is the equivalent of

11   trying to crush a fly with a hammer, your Honor.  93A is

12   definitely a hammer.  It's not a statute that exists in many

13   other jurisdictions in which I've had cases.  Certainly not in

14   my home state and in other states that I've had cases in.  And

15   it's an incredibly powerful tool, which means it has to be used

16   with discretion and only when clearly warranted.

17        The measure of damages to be clear under 93A is not

18   unjust enrichment, which is what KPM got; it's lost profits.

19   The jury went beyond lost profits and awarded KPM all of the

20   money that Blue Sun and ITG had made since Blue Sun was formed.

21   So even within that award there's an extra amount of money that

22   wouldn't account for the 93A damages.  93A damages would have

23   been about $900,000 or so against Blue Sun, and the jury

24   awarded 1.5 million.

25        There -- this is not that kind of a case, and the jury

1    went out of its way to give KPM everything that it warranted.

2          We're not conceding anything here, but I want to talk

3    a little bit about ITG, because again this statute, as I

4    understand it, requires that the actions by a defendant to be

5    found liable have to be intentional and callous.  And your

6    Honor will well remember the -- the -- and I apologize, there

7    were so many discussions about it, but we had many discussions

8    about the willful blindness instruction that your Honor

9    ultimately gave.  And I believe the jury took that instruction

10   to heart with respect to ITG.  I believe, and your Honor has

11   already alluded to it today, that the jury concluded that

12   Mr. Wilt, as in KPM's words, buried his head in the sand,

13   didn't wanted to hear about it, maybe he dropped a match near

14   the fire and he walked away.  Whatever the analogy is.  But

15   that's not intentional and callous.  That's something

16   different, because if it weren't -- if it wasn't -- if willful

17   blindness wasn't an issue in this case, your Honor wouldn't

18   have given the instruction and KPM wouldn't have asked for it.

19         And again, as I did before, I go back to the jury's

20   finding with respect to the trade secret issue.  I understand

21   your Honor's prior comments with respect to the injunction, but

22   I submit that that finding is significant and has some meaning

23   in the context of this overall case.  If the jury thought for

24   certain that ITG had taken the trade secrets and used them

25   intentionally and callously to hurt KPM, we would be in a

1    different situation with respect to 93A, but the jury rejected

2    that.  And I think when you look at that rejection, combined

3    with the willful blindness instruction, the conclusion has to

4    be that the jury didn't like the idea that Mr. Wilt buried his

5    head in the sand.  Okay.  They punished him for it.  They

6    punished ITG for it.  That doesn't rise to the level of 93A

7    culpability.  I think I've said enough on that.

8          There is an issue, a substantial issue here, your

9    Honor, and I'm going to give it some weight with respect to

10   whether the acts that give rise to plaintiff's claims actually

11   occurred within the Commonwealth of Massachusetts.

12         Clearly, the harm was felt in Massachusetts, I'm not

13   disputing that.  There has been ample testimony, but when one

14   looks at the -- the quantum of facts here, what do you have?

15   You have my clients located in Maryland.  You have the

16   defendants scattered all across the United States, and you have

17   the customers scattered all across the United States as well.

18   This case was fundamentally about my clients or the individual

19   defendants taking KPM data, KPM trade secrets, and selling

20   machines that were not made, by the way, in Massachusetts.

21   They're made in Maryland.  My client's machines are made in

22   Maryland to customers not located within the Commonwealth.

23         The reason that I mention that other states don't have

24   the statute is because it is an extraordinarily powerful tool,

25   and it's clearly designed, and the intention, obviously, of the

1    legislature was to govern actions, fundamentally actions within

2    the Commonwealth, not across all 50 states of the United

3    States, and the cases we --

4            THE COURT:  I just want to -- I just want to interrupt

5    you here.

6            MR. RITCHIE:  Yeah.

7            THE COURT:  One of the -- one of the main reasons

8    behind 93A --

9            MR. RITCHIE:  I'm sorry, your Honor.

10           THE COURT:  One of the main reasons the legislation

11   even came up is when predatory companies would prey on

12   Massachusetts citizens and then they would say you have to sue

13   us in Ohio or South Dakota or the Bahamas -- and especially

14   credit card companies.  And the amount of harm on consumers in

15   Massachusetts, who were either trapped, they had to take their

16   loss because there was no action that could fully compensate

17   them.  There was so -- there was -- that was a very -- and I

18   will agree with you that if there's a law in only one state

19   it's probably going to be in Massachusetts.

20           MR. RITCHIE:  Or New Jersey.

21           THE COURT:  Or New Jersey.  But the -- the -- the

22   reasoning behind it is not that -- in fact, the reasoning

23   behind it is that a corporation can't hide.  If it's going to

24   do business in Massachusetts, it takes on the responsibility of

25   knowing that there is this thing that will govern a

1    person's -- an individual's claim.

2          They were incorporated or paid -- or were recognized

3    by the Commonwealth of Massachusetts as having a headquarters

4    here, and that's enough.  It's enough.  It's -- what we know

5    now is our world is completely connected in ways and not really

6    by geography, but the requirement or the locus of a preliminary

7    part of this was the base of operations of the plaintiff and

8    where it took place, whether or not it was through, you know,

9    off-site working or -- or through businesses that weren't

10   located in Massachusetts, that's not really the issue, because

11   that really is why the statutes exists.  It's to provide

12   someone who has a leg in this Commonwealth that has an ability

13   to seek a remedy and -- but I think what's more problematic for

14   the entire 93A claim is because there is, you know, it

15   is -- it's not like what is evil.  It's really -- it's -- it's

16   intended to provide a remedy where there is no remedy.  So if

17   the -- like I said, if the loss is 15,000, it could bankrupt a

18   particular consumer.  So the -- if the behavior was so

19   egregious by the corporation, they should -- that's what the

20   Commonwealth has said.  You should -- you should make -- you're

21   going -- you're going to pay more because your harm had a

22   greater impact on this individual.

23          But if all of the other remedies in this -- we have a

24   lot of numbers here, and math is not my forte either.  We have

25   a lot of numbers here, and all of these numbers should add up

1    to real harm, and then a statement about the harm, but it

2    shouldn't be that the numbers are so big that they have no

3    connection to reasonableness, and I -- it's my hope that

4    whatever math we do I'm assisted with people who actually can

5    use the calculators or actually do it better than me, but what

6    we come to is an amount that -- that pays homage to that.  The

7    harm itself and some measure of making a statement, if the jury

8    has indicated that something should be said, but it shouldn't

9    be so great as to -- as to not have any connection to reality.

10   And we're not talking about Davey versus Goliaths here.  We're

11   talking about, you know, pretty equal people between

12   Wilts -- oh, no, oh, no, ITG --

13          MR. RITCHIE:  Well, I'm going to disagree with you

14   there.

15          THE COURT:  Well, listen, if Mr. Wilts had not thrown

16   a petal in a pond, there would have been no ripples.  None.

17   This would not even be an issue.  So we're talking about

18   people, who are at least intellectually and business wise of

19   the same ilk.  We're not just talking about one little person

20   here, so.  But I want to assure you all the numbers mean

21   something to me, and they have to be rooted in a reasonable

22   reading of the law and the intent of the law.  And they are not

23   intended to label anyone bad or deserving of retribution

24   through some type of an award.  The award is going to be based

25   in reality, and I -- I recognize the arguments that you made.

1    I do, all parties.  And I just want to be sure you all

2    understand that.

3         MR. RITCHIE:  Let me then conclude, your Honor,

4    otherwise, we'd submit on the briefs on that, but to conclude

5    with this statement, which is that I appreciate your Honor's

6    comments about based on reality.  I think they have to be

7    proportional too.

8         I understand your comment about, you know, the

9    intellectual capacities of Mr. Wilt and the individuals at KPM,

10   but it is David and Goliath when it comes to business sides.

11   And we have -- you know, we've given your Honor, I don't know,

12   the last five, six years of net profits.  This is a company

13   that, you know, can hardly make $50,000 annual a year.  So the

14   kinds of damages that KPM, whether it's under the 93A, whether

15   it's under trade secrets, whether it's under the attorneys'

16   fees that they're asking, this is -- this will end these

17   companies, I mean; and quite frankly and candidly, I know your

18   Honor may not agree.  I think that's the intention here.  We've

19   gone beyond punishment.  We've gone beyond recompense for KPM.

20   We have moved into something, in my view, very much darker,

21   which is the extinction of my clients.  And so I hope that your

22   Honor, when you do reach the numbers, that your Honor will take

23   that into account.

24        Thank you.

25        THE COURT:  I certainly expect to, and I would be held

1    to that standard.

2            MR. RITCHIE:  Thank you.

3            THE COURT:  All right.

4            MR. MAGEE:  Your Honor, if I may, one thing.  I can

5    just do it from here.

6            THE COURT:  All right.

7            MR. MAGEE:  I think Mr. Ritchie is conflating

8    willfulness and knowing under the statute.

9            It's a disjunctive test under 93A.  So we don't need

10   to show that Mr. Wilt was acting knowingly if we can show that

11   he was acting willfully.  And the Supreme Judicial Court has

12   already covered this in the *Kattar versus Demoulas* case saying

13   we have said that a finding of willful conduct within the

14   meaning of 93A is satisfied where the defendant has acted

15   recklessly.

16           So all the evidence of Mr. Wilt, you know, starting

17   this chain in motion and saying, no, don't -- I don't want to

18   see what's over there, that's not sufficient to insulate him

19   from a knowing and willful finding consistent with what the

20   jury found.

21           THE COURT:  All right.  Thank you very much.

22           That is our third and -- we didn't raise it, because

23   no one argued it except in the papers, but as far as

24   prejudgment interest, I -- I will use the same guide on

25   prejudgment interest.  I'm -- I'm going to -- I'm going to read

1    through.  I haven't fully read through all of the arguments

2    with the specificity I'm going to now, because after these

3    arguments and then so I just want you to be aware that I'm

4    really -- I haven't made a determination on that.  I understand

5    your arguments on both sides, and I will take those into

6    account.  All right.

7          Okay.  We have KPM's motion for attorney fees and

8    costs.

9          All right, counsel.

10         MR. MOSIER:  Good afternoon, your Honor.  Kevin Mosier

11   for KPM.

12         So I think, first, it's important to note that KPM is

13   entitled to fees under three separate hooks, if you will.

14         The first is Chapter 93A, which is a mandatory fee

15   provision.  Under Chapter 93A, KPM is entitled to its fees as

16   a -- fees and costs -- excuse me -- as a matter of right.

17         The second is contractural provisions with the

18   individual defendants which we've heard about.  These are in

19   evidence.  The contractual provisions themselves are clear.

20   They're unambiguous.  They have never at any point in this

21   litigation been challenged as -- as unenforceable or invalid.

22   And those provisions themselves are also mandatory.  They say

23   KPM shall be entitled to recover from you, meaning the

24   defendants, its reasonable costs and fees in the action.  And

25   the Supreme Judicial Court in Massachusetts has made clear that

1    when such a clear, unambiguous, valid, enforceable contractual

2    provision exists an award of fees is appropriate in that

3    instance.  Those are two mandatory fee provisions.

4        There's a third hock, which is under the uniform

5    defend trade secrets or -- excuse me, the Defend Trade Secrets

6    Act, the Massachusetts Uniform Trade Secrets Act.  Those are

7    discretionary, and we're going to focus our argument, as we

8    focused our brief, which is on the mandatory fee provisions.

9        So KPM is asking for -- I'm going to give the exact

10   numbers, and then I'll use a shorthand.  KPM is asking for

11   $3,799,531 in attorneys' fees.  I'm just going to say 3.8 for

12   convenience.  And $339,409.45 in costs, I'll say 340,000 for

13   convenience, for a total of just over 4.1 million.  This amount

14   is reasonable when you compare that with similar trade secret

15   cases to this one.

16       We've cited a number of cases in our briefing for your

17   Honor.  One of those is *Specialized Technology Resources*.  This

18   case involved one trade secret litigated by three law firms.

19   There was over $5 million in fees and costs awarded in that

20   case where damages themselves were just over 1 million, later

21   trebled to 3 million.

22       The most recent case in this jurisdiction was

23   *BioPoint*, which we've heard about today, Judge Stearns'

24   decision.  *BioPoint* involved trade secrets that were limited to

25   customer and client information, which is similar to one of the

1    three trade secrets here.  There weren't technical trade

2    secrets in that case, such as the calibration data sets or UCal

3    software at issue here.  In that case Judge Stearns awarded

4    $2.5 million in fees and costs.

5           There's also the *Contour Design* case we've heard

6    about.  That case was a six-day trial in the District of New

7    Hampshire, just over half the length of this trial, 1.5 million

8    in fees and costs.

9           More recently or -- excuse me -- actually, yes, more

10   recently the benchmark case litigated in Massachusetts that was

11   limited to one trade secret at trial.  There was limited

12   discovery, only five depositions taken in that case.  Most of

13   the case was decided on summary judgment; $1 million in fees

14   and costs in that case.

15          As we laid out our motion this is a complex case

16   involving numerous trade secrets and involving numerous

17   defendants at trial.  The parties were able to simplify the

18   technology and the trade secrets at trial for the jury.  That

19   doesn't mean that we didn't need to invest the time to

20   understand the trade secrets, to understand the facts, to

21   litigate the legal issues, and to be able to present those

22   facts and those issues in a way that a jury could understand.

23          There's a lot of motion practice required in this

24   case, as we laid out in our brief.  This is true of all stages

25   of the case, both pretrial and during trial.  There is motion

1       practice necessary to obtain the preliminary injunction, to

2       defend the preliminary injunction, to oppose motions to dismiss

3       that were filed separately by each individual defendant,

4       including the entity defendants.  I know individual defendants

5       has become a term of art in this case.

6               And there is also summary judgment, of course.  In

7       total there were 13 pretrial motions filed by just the

8       defendants alone.  Those included eight separate motions to

9       dismiss, as I just mentioned, two motions for clarification of

10      the preliminary injunction, an unsuccessful motion to dissolve

11      and modify the preliminary injunction, a frivolous and

12      unsuccessful motion to compel, and an unsuccessful motion of

13      summary judgment.

14              Discovery in this case was also a major effort.  There

15      were 21 total depositions taken, tens of thousands of documents

16      reviewed, and those documents were important in this case,

17      because as you saw the evidence of the wrongdoing was largely

18      from these documents that our team had to review.

19              And, as we know, KPM's discovery efforts were

20      obstructed by the spoliation of evidence, which we've talked

21      about here today, and I won't belabor it at oral argument.  The

22      trial itself proceeded over the course of ten days, including

23      nine live witnesses, which is a longer trial and more witnesses

24      than any of the cases I just mentioned.

25              It's important to note the defendants have not

1    challenged the reasonableness of the rates charged by KPM's

2    attorneys, nor have they challenged any particular category of

3    costs sought.

4         As one of the important considerations when assessing

5    the reasonableness of fees is the result obtained, and you just

6    heard counsel for defendants say not too long ago the jury gave

7    KPM everything it asked for.  KPM achieved a near complete

8    victory in its claims.  In view of the amount of time, effort

9    to litigate this case, the reasonable rates charged, the result

10   obtained, this is a reasonable amount of fees comparable to

11   other cases in this district.

12        And, you know, I just heard Mr. Ritchie talk about,

13   you know, the purpose as to -- I forget what word he used and

14   this company, various company.  That's not the purpose.  The

15   fees are the fees.  And also fairness to the defendant is just

16   quite simply not one of the considerations here.  The

17   consideration overall is the fair market value of the services

18   provided.

19        So the defendants are going ask this Court to do one

20   thing it cannot do and many things it should not do, and we

21   know this because they asked it in their briefing.  The thing

22   they're going to ask the Court to do, which it cannot do is

23   deny KPM's requests for fees and costs in their entirety.  KPM

24   has an unqualified right to recover its fees under 93A and

25   under the plain terms of the employment contracts of the

1    defendant.

2         The statutory language of 93A and the case law

3    interpreting it is clear that awarding fees and costs is not

4    discretionary.  What is discretionary is what amount is

5    reasonable.  That's the Court's discretion here.  The same goes

6    for attorney -- for the contractual provisions.

7         So I'd like to point out the cases that the defendants

8    cited in support of their argument for a complete or near total

9    reduction in fees and costs.

10        They cite the *Norkunas* case.  That's an ADA

11   case -- it's an ADA case decided under 42 U.S.C. 12205.  That's

12   a discretionary fee provision, not mandatory.

13        They cite *Grendel's Den* and *Culebras* a lot.  They cite

14   *Grendel's Den* as this case that says in egregious cases you can

15   deny fees altogether.  *Grendel's Den* and *Culebras* are again

16   discretionary fee provision cases under 1988, not mandatory fee

17   provision cases.

18        Importantly, in *Grendel's Den*, the Court still awarded

19   fees and costs despite what they call a complete absence of

20   contemporaneous time records.  So even in the case defendants

21   cite for the proposition that this Court can deny fees in its

22   entirety, that Court did not deny fees in their entirety, and

23   they were deciding those fees under a discretionary statute not

24   a mandatory one.

25        They also cite *DataTern*.  That's an exceptional case,

1    standard case.  Anyone who litigates maybe patents would

2    understand that the exceptional case standard is a very high

3    bar for fees.

4          They only cite three cases decided under a mandatory

5    fee provision:  *Gardner*, *Pizzo*, and *Full Spectrum*.

6          *Gardner*, again awarded fees despite no time records at

7    all.

8          *Pizzo* applied a 33 percent reduction for excessive

9    redaction, not a full rejection, and they prevent -- they

10   present *Full Spectrum* as an example of a complete denial.  They

11   say courts have denied fees in their entirety, here's an entire

12   paragraph on *Full Spectrum,* which was the Judge Hillman

13   decision.

14         In *Full Spectrum*, Judge Hillman still awarded

15   50 percent of the fees and costs requested, despite heavily

16   redacted invoices and other inefficiencies.

17         The defendants have cited no case where a court has

18   denied fees and costs in their entirety under Chapter 93A or a

19   valid contractual fee shifting provision.

20         So the consequence of KPM failing to meet its burden

21   to prove that the $4.1 million request is reasonable is not a

22   full denial.  And their own cases make this clear.  In fact,

23   *Full Spectrum* says they did not meet their burden but still

24   awarded fees.  The consequence, if KPM hasn't met its burden,

25   is just a lesser amount than what KPM has asked for, not zero

1    and not any amount lesser than the fair value of the work that

2    was performed.

3         The defendants are also going to ask this Court to

4    separate out and deny fees for claims that were unsuccessful.

5    The case law is clear that this Court should not do that.

6         We've cited to you a number of cases both from the

7    First Circuit and from the Mass Supreme Judicial Court that

8    talks about when all of the claims are intertwined

9    or -- and/or, the same thing here, when all the claims are

10   intertwined or the same legal effort is required to litigate

11   and prove those claims, there's no need to separate out

12   successful and unsuccessful claims under 93A, because the

13   effort required was the same either way.

14        And this is true with ITG.  You know, they want to

15   separate out money spent litigating the trade secret claims

16   against ITG, but to litigate the tortious interference claims

17   against ITG, KPM still had to litigate the misuse and

18   misappropriation of trade secrets and confidential information

19   with regard to the individual defendants.  There's no

20   meaningful difference in legal effort that was expended.

21        One case in particular, I think has pretty strong

22   language.  It's *Brogan versus City of Boston* from the First

23   Circuit, and it says, In these instances where the legal effort

24   required was the same regardless of which particular claims are

25   brought and which particular claims are successful, that court

1    says, quote, any rationale for discounting hours spent on

2    unsuccessful claims does not apply.

3          The same is true in *Haddad Motor Group*.  The same is

4    true in the *Twin Fires* case, and these are just some I picked

5    out in this authority's legion here.

6          Defendants are also going to ask for global reduction

7    for allegedly vague time entries or block billing.  That's not

8    warranted here.  The invoices KPM submitted were kept

9    contemporaneously.  They provide sufficient evidence of the

10   task performed and the number of hours expended.  Most of KPM's

11   entries are not block billing entries, because they contain

12   either only one task or a sufficient narrative description to

13   understand what work was performed in those entries.

14         In any event, the Supreme Court of Massachusetts has

15   made it clear that the Court is to consider the request as a

16   whole.  It's not to parse out individual entries.  That

17   approach is more of what's known as the lodestar approach, and

18   it's clear from case law that the lodestar approach is, quote,

19   disfavored under the holistic approach that is favored in these

20   instances.

21         So defendants cite *Benchmark*, both as justification

22   for parsing out unsuccessful claims and for a global reduction

23   of block billing.  In *Benchmark* there is a 50 percent global

24   reduction for a number of things.  It wasn't just one or the

25   other.  But it's important to know that the 50 percent

1  reduction included work spent on claims that the Court found

2  were wholly unrelated.  There are no wholly unrelated claims

3  here.

4          And it's also interesting in the cases cited by the

5  defendants, including the *Volkswagen* and *Audi* case, those cases

6  state that the typical global reduction for block billing, if

7  there is one at all, is in the ballpark of 15 to 20 percent,

8  not 50 percent, and not a complete denial.

9          They also ask this Court to apportion fees on a

10  defendant-by-defendant basis.  We have mentioned why we believe

11  that each defendant should be jointly and severally liable.

12  And we don't believe that regardless, separating out fees on a

13  defendant-by-defendant basis makes sense here, given how wholly

14  interrelated the claims are, given how all of the defendants be

15  them individual defendants or the entity defendants, how all of

16  their actions come together to form the big picture simply

17  would not make sense to do that.  It's certainly not required

18  to do that.  I don't believe defendants cited in their briefing

19  any case that did that.  Perhaps they did.  I don't recall.

20  It's certainly not required.

21          Reasonable attorneys' fees can greatly exceed the

22  amount of actual damages.  Earlier we talked about a case where

23  there was $5 million in fees on a $1 million jury verdict.  And

24  in fact, under 93A, attorneys' fees can be awarded -- I mean

25  fees and costs -- when I say attorneys' fees, I'm using a

1    shorthand.  Under 93A attorneys' fees and costs can be awarded

2    despite no damages at all against anyone, and that's what

3    happened in the *Benchmark* case.  There were no damages.  There

4    was still a $1 million award of fees and costs.

5         The individual defendants signed contracts knowingly

6    and voluntarily that qualified an absolute right for KPM

7    to -- for KPM to recover its reasonable fees as a matter of

8    right.  Nothing in that contract provided that recovery would

9    be based on liability, apportionment, right, apportionment

10   based on liability.  You could draft a contract that does that.

11   This contract was not that.  It was not qualified in such a way

12   that says, well, KPM can recover its reasonable fees, but we

13   need to figure out how to apportion that between defendant

14   based on wrongdoing.  That's not what the fee provision says.

15        And again, the defendants have not pointed to any case

16   that would require this Court to do that.

17        And as I mentioned before, fairness is not one of the

18   considerations here.  Here is what the Court does consider.  It

19   considers the nature of the case and issues presented, it's a

20   complex case with many issued presented; the time and labor

21   required to litigate the case; the amount of damages involved;

22   the result obtained; the experience and ability of the

23   attorneys; the usual price charged for similar services in the

24   same practice area; and the amount of fees and costs awarded in

25   similar cases.

1          It does not include this metric of what is fair.  The

2     overall question is what is the fair market value of the

3     services provided by KPM's counsel.  And we submit to you that

4     the fair market value is $4.1 million in total, and that's

5     broken up across fees and costs.

6          I think I will rest there and field any questions your

7     Honor may have and reserve some time to respond to whatever we

8     hear from the defendants.

9          THE COURT:  Thank you very much.

10         MR. MOSIER:  Thank you, your Honor.

11         THE COURT:  Attorney Wilson.

12         MR. WILSON:  Your Honor, while fairness may not be one

13     of the factors, certainly your Honor has the, I would say in

14     this case, unfortunate obligation to determine what is

15     reasonable.  And we would submit that the manner in which KPM

16     has submitted their attorneys' fees and costs has rendered it

17     impossible, certainly for the defendants, and I would suggest

18     for your Honor as well to make that determination.

19         The redactions to these invoices, I'm sure you've seen

20     plenty over your career.  I've seen a few.  I think of this as

21     outrageous.  I've never seen anything close to this level of

22     redactions.  Clearly, information was redacted from these

23     invoices that did not include any kind of privileged

24     communications.  Who somebody talked to is not privileged.

25     What document somebody may have worked on is not privileged.

1          And in the *Grendel's Den* case, the First Circuit did

2     say that in egregious cases the Court does have the discretion

3     to disallow attorneys' fees.  And obviously, that's going to be

4     at your Honor's discretion.  And we think this, based on these

5     redactions, it's certainly an egregious -- an egregious case.

6          And, frankly, the fact that KPM then came back on

7     reply brief and said, oops, we want a do-over, here's some less

8     redacted invoices, I think the Court should not consider those.

9     Obviously, a reply brief should be limited to things that you

10    couldn't possibly anticipate the other side would raise; and

11    frankly, we spent quite a bit of time and money going through

12    those invoices and now to have -- to be required to do it a

13    second time because they chose to present their fees in a way

14    that rendered it impossible shouldn't fall on us.  And so I

15    would ask that your Honor not to consider the second set of

16    invoices that were submitted.

17         Very briefly on the remaining issues, I believe

18    Attorney Mosier said that these invoices don't include block

19    billing.  Every single -- every single entry almost in these

20    bills includes block billing.  Plenty of them were completely

21    vague.  "Attention to" and then two or three words that are

22    redacted.  I don't know what those words were because they were

23    redacted, but it couldn't have possibly have included enough

24    detail for your Honor to determine whether the amount spent was

25    reasonable.

1          If -- if KPM is okay with its lawyers, you know,

2     providing those types of invoices, that's between them, but if

3     they're going to come to court and ask the defendants to pay

4     the bill, they need to provide more detail.

5          There were unsuccessful claims that they're seeking

6     their fees on.  Three of the defendants were dismissed from the

7     case.  I will concede it's a smaller portion of the overall

8     amount.  So I'm not going to belabor the point.

9          And then there was quite a bit of duplicative work.

10    You know, multiple law firms have been shuffled in and out of

11    the case on KPM's side.  Again, certainly they're -- it's up to

12    them how they want to, you know, who they want to hire, how

13    many lawyers they want to staff on the case.  But ultimately it

14    comes down to whether the total amount was reasonable.  And we

15    think those -- these invoices, to the extent you can decipher

16    them, evidenced quite a bit of duplicative work.

17         There was also a lot of work performed by attorneys on

18    noncore tasks.  And certainly, I want to make sure as an

19    associate at a large law firm, nobody's a bigger champion than

20    I am for younger attorneys getting the opportunities,

21    especially in trial, to come and do things.  So I certainly

22    don't want anything we wrote to be seen as disparaging either

23    Attorney Zacharakis or Mosier.  I think the issue is though, if

24    they want to bring multiple lawyers to hearings, they want to

25    bring multiple lawyers to depositions or trials, I think that's

1    great.  I don't think that they can then have the defendants

2    pay the bill on that.

3            And -- and the last point that I think is important is

4    this issue of apportionment.  The individual defendants, the

5    percentage of harm that the jury found that they caused overall

6    was a fraction of a percent.  Mr. Eilert, I think, was

7    .1 percent.  I think Mr. Lucas was the highest at .8 percent.

8    And, your Honor, under the *Torres Rivera* case of the First

9    Circuit has discretion to weigh equitable factors in terms of

10   deciding how to apportion any fee amount.

11           And one of the things that the Court can consider is

12   the defendants ability to pay.  Your Honor heard evidence

13   during trial that these individual defendants make modest

14   salaries at -- at Blue Sun.  And, frankly, I think, you know,

15   we've talked a lot about today about sort of honoring the

16   jury's decision.  And I think, you know, I think what can be

17   inferred from the jury's decision is they did not want to have

18   the individual defendants bear the financial burden of a

19   judgment, which is why the amounts that they found against the

20   individual defendants was quite small at least vis-a-vis what

21   they ordered against the -- the corporate defendants.

22           To have someone like Arnold Eilert -- and again, we'll

23   get to the double counting later -- whether it's $2,500 or

24   $5,000 to then be held responsible for a $4 million fee, I

25   would submit would be inequitable.  I think this is a case

1    where it cries out for apportionment based on the respective

2    liability of the defendants.  And so to the extent your Honor

3    awards any attorneys' fees we would ask that they be

4    apportioned based on each defendant's percentage of overall

5    liability.

6              THE COURT:  Thank you.

7              MR. RITCHIE:  Nothing, your Honor.

8              THE COURT:  All right.

9              MR. MOSIER:  Briefly, your Honor, if I may?

10             THE COURT:  Thank you very much.

11             MR. MOSIER:  Can I briefly rebut, your Honor?

12             THE COURT:  No.  I've got -- I've got so much to read

13   and I appreciate -- I appreciate your willingness to come back

14   and tell me more, but we're going to move on.

15             Let's see.  We've got -- all right.  So we have the

16   motions on behalf of the defendants.  And so we have the

17   individual defendants and regarding the altering or amending

18   the judgment and then the corporate defendants.

19             So, Attorney Wilson, do you wish to go?  Whoever,

20   Attorney Ritchie, I don't care...

21             MR. WILSON:  I think the order we had before was for

22   him to go first.

23             THE COURT:  All right.  Very good.

24             MR. WILSON:  That's to keep the order of the

25   numbering.

1          THE COURT:  Thank you.

2          MR. RITCHIE:  Thank you, your Honor.

3          This motion seeks to alter or amend the judgment in

4   two ways.

5          One is there were two numbers entered by the jury, one

6   on the trade secret count and one on the tortious interference

7   and contract count of $1.5 million.  We think that's a double

8   counting by the jury.  KPM put on evidence that at most its

9   damages were $2 million, and these were all based on an unjust

10  enrichment theory that related to failed made by Blue Sun

11  during its lifetime.  But there was no evidence to support a

12  $3 million entry of judgment against Blue Sun, and it's clear

13  that the jury just simply answered and provided that number

14  under both counts, because that's what it thought its duty was

15  to do, but we don't think there can be a double counting

16  against Blue Sun.  These were duplicative damage awards.  And

17  so when judgment is entered in this case, there should only be

18  one number entered against Blue Sun, and that's $1.5 million.

19         I think -- I'm not sure I completely understand the

20  KPM response, and I'm sure they'll speak for themselves.  I

21  think we have some form of agreement on that.  I think KPM's

22  position is the finding of liability on both counts shouldn't

23  be reversed, and I'm not -- we're not seeking that.  But with

24  respect to the $1.5 million entered twice, we don't think

25  that's right, and the Court should alter the judgment that way.

1           With respect to ITG, the Court may recall that

2    Dr. Zoltowski, plaintiff's expert, opined that the total amount

3    of unjust enrichment damages that were available to KPM against

4    ITG were $1,143,127, and that was taking into account all sales

5    and all profits made by ITG during the time that Blue Sun was

6    in existence.

7           There was also a $211,000 consequential damage number

8    that Mr. Olson testified to that I think had to do with hiring

9    employees and trying to replace people that had left, something

10   like that.  So -- but the jury in this case came back and

11   awarded $1.8 million against ITG under the tortious

12   interference contract count, which is about $600,000 or so more

13   than what KPM asked for.  That number doesn't bear any rational

14   relationship to Dr. Zoltowski's testimony.  No one testified to

15   that number.  There's no way to get to that number based on

16   what Dr. Zoltowski said.  And so we think that the Court should

17   do the following, which is to enter judgment against ITG in the

18   amount of $1,143,127 plus half of the $211,000 number.  I'm

19   trying to be fair about this.  It seems reasonable that that

20   number could be split -- can't be entered twice against ITG and

21   Blue Sun, but could be split between these two defendants, and

22   again I apologize for the math, but whatever those two numbers

23   add up to, that's what we think that amount -- I think I have

24   it in our papers.  It's -- I have it as $1,248,127.  I mean I

25   hope that's right.  I think it's approximately right.  So that

1   would be the number of Dr. Zoltowski's damages plus half of

2   that $211,000 number.  That number conforms with the evidence

3   and -- and quite frankly, KPM goes through some pretty

4   interesting mental gymnastics to try to justify the 1.8.  They

5   say, well, you know, there was a 55/45 split and that comports

6   with this 65 -- 65/35 split between ITG and -- and Blue Sun

7   with respect to the sales, but those numbers have nothing to do

8   with one another.  That's apples and oranges.

9        Then there's some suggestion, I think, that there

10  could have been joint and several liability.  By the way,

11  that's a -- that's a theory that was never pled in this case.

12  It was a question that was not submitted to the jury and

13  neither was the alter ego of piercing the corporate veil

14  question ever suggested to the jury.  So that can't provide a

15  basis for that number.  So we think a rational reduction of

16  that amount down to the number for ITG in the $1.2 million

17  range makes sense.

18        Thank you.

19        THE COURT:  Thank you.

20        All right.

21        MS. ZACHARAKIS:  Good afternoon, your Honor.  Attorney

22  Paige Zacharakis representing the plaintiffs.

23        I'll first address the defendants' motions first, and

24  then we'll go through the -- the plaintiff's math, if you will,

25  of what the -- the final monetary damages that the plaintiff is

1    proposing.

2           So, first, I can confirm that the plaintiff is not

3    seeking to double count here.  The damages awarded by

4    or -- they're not seeking to double count the damages awarded

5    by the jury against the defendants.

6           For example, the $20,000 the jury awarded against

7    Irvin Lucas is $20,000.  We're not seeking $20,000 for his

8    breach of contract and another $20,000 for the misappropriation

9    of trade secrets.  It is just the $20,000 as the compensatory

10   damages.  And that's how the plaintiff reads the jury verdict.

11          So to the extent -- to the extent that the Court

12   believes that the jury verdict needs to be modified to

13   represent that understanding, then plaintiff doesn't oppose,

14   but we believe that the jury verdict is clear that it's not to

15   double count those damages.

16          And what the plaintiff does oppose relates mainly to

17   the entity defendants' motion for remitter, which is

18   Motion No. 5, and what Mr. Ritchie was just speaking to.

19          Again, plaintiff is not seeking to double count the

20   jury's -- jury's awards against Blue Sun, that 1.5 million.

21          But in order for the defendants to argue a successful

22   motion for remitter of the 1.8 and the $1.5 million figure, the

23   First Circuit has determined that they must meet a heavy burden

24   of showing that the award is grossly excessive, inordinate,

25   shocking to the conscience of the Court, or so high that it

1    would be a denial of justice to permit it to stand, which the

2    defendant -- the entity defendants have not done.

3         The defendants provided little explanation as to why

4    the jury award should be remitted based on the First Circuit

5    precedent, and their argument appears on page 6 of their memo,

6    which is ECF 250.  It essentially said what Mr. Ritchie just

7    said, that Mr. Zoltowski didn't ask for the 3.3 million

8    or -- and the 1.8 million split with ITG and 1.5 split to Blue

9    Sun; and, therefore, it should be remitted.

10        However, the total amount of damages granted against

11   the entity defendants was the $3.3 million.  It's only about

12   $127,000 short of the total amount that KPM's expert presented

13   at trial.  And that $127,000 difference is not grossly

14   excessive, and the difference could be justified with something

15   as simple as the jury wanted to use round numbers.  The jury's

16   free to make its own allocation, and it's not bound to follow

17   the suggestion of KPM's expert.

18        The purpose of Mr. Zoltowski's presentation to the

19   jury was to assist the jury in evaluating the complexities of

20   the damages evidence that was presented at trial.  The jury was

21   allowed to accept all, some, or none of Mr. Zoltowski's

22   calculations.

23        And Mr. Ritchie says that the plaintiff's

24   interpretation of the $1.8 million split and the $1.5 million,

25   the 55 and 45 percent, is some sort of mental gymnastics.  I

1   disagree.  I think it makes sense if the jury decided that

2   $3.3 million should be the total award against the entity

3   defendants that they would evaluate a 55/45 percent split to

4   the 3.3 million taking into consideration the 65 percent that

5   ITG accepts in -- for every analyzer that Blue Sun sells.

6          So the entity defendants' argument for remitter in

7   their papers is that plaintiff's expert did not ask for the

8   exact number of the jury -- that the jury awarded so that does

9   not meet the high burden of establishing that the jury award

10  was grossly excessive.  Without meeting the high burden that

11  would justify a remitter in this case, the instant defendants'

12  motion for remitter should be denied.

13         Now, from there I'd like to go into an explanation

14  what the final judgment is that the plaintiffs are seeking, and

15  I think we've all kind of mentioned how our math skills might

16  not be the best, so to help, I have created a demonstrative

17  that goes through the math of what the plaintiff or the

18  breakdown of what plaintiff is asking for.

19         If I may approach the bench?

20         THE COURT:  Certainly.  Do you want to just put it on

21  the screen?

22         MS. ZACHARAKIS:  Sure, we can do that.

23         THE COURT:  All you have to do is just put it, and

24  we'll put it on the overhead projector.

25         Could you do that, Marty?

1          THE CLERK:  Yeah.

2          MR. MAGEE:  We can do it that electronically, too.

3          THE COURT:  Yeah, stop showing off.  We've got the --

4     we've got that thing.  Let's use that thing.

5          MR. WILSON:  Dust it off here.

6          THE COURT:  Thank you.

7          No, we use it all the time.  Not everyone comes in

8     with a team of IT, so.

9          All right.  So let's see what we've got.

10         MS. ZACHARAKIS:  So in total plaintiff is seeking

11    $11,790,793.50 against the defendants before assessing the

12    attorneys' fees, costs, and interests.  It's broken down as

13    follows.

14         So as you can see, on the fourth box we are seeking

15    $6,248,293.50 against Blue Sun/ITG jointly and severally.  And

16    that is based on either a piercing of the corporate veil theory

17    or a vicarious liability theory; and in support of that, there

18    was evidence that was submitted at trial showing that ITG set

19    up Blue Sun to be the sales arm of the company.  After ITG set

20    up Blue Sun, Blue Sun became the main distributor, not the sole

21    distributor, of ITG's M5 analyzer.  Blue Sun did not sell any

22    other analyzers, other than those manufactured by ITG.

23         Mr. Wilt is the owner of ITG.  He's the sole manager

24    of Blue Sun.  Blue Sun is the sole member of -- or ITG is the

25    sole member of Blue Sun; therefore, under the *Consolis Finance*

1    SJC decision, ITG should be vicarious- -- held vicariously

2    liable for Blue Sun's portion of the damages assessed against

3    it; or in the alternative, if the Court is so inclined, to

4    pierce the corporate veil, as Attorney Magee has explained.

5         Now, these numbers, that $6,248,293.50 figure is based

6    on the following math.  So Blue Sun was found liable on Counts

7    One, Two, Seven, and Ten.  Those are the --

8         THE COURT:  All right.  I'm going to just interrupt

9    you right here.  Okay.  I can do the math because I can do this

10   with a calculator.

11        MS. ZACHARAKIS:  All right.  Perfect.

12        THE COURT:  How -- why would I be able to assess a

13   compensatory damage award for two violations that were not put

14   before the jury regarding Idahoan and R&R Machine?

15        MS. ZACHARAKIS:  So those were in relation to the

16   violation of the preliminary injunction --

17        THE COURT:  Right.

18        MS. ZACHARAKIS:  -- and that --

19        THE COURT:  Was there an action that was sought before

20   the Court to -- for some type of a damage award for that, for

21   violation of the preliminary injunction?  Was there a

22   new -- was there an amendment to the complaint to include those

23   as counts that could be tried and then -- or even on a separate

24   case?

25        MS. ZACHARAKIS:  Yeah.  So these amounts were not

1   tried, but we -- the plaintiff was not aware of --

2       THE COURT:  The action wasn't tried.  There was no

3   litigation.  I didn't make a ruling on R&R or Idahoan as it

4   violating a preliminary injunction.  I mean, if another -- I

5   don't know if there was -- if there had been a legal

6   determination by a judge, a judicial determination on either of

7   those prior to the trial.

8       MS. ZACHARAKIS:  There have not, those two specific.

9       THE COURT:  Those are -- will not be considered as

10   part of compensatory damages.  They were not litigated.  And I

11   mean maybe you can still litigate them or they should have been

12   encompassed in the litigation, but they were not litigated.  So

13   they will not be considered as part of any award, so.

14       MS. ZACHARAKIS:  Understood.

15       I will say that the -- the information of the Idahoan

16   and the R&R sales are in the trial record.

17       THE COURT:  Sure, of course they're in the trial

18   record.  So are other things.  But this was a jury trial on

19   specific issues, and the jury was given very specific

20   constructions, and they made determinations, and then

21   they -- and they did -- and I -- we have the -- here we have

22   their -- their notes regarding, you know, asking the Court for

23   further instruction on certain things.  It was not put to the

24   jury.  It wasn't even put to the judge as a -- as a jury waived

25   portion.  So it's not -- there's not going to be compensation

1   for things that were not litigated here.

2        MS. ZACHARAKIS:  Okay.

3        THE COURT:  And so we will take the math.  I'd rather

4   hear the logic besides the math.  I get it.  I understand it.

5   And I'm glad that there's -- that it wasn't intended to be

6   double, that we're talking about the same actions.  I think it

7   references the jury verdict and the amounts awarded is a

8   juror's reflection that they believe ITG, i.e., Mr. Wilts, was

9   just as responsible as Blue Sun in that entity on the things

10  that they found for them.  So that is very important to the

11  Court, and I will make the calculations based on that, but --

12       MS. ZACHARAKIS:  Okay.  Understood, your Honor.

13  Understood.

14       THE COURT:  All right.  And I -- I haven't made a

15  determination yet against the 93A or any other double or

16  trebling.  It's helpful to get information about if there's

17  been some argument that you think mischaracterizes the reason

18  that you're seeking.  I mean it's certainly helpful talking

19  about the attorneys' fees.  We will -- we will assess those and

20  take those into account.  We also -- it will be very helpful

21  for us when we're talking about things like whether -- you

22  know, the assessment of attorneys' fees after a certain

23  determination by the jury or the Court, and those we also will

24  take into account.

25            We're talking about a lot of numbers here, a lot, and

1   we're talking about numbers for different things in each, and

2   I -- I'm not sure how I'm actually going to handle the

3   assessment on the individuals, but the individuals will not be

4   severally liable for the million-dollar verdicts.  They will be

5   liable for their own verdict and the -- and the assessments

6   against them.

7           So the individual defendants were not found to be

8   liable for $3 million or $1.5 million, and they

9   will -- but -- but Blue Sun is -- and Blue Sun stands in

10  the same place as ITG, at least certain assessments.

11          MS. ZACHARAKIS:  Your Honor, I'd just add that the

12  plaintiff agrees with you, and as we flip to the second page

13  which displays the individual defendants.

14          As you'll see here what we're asking for is the

15  compensatory damages.

16          THE COURT:  Okay.

17          MS. ZACHARAKIS:  Is the compensatory damages amount

18  adding the exemplary damages under misappropriation of trade

19  secrets, which is a plus two times.  And then you see here on

20  the last column, we're asking that the individual defendants be

21  severally liable for each of these amounts.

22          THE COURT:  All right.  And we have that -- is that

23  something that you filed with one of the -- one of the

24  submissions?  I don't know if we have that.

25          All right.  So can we have a copy of that?

1          MS. ZACHARAKIS:  Yes.

2          THE COURT:  Thank you.

3          MS. ZACHARAKIS:  Moving on from the demonstrative,

4     I'll just add that we are seeking that the judgment against

5     ITG, the severally imposed; however, the amount assessed

6     against Blue Sun should be jointly and severally imposed with

7     ITG.  That's essentially what the plaintiffs are asking for

8     here.

9          And the last thing I'll add is just that the

10    plaintiffs believe that the interest rate that should be

11    applied is the 12 percent, which is set by the statute.

12         Otherwise, in summary, the plaintiff does not oppose

13    the modification of the jury verdict if the Court so -- if the

14    Court is inclined to agree with the defendants, and that needs

15    to be clear that there is no double counting.

16         The defendants' motion for remitter should be denied

17    because they have not met that burden.

18         The final judgment should be -- and the plaintiff's

19    position outlined as it is in the demonstrative, but we

20    understand the Court's position on it, and that a 12 percent

21    interest rate should be applied across all of the defendants'

22    damages.

23         Thank you.

24         THE COURT:  Thank you, counsel.

25         MR. RITCHIE:  Briefly, your Honor.

1          I can do it from here, if that's okay.

2          THE COURT:  Okay.  That's fine.

3          MR. RITCHIE:  First of all, we're not -- we are

4    moving -- I should have said this before.  We're moving both

5    for alter or amendment of the award under Rule 59(e) as well as

6    for remitter under rule -- well, both rules.

7          The alter amendment doesn't require the shocking of

8    the conscience or some kind of, you know, outstanding, you

9    know, crazy award.  It requires simply that the Court conform

10   the -- the entry of judgment with the evidence.

11         Now, with respect to Blue Sun, I take it from

12   plaintiff graph where they're asking for $1.5 million in

13   compensatory damages that they agree with that.

14         And with respect to ITG, we would say again, your

15   Honor, that the 1.8 million number bears no rational

16   relationship to the evidence for the testimony from

17   Mr. Gutkoski.  There's a bigger point here.  I'm not -- I want

18   to move on, because plaintiffs have now put up on the board

19   this language joint and several liability.  Your Honor will

20   recall from the very first day of this trial, we filed a motion

21   to keep out arguments about piercing the corporate veil, about

22   alter ego.

23         THE COURT:  There's no piercing of anything in this

24   courtroom.

25         MR. RITCHIE:  Well, I understand that, but I --

1        THE COURT:  Ears or otherwise.  And so -- and as far

2    as the -- I heard the arguments about the assessment against

3    Blue Sun and the assessment against ITG.  I'm going to take

4    your arguments, and I'm going to read it, but that may not be

5    my ruling.  That -- I'm going to -- I'm going to try the best I

6    can to end up with respect for the jurors' work as long as it

7    aligns with the case law and reasonableness.  I'm going to try

8    and keep in mind on the outside that this is not about a

9    punishment.  This is about some judicial and legal recognition

10   of a harm and then a -- and then the award to recognize that

11   harm.  And all points I intend to work toward something

12   that -- that will address what have been the concerns,

13   especially going forward, but also with an undertaking of a

14   real goal of making sure that everyone walks away understanding

15   that this is not a judgment about people.  It is a judgment

16   about action that was legally recognized and will be

17   compensated appropriately in conjunction with the law and the

18   issues of fairness to the best that we can do.  And then -- and

19   then where you all go from there could be to somewhere else,

20   and I respect that I have two bosses.

21       One is right on my shoulder in the First Circuit, and

22   the other is further away and may never get it, but they could.

23   Since there's multiple levels, I'm sure that the

24   arguments -- you have really good lawyering here.  Let's face

25   it, really good lawyering.  We're lucky to have both sides well

1  represented, and the filings have been immensely helpful.

2  That's why I have been able to ask what I think are smart

3  questions, because they prepared them for me and -- but also I

4  think we're going to get to something that looks in the end

5  kind of what should have happened.  And I don't take any of the

6  arguments whatsoever in any spirit other than the one it was

7  given, which is you're advocates, and you're supposed to, and

8  that's the way it works.  So I will be as fair as I can.

9        And, Attorney Ritchie, if you all disagree with it you

10  can always bring post-trial motions asking me to reconsider

11  what I've done or to correct what appears to be an error.  I'm

12  not -- I don't have any ego about that.

13        MR. RITCHIE:  That's fine, your Honor.  I just want to

14  make sure that your Honor's consideration considers the claims

15  that were actually pled and pursued in this case and not new

16  matters that have come as --

17        THE COURT:  Well, and I think I have demonstrated

18  that.  I'm not -- you know, I'm not going to take on a burden

19  that we don't have to take on.  And not only that, I shouldn't.

20  I shouldn't.  That's an issue that was not litigated, the

21  issues related to the preliminary injunction issues.  That's

22  something completely separate.

23        And so with all of that said, the very, very

24  significant amount of -- of guidance for us from both parties

25  and then we will work through and get -- we're hoping -- I'm

1    hoping we thought about we could the end of the month.  I'm

2    hoping by the end of October, we certainly get out our

3    findings.  Okay.  Certainly within 45 days.

4          All right.  Thank you all very much.  I appreciate all

5    of your patience and all of your hard work on behalf of each

6    one of your clients.  All right.

7          COUNSEL IN UNISON:  Thank you, your Honor.

8          THE COURT:  All right.  Thank you.

9          And, Attorney Ritchie, you sort of got the last word,

10   so I'm just going to let the record reflect that.

11          (At 12:51 p.m., court was adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4      certify that the foregoing transcript is a true and accurate

5      transcription of my stenographic notes before the Honorable

6      Margaret R. Guzman, to the best of my skill, knowledge, and

7      ability.

8

9

10         /s/ Marianne Kusa-Ryll                    11/10/23

11         Marianne Kusa-Ryll, RDR, CRR                Date

12         Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25