```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3

 4    KPM Analytics North America   )
      Corporation,                   )
 5                      Plaintiff,   )
                                     )
 6                                   )
      vs.                            )    Civil Action No. 21cv10572-MRG
 7                                   )
                                     )
 8    Blue Sun Scientific, LLC,      )
      The Innovative Technologies    )
 9    Group & Co., Ltd., Arnold      )
      Eilert, Michelle Gajewski,     )
10    Robert Gajewski, Rachael       )
      Glenister, Gregory Israelson, )
11    Irvin Lucas, and Philip        )
      Ossowski,                      )
12                      Defendants.  )

13

14    BEFORE:  The Honorable Margaret R. Guzman

15
                           Motion Hearing
16

17

18                              United States District Court
                                Courtroom No. 2
19                              595 Main Street
                                Worcester, Massachusetts
20                              February 28, 2024

21

22

23                    Marianne Kusa-Ryll, RDR, CRR
                         Official Court Reporter
24                     United States District Court
                        595 Main Street, Room 514A
25                        Worcester, MA 01608-2093
                       508-929-3399 justicehill@aol.com
                    Mechanical Steno - Transcript by Computer
```

```
 1    APPEARANCES:

 2    Sunstein LLP
      John T. Gutkoski, Esquire
 3    Kevin R. Mosier, Esquire
      100 High Street
 4    Boston, Massachusetts 02110
      on behalf of the Plaintiff
 5
      Morse Barnes-Brown & Pendelton, PC
 6    Scott R. Magee, Esquire
      Paige Zacharakis, Esquire
 7    Jacqueline Salwa, Esquire
      480 Totten Pond Road, 4th Floor
 8    Waltham, Massachusetts 02451
      on behalf of the Plaintiff
 9
      Gordon Feinblatt LLC
10    George Faulkner Ritchie, IV, Esquire
      1001 Fleet Street
11    Suite 700
      Baltimore, Maryland 21202
12    On behalf of the Defendant, Blue Sun Scientific, The Innovative
      Technologies Group & Co., Ltd.
13
      Seyfarth Shaw LLP
14    Dallin R. Wilson, Esquire
      World Trade Center East
15    Two Seaport Lane
      Suite 1200
16    Boston Massachusetts 02210
      on behalf of the Defendants, Arnold Eilert, Robert Gajewski,
17    Rachael Glenister, and Irvin Lucas

18    Also present:

19    Irvin Lucas
      Robert Gajewski
20    Robert Wilt

21    Also present: (via telephone)

22    Rachael Glenister
      Arnold Eilert
23

24

25
```

1    P R O C E E D I N G S

2            (The following proceedings were held in open court

3    before the Honorable Margaret R. Guzman, United States District

4    Judge, United States District Court, District of Massachusetts,

5    at the Donohue Federal Building & United States Courthouse,

6    595 Main Street, Worcester, Massachusetts, on February 28,

7    2024.)

8            THE CLERK:  All rise.

9            Court is now open.  You may be seated.

10           THE COURT:  All right.  Good morning, everyone.

11           COUNSEL IN UNISON:  Good morning, your Honor.

12           THE CLERK:  Case Number 21-10572, KPM Analytics North

13   America Corporation versus Blue Sun Scientific.

14           Counsel, please note your appearance for the record.

15           MR. GUTKOSKI:  Good morning, your Honor.  John

16   Gutkoski on behalf of KPM.  With me is my colleagues Kevin

17   Mosier and Jacqueline Salwa, cocounsel Scott McGee, and Paige

18   Zacharakis, and with us this morning on behalf of KPM is its

19   chief commercial officer, Mr. Yuegang Zhao.

20           THE COURT:  All right.  Good morning, all of you.

21           MR. ZHAO:  Good morning.

22           MR. WILSON:  Good morning, your Honor.  Dallin Wilson

23   on behalf of the individual Defendants Arnold Eilert, Rachael

24   Glenister, Robert Gajewski, and Irvin Lucas.  And Mr. Lukas and

25   Mr. Gajewski are present today in the courtroom; and

1    Ms. Glenister and Mr. Eilert, as I understand, are on the

2    telephone.

3              THE COURT:  Thank you.

4              MR. RITCHIE:  And good morning, your Honor.  George

5    Ritchie on behalf of Blue Scientific and Innovative Technology

6    Group.

7              Mr. Lucas is here in the courtroom from Blue Sun; and

8    Mr. Robert Wilt is here for ITG.

9              THE COURT:  All right.  Thank you, all.  It's good to

10   see you all again.

11             We have been busy, since we finished our business

12   here, and we -- I have had to refamiliarize myself with -- with

13   our case, and I have familiarized myself with the filings.

14             So let me -- I'd like to, if we could, start with

15   KPM's argument regarding its most recent filing, because --

16   regarding the additional violations alleged of the preliminary

17   injunction.

18             And are we prepared to do that?

19             MR. GUTKOSKI:  Sure.

20             THE COURT:  Okay.

21             MR. GUTKOSKI:  I believe our hearing on all the

22   post-trial motions was in October.  At the beginning of

23   November, KPM became aware through communications with its

24   customer, Omega Protein, one of the customers that was featured

25   during the trial, of additional violations of the preliminary

1    injunction order.

2        Confronted with that new information and with briefing

3    being closed, we had the option, as we saw it, either filing a

4    motion for contempt, which seemed to just be seeking additional

5    fines or -- or penalties on top of everything the jury had

6    already ordered and everything that we had submitted in the

7    post-trial motions, which we thought would cause potentially

8    additional delay of the Court entering final judgment; or

9    instead, the track that we chose, which was to submit this new

10   information to the Court for its consideration and thought it

11   most relevant to the motions for a permanent injunction and for

12   multiple damages under 93A, and that is the option that we

13   chose and the motion that we have before us today.

14       The evidence as set forth in the moving papers is that

15   in April of 2023, two months before trial, Blue Sun was

16   approached to provide preventive maintenance for Omega Protein.

17       Omega Protein, as was established at trial, is a

18   customer that Mr. Gajewski, in conjunction with his wife, who

19   is then working at KPM, and Mr. Lucas, diverted to Blue Sun.

20   This is at trial Exhibits 112 through 114 and related testimony

21   as cited in our papers.

22       This was the customer that Mrs. Gajewski received the

23   inquiry to provide preventive maintenance for in 2019.

24   Mrs. Gajewski quoted them a price.  That price was then

25   communicated to Mr. Gajewski and by Mr. Gajewski to Mr. Lucas.

1    Blue Sun then undercut that price with that trade secret

2    confidential information in order to secure the preventive

3    maintenance business for Blue Sun.  And Mr. Gajewski did go and

4    perform the preventive maintenance for Omega Protein in 2019,

5    and Blue Sun charged that reduced price for, I believe, the

6    record shows five different units at three different locations.

7         The evidence at trial also established that they

8    continued that relationship and performed preventive

9    maintenance in 2020, 2021, and 2022.

10        As the Court knows, in 2021 the Court issued a

11   preliminary injunction, which in part prohibited the individual

12   defendants and Blue Sun for performing any preventive

13   maintenance services on KPM SpectraStar units at any of KPM's

14   customers with which the -- any of the defendants had had prior

15   contact.

16        The evidence that came to light in November of last

17   year was that KPM -- was that Omega Protein reached out

18   to -- reached out to the defendants seeking preventive

19   maintenance for 2023, and that it was performed in April of

20   2023, as it had been in the previous years, but this time was

21   done by a company called Caltest.

22        Caltest was touched on briefly in the trial record,

23   because as our papers show in discovery, Caltest was revealed

24   to be a company that Blue Sun had acquired.  And we asked

25   Mr. Lucas, as the 30(b)(6) designee of Blue Sun what, if any,

1    involvement Caltest had in servicing KPM machines.  As you see

2    in the deposition testimony, he testified that they had no

3    involvement; that if a customer called or reached out to Blue

4    Sun or the defendants in order to obtain preventive maintenance

5    that would be performed by Mr. Gajewski or Mr. Eilert or one of

6    the other former KPM employees by Blue Sun.  It would not be

7    done by Caltest.  That Caltest had only one employee, and he

8    was only involved in writing calibrations for FOSS machines,

9    one of the other competitors.

10        Despite that fact, Omega Protein in the November time

11   frame last year told KPM that it had received preventive

12   maintenance on its five SpectraStar units from Caltest.  The

13   website information for Caltest confirms that it shares an

14   address, the corporate address of Blue Sun and ITG in Maryland.

15   And the Caltest president is Irvin Lucas.

16        These -- these are all the points that we've set forth

17   in our papers.  We believe that the Court should consider this

18   because it only became -- we only became aware of it after

19   trial and after briefing.

20        As the Court will recall from testimony at trial, many

21   of the records and emails from the defendants were deleted and

22   destroyed, and as a result all of the -- most of the evidence

23   that is available to KPM regarding the defendants' actions

24   comes to us second or third hand by customers; and in this

25   case, that is what happened.  After the briefing was completed,

1    this information came to us.

2          In opposition to the motion asking the Court to

3    consider this new information and this latest violation, most

4    notably the defendants do not say that they did not do it.

5    Nowhere in their papers do they say that they did not provide

6    preventive maintenance for Omega Protein in April of 2023, nor

7    do they say they did not try to obscure doing so by doing this

8    through the Caltest entity rather than themselves, and nowhere

9    do they say that they did not violate the preliminary

10   injunction and its restriction on the individual defendants and

11   Blue Sun from doing so.

12         They instead raise a series of procedural arguments

13   saying that we should be here in a contempt proceeding.  Again,

14   that was an option available to us, and in theory still is, but

15   we think it most relevant that the Court consider this in

16   wrapping up its decisions on the post-trial motions and

17   entering final judgment.

18         The preliminary injunction was clear.  It had two

19   fundamental restrictions.  One, none of you can sell any of

20   your own analyzers to any of the customers that the individual

21   defendants previously dealt with.

22         And in our post-trial papers, in our post-trial

23   motions, we were able to uncover two situations, one with R&R

24   Machine and one with Idahoan where they violated that

25   provision.

1          The other restriction, significant restriction in the

2     preliminary injunction, was not to provide individual -- the

3     individual defendants and Blue Sun were not to provide any

4     preventive maintenance services on this service-to-sale model

5     that these parties operate under, were not to provide any

6     services on SpectraStar machines to any of those customers, and

7     now we have evidence regarding Omega Protein of them violating

8     that.

9          These actions, we believe, are directly relevant to

10    the Court's entry of a permanent injunction and to the

11    inappropriate, unfair and deceptive trade practices practiced

12    by the defendants, and we can ask the Court to grant the relief

13    that we've asked for under 93A and in regard to equitable

14    relief of a permanent injunction as set forth in our papers,

15    not only for the reasons set forth in those papers and argued

16    back in October, but based on this new information.

17          THE COURT:  All right.  Thank you.

18          All right.  Attorney Wilson.

19          MR. WILSON:  Good morning, your Honor.

20          Very briefly, I think Attorney Gutkoski -- I

21    appreciate his candor recognizes that there were what he says

22    two -- two ways they could have done this.  One was pursuing a

23    contempt proceeding, and one was to file what was a motion to

24    file a supplementary brief that attached an affidavit that I

25    think we all admit is inadmissible.  It's double hearsay.  It's

1    Mr. Zhao says that another employee of KPM told him that

2    somebody from Omega Protein told him that this had happened.

3    We think that not only is it a matter of procedural improper,

4    it's a due process issue.

5          Effectively, what they're saying is you need to come

6    out and deny this admissible evidence that never would have

7    come in at trial.  Mr. Zhao wasn't a witness.  And had they

8    tried to bring in testimony this way, I presume it would not

9    have been allowed at trial.  So, effectively, they're trying to

10   get around what would have prevented this evidence of coming in

11   at trial and saying, well, you should consider this on a motion

12   to file a supplementary brief.  We've opposed it.  We think

13   there are serious due process concerns about your Honor

14   considering evidence that didn't come in at trial and cannot

15   come in the way that they've tried to put it in.

16         THE COURT:  For any purpose whatsoever?

17         MR. WILSON:  For any -- it's -- it's clearly being

18   offered for the truth of the matter asserted, right.

19         THE COURT:  Uh-huh.

20         MR. WILSON:  I mean, it is hearsay.  I'm not aware of

21   any exception to hearsay that would allow the Court to consider

22   this.

23         THE COURT:  Do you want a hearing in which you can

24   refute it?  Do you want -- do you want to put on witnesses that

25   will refute that?

1        MR. WILSON:  We don't, your Honor, and we don't think

2   we should be put in a position, particularly in this procedural

3   setting, a motion to file a supplementary brief to show up and

4   say, okay, now we're going to put on evidence to refute -- to

5   refute evidence that would not have come in at trial.  It could

6   not have come in.  And I don't think there's any way for your

7   Honor to consider it at this stage in these proceedings.

8        The last thing I would say is an argument that KPM

9   repeatedly makes is that somehow a violation of a preliminary

10  injunction should somehow be considered by the Court in

11  structuring a permanent injunction.  And -- and we

12  fundamentally disagree with that.  An injunction is not a

13  punitive thing.  It cannot be a punitive thing.  And the way

14  that they're treating this is we should punish these folks for

15  violating the preliminary injunction by ordering a more

16  stringent or more burdensome permanent injunction.  And that

17  simply is not the law.  It cannot be punitive.  And so I'm not

18  sure that this has any relevance whatsoever to the motions that

19  are pending before your Honor; and even if they are, again,

20  there's -- there has been no admissible evidence put before

21  your Honor to consider, and for that reason we would ask that

22  the motion be denied.

23        THE COURT:  All right.  Thank you.

24        MR. RITCHIE:  Your Honor, I adopt Mr. Wilson's

25  comments.

1        The only thing I would add is there's no evidence

2   before the Court that ITG had anything to do with this

3   particular servicing or is aware of it.  And that's all I have

4   to add.

5        Thank you.

6        MR. GUTKOSKI:  Your Honor, if I could just say by way

7   of reply.  Mr. Lucas is here.  I'm happy to have him take the

8   stand, and I'm happy to ask him exactly what he did, be it for

9   Blue Sun or Caltest or both in April of 2023.

10        THE COURT:  All right.  Well, let me -- let me just

11   tell you what I think is relevant and in the -- to the case

12   before us, and the stage we're at right now and the -- you

13   know, what -- what this new information, what its relevance is

14   to -- to the determinations that I have to make.

15        The -- the trial was long and well fought, and the

16   jury was clear in very -- many respects.

17        The -- the preliminary injunction is also very clear.

18   Judge Hillman -- it was including the updated preliminary

19   injunction on December 17th, 2021.  It was very specific about

20   what it was intended to do.

21        I did not create this preliminary injunction, but

22   based on what I heard at the trial and my awareness of all of

23   the -- and familiarity with the filings through the -- I became

24   familiar with the case, you know, through all the multiple

25   filings, that Judge Hillman was clear, very clear, really very

1   specific, and it was -- it was written in a way that was

2   speaking to what I believe he found to be significant

3   allegations of particularized behavior, which then now from

4   where we are the jury agreed with.  The jury found for the most

5   part that there was a substantial and sufficient standard that

6   was met in the determination of what happened between the

7   employees of KPM, the entities known as ITG and Blue Sun, and

8   they -- we -- we saw -- we saw multiple witnesses talking about

9   that.

10          So the preliminary injunction, when you look at it

11  from December 17, 2021, was in my mind firmly supported by the

12  evidence that was found by a jury, overwhelmingly found.  They

13  were unanimous in their determination of what the facts were,

14  which supported many of the charges, and we have their verdicts

15  here.

16          And specifically, the ones I think that are the most

17  relevant are their -- the unfair and deceptive trade practices

18  and the trade secrets misappropriations.  Both of those types

19  of claims were determined by the jury to be supported by the

20  actions that they -- that they heard about in the evidence.

21          The preliminary injunction was intended -- and it's an

22  unusual remedy prior to trial.  We generally don't punish

23  people until a jury or a judge has made a legal determination

24  that the behavior that's claimed is, in fact, supported by

25  evidence.  But in this -- where we are right now, we're not in

1    that same position.  A jury heard weeks of evidence, mountains

2    of evidence, and worked through a determination that the

3    evidence that had been presented established that information

4    product and trade-protected information was being taken without

5    permission, without paying for it from the entity of KPM's --

6    within KPM's world, and it was taken and it was used and it was

7    used in a way that benefitted financially the people that were

8    using it.  And Judge Hillman said don't -- don't do it anymore.

9    We haven't found you responsible, but there's enough evidence

10   to suggest that if you are, don't do it anymore.  And that was

11   basically what the preliminary injunction said.  That was my

12   understanding of it.

13           And it was very specific.  If you got this information

14   while you were employed there, it was KPM's, not yours.  And if

15   you -- and it was very specific in the things that they

16   shouldn't be doing, reaching out to customers and -- and doing

17   things, very specific things.

18           It wasn't -- it isn't -- you know, trade secrets can

19   be overwhelming if that's not your field.  In the infrared

20   spectrometer information, that was really overwhelming for a

21   nonscience person, but I thought it was very well described in

22   our trial, and I had a little clinic on that myself, and the

23   jury understood, but the people in that field know that it

24   takes a lot of time and money and investment to create that

25   type of technology.  It takes years and decades to build a

1    customer base that supports you and provides financial benefit

2    from the relationship.  And what we learned in the trial is

3    that very easily and very quickly someone who has a desire to

4    take shortcuts can do that.  They tricked clients into thinking

5    that they were still working with KPM.  They outright made

6    falsehoods regarding their ability to propose that they do

7    their work with a different entity, and that was determined by

8    a jury.

9         The preliminary injunction is unusual, especially in

10   the world that I'm used to, because it really is -- it's like a

11   prejury judgment, but in this case at trial, it was thwarted,

12   the evidence was that what was told they shouldn't do had been

13   supported by a jury found that that -- the evidence that was

14   presented supported the allegations that they had, in fact,

15   misbehaved in this way and -- and that that was what their

16   verdict said very loudly.

17        And an allegation that after our jury had made this

18   determination that same behavior continued, it is contemptuous

19   if you find that it has been -- and I agree, that this could

20   actually be an action for contempt, but that's not what is

21   before the Court.

22        MR. WILSON:  Can I just clarify one thing, your Honor?

23        THE COURT:  Yes.

24        MR. WILSON:  I believe the allegation here was that

25   the service was done here before trial, and it was learned

1    about later.  I'm not suggesting that's a big -- changes your

2    analysis at all, but I just wanted to make sure the record was

3    clear that the allegation here is the service was performed

4    prior to trial, not after.

5            THE COURT:  But it was not performed prior to when the

6    preliminary injunction was issued.

7            MR. WILSON:  I understand.

8            THE COURT:  That's -- of course the secrets don't

9    always come out when it's convenient, because had we known

10   that, right, you know, I don't know if that evidence would have

11   gone, but I'm being asked to determine whether or not -- so the

12   jury has made a recommendation that a 93A should be supported.

13   All right.  And I have to -- I take that recommendation, but I

14   have to make my own independent analysis, and I have to

15   determine if yes, you know, the significance of double and

16   tripling damages is not lost on me.  This is -- we're talking

17   about big numbers here.  But December 17, 2021, was enough

18   notice to the players to stop it.  Stop it.  They took the

19   risk, if this is determined to have been supported by evidence,

20   they took the risk at -- at what I now have to make a

21   determination.  I have to struggle with under the 93A

22   consideration whether or not I should support it.  Was the

23   behavior willful and malicious?  I have to determine that.  I

24   can't say that, you know, we -- in our district the -- the

25   First Circuit, we don't have -- there's not a -- there is not a

1    seminal case on the determination about what is the standard.

2    I mean, I know -- you know, it's kind of like, you know, I

3    can't describe it, but I know it when I see it, but in this

4    case, we have two different cases that have come out with

5    different -- on different fact patterns, and they have

6    established, you know, sort of, you know, two different

7    determinations of what would be -- what would support the -- a

8    93A.

9         Well, willful and malicious is one of those.  And if

10   you're told in December of 2021 to not do something, the -- the

11   fact that in November of 2023 or February of 2024 there's an

12   allegation that after December 2021 you did some of the

13   things -- there's just an allegation about it, you did some of

14   the things that were -- you were told not to do, I think

15   that -- that answers the question about is that willful and

16   malicious.

17        Willful means you're doing it knowing that you

18   shouldn't be; and malicious is for an intention that is not for

19   the purpose -- the person who is protected by the injunction.

20   That's -- so the problem is not I don't consider this as a

21   contempt.  It's not alleged as a contempt.  It's not alleged as

22   a new offense.  That has to be -- that's a separate trial.  I'm

23   not -- I am not treating this as something that I should be

24   punishing them and attaching money to it for this particular

25   allegation.

1           If they want to pursue that, they have to file.  They

2    have to file a suit against it, and then a jury or a judge has

3    to make a determination, if the evidence warrants a finding.

4    But that's not the standard to determine whether or not there's

5    evidence that without a permanent nature of this preliminary

6    injunction the beat's just going to keep going on.

7           And it was pretty clear in the evidence that, you

8    know, shaming and reminding and, you know -- you know, sending

9    letters to stop or -- that's not -- that has no -- there's some

10   incentive of continuing this behavior on the part of some of

11   the players in this case that -- that is -- doesn't have an

12   effect on them.  They just ignored it.  And the fact that

13   there's an allegation that very, very similar behavior, going

14   through the service contract, you know, make your way in that

15   way, that was -- that was repeated over and over and over

16   again.  And unless there's some, you know, some significant

17   refuting of the allegations of that, it is relevant to my

18   determination as to whether or not the players who were

19   determined to have taken those shortcuts, whether or not they

20   will continue to do it, and what -- how do we protect the

21   plaintiff that has met its case, that -- that's what's here

22   today.  And that's not about contempt.  That's about, you know,

23   Judge Hillman didn't say, you know, and I hope you'll abide by

24   this.  I mean he signed it as a U.S. district judge with all of

25   the power that that comes with it.  And that is at least

1    allegedly didn't stop them.

2         So I -- as far as whether or not they should file a

3    request for contempt, I don't think it's contempt.  It just is

4    intended to show me whether or not any -- a preliminary

5    injunction that expires will not have any harm to KPM or

6    whether or not they need to permanently, with the confines of

7    the information that they earned, they own, should be protected

8    for a period of time, and I think that -- I think it's

9    extremely relevant to that.

10        Attorney Ritchie.

11        MR. RITCHIE:  Your Honor, maybe -- maybe I spoke too

12   briefly, but I'll try to flesh out what I was trying to convey

13   before, which is that this particular allegation -- I

14   understand the Court's view and the jury's view of what

15   happened last May, but this particular allegation sheds no

16   light on the behavior of ITG for purposes of the determinations

17   your Honor has identified, the 93A claim and the permanent

18   injunction claim.

19        With respect to the permanent injunction claim, your

20   Honor, recall that the testimony was that ITG had a stand-alone

21   independent business as a manufacturer and seller of these

22   machines; and, in fact, they had designed the very machine, the

23   first machines that KPM sold.  This is Mr. Wilt was the

24   progenitor, if you will, of this particular style of machine

25   and this business, and nothing about this particular incident

1    sheds any light on whether or not ITG should be allowed to

2    manufacture and sell, perhaps not through Blue Sun, but on its

3    own machines that it always manufactured and sold.  There is

4    nothing linking this particular incident to anything that

5    relates to the ITG manufacturing and to its own independent

6    business line.

7            One could question and -- and wonder about the why ITG

8    is associated here in this courtroom with some of the other

9    defendants, you know, that's -- you know, I'm sure those

10   questions have lingered in the jury's mind and in the Court's

11   mind.  But with respect to ITG, the fact that Blue Sun and this

12   other party Caltest did one servicing, you know, allegedly

13   during a time when the injunction was applied doesn't -- has

14   nothing to do with ITG manufacturing and selling its own

15   machine.  So that's part one.

16           And then part two, on the 93A claim, your Honor said

17   willful and malicious, which meanings intentional, right, and

18   that you were doing it to hurt somebody.  There's nothing that

19   links this alleged servicing to anything that ITG made, and

20   there's no inference the Court can make that ITG did something

21   willful to allow the servicing to happen or that ITG did

22   something malicious to hurt KPM in the servicing of this

23   machine.

24           So when I jumped up and spoke very briefly, I should

25   have been clearer, but I wanted to get that on the record and

1    explain this to your Honor because I --

2         THE COURT:  Even -- listen, even if you -- you know,

3    you went back to your office and you called and you said, you

4    know, but I just had a thought.  I -- I understand that.  I

5    really do.  And I -- again, the preliminary injunction is

6    intended to protect what KPM has that a jury has found that

7    they have or what we -- anybody could agree that they have from

8    unfair acts by the defendants.

9         The -- and the preliminary injunction mostly was going

10    to, in my mind, from what I read, people who did not -- people

11    who had access to this information under protected

12    circumstances through their employment contracts, you know,

13    they could -- if they had broke in and they went into the

14    computer, they'd be criminals for having broken in and taking

15    something.

16         The -- the admonition against using any information

17    that they gained there outside of there, that's like as if they

18    were breaking in.  So this is the -- and I think that we should

19    be able to fashion the injunction in ways that protects your

20    client.  I agree he does -- ITG does not stand in the same

21    places especially related to this particular allegation as Blue

22    Sun does.  And so I agree with that.

23         MR. RITCHIE:  Okay.

24         THE COURT:  But I don't agree that -- that -- that

25    there is some -- that a jury needs to hear about this.

1          Now, if this were just wholly out of -- you know,

2     if -- if Blue Sun and the allegations on this and the chance

3     that it might have a permanent -- and create a permanent

4     injunction wanted to challenge that, we could have a hearing.

5     We could put on evidence, and it would only be solely related

6     to whether or not this -- there was probable cause to believe

7     or some standard that this actually happened.  Maybe it is out

8     of cloth, maybe it's not true, and that could be refuted, but

9     if it's not refuted, the allegation is informing my

10    determination on whether or not to make this a permanent

11    injunction.

12         But it -- it needs to inform the way I handle ITG

13    regarding a permanent injunction as well, and that is where you

14    don't need to stand up.  I will hear you on that.  I -- so the

15    first line that I have to -- I want to be sure everyone's clear

16    about, I'm not treating this as a contempt.  It's contemptuous

17    if it happened, it really is, but I'm treating this as

18    information whether -- because there was a motion for me to

19    make this a permanent injunction.  So I find this information

20    unrefuted provides KPM and provides the Court with the

21    assurance that a permanent injunction may very well be the only

22    way to protect KPM because -- because there were -- there was

23    an allegation that all of the stuff that was taken, the

24    computer disks and all those databases were destroyed, were no

25    longer available, that's an allegation, because I do not think

1    that a jury found that that information does not exist.  I

2    think there's -- it may be somewhere.  It may have been

3    prevented from being brought to the Court.  It may have been

4    not shared, but there is a continuing danger for KPM through

5    its own clients that it cultivated and developed long-term

6    relationships with that had a financial benefit to them that is

7    not -- is being unfairly used so -- by someone else.

8           So it goes to the nature of the injunction, whether

9    it's prelim- -- whether it should be permanent or not.  But it

10   does also go to whether or not the behavior -- you know, the

11   jury made a determination.  They were -- I guess 93A is kind of

12   like does it offend you what they did in the sense of the law.

13   And I think the jury was really offended, but I still have to

14   make a determination whether or not I'm going to determine that

15   93A violations have been met and then to determine what to do

16   about that.

17          This information is relevant to that.  It's relevant

18   in that, you know, the actions of the employees may have just

19   been greed.  Maybe it's just greedy.  Maybe they just -- maybe

20   just lazy.  Maybe they just wanted to take what somebody else

21   had and -- and use it and make the money and not have to do the

22   work, invest the intellect, the resources.  Maybe that's what

23   they did.  But then when they were told to stop doing it, and

24   they kept doing it, that says it was more than just greedy.  It

25   was in your face.  And so I -- that is why it's important.

1          And I would like counsel, Attorney Gutkoski, to talk

2     about ITG's, you know, what impact a permanent injunction

3     should have on ITG, because I think that's -- I think that is a

4     relevant issue.

5          MR. RITCHIE:  Well, I think that the permanent

6     injunction that KPM is asking for would effectively stop ITG

7     from selling its machines.

8          ITG created the market.  All the customers that

9     Mr. Olson described were legacy customers from ITG back when it

10    was Unity Scientific, which was the business that KPM purchased

11    from Mr. Wilt and his partner.  And all those customers

12    Mr. Wilt testified were people -- customers they sold machines

13    to.

14         Now, that alone isn't enough, and I -- I understand

15    the position the Court is in, but I would offer this.  The jury

16    did find -- I mean, I -- I know the Court wants to give credit

17    for all the jury findings, and I understand that.

18         THE COURT:  No, it's respect.  It's not credit.  I

19    have to respect --

20         MR. RITCHIE:  Well, okay, I think that's a better

21    word.  The respect should also be given to the jury finding

22    that ITG didn't take -- didn't misappropriate KPM's trade

23    secrets, which when you couple that with the evidence means

24    that ITG stand-alone created its own machines on its own

25    technology and sold that technology without regard to the KPM

1    trade secrets.

2          I understand there's this issue about servicing and,

3    you know, that it's a complicated thing.  But give the jury

4    respect, it means something.  That finding means something just

5    like the other jury findings mean something.

6          And I think that the Court could fashion an

7    injunction, if it were so inclined.  I don't think there should

8    be a permanent injunction, but if there were one to be issued,

9    the Court could fashion one that would allow ITG to sell its

10   machines in the same market it sold prior to Blue Sun, prior to

11   this court case, prior to the jury finding, because I think

12   what the jury was signalling was yes, we accept Mr. Wilt's

13   testimony.

14         THE COURT:  Well -- well, if Mr. Wilt approaches or

15   ITG approaches a -- a potential client, and that potential

16   client, he didn't get that information from the client base

17   that they already have, then it's just competition.  This is

18   the -- the injunction is about taking information, client

19   contacts names, what they were serviced for, what machines they

20   have.  That's what happened here.  That was taken, and then

21   they were contacted.

22         MR. RITCHIE:  Well, but I think the testimony was

23   clear -- Mr. Wilt said all these customers -- remember

24   Mr. Olson was on the stand, and counsel showed him a piece of

25   paper, and we went through this rigamarole of could he remember

1    the names written down on the piece of paper, and actually he

2    couldn't.  No offense to Mr. Olson.  It's a big company, and I

3    get it.

4          Mr. Wilt named all of his customers at Unity

5    Scientific when it was a start-up company, and those are the

6    same customers.  So whether, you know, Disney or I'm trying to

7    think of some of the names of these companies now, and I

8    apologize.  All those names, all those customers were in

9    Mr. Wilt's head and in his database before Blue Sun, before

10   Unity Scientific was sold to KPM.  All that existed so I think

11   that if there were an injunction issued that was clear about

12   issues relating to servicing and issues making clear that

13   there's no technology that -- that -- remember there was the

14   whole question of the software, your Honor, and whether or not

15   that was a trade secret and whether or not that had been

16   misappropriated, and the jury found that the individual

17   defendants in Blue Sun had misappropriated that software, but

18   they did not find that with respect to ITG.

19         So an injunction that incorporated those jury findings

20   would have exempted ITG to sell its own technology to customers

21   it had previously sold to, I think that's a fair argument,

22   because I think that respects the very fine balance that the

23   jury engaged in in this case.  And I give the jury credit for

24   sifting through a lot of evidence.

25         THE COURT:  But they did find that -- I mean, they

1    made a recommendation regarding the 93A to both, to ITG and

2    Blue Sun.  So I'm -- you know, it isn't that they were saying,

3    geez, I don't know why that guy is here.  That isn't -- that

4    wasn't the case.

5         But I -- and I also -- I'm going to hear from the

6    plaintiffs, but I mean didn't Mr. -- I mean, it's my

7    understanding that Mr. Wilt got something for what KPM made its

8    business on.  Mr. Wilt bargained in some way at some point;

9    otherwise, he'd be claiming that someone stole his invention

10   and his customer base, right?

11        So he -- I think -- I mean, I don't know quite -- I

12   don't know quite what it is that you're referring to as far as

13   he -- yeah, he created those things.  He was showing us what

14   the -- the machine and everything, but he -- you know, so I'm

15   not quite sure where it is that you're going with this, why --

16        MR. RITCHIE:  Well, I think what I wanted to -- I'm

17   not sure if I'm going to answer the Court's question, but I had

18   a thought, which is that you're right, the jury didn't make the

19   recommendation on the 93A with respect to ITG.  And if you go

20   back and look at the verdict sheet, the jury found that ITG

21   interfered with the contracts.  That was the tortious

22   interference with contracts, which in this case was the

23   employment contracts, I think.  I mean, KPM didn't make that

24   very clear to the jury; and, in fact, the jury asked that

25   question.  But it seems clear they were concerned about the

1    servicing aspect that was going on with Mr. Gajewski and

2    Mr. Lucas and the others.  And if you -- they clearly drew a --

3    they drew a distinction between what was happening on the

4    employment side of Blue Sun and what was happening on the trade

5    secret side at ITG.

6            And so that's where I'm going with this, your Honor.

7    If an injunction issues, one ought to issue that allows ITG to

8    engage in the manufacture and sale of the machines that it has

9    always manufactured and sold without regard to Blue Sun or

10   anything else because none -- nothing that the jury found

11   indicates that the jury thought that ITG uses KPM trade secrets

12   with respect to the manufacture and sale of its machines, which

13   is the ITG business, and that was the jury's finding, no trade

14   secret misappropriation.  So that's the point that I'm

15   hopefully trying to make to the Court.

16           THE COURT:  Well, they did -- they did issue a

17   1.8 million judgment regarding tortious interference --

18           MR. RITCHIE:  And that's right.

19           THE COURT:  -- and but for ITG there is no Blue Sun.

20   And that was -- that was very clear.

21           MR. RITCHIE:  And those are the damages, and that's

22   the --

23           THE COURT:  Yeah.

24           MR. RITCHIE:  -- harm that the jury is compensating

25   KPM for with respect to the employment-based service issues

1  │  that the jury was clearly concerned about.

2  │       But going forward, going forward, not past damages,

3  │  going forward and -- and -- and -- and, you know, you have this

4  │  pre -- you have Unity Scientific pre KPM when you have the

5  │  situation today, and there's nothing that shouldn't allow the

6  │  Court to take ITG back to the pre KPM/Unity Scientific model

7  │  where it's selling its machines without regard to Blue Sun.

8  │       THE COURT:  Well, I'm never going to do that.  I may

9  │  not prevent it, but I -- I can't even -- I'm never going to

10 │  have any role in them doing what they're going to do.

11 │       So let me hear from -- let me hear from KPM

12 │  regarding -- and I do agree that they do stand in a different

13 │  place, but, you know, whether there are corporate documents

14 │  that link them now or not, they're -- they're tied together.

15 │  There's -- there's no doubt that there's -- you know, this is

16 │  not -- it's not two people that run into each other for the

17 │  first time in the elevator on the way to the trial.

18 │       So let me hear from counsel.

19 │       MR. GUTKOSKI:  The Court's correct, the jury was

20 │  offended.  This conduct is atrocious, and the jury spoke loud

21 │  and clear in terms of who it held accountable for that

22 │  atrocious behavior with its verdict, which included, as your

23 │  Honor just noted, the largest damages award against ITG and,

24 │  therefore, its owner Mr. Wilt.

25 │       We heard extensive testimony that Wilt is the sole

1    owner of ITG, and ITG is the sole owner of Blue Sun.  The

2    revenues for Blue Sun, that Blue Sun earned flowed up to ITG.

3    The jury heard all that.  They understood who was the ultimate

4    beneficiary of this, and they rejected Mr. Wilt's repeated

5    attempts to say I didn't know what was going on.  I -- I -- I

6    turned a blind eye to that.  It was all Lucas, he -- he did all

7    of this.

8         Well, your Honor is correct that the preliminary

9    injunction in December 17th -- in -- in August of '21 and then

10   renewed in December of '21, after the defendants challenged it

11   was clear, was clear notice to the individual defendants and

12   Mr. Lucas to stop, but it was also notice to Mr. Wilt and ITG,

13   you should be looking in on this.  You should be making sure

14   this isn't happening.

15        Part of that injunction went to ITG.  We heard no

16   evidence, and there's nothing in the record to say that once he

17   was put on notice that Mr. Wilt and ITG did anything to change

18   Mr. Lucas' actions, to reign in him and Mr. Gajewski.  The

19   evidence that has come to light afterwards indicates that he

20   did nothing more, that they continued doing, that they will not

21   stop, as your Honor has noted.

22        The two corporate defendants do stand in -- based on

23   the record, do stand in different positions, overlapping.  It's

24   a Venn diagram.  Significant overlap, but separate.  And Judge

25   Hillman already addressed that.

1          In ECF 120, the preliminary injunction, as revised in

2     December of '21, specifically set forth a restriction on

3     providing any services or products in paragraph 5.  And it

4     restricted those activities as to the individual defendants and

5     Blue Sun.

6          In paragraph 6, it restricted all defendants,

7     including ITG, from selling any of their analyzer products to

8     any of the customers that the defendants previously had any

9     connection with at KPM.

10         Some of these customers do date back to the early

11    foundings of Unity, which Mr. Wilt founded and sold; sold that

12    business, sold the rights to it, sold the technology, sold the

13    customers and the relationships and the trade secrets.  He has

14    no right to use those anymore.

15         And Judge Hillman said, if you look at ECF 93, his

16    order explaining the initial preliminary injunction ECF 94, he

17    says he has got -- he, ITG, has this separate business, so I'm

18    going to address that distinction by setting forth these

19    different restrictions in five and six.

20         The restriction on ITG is as to selling to our KPM's

21    customers any analyzer.  He has already solved this problem.

22    Judge Hillman has already solved this problem for us.  In our

23    proposed permanent injunction, ECF 277-1, KPM simply asked the

24    Court to continue this exact same solution.  We ask in

25    paragraph 5 that the individual defendants and Blue Sun are

1    prohibited from selling and offering to sell services and

2    products.

3         ITG can -- can sell its additional consumables and

4    products and -- and -- and things that it has always sold for

5    the use of any customer.  The restriction on ITG is as to sales

6    in paragraph 6 in our proposed permanent injunction, and it

7    continues Judge Hillman's same restriction.

8         In terms of selling new analyzers, we're not asking to

9    bar him from the analyzer market.  We're not asking to bar him

10   and ITG from competition, if there -- all the other rest of the

11   customers in the world who can use near infrared analyzers, he

12   is free to sell to, except those customers that any one of the

13   defendants, him or Lucas or Gajewski or Glenister or Eilert,

14   anyone who has gone from KPM to Blue Sun, any customers that

15   they had previous contact with, that the jury was so offended

16   that they were manipulating and lying to and confusing as the

17   Court has noted here this morning, those are off limits.

18        He can compete with the rest of the -- the rest of the

19   marketplace and the rest of the world.  Just stay away from our

20   customers, stay away from those that have been -- that your

21   access to, your knowledge of has been tainted by the

22   reprehensible acts of your employees who used to be our

23   employee, that so offended the jury.

24        THE COURT:  Well, how do we -- but how do we prevent

25   it from being overreach?

1          So there are, you know, if -- if the information -- if

2     the contact that Mr. Wilt has with someone is not tainted by

3     that, how do we -- how do we -- we want him to be able to -- to

4     sell the product that he's created but without the -- the

5     offensive behavior was literally taking the service

6     relationships, using them as the door to get in to selling them

7     product and services.

8          I also want to just address the issue of, you know,

9     there's a period of time at which all of this becomes, you

10    know, you don't want anything to be in perpetuity.  You

11    want -- there was a period of time when this needs to address

12    the needs that KPM has, but also does not stifle competition

13    and other things that we really do value.  So these are other

14    issues that I struggle with as far as the length of time and

15    the wording.

16         So the -- I do think that -- I mean, how is it, and

17    counsel, I'm just wondering, how is it that -- this is my

18    concern.  I don't have -- this is not intended to be

19    punishment.  This is intended to be protection based on the way

20    the jury -- the way the claims were presented and what was

21    really established at trial so that they're not unfair.

22         And do you think that there's something about the

23    wording that we can do that might address that particular

24    issue?

25              MR. RITCHIE:  I'm going to say two things with the

1   risk of possibly coming back here to Worcester.

2          THE COURT:  We can do it by Zoom.

3          MR. RITCHIE:  I wasn't prepared to do this.

4          THE COURT:  No, and I -- we can do this -- we don't

5   have to do this in person.  We can do this by Zoom, not that

6   Worcester is a wonderful place to visit, but it is -- I want to

7   get this correct, right.  There's no doubt in my mind that a

8   permanent injunction is necessary because I really -- I -- I

9   think that, you know, what was discovered in that instance is

10  just not the only thing that what might come up so just because

11  that is pretty clear that that was -- that that was a standard

12  course of behavior, and I don't -- you know, people don't

13  generally change, so.  But I take very serious the -- the

14  issues that you raise on behalf of ITG, and I think that when

15  we're going forward, I think there's no doubt in my mind that a

16  permanent injunction is necessary, but an -- an appropriate

17  discussion -- and the -- the Blue Sun and all those individual

18  defendants, we can very easily tell them what not to do, very

19  specifically.  Whether they follow it or not is really

20  something for future court dates, but I want ITG to be treated

21  appropriately, and I would like the two parties to talk about

22  potential offering of potential language that I could consider

23  as an amendment or we can have a hearing on Zoom in which we

24  can argue, and then I will make a decision if we can't come to

25  an agreement.  And that's not -- that's no in any pejorative.

1    You can or cannot.  I mean, and maybe you can come to some

2    specific language especially because of that specific, but this

3    also would mean that there has -- there's going to have

4    to -- if there is a difference between ITG and Blue Sun and

5    treatment in the permanent, there has got to be a Chinese wall

6    that is built because -- because, you know, we can't use one

7    and have -- and have it be -- have it be perverted by the other

8    players who very well could, and I think that they still have

9    an incentive to do it, so.

10        MR. RITCHIE:  Could I make a suggestion, your Honor?

11        THE COURT:  Sure.

12        MR. RITCHIE:  I -- to give the parties a reasonable

13   amount of time to have these discussions, and then we could

14   report back to the Court whether there is agreement, whether we

15   have a need to have a further hearing on that point.

16        THE COURT:  Absolutely.  Absolutely.  And I'm

17   not -- we're -- we're not dealing with the other motions right

18   now.  We're -- this is really -- this was really important, I

19   think, to have this one, but these are motions that I have

20   to -- we're going to be making sure we have our rulings before

21   the end of March, but if you -- we're available at any time.

22   I'm going to take this particular -- the language of it under

23   advisement.

24        Please note, you can let your clients know that I

25   intend that they will receive protection.  Some of the specific

1    language between ITG will not yet be determined.  I want you

2    all to talk about it.  We can have a Zoom hearing to -- to

3    debate it, but we'll -- let's do this on a -- let's keep this

4    on within the next couple of weeks.  We have some form of

5    agreement or not, but a discussion.

6          MR. GUTKOSKI:  I'm happy to have a conversation with

7    opposing counsel regarding language.  I think that both sides

8    have already presented language to the Court and the -- I

9    understood the record was closed in that regard; however, I'm

10   happy to have that conversation and see if we can come to some

11   sort of conclusion.

12         Did I understand the Court to say that you're

13   expecting to have rulings on the post-trial motions and the

14   entry of final judgment by the end of March?

15         THE COURT:  Yes.

16         MR. GUTKOSKI:  Okay.  We'll -- we'll endeavor to do

17   that in the next week or so then.

18         THE COURT:  Good.  I appreciate it.

19         MR. WILSON:  Your Honor, may I make one very quick

20   request?

21         THE COURT:  Sure.

22         MR. WILSON:  I certainly don't want to extend this any

23   further.  In light of your Honor's position on the relevance of

24   some of this information, I would just like to reserve the

25   right to perhaps speak with our clients about whether or not

1     they would like a hearing to provide it --

2               THE COURT:  Oh, absolutely.

3               MR. WILSON:  I don't think doing it today is fair.

4               THE COURT:  No, no, and so -- this was just a good

5     discussion, as it has always been.  I mean, this is really very

6     important, and it certainly will have an impact on them; and if

7     at any time anybody wishes to be heard, again the beauty about

8     the new technology is we actually can do it.  We're available

9     and we'll -- we'll make ourselves available at a convenient

10    time for everyone, and it won't have to be an in person.

11              MR. WILSON:  Thank you.

12              So perhaps as part of the -- the status report, we'll

13    indicate to the Court whether or not the individual defendants

14    would like to comment on some of this.

15              THE COURT:  Absolutely.  All right.

16              MR. GUTKOSKI:  If -- if there is to be the offering of

17    evidence, your Honor, because the information as to what they

18    did in April of '23 is in their possession, we would like --

19              THE COURT:  Okay.  Cart and horse, right?

20              MR. GUTKOSKI:  Huh?

21              THE COURT:  So you're putting a cart before the horse

22    in this case.  So we're not going to -- if that's going to

23    happen there, clearly there will be an exchange of discovery or

24    a different discussion, okay, so.

25              MR. GUTKOSKI:  Thank you.

1          THE COURT:  All right.  Thank you all very much.  Good

2     to see you all, and enjoy Worcester while you're here.  All

3     right.

4          MR. RITCHIE:  Thank you, your Honor.

5          MR. WILSON:  Thank you, your Honor.

6          (At 11:07 a.m., court was adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4      certify that the foregoing transcript is a true and accurate

5      transcription of my stenographic notes before the Honorable

6      Margaret R. Guzman, to the best of my skill, knowledge, and

7      ability.

8

9

10         /s/ Marianne Kusa-Ryll              03-22-2024
           Marianne Kusa-Ryll, RDR, CRR              Date
11         Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25