1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4    KPM Analytics North America  )
     Corporation,                  )
5                    Plaintiff,    )
                                   )
6                                  )
     vs.                           )    Civil Action No. 21cv10572-MRG
7                                  )
                                   )
8    Blue Sun Scientific, LLC,     )
     The Innovative Technologies   )
9    Group & Co., Ltd., Arnold     )
     Eilert, Michelle Gajewski,    )
10   Robert Gajewski, Rachael      )
     Glenister, Gregory Israelson,)
11   Irvin Lucas, and Philip       )
     Ossowski,                     )
12                   Defendants.   )

13

14   BEFORE:  The Honorable Margaret R. Guzman

15
                     Video Conferenced Motion Hearing
16

17

18                               United States District Court
                                 Courtroom No. 2
19                               595 Main Street
                                 Worcester, Massachusetts
20                               June 21, 2021

21

22

23                      Marianne Kusa-Ryll, RDR, CRR
                           Official Court Reporter
                        United States District Court
24                       595 Main Street, Room 514A
                          Worcester, MA 01608-2093
25                    508-929-3399 justicehill@aol.com
                    Mechanical Steno - Transcript by Computer

```
 1    APPEARANCES (remotely):

 2    Sunstein LLP
      John T. Gutkoski, Esquire
 3    100 High Street
      Boston, Massachusetts 02110
 4    on behalf of the Plaintiff

 5    Morse Barnes-Brown & Pendelton, PC
      Scott R. Magee, Esquire
 6    480 Totten Pond Road, 4th Floor
      Waltham, Massachusetts 02451
 7    on behalf of the Plaintiff

 8    Gordon Feinblatt LLC
      George Faulkner Ritchie, IV, Esquire
 9    Craig Royal, Esquire
      1001 Fleet Street
10    Suite 700
      Baltimore, Maryland 21202
11    On behalf of the Defendant, Blue Sun Scientific, The Innovative
      Technologies Group & Co., Ltd.
12
      Seyfarth Shaw LLP
13    Dallin R. Wilson, Esquire
      William Prickett, Esquire
14    World Trade Center East
      Two Seaport Lane
15    Suite 1200
      Boston, Massachusetts 02210
16    on behalf of the Defendants, Arnold Eilert, Robert Gajewski,
      Rachael Glenister, and Irvin Lucas
17
      Todd & Weld, LLP
18    Marie T. Davis, Esquire
      One Federal Street
19    27th Floor
      Boston, Massachusetts 02110
20    on behalf of the Defendants, Arnold Eilert, Robert Gajewski,
      Rachael Glenister, and Irvin Lucas
21

22

23

24

25
```

P R O C E E D I N G S

1

2          (The following proceedings were held remotely before

3    the Honorable Timothy S. Hillman, United States District Judge,

4    United States District Court, District of Massachusetts, on

5    June 21, 2021.)

6          THE CLERK:  Case No. 21-10572, KPM Analytics North

7    America Corporation versus Blue Sun Scientific.

8          Counsel, please note your appearance for the record.

9          MR. MAGEE:  My name's Scott Magee.  I'm from Morse on

10   behalf of the plaintiff KPM and Wilt.

11         MR. PRICKETT:  Your Honor, William Prickett and Dallin

12   Wilson from Seyfarth Shaw on behalf of the individual

13   defendants.

14         Mr. Wilson will be doing the argument.

15         MR. RITCHIE:  Good afternoon, your Honor.  George

16   Richie and Roy Craig on behalf of the entity defendants, Blue

17   Sun Scientific and Innovative Technologies Group.

18         I will be doing the argument for those entities, the

19   defendants.

20         MS. DAVIS:  Good afternoon, your Honor.  I'm Marie

21   Davis, local counsel to the entity defendants.

22         THE COURT:  All right.  And good afternoon to all of

23   you.

24         So we've got an hour, and so we'll split it up

25   30 minutes for the plaintiffs -- plaintiff rather, and

1   30 minutes for the defendants.

2           Why don't -- Mr. Richie, why don't you start with

3   Document 20, which is your motion to dismiss on behalf of Blue

4   Sun and ITG.

5           MR. RITCHIE:  Of course, your Honor.  And, your Honor,

6   if I may, again, George Ritchie on behalf of Blue Sun and ITGC.

7           I'm going to address the jurisdictional issues and a

8   couple of the issues that are 12(b)(6).

9           If it's okay with the Court, I'm going to let

10  Mr. Dallin [sic] address some of the 12(b)(6) issues that are

11  common to all the defendants.

12          THE COURT:  Okay.  That's good.  So let me -- let me

13  hear you first, and then I'll decide, or I think maybe what

14  I'll do is I'll ask defendants whether they want to respond or

15  wait until the end.

16          So go ahead.

17          MR. RITCHIE:  Okay.  Thank you, your Honor.  Again,

18  George Ritchie on behalf of the entity defendants.

19          Your Honor, we filed a motion to dismiss plaintiff's

20  complaint in this matter pursuant to Rules 12(b)(1) and

21  12(b)(6).

22          As the Court knows, the rule -- the motions under

23  12(b)(1) address the question of whether or not this Court has

24  personal jurisdiction over ITGC and Blue Sun.  For the reasons

25  that I'll explain and are set forth in my paper, we do not

1    think that this Court does have personal jurisdiction over

2    these defendants.

3            And I misspoke, your Honor, it's 12(b)(2).  I

4    apologize.  Not 12(b)(1), the personal jurisdiction.

5            In -- in order to establish personal jurisdiction over

6    a defendant, a plaintiff bears the burden of proving that the

7    jurisdiction lies in the forum state and a plaintiff may not

8    rely on supported allegations in its pleading, but must rather

9    come forth with specific facts that demonstrates the

10   jurisdiction exists.

11           Of course, to establish personal jurisdiction, a

12   plaintiff must meet both the requirements of the Massachusetts

13   long-arm statute and the due process clause of the Fourteenth

14   Amendment of the U.S. Constitution.  The requirements under

15   Massachusetts long-arm statute are similar to but not

16   necessarily the same as those imposed by the due process

17   clause.

18           Importantly, in the exercise of jurisdiction under the

19   long-arm statute is only proper if it is consistent with one of

20   the enumerated eight grounds that the statute identifies.

21           Plaintiff alleges generally in its complaint that this

22   Court has such jurisdiction under the long-arm statute but does

23   not really get the complaint addressed specifically why or

24   which factor would apply.

25           Looking through the factors that could potentially

1    apply to the entity defendants in this case, we can see that

2    MGL 2 -- 223A, Section 3(b), which relates to whether or not

3    the defendant has an interest in real property does not apply

4    here.

5         We have set forth an affidavit in our moving papers by

6    Mr. Robert Wilt, who is the chairman of Blue Sun and ITGC that

7    sets forth that these are, in fact, Maryland entities,

8    incorporated in Maryland, with a principal place of business in

9    Maryland.  With the exception of some very limited commercial

10   activity by ITGC in this Commonwealth, there is no business

11   activity by these defendants in the Commonwealth.  And neither

12   of these defendants have real property.  Neither of these

13   defendants have a contract to insure any person or property

14   under 223 3(f) and so, therefore, that subsection does not

15   apply.

16        In -- In their opposition to our motion, the

17   plaintiffs cite to 223A and 3(c) in which they allege that, in

18   fact, these entity defendants have caused tortious injury in

19   the Commonwealth by an act or omission in the Commonwealth.

20   And we don't think for the reasons that I'll describe, your

21   Honor, that this particular subsection applies.

22        There are no allegations of any commercial activity by

23   these defendants that relate to the claims in this matter save

24   for two that the plaintiff identified in their opposition to

25   the motion to dismiss.

1          First, that paragraph 16, plaintiff alleges they

2    believe that Blue Sun, not ITGC, but Blue Sun regularly

3    communicated with employees of plaintiff, a Massachusetts-based

4    employer.

5          I'll be candid when I first read that allegation and I

6    read the moving papers, I assumed that that meant that the

7    allegation was that Blue Sun communicated with the individual

8    defendants, although as I read it again now, that's not clear

9    to me at all, that that is -- that's what plaintiff is

10   referring to.  Plaintiff just simply says employees of the

11   plaintiff.  So I don't know whether those refer -- those

12   allegations refer to communication of the individual defendants

13   or some other employees of the plaintiff.  Either way this

14   allegation on its own is sufficient for the exercise of

15   personal jurisdiction over these entities.  We've cited cases

16   to the effect, it's simply -- simple communications unrelated

17   to the allegations in this lawsuit are sufficient to form the

18   basis of a claim for personal jurisdiction under the

19   Massachusetts long-arm statute.

20          The second fact that the plaintiff identifies in its

21   opposition is an allegation that appears in its count for the

22   tortious interference with contract in which the defend- -- the

23   plaintiff alleges that the entity defendants were, quote, aware

24   of the -- the employment agreement that the individual

25   defendants had.  And relying on certain case law, the -- the

1   plaintiffs say, well, this allegation is enough.  We don't

2   think so.

3        Again, this is -- the simple fact that my clients may

4   have been aware of employment agreements, which is something

5   the plaintiffs will have to prove, is not an act or omission

6   within the Commonwealth.  Plaintiff relies heavily on a series

7   of decisions in its opposition.  One called *Ealing Corp. versus*

8   *Harrods*, 790 F.2d, 978, a First Circuit decision from 1986.

9   Another decision called *The Scuderi Group versus LGD Tech*, 575,

10   F 2d. -- F.Supp 2d 312 from this district, and a state court

11   case called *Captivate, LLC*.  In all those cases, the defendants

12   were out-of-state defendants alleged to have made false

13   representation to the plaintiff located within the

14   Commonwealth.

15        In each of these cases, the courts in those cases

16   found that those statements in the Commonwealth to a plaintiff

17   were sufficient to have -- to have caused tortious injury by an

18   act or omission within the Commonwealth.

19        However, your Honor, their -- this case, the case that

20   has been filed here against our clients does not involve

21   allegations of misstatements or misrepresentations within the

22   Commonwealth.  In fact, there is no allegation that -- that

23   Blue Sun or ITGC did anything within this Commonwealth save

24   apparently potentially being aware of the employment agreement.

25        So for this factor, your Honor, we don't think that

1    plaintiffs have met the burden of showing jurisdiction under

2    the Massachusetts long-arm statute; and for that reason alone,

3    this Court can dismiss and we would ask the Court to dismiss

4    these claims against Blue Sun and ITGC.

5           Separate and apart from the issue of whether or not

6    plaintiffs have met their burden under the long-arm statute, of

7    course, plaintiffs also have to meet their burden to show that

8    the exercise in jurisdiction would be consistent with the due

9    process clause of the Fourteenth Amendment such that in

10   language we're all familiar with from first year in law school,

11   I imagine, does not offend notions -- traditional notions of

12   fair play and substantial justice.

13          And in that analysis plaintiffs need to prove either

14   that this Court would have general jurisdiction over the entity

15   defendants or jurisdiction specific to the allegations in this

16   case.

17          We do not believe, number one, that plaintiffs can

18   show general jurisdiction.  General jurisdiction only applies

19   when the contact between the entity or individual in the forum

20   state are so continuous and systematic as to render it

21   essentially at home.  Neither Blue Sun nor ITG have such

22   contact.  They are not at home here in the Commonwealth of

23   Massachusetts.  They are at home in the State of Maryland.

24          Importantly, plaintiff does not appear to challenge or

25   contest that issue, and its opposition agrees.  Instead,

1    plaintiff moves to a question of whether or not there is

2    specific jurisdiction over these entity defendants that would

3    give rise to personal jurisdiction.  And in that respect, this

4    Court needs to apply a three-prong test, namely, one, asking

5    whether or not the claim arises out of or relates to the

6    defendants' forum state activities.  This is the factor that is

7    also known as relatedness.

8         The second question is whether or not the defendants'

9    contacts with the forum state represent a purposeful availment

10   of the privilege of conducting activities in that state

11   sufficient to render being hailed into the Court foreseeable.

12        And, finally, if, and only if, those two factors are

13   met whether the exercise of jurisdiction is also reasonable.

14   Failure to meet any of these factors would doom plaintiff's

15   attempts to show personal jurisdiction.

16        Again, looking at the complaint, as I've said, the

17   only two specific allegations against the entity defendants are

18   some vague unexplained conversations or communications they had

19   with employees of the plaintiff.  There's no -- there's no

20   attempt to tie those communications to anything that relates to

21   the allegations in the complaint.  It's simply an observation.

22   It's the reasons I've described.  That's not sufficient to show

23   relatedness because they -- the plaintiff itself does not

24   relate -- does not allege relatedness over those conversations.

25        And the -- finally, the question is whether or not a

1    very general boilerplate allegation that arises in Count Eight

2    of plaintiff's complaint in tortious interference count that

3    the defendants were aware of these employment agreements,

4    whether that alone is sufficient to meet the relatedness prong

5    and -- and also, you know, separately, the -- the purposeful

6    available -- availment prong for questions of specific

7    jurisdiction.  We -- we don't think they're all are in.  In

8    fact, we haven't found any case that would suggest that.

9           Plaintiff's cite and rely heavily on this *Astro-Med*

10   decision in the First Circuit in 2008, *Astro-Med versus Nihon*

11   *Kohden, K-O-H-D-E-N, America*.  The cite is 591 F.3d 1 in 2008.

12   The specific jurisdiction exists over the defendants because

13   the -- these entity defendants were aware of the -- of the

14   employment contract, but close reading of *Astro-Med*, as we've

15   pointed out in our reply brief, really does not support

16   plaintiff's argument.  It is true that in *Astro-Med*, the Court

17   there found that personal jurisdiction or at least the prongs

18   of relatedness had been satisfied, but there was a very long

19   list of things that the Court had cited to that were alleged in

20   the complaint and that the Court found were sufficient to

21   satisfy the prong of related.  These included a lot of detailed

22   knowledge that the defendant had about the employment

23   agreement, including where -- about where, first of all, the

24   plaintiff was located, where the plant that had -- where --

25   where the defendant had entered into the employment agreement,

1    that there was a contract-specific clause requiring

2    application, in this case Rhode Island law, that the contract

3    contained noncompete and nondisclosure provisions, and that

4    there had been an exclusive consent to the jurisdiction of

5    Rhode Island courts to resolve any disputes.

6            It is further that the defendant in that *Astro-Med*

7    case had sought and obtained legal advice with respect to the

8    analysis of the employment agreements at issue, which the Court

9    found was an acknowledgment by this defendant that it was

10   exposing itself to legal risk by hiring the employee in that

11   case.  And none of these specific facts that were alleged in

12   the *Astro-Med* case appear here.

13           We have one boilerplate complaint that the defendants

14   were, quote, aware of the employment contract.  It doesn't say

15   how.  It doesn't say what we knew.  It doesn't say how we knew

16   it.  It doesn't say that we had done an illegal analysis or

17   received an opinion letter or any other kind of legal advice.

18   There -- as far as I know, there is no forum-specific clause in

19   these employment agreements that were required for this case to

20   be brought in this Court.

21           So none of the factors that were there in *Astro-Med*

22   have been pled here.  And without more, what we're really left

23   with is an allegation that we knew about the contracts and

24   somewhere along the line, in some year that's not specified, we

25   had communications with unidentified employees of the

1    defendant.  We don't think that satisfies the relatedness

2    factor under this specific -- this Court's specific

3    jurisdiction analysis.

4            We also don't think that it satisfies the Court's

5    further requirement that we purposely avail ourselves of this

6    forum, which nothing in the plaintiff's complaint that would

7    suggest that either Blue Sun or ITGC took any action that would

8    expose itself knowingly to the jurisdiction of this Court.

9            Your Honor, I'm going to move on and wrap up because I

10   don't want to take up too much of the Court's time.  But for

11   the reasons I've identified, your Honor, we don't think that

12   personal jurisdiction exists over these entity defendants, and

13   we would ask the Court to dismiss Blue Sun and ITGC from this.

14           Thank you.

15           THE COURT:  Thank you.

16           Mr. McGee, did you want to respond to that or do you

17   want to wait until Mr. Wilson finishes?

18           MR. McGEE:  It probably makes sense for me to respond

19   to the jurisdiction arguments now and then --

20           THE COURT:  Great.

21           MR. McGEE:  -- Mr. Gutkoski, who's also representing

22   the plaintiff, is going to handle the arguments with respect to

23   the 12(b)(6) issues that I expect Mr. Wilson is going to raise.

24           THE COURT:  All right.

25           MR. McGEE:  So we divide them nicely.

1           THE COURT:  Go ahead.

2           MR. McGEE:  All right.  Your Honor, with respect to

3      the long-arm statute -- I'll get right to it.  Section 3(c) of

4      the long-arm statute is what applies here, and it applies to

5      actions arising from the persons causing tortious injury by any

6      act or omission in the Commonwealth.

7           Mr. Ritchie had mentioned that they've set some briefs

8      in their cases challenging the long-arm jurisdiction

9      application here.  Each of the cases that the entity defendants

10     have cited do not actually apply to Section 3(c).  They all

11     apply to Section 3(a) or some other sections, which we are not

12     relying upon here.

13          The three cases that we did cite, which Mr. Ritchie

14     made reference to, *The Scuderi Group*, the *Captivate* case, and

15     the *Ealing* case all do apply the Section 3(c).  And we find

16     that in those cases, it's almost coextensive with the

17     constitutional analysis and, in fact, the judge in the business

18     session in the *Captivate* case put it all together and said that

19     the contact in that case, which was very attenuated,

20     Massachusetts still satisfied the long-arm statute.  In fact,

21     what had happened there was there was a scheme.  I believe the

22     County Court described it as a scheme, to defraud a company

23     through setting up a sham corporation, and a husband and wife

24     were named as defendants.  All the real communications went to

25     the wife or were largely addressed to the wife down in Florida,

1    with no further contacts from Massachusetts, but her husband

2    had even -- he did not actively take any role in reaching out

3    to Massachusetts; yet, the Court there found that there was

4    still sufficient contacts to satisfy the long-arm statute on a

5    prima facie basis, and there's no reason that this Court should

6    by the long-arm statute do any differently here.  And, in fact,

7    the conduct of the entity defendants, who of course do act

8    through the individuals employed by the entity defendants is

9    even closer and has a closer nexus to Massachusetts.

10          Specifically, if you look to reading together

11   paragraphs 3, 16, 32 through 36 and then 64 through 81 of the

12   complaint, you will see that KPM maintains its trade secrets

13   here in Massachusetts.  The individual defendants, who prior to

14   filing the complaint of -- that's paragraphs 32 through 36.

15   That's Mr. Lucas, Ms. Glenister, Mr. Eilert, Mr. Israelson, and

16   Mr. Ossowski all have formerly been employed by KPM, but were

17   at the time of filing of the complaint employed by the

18   defendant, one of the two entity defendants, which we alleged

19   in paragraph one of our complaint defined collectively as Blue

20   Sun, and that's how we allege it throughout the complaint.

21          Those individuals have with them the knowledge that

22   they took from KPM.  You don't get a new job and all of a

23   sudden forget what you knew at your old job.  But then the real

24   crux here is that Blue Sun acting through these individuals and

25   probably others took the trade secrets in the form of KPM's

1    application notes that are described in great detail from

2    paragraphs 64 to 81 of the complaint and they used that.  They

3    posted them publicly on their website.  The precise other uses

4    that they're putting them to, we don't know the full extent of

5    it, but we do know that they are using that.  And that right

6    there is a much tighter nexus to Massachusetts because it was

7    the trade secrets in Massachusetts that the defendants

8    misappropriated and took.

9         With respect to the constitutional questions, I

10   would -- if your Honor has not yet had an opportunity to, I

11   would encourage your Honor to look at three cases that are

12   cited in our brief that really drive home the point that the

13   facts we have alleged in the verified complaint do, in fact,

14   satisfy the due process requirements plus the relatedness prong

15   and the purposeful availment prong.  Those three cases are the

16   *Astro-Med* case, that Mr. Ritchie spoke about; the North

17   Laminate [sic] case, by the First Circuit from 2005; and then

18   Judge Burroughs' recent decision from 2019, in the *Conning*

19   case.

20        What you see in each of those, the common thread

21   for -- in fact, both the relatedness and the purposeful

22   availment prong, although they are analyzed separately, is that

23   when an out-of-state defendant commits an intentional tort,

24   which is what we have alleged here, when it's -- when it's an

25   intentional tort, as opposed to something like negligence, they

1    have satisfied the relatedness prong, and I'll just quote from

2    Judge Burroughs.  She says, In tort case of where the defendant

3    causes plaintiff to suffer an injury in the forum state, the

4    nexus requirement may be satisfied even if it was not

5    physically present there.  And she goes on to cite both the

6    *Astro-Med* case and the *North Laminate Sales* case for how in

7    both of those cases all of the conduct that occurred that led

8    to the injuries occurred outside the forum state.

9         In the Court case of *North Laminate Sales*, the conduct

10   was done in New York, but it was targeting the plaintiff in New

11   Hampshire.

12        And then the conduct in the *Astro-Med* case was an

13   out-of-state employer, California, pursuing an employee of the

14   plaintiff, who is based in Florida, and the employer, the

15   plaintiff employer, was based in Rhode Island, and the Court

16   held in that case that it was sufficient that the injury, the

17   intentional injury in the forum state was sufficient to create

18   both the relatedness prong or satisfy both the relatedness

19   prong and the purposeful availment prong.

20        And I would -- and I would suggest, your Honor, that

21   earlier this year in 2021, when the Supreme Court issued its

22   decision in the *Ford Motor* case it, in fact, reinforced the

23   notion that we don't -- that there need not be a but-for causal

24   injury that arises out of the forum state so long as it is

25   related to the forum state.  So Justice Kagan's opinion in that

1   case, which we cited in our brief, and I believe we quoted in

2   our brief, reinforces the point that *Astro-Med* is still good

3   law and *North Laminate Sales* is still good law, and that the

4   *Conning* case is correct.

5           As to anything else, the -- I know Mr. Ritchie did not

6   address the Gestalt factors, and I'll just mention those

7   quickly, but we can rely on our brief for those because in each

8   of those situations -- each of the first four of the Gestalt

9   factors that potentially look to how efficient the case is

10  going to be; is there going to be a burden or an undue burden

11  on the defendants.  All of those factors weigh in favor of

12  maintaining the case here in Massachusetts so that all of the

13  parties can be litigating in a single jurisdiction so that

14  there is no risk and inconsistent verdict and that there's no

15  duplicative discovery, there's no waste of judicial economic

16  resources.

17          So unless your Honor has any further questions or any

18  questions, I will rest on my brief.

19          THE COURT:  Thank you, Mr. Magee.

20          Mr. Wilson.  So I've got you for 15 minutes to talk

21  about the 12(b)(6) motions.

22          Do you want to do them all at once or seriatim?  You

23  tell me.

24          MR. WILSON:  I think it makes sense to do them all at

25  once.

1          THE COURT:  Okay.  Good.  I think that works for us

2    too.  Go ahead.

3          MR. WILSON:  And, your Honor, that's a great foray

4    into -- into our argument, which is the big concern that the

5    individual defendants have here is is that they need to be

6    treated individually, that they can't be treated as this

7    monolithic group that's lumped together.

8          And so if we parse out the actual allegations against

9    each of the individual defendants, I think the Court will find

10   that they failed to satisfy the federal pleading standard.

11         Oftentimes I'll admit that when I -- when I draft a

12   brief sometimes we cut and paste the -- you know, the standard

13   of review section for -- and we quote to *Iqbal* and *Twombly*, and

14   we -- we really don't get into the -- the guts of what

15   those -- those decisions held and how they changed the federal

16   pleading standard.  But here given the way that KPM has

17   asserted their allegations against the individual defendants, I

18   think it's really important again that we parse them out and

19   that we address each one individually.

20         And really the claims break down into really two

21   buckets.  One is are these claims that are based on

22   misappropriation of trade secrets or disclosure of confidential

23   information.  Each of the claims, except for the breach of the

24   noncompete agreements, all of those claims are based on this

25   alleged misappropriation of trade secrets.  So we can kind of

1    treat all those as one group.

2            And then, like I said, there are -- there are these

3    separate claims for breach of two different really noncompete

4    agreements, one based in Connecticut for some of the

5    individuals defendants and one based in Massachusetts.

6            And so I'm going to start with -- with talking about

7    why KPM has not satisfied the *Iqbal* and *Twombly* standard of

8    stating a plausible claim that each of the individual

9    defendants misappropriated any KPM trade secrets.  And to do

10    so, understanding I have 15 minutes, I'm still going to try to

11    go through one by one to -- to parse out the allegations

12    against each individual defendant, and we'll start with

13    Mr. Eilert.

14            Notwithstanding the kind of prolix complaint, there's

15    really only two paragraphs in the entire complaint that

16    reference Mr. Eilert and any of his conduct.

17            The first is that he sent an email to Mr. and Mrs.

18    Gajewski about a Unity customer, and, you know, this -- this

19    email's attached to the complaint.  KPM does their best to try

20    to characterize what this email says and what it means, but

21    it's attached to the complaint so the Court can look at it and

22    determine for itself what it means.  But what was going on in

23    that email was that this customer was utilizing an older

24    application that KPM has -- I think the quote in the email is

25    deemphasized, and this will be kind of a theme throughout this

1    case which is that, you know, KPM has sort of moved on from

2    some of its older equipment and is no longer servicing certain

3    equipment that is -- it's just older.

4            And so in this email, Mr. Eilert says he was talking

5    to a customer about this application.  He specifically says in

6    the email that he didn't say anything about Blue Sun, but

7    simply sent an email to Mr. and Mrs. Gajewski saying that

8    perhaps they should contact this customer to see whether they

9    could do anything about this -- this deemphasized application

10   this customer was using.

11           Importantly, the complaint doesn't saying any about

12   any follow-up action that was taken by Mr. Eilert.  It doesn't

13   say that KPM lost any business from this customer.  All we have

14   is this kind of free-floating email out there that's not tied

15   really to anything else.

16           The second allegation against Mr. Eilert is that he

17   received an email from a customer that was considering moving

18   their business to Blue Sun.  Mr. Eilert doesn't even respond in

19   the email.  He doesn't say that he took any action.  Again,

20   other than receiving the email, that's the extent of

21   Mr. Eilert's conduct.  So those are the only two allegations in

22   the entire complaint again about Mr. Eilert.

23           None of those emails say anything about KPM trade

24   secrets.  They don't say anything about disclosing confidential

25   information to Blue Sun, simply that he sent one email and he

1    received one email.

2         Next, we'll move to Mrs. Gajewski, and there's really

3    two -- two allegations against her.  One is that she received

4    the email that I just talked about from Mr. Eilert.  And the

5    second is she received some UPS notifications that some

6    packages that were sent from the Gajewski household were

7    delivered.

8         KPM admits in the complaint they have no idea what was

9    in those packages.  And, frankly, they don't even suggest that

10   the contents of those packages had anything to do with KPM

11   trade secrets or confidential information.  That's it for

12   Mrs. Gajewski.

13        The next is Ms. Rachael Glenister.  Here again, no

14   allegations whatsoever against her that she used any trade

15   secrets, disclosed anything to Blue Sun.  All it says is that

16   while she was a KPM employee she was working on certain sales

17   opportunities is the phrase the complaint uses, and that KPM

18   lost those sales opportunities, and that they think that those

19   customers went to Blue Sun.

20        Importantly, though, it does not allege that

21   Ms. Glenister used any trade secrets or confidential

22   information to secure those sales on behalf of Blue Sun, only

23   that she used to work for KPM and now she works for Blue Sun.

24   That's -- that's really the extent of -- of the allegation.

25        Next is Mr. Greg Israelson.  Again, one paragraph in

1    the entire complaint about Mr. Israelson, and that is that he

2    sent himself a link to KPM that is a known software tool used

3    for remote copying of files.

4          Again, what's most important is what's not alleged,

5    right, which is there's no allegation that he actually used the

6    link to do anything.  It doesn't say what he copied or sent to

7    himself.  It doesn't say that it was KPM trade secrets or

8    confidential information, only that he sent himself the link.

9          The next is Irvin Lucas.  Two allegations against

10   Mr. Lucas.  One is that he wiped his KPM computer before

11   returning it to KPM.  And, secondly, that he was the recipient

12   of two emails after he had resigned from KPM and was working

13   for Blue Sun that involved KPM -- I think a KPM customer and in

14   one case a KPM distributor.

15         Again, he wasn't working for KPM at the time, and KPM

16   doesn't allege that those emails contain any kind of trade

17   secrets or confidential information or really that Mr. Lucas

18   did anything improper by the mere receiving of these emails.

19         And then last and perhaps the worst of the bunch, I'll

20   say is -- is Mr. Philip Ossowski.  There is not one allegation

21   in the entire complaint about Mr. Ossowski.  It says that he

22   worked for KPM and now he works for Blue Sun.  And somehow from

23   those -- those two allegations he is now the defendant

24   with -- in federal court with, I think, seven claims against

25   him.

1              And then we'll move on to Mr. Gajewski.  And I will

2      concede that Mr. Gajewski is on different footing than the

3      other six.  At least he's -- he's referenced in the complaint a

4      handful of times.  But -- but the important thing to note about

5      the allegations about Mr. Gajewski -- so one is that he was

6      allegedly the source of these application notes ending up on

7      Blue Sun's website.  And I will concede that I'm still trying

8      to understand the technology at issue here.  It's probably my

9      own shortcomings that are preventing that from happening, but

10     we've come up with, I think, a useful analogy that helps

11     explain kind of what the technology is and what these

12     application notes are.  And that is if you think of these

13     devices, these spectrometers as a camera, they kind of take a

14     photograph of a sample usually in this case it seems like

15     different food products and that -- that -- that camera creates

16     a picture, and I think that these application notes to kind of

17     be -- analogize to being a photograph that comes from

18     the -- from the camera.  And, of course, the picture that comes

19     out of that camera is not a trade secret.  It's not

20     confidential information.  Perhaps the technology that

21     underlies the camera, the software, the hardware, what actually

22     creates the photograph, that may be a trade secret.  But that's

23     not what was -- that was uploaded here.  It was simply the

24     equivalent of a photograph that not surprisingly came from or

25     was found -- excuse me -- on Mr. Gajewski's KPM laptop, which

1    shouldn't be a surprise.  He -- he was working there at the

2    time.  He was utilizing this information.  It can't be

3    misappropriation if he simply accessed information that you

4    were allowed to access.  And so the idea that somehow

5    he's -- he's transferred, you know, source code and calibration

6    steps and all this other information, the simple uploading of

7    an application note, which was kind of like a photograph, it

8    doesn't support -- the inference that KPM is asking the Court

9    to draw, I think, is too -- a bridge too far here.

10         And then lastly, you know, the question is even some

11    of these -- this information, these calibrations that's what

12    they're referred to in the complaint.  This is really

13    information that KPM has received from customers over the

14    years; and even keeping the, you know, the complaint, or the

15    allegations within the four corners of the complaint, they

16    received this information from customers.  It's not their

17    information, so it can't be their trade secret.

18         And so, again, going back to the main point here,

19    which is if we parse out the allegations against each

20    individual defendant, certainly against all of them, there

21    are -- there is insufficient facts alleged to plausibly state

22    any kind of claim for misappropriation of trade secrets.

23         In their opposition KPM suggests, well, once we've got

24    a chance to take some discovery, you know, we can fill in some

25    of the gaps.  But, of course, that's not the -- that's not the

1    standard that we apply really in any court, particularly not in

2    federal court.  KPM's required to plausibly state a claim, and

3    then they get to take discovery.  So we would ask the Court

4    to -- to dismiss all of the claims against the individual

5    defendants that are based on some kind of trade secret or

6    misappropriation.

7            I'll quickly move on to the -- the claim for breach of

8    the noncompete.  Three of the individual defendants have

9    identical noncompetition agreements.  They have Connecticut

10   choice of law provisions.  And under Connecticut law, a

11   five-part test is applied to determine the reasonableness of a

12   restrictive covenant.  We've laid them out in our briefing, but

13   they are -- I'll focus on four of them for the purposes of this

14   motion.

15           One is the length of time of the restriction.  One is

16   the geographic scope.  The third is the degree of protection

17   that's necessary to protect legitimate business interests.  And

18   then the fourth is whether the restrictions imposed on the

19   employee would impact their ability to stay within their chosen

20   occupation.

21           The Connecticut noncompetes in this case have a

22   two-year restricted covenant that is effectively global in

23   scope.  It's anywhere that KPM or any of its affiliates do

24   business.

25           We -- we argued in our motion to dismiss that that is

1    effectively a global noncompete; and in their opposition, KPM

2    doesn't seem to dispute that.  So on their face, a two-year

3    global restriction, we think, is overbroad and no additional

4    discovery is necessary to -- to alter that analysis.

5            But what I would really like to focus on is this third

6    point, and that is whether the -- the scope of the noncompete

7    are necessary to protect a legitimate business interest of KPM,

8    and the real problem with these noncompetes is their scope

9    prohibits the employees from working and I quote, in any manner

10   for any company that's engaged in the -- and I'll again use the

11   language of the agreement -- in the design and manufacture,

12   marketing, sale, licensing or research and development relating

13   to the business, which is a defined term, or related to those

14   products, technologies, developments, inventions, improvements,

15   or technical information associated with the business.

16           And so effectively what these agreements do is

17   they -- they prohibit these individual defendants from working

18   in any matter for any business that has anything to do with AR

19   technology.  We use the example in our -- in our motion to

20   dismiss it would prevent them from working in the mail room.

21   It would prevent them from providing janitorial services.  It

22   would prohibit them from working on an NIR product that does

23   not compete with any of KPM's products.  And there's simply no

24   legitimate business interest that KP has -- KPM has to prevent

25   these folks from doing so.

1          And what's important is under the Connecticut -- under

2    Connecticut law a finding of unreasonableness on any of these

3    criteria is sufficient to render the covenant unenforceable.

4    And so again going back to KPM's argument that, well, we need

5    some discovery.  It's too early to decide whether or not that

6    these restrictions are reasonable.  Not so.  There is no

7    discovery that could unearth a fact that would somehow make

8    these extremely broad covenants reasonable, and so we think

9    it's appropriate to -- to have them dismissed on a 12(b)(6)

10   motion.

11         Lastly, is the restriction on -- on the employee's

12   ability to pursue their occupation.  These folks work in NIR

13   technology.  I think it's a relatively small field, and

14   effectively these folks would be out of their chosen field, a

15   field that they have years of experience in for two years.  And

16   again, all the discovery in the world isn't going to make that

17   more reasonable.

18         I'll quickly move on to Mr. Ossowski's noncompete,

19   which is unique because it was on a different forum, and it's

20   governed by Massachusetts law.  And, importantly, it was signed

21   after the recent -- I guess not so recent anymore, but the

22   Massachusetts Noncompetition Agreement Act, which become

23   effective October 1, 2018, which significantly changed the

24   landscape in terms of enforcement of noncomp- -- noncompete

25   agreements in Massachusetts.

1          The act sets forth several what they call minimum

2     requirements for a noncompete to be enforceable in

3     Massachusetts.  Two at least are applicable here.  One is if

4     the agreement is entered into at the commencement of

5     employment, the agreement must expressly state that the

6     employee has the right to consult with counsel.  Mr. Ossowski'S

7     agreement is attached to the complaint.  It clearly doesn't

8     contain that language.

9          The act also requires that the agreement has to be

10    supported by a guarded lead or other mutually agreed upon

11    consideration that's specified in the agreement.  Once again,

12    Mr. Ossowski's agreement contains no such language.  We raised

13    these arguments in our motion to dismiss on behalf of

14    Mr. Ossowski.  KPM did not address them at all.  It made no

15    effort to argue that the agreement complies with Massachusetts

16    law.  It completely glossed over it and, therefore, has

17    effectively, I think, conceded that his agreement is not

18    enforceable in Massachusetts and should therefore be dismissed.

19          Very quickly, the last issue --

20          THE COURT:  You're out -- you're out of time,

21    Mr. Wilson.  Sorry.

22          MR. WILSON:  Okay.  I think the last issue, which is

23    Mrs. Gajewski's Connecticut forum selection clause, we'll rely

24    on our briefing, and I think your Honor can -- can decide it

25    that way.

1          Thank you, Mr. Wilson.

2          Mr. Gutkoski, why don't you go.  And talk to me about

3    anything you want, but particularly the complaint, the count

4    again Mr. Ossowski.

5          MR. GUTKOSKI:  Your Honor, KPM concedes on the face of

6    his agreement that Mr. Ossowski's agreement does not comply

7    with the changes to Massachusetts law.

8          THE COURT:  Thank you.  Thank you for your candor.

9          MR. GUTKOSKI:  In contrast, your Honor, we believe as

10   set forth in our briefing that the noncompete -- seeing we

11   started with the noncompete, so I'll just address that under

12   the additional three defendants under Connecticut law.  The

13   defendants are asking for a determination of reasonableness.

14         What is reasonable?  What is inappropriate scope

15   limitation regarding limitations that should be enforced

16   against the defendants based on two main factors?

17         One, what they have done; and two, what they have done

18   and its impact on KPM.  As I will get into in a moment about

19   the trade secret allegations and the discovery that has been

20   conducted already under your Honor's order, what we are -- what

21   we have alleged and what we are learning is that their

22   misconduct is extensive both in duration going on for multiple

23   years, both in terms of its duplicitousness in that it was

24   being engaged in while they were -- these defendants were

25   employed at KPM for months, in some cases years, working on

1    Blue Sun's behalf and under Blue Sun's name with KPM customers

2    that are located across the country.

3         We see it in regard to multiple services and multiple

4    products and are just learning now the impact that it -- that

5    those actions are having on KPM, its ongoing relationships with

6    these customers, and its ability to practice its -- its normal

7    business practices of renewing those relationships on a yearly

8    basis.  And so the evolution of the case and additional

9    discovery is going to reveal facts that go directly to the

10   reasonableness and necessity of enforcing these restrictions in

11   order to determine what is reasonably necessary for the fair

12   protection of KPM's business.

13        It is inappropriate on these facts and under the cases

14   cited by the defendants to make any rulings on the permissible

15   scope under Connecticut law of the noncompetes for those three

16   defendants.

17        Turning now to the additional arguments raised by

18   Mr. Wilson, KPM notes that Mr. Wilson is very careful and was

19   very careful to limit his comments to what is actually alleged

20   in the complaint, which is fair focus for a motion to dismiss.

21   However, here we have moved beyond what was initially set forth

22   in the complaint.  We have exchanged thousands of documents

23   between the parties, and what those, as we dig through them,

24   those documents and communications show is exactly what I

25   feared when I spoke to your Honor regarding the -- when last we

1    met regarding the motion for expedited discovery, namely, that

2    what was set forth in the complaints was just the tip of the

3    iceberg.  What we have seen since then and we were able to give

4    your Honor immediately after that hearing one such additional

5    fact that was set forth in Docket No. 43, my -- my letter of

6    May 19th, that was enclosing an additional email that we found

7    before the production.  And I'll represent to the Court that

8    the discovery that has been conducted since then has shown

9    dozens of additional emails involving each and every one of the

10   individual defendants, including Mr. Ossowski, engaged in

11   misrepresenting to KPM's customers that they were working on

12   behalf of KPM when they, in fact, were offering services and

13   providing services on behalf of Blue Sun confusing customers as

14   to whether they were working for Blue Sun or KPM; confusing

15   customers as to whether or not Blue Sun was in effect

16   associated with KPM or a new name of KPM or a new division of

17   KPM; and proceeding to not only offer services but provide

18   services on KPM's analyzer products as Blue Sun and in some

19   cases divert the payment from those customers that the

20   customers thought they were paying to KPM instead to Blue Sun.

21        THE COURT:  So Mr. Gutkoski, I'm -- you understand I

22   am required to focus on your complaint, not on what you have

23   learned from discovery?

24        MR. GUTKOSKI:  And therein we have two potential

25   approaches that I would suggest to the Court.  One is looking

1    at the four corners of the complaint, we set forth the specific

2    allegations that we were aware at that time upon filing the

3    complaint as to each of the individual defendants and their use

4    and misuse and misrepresentation with these customers between

5    paragraphs 40 to 53.  We believe that those are sufficient

6    under a Rule 8 notice standard or under the *Iqbal-Twombly*

7    standard in setting forth plausible and more than speculative

8    allegations regarding improper use of the trade secrets.  What

9    you heard from Mr. Wilson today was arguing about facts,

10   mischaracterizing or recharacterizing emails, telling you what

11   application notes were and were not, and trying to minimize the

12   conduct that was pled in those paragraphs regarding each of

13   these defendants.

14           On the -- within the four corners of the complaint, we

15   believe we've satisfied the necessary pleading standards and

16   the -- the requirements under *Iqbal* and *Twombly* regarding the

17   trade secret counts.  We also believe that we have satisfied

18   from a pleading standpoint allegations setting forth adequate

19   claims for the breach of contract, the breach of the duty of

20   loyalty, the 93A claims that Mr. Wilson didn't address, and

21   that each of the conduct -- pieces of conduct regarding the

22   actions of each of the individual defendants as set forth in

23   the complaint sets forth actionable claims supporting each of

24   those counts; and therefore, we contend that the motion to

25   dismiss should be denied on the basis of the allegations there.

1          However, in addition, we point out to your Honor that

2     should the Court dismiss the existing complaint in terms of

3     what we have now learned, we would quickly be in a situation

4     where we could refile the complaint with additional allegations

5     and additional specifics as to each of the defendants.

6          That seems to us to be form over substance.  Not only

7     is our actual complaint sufficient, but our next complaint will

8     be even more detailed and more sufficient.  These defendants

9     are in no way prejudiced regarding knowing what they're being

10    accused of, knowing the actions that they were involved in,

11    knowing the where and when of their conduct because it's on the

12    face of their own emails.  There is no question, no doubt about

13    their ability to defend themselves.  They've produced thousands

14    of pages of documents and will soon under the Court's order sit

15    for depositions at least as the entity defendants and

16    Mr. Gajewski in an attempt to try to justify their -- their --

17    their behavior.  But there is no question what the behavior

18    here alleged is and that it supports each of our allegations

19    not only for the trade secret counts, but the additional state

20    law counts as well.

21          For those reasons, both the sufficiency of the

22    complaint itself and the practicality of the situation, we find

23    ourselves in as a matter of honest truth, we would ask that the

24    motions be denied.

25          THE COURT:  Mr. Gutkoski, what specific trade secrets

1  does the complaint allege that Rachael Glenister

2  misappropriated?

3       MR. GUTKOSKI:  In order -- what it alleges is that

4  Ms. Glenister reached out and facilitated the provision of

5  services by Blue Sun to KPM's customers to service KPM

6  machines.

7       In order to service KPM machines, one must make use of

8  KPM's data and software, the very specific trade secrets that

9  we have alleged have been misappropriated here by the

10  defendants; and therefore, in order for Ms. Glenister to

11  facilitate those actions, those services and the provision of

12  those services by anyone other than KPM, and instead by Blue

13  Sun, it by definition requires the use of KPM's trade secrets.

14       THE COURT:  I feel like I'm chasing my tail.

15       All right.  Thank you, everybody.  Nice job.  We are

16  going to take it under advisement, and we will let you know

17  something soon.

18       Thank you.

19       MR. GUTKOSKI:  Thank you, your Honor.

20       MR. MAGEE:  Thank you, your Honor.

21       MR. RITCHIE:  Thank you, your Honor.

22       (At 3:50 p.m., court was adjourned.)

23

24

25

1                          C E R T I F I C A T E

2

3            I, Marianne Kusa-Ryll, Certified Realtime

4   Reporter, do hereby certify that the foregoing transcript is a

5   true and accurate transcription of our stenographic notes in

6   Case No. 21cv10572, KPM Analytics North America Corporation vs.

7   Blue Sun Scientific, LLC, on June 12, 2021, to the best of my

8   knowledge, skill, and ability.

9

10

11                      /s/ Marianne Kusa-Ryll 3-29-2025
                         Marianne Kusa-Ryll, RDR, CRR
12                       Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25