1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3    _____

4    KPM ANALYTICS NORTH AMERICA
     CORPORATION,
5                                            Civil Action No.
             Plaintiff,                      4:21-cv-10572-MRG
6
         v.
7
     BLUE SUN SCIENTIFIC, LLC, et al.,
8
             Defendants.
9

10   _____

11

12       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

13

14                           MOTION

15

16                   Tuesday, February 14, 2023
                            1:07 p.m.
17

18

19

20
     John J. Moakley United States Courthouse
21   Via Videoconference
     One Courthouse Way
22   Boston, Massachusetts

23
     Rachel M. Lopez, CRR
24   Official Court Reporter
     raeufp@gmail.com
25

1                    **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:
3
        SUNSTEIN LLP
4        BY:  JOHN T. GUTKOSKI
        100 High Street
5        Boston, Massachusetts  02110
        (617) 443-9292
6        jgutkoski@sunsteinlaw.com

7
        MORSE BARNES-BROWN & PENDELTON, PC
8        BY:  SCOTT R. MAGEE AND PAIGE K. ZACHARAKIS
        480 Totten Pond Road
9        4th Floor
        Waltham, Massachusetts  02451
10       (781) 622-5930
        smagee@morse.law
11       pzacharakis@morse.law

12

13  On behalf of the Defendants Blue Sun Scientific and The
   Innovative Technologies Group & Co.:
14
        GORDON FEINBLATT LLC
15       BY:  GEORGE FAULKNER RITCHIE, IV
        1001 Fleet Street
16       Suite 700
        Baltimore, Maryland  21202
17       (410) 576-4131
        gritchie@gfrlaw.com
18

19
   On behalf of the Defendants Eilert, Gajewski, Glenister, and
20  Lucas:

21       SEYFARTH SHAW, LLP
        BY:  DALLIN R. WILSON AND WILLIAM L. PRICKETT
22       Two Seaport Lane
        Suite 1200
23       Boston, Massachusetts  02210
        (617) 946-4800
24       wprickett@seyfarth.com
        drwilson@seyfarth.com

25

**P R O C E E D I N G S**

1

2        (In open court.)

3        THE COURTROOM CLERK:  The United States District

4    Court for the District of Massachusetts is now in session,

5    the Honorable Leo T. Sorokin presiding.

6        Today is Tuesday, February 14, 2023, and we are on

7    the record in civil case number 21-10572, KPM Analytics North

8    America, Corporation, versus Blue Sun Scientific, LLC, et al.

9        And would counsel please identify themselves for

10    the record.

11        MR. GUTKOSKI:  This is John Gutkoski, from

12    Sunstein, LLP.  I'm here representing the plaintiff, KPM.

13        With me are colleagues from co-counsel Morse, Scott

14    Magee and Paige Zacharakis.

15        MR. RITCHIE:  And I'm George Ritchie, from Gordon

16    Feinblatt, LLC, here on behalf of defendants Innovative

17    Technologies Group and Blue Sun Scientific, LLC.

18        MR. WILSON:  Good afternoon, Your Honor, Dallin

19    Wilson, on behalf of what we refer to as the individual

20    defendants, Arnold Eilert, Robert Gajewski, Rachael

21    Glenister, and Irvin Lucas.

22        And with me today is Will Prickett from our office,

23    as well.

24        THE DEPUTY CLERK:  Judge, we can't hear you.

25        THE COURT:  Can you hear me now?  Okay.  Sorry

```
 1    about that --
 2              THE DEPUTY CLERK:  Judge, sorry, you're cutting
 3    out.
 4              THE COURT:  Hold on.
 5              Can you hear me now, Rachel?
 6              Sorry about that.  You think this far into the
 7    pandemic, these problems would be over.
 8              Okay.  So we'll here for both motions, the motion
 9    to dissolve, and the motion for summary judgment by one of
10    the defendants.
11              I'll hear you -- I've read all the papers.  You
12    don't waive anything by not raising it, because it's all in
13    the papers.  So I'll hear the movants first.
14              MR. WILSON:  Your Honor, would you like to hear the
15    motion to dissolve first or the motion for summary judgment
16    first?
17              THE COURT:  It is -- I view them as somewhat
18    related, so -- although not completely.  I suppose summary
19    judgment first, because that would end -- that would moot the
20    other motion.
21              MR. RITCHIE:  Good afternoon, Your Honor, George
22    Ritchie, on behalf of Innovative Technologies Group.  I'll be
23    arguing the motion for summary judgment with respect to that
24    defendant.
25              I'm going to call Innovative Technologies Group
```

1    "ITG" for short.  And so the Court is aware, I may refer to

2    plaintiff or KPM Analytics, which is the plaintiff in this

3    case, as we go through it.

4         There are, by my count, Your Honor, six remaining

5    counts against ITG.  Counts 1 and 2 are what I would call the

6    trade secret counts, which the Defend the Trade Secrets Act,

7    the federal Trade Secrets Act, as well as the Massachusetts

8    equivalent.

9         THE COURT:  Maybe I should cut to the chase.  It

10   seems like the issue on the motion for summary judgment comes

11   down to two questions, though you could correct me if you

12   think there are other issues.  One is whether or not

13   plaintiff has sufficient evidence to establish that ITG knew

14   about the alleged misappropriation of the trade secrets; and

15   second, whether it's possible for them to proceed on some

16   sort of piercing the veil or vicarious liability theory.

17        MR. RITCHIE:  Thank you, Your Honor.  I'll get to

18   it, because I appreciate the Court's questions.  But I agree

19   to those questions; however, I think I would add a second

20   element, a sort of 1(a) and 1(b) to Your Honor's first

21   question.

22        I do think that it's important for the Court to

23   understand that there is no proof in this case that ITG knew

24   of any misappropriation or use by the individual defendants

25   or Blue Sun of the alleged trade secrets in this case.  And

1    although KPM spent a lot of time trying to kick up a cloud of

2    dust around that issue, the simple fact that Robert Wilt, who

3    was the president of ITG, testified by that dispute -- that

4    he was not aware of the trade secrets had been taken by these

5    defendants when they were hired by ITG.  He was not aware

6    that there were any trade secrets being used by these

7    defendants or Blue Sun when they began selling the machines.

8    And they weren't aware that there were any contacts between

9    KPM and these plaintiffs that contained confidentiality

10   clauses.

11        So that's the testimony, and there really isn't any

12   dispute about that.  There's no document that would suggest

13   otherwise.  There's no other witness who's come forward to

14   say, "No, that's not true.  Mr. Wilt, in fact, did know these

15   things."  No one has said that.  So I think that, to some

16   extent, that answers the Court's question.

17        There are some inferences, that KPM would ask this

18   Court to draw, which we don't think are warranted here.  And

19   I think the biggest of those is, in KPM's papers, KPM points

20   to a period of time during which Irvin Lucas, who is the

21   president of Blue Sun, agreed with Mr. Wilt to form Blue Sun.

22   This is in late 2018.  And KPM points out, well, Mr. Lukas

23   was actually still employed by KPM at that time, and,

24   therefore, it would stand to reason that Mr. Wilt would have

25   known that there was a contract relating to confidentiality.

1          Well, I don't think that's true.  And, in fact, as

2     the papers made clear, although Blue Sun is formed in 2018,

3     it really didn't begin doing business until 2019.  The mere

4     fact that Mr. Lucas was employed by KPM at that period of

5     time in 2018 -- as long as he had a contract, there was no

6     reason to believe that.  But more importantly, it's not just

7     the knowledge of the contract that's important.  It's also

8     the knowledge as to whether he was breaching that contract.

9          So now I've moved into the tortious interference

10    with contract claim.  But let me talk about that.  Because

11    that claim requires not only a knowledge of the contract, but

12    that the defendant itself -- and the defendant here is ITG,

13    not Blue Sun.  But that defendant took some action to

14    actively interfere with that contract.

15          Well, you know, again, we've said that ITG was not

16    aware of that contract.  Mr. Wilt has said so.

17          There's also no evidence that Mr. Wilt or ITG did

18    anything to actively interfere with that contract about which

19    it had no knowledge.

20          You know, there have been allegations made against

21    Blue Sun as to what Blue Sun did or did not do with the

22    knowledge of that contract.  But that's a separate issue from

23    ITG, and it would require this Court to find, I think, that

24    in order to allow this case to go to a jury, some active

25    participation or action taken by ITG itself to induce

1    Mr. Lucas to breach that contract and to have the knowledge

2    that he, in fact, was breaching that contract when he came

3    over to ITG.  And that simply isn't there.

4         There is a lot of other arguments in KPM's papers

5    relating to the downstream benefits that ITG did or did not

6    received from the alleged misappropriation of trade secrets

7    and the alleged interference with contract.  But those

8    downstream benefits don't, in and of themselves, establish

9    liability.  None of the cases that KPM has cited in its

10   papers, nor any that we find, where a party which has not

11   disclosed the trade secret, utilized the trade secret, or

12   interfered with a contract, that those benefits expose them

13   to liability for actions taken by other defendants.

14        And I want to draw the Court's attention, if I

15   could, to several cases that KPM relies upon in its papers.

16   These are the *Data General* case, another case by the name of

17   *Curtiss-Wright*.  And these cases, I think, what KPM has done

18   here is kind of creatively read these cases in a way that

19   favors their position.

20        So for instance, KPM takes the position that if a

21   party knowingly is aware of a disclosure or use of a trade

22   secret, it is, therefore, liable under the federal Trade

23   Secrets Act or the Massachusetts law.  But, in fact, that's

24   actually not what those cases say, and I want to read to the

25   Court section -- or statement of torts 757, which comes right

1    out of *Curtiss-Wright* and *Data General*.  And that's the

2    section upon which those courts rely for for its rulings in

3    the case.

4            That restatement section says, "One who discloses

5    or uses another trade secret, without privilege to do so, is

6    liable to the other, if he learned the secret from a third

7    person, with notice of the facts that it was secret, and the

8    third person discovered it by improper means or that the

9    third person's disclosure was otherwise a breach."

10            And what KPM tries to do in its papers is to say,

11    "Well, if you knew -- if you knew of something, then, you

12    know, you're, therefore, liable."  Well, we dispute that we

13    knew anything about this.  And "we," I mean ITG, knew that

14    these were trade secrets.

15            But there's a second requirement that KPM does not

16    focus in on, which is that that restatement of torts section

17    only applies to a party who uses or discloses another trade

18    secret.  And there's no evidence that ITG used or disclosed

19    the trade secret in this case.

20            *Data General*, *Curtiss-Wright* -- there have a

21    different fact pattern.  In those cases, there was a

22    corporate defendant, who had hired the departing employee,

23    the employee, himself, and then the plaintiff.  There was no

24    other defendant, another corporation, like there is here with

25    ITG, whether it's some vague connection or vague allegation

1    that this other party was benefitting from someone else's

2    disclosure or use of the trade secret.

3          But that absence of that particular party

4    configuration distinguishes, I think, this case from the

5    cases upon which KPM relies.  If KPM can't show that ITG

6    itself used or disclosed the trade secret, then whether or

7    not it knew about a trade secret is irrelevant.

8          Secondly, we don't think that ITG did know that

9    there was a trade secret.  There's no evidence that suggests

10   otherwise.  And the inferences that KPM tries to draw to the

11   contrary, we think, fail.

12         THE COURT:  You don't think you can draw reasonable

13   inferences in support of that knowledge.

14         MR. RITCHIE:  I don't think they're reasonable,

15   Your Honor, no.  There are -- there's a whole litany of what

16   did Blue Sun do?  What did Mr. Lucas do?  Et cetera,

17   et cetera.

18         I think it's important for context that the Court

19   understand that ITG was in this business long before Blue Sun

20   came around.  The original design of the KPM machine comes

21   from ITG.  So it is perfectly possible for ITG to have hired

22   these defendants, without believing that they were going to

23   violate any contractual protection or disclose a trade secret

24   and employ them in selling the machines that ITG has made for

25   a long time.  And given that history, I don't think there's a

1    reasonable inference, well, there has to be some malfeasance

2    on ITG's part, simply because it hired these people to sell

3    these machines.  So I don't think that's a reasonable

4    inference to make.

5          And I don't think the law supports the particular

6    theory that KPM is advancing here.  If ITG itself is not

7    using the trade secret, it can't be liable under 757 of the

8    restatement of torts, and it can't be liable under the

9    Massachusetts laws that have been interpreted, that section

10    and the federal and state Trade Secrets Act.

11          So I hope that answers Your Honor's first question.

12          Let me just address, briefly, the other two counts.

13    There is a conversion count, I believe, which still stands.

14    But we think that goes away, because there's no proof that

15    ITG itself has converted any property or trade secret of KPM.

16    So that count should depart.

17          And then, finally, there is the Massachusetts

18    General Law, 93A, Section 11 count.  I think the same

19    arguments that have applied to the trade secret and tortious

20    interference count would also apply there.  So I'm happy to

21    move on to the alter ego veil-piercing theory, unless the

22    Court has any further questions.

23          THE COURT:  No.  Go ahead.

24          MR. RITCHIE:  So I guess I'd start with the answer

25    that the 30(b)(6) witness from KPM gave me at a deposition,

1    when I asked him about the basis of the claims against ITG,

2    and I was told that, well, the basis is because ITG and Blue

3    Sun are almost a singular entity that have a common facility

4    and a common ownership.

5            Well, you know, as we've said in our papers, there

6    was no alter ego or veil-piercing theory pled, per se, in

7    plaintiff's complaint or amended complaint in this case.  So

8    I don't think, for that reason, that it ought to be able to

9    pursue it.

10           But even if the Court were to allow it, I think

11   that the KPM claims would fall far short of the four-factor

12   test that's been set out in Massachusetts law for veil

13   piercing or establishing an alter ego.  And importantly, the

14   rule in this state, as I understand it, and in many other

15   states, is simply that mere ownership of one corporation by

16   another is not enough to pierce the veil or to establish an

17   alter ego.  So the mere fact that ITG happens to own Blue Sun

18   is, not in and of itself, a dispositive fact at all.  It's

19   one of other 12 other factors that gets weighed in.  And

20   ownership of one party is not uncommon at all by another

21   party.

22           I think the other part, before I get to the

23   12-factor test, is the context of when an alter ego claim can

24   be pursued.  Alter ego claims are generally reserved for

25   situations where a party has been defrauded in contractual

dealings, thinking that it was dealing with one party, when
it was actually dealing with another, or where assets have
been transferred from one entity to another to avoid
judgment.

This case does not involve fraud.  It does not
involve fraud on KPM.  KPM has alleged a whole host of other
things, but the one thing that KPM has not alleged is that it
didn't know who Blue Sun was or who ITG is.  That was
transparently clear to them.  So this is not the situation
where the alter ego claim would arise, and I don't think that
it's properly used in this context.  And for that reason, ITG
would be entitled to summary judgment.

Turning to the other factors -- and, you know,
we've listed them either in a footnote.  Some didn't
necessarily apply.

THE COURT:  I'm familiar --

MR. RITCHIE:  Yeah.  But importantly, for the
factors that do apply, there are no loans or capitalization
of Blue Sun by ITG.  The evidence is undisputed that Blue Sun
has the authority to hire and fire employees as it chooses.
Blue Sun sets the price it charges customers for the NIR
Analyzer machines itself.

And I think, most importantly for this case, Blue
Sun and ITG enter into an arm's length transaction with
respect to the sale of machines.  ITG manufactures the

1   machines.  It then sells those machines to Blue Sun.  And

2   upon sale by Blue Sun, ITG gets 65 percent of the profit, and

3   Blue Sun gets 35 percent.

4           This is not a situation where ITG just simply ships

5   a machine down to Blue Sun, and they both own it.  And if

6   they sell it, great; if they don't -- both parties pay their

7   own costs out of the proceeds of the sale to the ultimate

8   customer.  And this has been memorialized, and there's no

9   evidence to the contrary that this is exactly how these

10  parties operate.

11          ITG requires no financial reporting or sales

12  forecasting from Blue Sun, and ITG receives no revenue from

13  Blue Sun's service or support from the NIR Anaylzer,

14  including the plaintiff's machines.  And I know that the

15  servicing issue has been focused by the plaintiff in this

16  case.

17          So we think that this clearly demonstrates that ITG

18  and Blue Sun are separate entities and have separate bank

19  accounts.  There's no -- there's no allegation of fraud, that

20  KPM was defrauded by the confusing identities of these two

21  parties, and for that reason, we do not think that the veil

22  piercing applies.

23          And with that, Your Honor, I'll rest, unless the

24  Court has any --

25          THE COURT:  Okay.  Let's hear what KPM has to say.

1          MR. GUTKOSKI:  Thank you, Your Honor.

2          ITG would have the Court believe that the record

3     shows that ITG and Mr. Wilt hired Mr. Lucas, let him begin

4     working for ITG in establishing Blue Sun, while he was still

5     at KPM, and then had no knowledge of his actions after

6     that -- had no knowledge that he staffed Blue Sun solely with

7     KPM employees; that he had those employees benefit -- conduct

8     actions to benefit Blue Sun and to migrate KPM customers over

9     to Blue Sun, while they were still employed and taking a

10    paycheck from KPM; and that ITG directed and transferred the

11    entire sales effort of its own Analyzers over to Blue Sun and

12    these former KPM employees, and never had any knowledge,

13    whatsoever, as to whom they were selling these to, how they

14    were selling them, and had no involvement in their actions.

15          The record, in fact, does not show such lack of

16    knowledge or lack of participation.  Rather, it shows that

17    Mr. Wilt and ITG was involved with hiring some of the -- and

18    interviewing some of the additional KPM employees after

19    Mr. Lucas; that they were involved in having the sales folks

20    that they already had, prior to the creation of Blue Sun and

21    Mr. Lucas, work hand-in-hand with him to transfer the

22    information that they had regarding customers over to him and

23    to get his information about those customers; and that they

24    were involved in sharing of technical capabilities about the

25    ITG, what used to be called the M5 Analyzer, that then got

1  rebranded as the Phoenix, and sharing that with such

2  customers.

3         These e-mails and communications that involve

4  employees of both ITG and Blue Sun are attached to

5  Mr. Magee's declaration.  And I specifically direct the Court

6  to Exhibits 11 through 14, 18 to 19, 21, 23 to 24, and 26.

7         In fact, Mr. Wilt did know that he was giving

8  complete control over the sales of all Analyzers that ITG

9  would be manufacturing and selling, going forward, to

10  Mr. Lucas.  At best, Mr. Wilt deliberately did not ask

11  Mr. Lucas about any contracts that he had and would have the

12  Court believe that he can escape liability, and ITG can

13  escape liability, merely by setting up a wholly owned

14  subsidiary, putting Mr. Lucas in charge of it, and then

15  directing him to go off and sell to these KPM customers and

16  sell these Analyzers, without knowing why their sales were

17  increasing, why these customers were buying them, or why

18  Mr. Lucas and the KPM employees were having the success that

19  they had.

20         The law does not permit him to do that and does not

21  permit him to avoid liability by putting his hands over his

22  eyes --

23         THE COURT:  So let me just jump in here.  So you

24  say these, and other facts, are sufficient to draw a

25  reasonable inference that they did know?

1          MR. GUTKOSKI:  Correct.  Not only to draw the

2     reasonable inference, but to see that they actually

3     participated in the actions noted in those -- the exhibits

4     that I noted.

5          THE COURT:  So do you agree with defense counsel

6     that -- or disagree with defense counsel, or it doesn't

7     matter, as to whether ITG used or disclosed the trade secret?

8     You say I don't have to worry about whether that's a

9     requirement or not, because these e-mails show that they did

10    participate?

11         MR. GUTKOSKI:  They did participate, but in

12    addition, Your Honor, the law is clear that, under the

13    *Curtiss-Wright* and *Optos* line of cases, that somebody who

14    benefits from the misuse of a trade secret.  And here, the

15    only Analyzers that were sold benefitted both Blue Sun and

16    the manufacturer at ITG.  And so the -- every sale that went

17    to a KPM customer, through the diverted customer

18    relationships by Blue Sun and the former KPM employees,

19    directly benefitted ITG, and ITG can be held liable for those

20    improper sales and those unfair and deceptive trade practices

21    utilized in selling them.

22         THE COURT:  And is it your position, you can pierce

23    the veil, even though you're not a creditor?

24         MR. GUTKOSKI:  It's our position that if there were

25    to be no direct liability, for all the reasons that we've

1    just been discussing, that the would have piercing the veil

2    and indirect liability due to the extensive ownership,

3    control, and operation of Blue Sun by ITG, given the fact

4    that Blue Sun's entire existence is for using these former

5    KPM customer relationships in order to make sales for ITG.

6             THE COURT:  So is that right, though, that piercing

7    the veil reaches that far?

8             MR. GUTKOSKI:  I think it does, Your Honor.  I

9    think the level of control here, and the fact that Blue Sun

10   was, we believe it will be shown at trial, created solely for

11   the basis of acquiring these relationships, misusing these

12   trade secrets and confidential information, confusing these

13   customers, in order to sell a product for -- that had not

14   been selling very well for ITG, and then begin selling much

15   more effectively to those very customers.  And under these

16   circumstances, it would extend that far, because otherwise,

17   Blue Sun wouldn't exist.

18            THE COURT:  Okay.  Anything else you want to say in

19   reply to that, before I turn to the injunction?

20            MR. GUTKOSKI:  Sorry, were you directing that to

21   Mr. Ritchie or to myself, Your Honor?

22            THE COURT:  Yes, to Mr. Ritchie.  Sorry.

23            MR. RITCHIE:  Just briefly, Your Honor.  I just

24   wanted to say, I want to make sure that -- you know, counsel

25   keeps talking about the downstream benefits to ITG, and the

1    fact that Blue Sun hired these folks and ITG knew that Blue

2    Sun hired these folks.  There's nothing that prohibits Blue

3    Sun from hiring these people.  What's at issue in this case

4    now is whether or not these individuals breached provisions

5    of their confidentiality agreement with KPM, not prevent them

6    from working for Blue Sun.  So that, in and of itself,

7    establishes absolutely nothing.

8          What plaintiff has to establish is that ITG knew

9    there were confidentiality agreements and knew that they were

10   being breached by these individual defendants.  Not a single

11   one of the e-mail that Mr. Gutkoski so obliquely referenced

12   in his argument established any action by ITG that would

13   establish liability, either under the trade secrets count or

14   the tortious interference of contract count.  And I want the

15   Court to understand that.

16         And finally, again, the downstream benefits do not,

17   in and of themselves, establish liability.  The law is clear

18   that a defendant has to do something in order to expose

19   itself to liability under these trade secret claims.  So even

20   if it knows that a trade secret is being violated, that, in

21   and of itself, is not enough.  It's under no duty to

22   investigate the issue.  There's no case that says that.  It's

23   only where defendant itself has taken actions to disclose or

24   use the trade secrets, that's where the law comes in.  That's

25   what a defendant will have to answer for.  That hasn't

1    happened here with ITG.

2             And I just add, Your Honor, with the notion that --

3    and we've cited a couple of cases to this effect in our

4    papers.  Piercing the corporate veil is not, in and of

5    itself, a cause of action.  The purpose of piercing the veil

6    is to protect, Your Honor pointed out, creditors of

7    companies.  And so for that reason, we don't think the

8    piercing veil argument flies, either.

9             Thank you.

10            THE COURT:  Okay.  Thanks.

11            I'll hear you on the preliminary injunction.

12            MR. WILSON:  Thank you, Your Honor.  I'm going to

13   be handling that, on behalf of the individual defendants.

14   I'm mindful that you've read the papers, and, therefore, I

15   won't belabor all of the points that we raised.

16            But as Your Honor is likely aware, back in August

17   of 2021, Judge Hillman entered a preliminary injunction that

18   had various provisions in it, but two in particular that are

19   salient to the motion today; and that is, an order that

20   enjoined the individual defendants and Blue Sun from

21   servicing any NIR instruments that were manufactured by KPM

22   and also selling any of the Blue Sun Analyzers to any former

23   KPM customers that they interacted with while they were at

24   KPM.

25            And we're asking the Court to, at a minimum, modify

1  the injunction to remove those two provisions so that the

2  individual defendants can service any NIR instruments and

3  that they can sell Blue Sun instruments to any customers that

4  would like to buy them.

5        A couple of factual points that I think are very

6  important up front, and that is that none of the individual

7  defendants have worked for KPM for quite some time.

8  Mr. Lucas hasn't worked there for almost four years.  It's

9  been two-and-a-half years since Ms. Glenister worked there.

10  It's been almost two years since Mr. Gajewski worked there,

11  and it's been a little over two years since Mr. Eilert worked

12  there.

13        I'm going to focus my argument today on one of the

14  factors that the Court considers when dealing with

15  preliminary injunction, and that is irreparable harm.  And as

16  we argued in our papers, we don't think there's no evidence

17  of irreparable harm.  We didn't think there was any back in

18  August, when the Court entered the order.  But certainly, a

19  year and a half later, there's simply no evidence that KPM is

20  going to suffer any irreparable harm if the individual

21  defendants are simply allowed to service customer instruments

22  that those customers want to be serviced by Blue Sun, and to

23  sell instruments to customer that want to buy Blue Sun

24  instruments.

25        Injunctions are not designed to punish past

1   conduct, but are designed to prevent irreparable harm in the

2   future.  KPM's opposition to the motion focusses almost

3   exclusively on events that occurred years ago.  In fact,

4   almost all of the conduct that they complain of occurred

5   while at least one of the individual defendants was still

6   employed by KPM.

7        But what they have admitted to, because they have

8   to, is that none of the individual defendants took anything

9   with them.  There's no evidence that they downloaded any

10  information, that they took anything out the door with them.

11       When the original motion for an injunction was

12  filed, they made a big deal that Mr. Eilert had a bunch of

13  NIR equipment in his basement that they said was KPM property

14  that he improperly retained.  Just to show how silly that

15  argument was, Mr. Eilert subsequently returned that.  He

16  boxed it all up.  He sent it to KPM.

17       And during KPM's 30(b)(6) deposition, I asked the

18  representative, "Well, what did you guys do with that

19  equipment?"  And they said, "Nothing.  It's still in the

20  boxes."  They hadn't even opened it, hadn't even looked to

21  see what he had taken.  It's still, presumably, collecting

22  dust somewhere in a KPM warehouse.

23       The other item that was allegedly retained was a

24  thumb drive that Mr. Gajewski had used to transfer

25  information between two KPM computers while he was still

1    employed.  He testified that he never looked at it; that he

2    forgot he had it.  He subsequently returned it to KPM.

3         KPM has not suggested, based on their review of

4    that -- that thumb drive, which they've had in their

5    possession now for quite some time, that there's any evidence

6    of improper use of that information.

7         So the record before the Court is that there was no

8    information that was taken from KPM from any of the

9    individual defendants.  And so what we're left with is, sort

10   of, this information that it's in the heads of these four

11   individuals.  As the record showed, all of these individuals

12   worked in the NIR industry long before they were employed by

13   KPM.  They knew many of these customers beforehand.

14        THE COURT:  Mr. Wilson, is -- circumstances have

15   changed.

16        MR. WILSON:  Sure.

17        THE COURT:  Versus how much of this is, "You know

18   what?  You, Judge, should reconsider what Judge Hillman did."

19        MR. WILSON:  Well, we're certainly not asking the

20   Court to reconsider what Judge Hillman did.  I think there

21   are a couple of important points here.  One is, what has

22   happened in the year and a half since the order entered?

23   Well, a couple of really important things happened:

24        Number one, KPM admits that it changed all of its

25   pricing.  So the individual defendants don't know anything

1    about KPM's current pricing, which was a big deal when the
2    original order was entered.
3            Secondly, they've introduced new product offerings.
4    Again, individual defendants don't know anything about that.
5            They've changed their marketing strategies.
6    Individual defendants don't know anything about that.
7            At most, what they know about are things about
8    customers from two, three, four years ago.  And that
9    information, it goes stale.
10           They could easily have gotten that information from
11   the customers, certainly within a year and a half.  There
12   could be some argument that, yeah, a noncompete for a year,
13   or so, would be appropriate so that KPM could shore up those
14   relationships.  But the idea is that it seems like KPM is
15   suggesting that there's going to be some perpetual noncompete
16   that is going to exist even after trial.  And there's simply
17   no law, that we're aware of, that would permit that.
18           The other changed circumstances that Judge Hillman
19   seemed to be concerned about is customer confusion; that
20   there was some confusion among customers whether they were
21   dealing with KPM or whether they were dealing with Blue Sun.
22   We've put some evidence forward, sort of, after the expedited
23   discovery that shows there wasn't really any customer
24   confusion in the first place.  But KPM sent out a later to
25   every single active customer, explaining the differences

1    between the companies.  We think they improperly maligned

2    Blue Sun in that process, suggesting that Blue Sun was going

3    to go out of business because of this litigation, and,

4    therefore, customers shouldn't do business with them.

5              There's no evidence that, sort of, after the

6    injunction was entered, that Blue Sun has somehow improperly

7    suggested to any customers that they are related to KPM in

8    any way.  Customers are well aware at this point.  There's a

9    public lawsuit that's been pending for a couple of years.  So

10   again, there's no -- there was no irreparable harm that's

11   going to be caused by customer confusion.  That's all been

12   resolved.

13             And then the last point that I would just like to

14   make is, sort of, dovetailing off of what I just mentioned,

15   which is, you know, those who seek equity, must do equity.

16   And what KPM has done is they've used this injunction order

17   as a weapon against Blue Sun.  They've told customers, "Oh,

18   they're going to go out of business because of this lawsuit.

19   You shouldn't do business with them."  Privately, they've

20   been admitting that unless this injunction is vacated, Blue

21   Sun is likely to go out of business.  An injunction is

22   designed to maintain the status quo until we get to trial.

23   It's not to be used as a weapon to put one of the parties out

24   of business so they can't ever get to trial.

25             I think, in fact, one of the most egregious

examples that we've presented in our motion is that KPM has a

special sales incentive to target Blue Sun customers, and the

salesperson will -- to get somebody to switch over, they

offer these customers a free Analyzer.  These are equipment

that cost tens of thousands of dollars.  They're willing to

eat that cost, as long as they can take a customer from Blue

Sun, convert it over to KPM.  And I think they're going to

offer the salesperson a case of French wine or something like

that.  Meanwhile, KPM -- or Blue Sun and the individual

defendants have their hands tied behind their back because of

this injunction order.

So it's been a year and a half.  Any harm that the

injunction was designed to prevent, has been prevented.  And

at some point, KPM is going to have to compete with Blue Sun,

and we think that time has long since passed.  These

individuals signed one-year noncompetes.  KPM certainly

understood that within a year, they would be allowed to

compete.  They've gotten the benefit now of a

year-and-a-half-long noncompete, which was more than they

even bargained for.

And ultimately, if Your Honor is reluctant to

simply dissolve the entire injunction, certainly you can keep

in place any kind of order that prohibits the use of

confidential information or trade secrets.  Again, there are

none.  They don't have possession of any.  That seems to be

1    undisputed.  So there are certain protections that can be

2    maintained to ensure that true trade secrets and confidential

3    information aren't being used.

4              But the de facto noncompete part of the noncompete,

5    or of injunction, we think has run its course.  We have no

6    trial date.  It's unclear when this action will ultimately be

7    resolved.  And so --

8              THE COURT:  When do you want it?

9              MR. WILSON:  I suspect we'll maybe get to that,

10   hopefully today.

11             But in the meantime, this is really harming Blue

12   Sun, and there's really no harm to KPM if they're simply

13   forced to compete on a level playing field with Blue Sun

14   and --

15             THE COURT:  Understood.  Let me see what

16   Mr. Gutkoski has to say.

17             MR. GUTKOSKI:  While, this is the first opportunity

18   for Your Honor personally hearing these arguments, the court

19   has actually heard them now for a fourth time.  Judge Hillman

20   considered many, if not all, of these arguments, in one form

21   or another, in entering a very focused and specific

22   preliminary injunction.  And he kept that injunction in

23   place, which he ordered for the duration of this action, as

24   noted in the injunction itself, document number 94 on the

25   docket, over two subsequent -- this now being the third

1    subsequent attempt to try to dissolve this injunction.

2              In establishing the injunction, Judge Hillman

3    explained, and the Court explained, in Document 93, at

4    page 22, that, "The record shows the defendants' actions to

5    divert KPM customers are ongoing, suggesting a high

6    possibility of future harm, and they have caused customer

7    confusion and alarm, which likely affects KPM's goodwill.

8    KPM stands to lose future preventative maintenance, the

9    annual maintenance these Analyzers go through, and future

10   Analyzers sales opportunities as a result of defendants'

11   actions."

12             Your Honor, KPM contends that this argument today

13   is just the latest in the ongoing actions.  And damage to --

14             THE COURT:  Right.  But at some point -- sure.  But

15   what is the categories of confidential information and trade

16   secrets that you're seeking to protect for your client?

17             MR. GUTKOSKI:  So the argument that you just heard

18   from defense counsel focused on the customer information and

19   completely avoided the technical information.

20             THE COURT:  That's why I'm asking you what you're

21   trying to protect.

22             MR. GUTKOSKI:  Correct.  Sorry for the long-winded

23   introduction.  The technical information that was misused --

24   misused here was in many -- several different forms.  First

25   of all, they were the application notes and data that was

1    misused, taken from KPM, and misused by Mr. Gajewski and

2    Mr. Lucas, to misrepresent the measurement capabilities of

3    the Phoenix Analyzer.  While those application notes were

4    returned, the population of customers has been lied to by the

5    misuse of those trade secrets as to what the Phoenix Analyzer

6    can and can't do.

7              These customers have been -- were told for over a

8    year that this Analyzer, this competing analyzer was just as

9    good as the KPM SpectraStar.  And the fact is that that

10   information was all taken from us and misrepresented that

11   those measurements have been taken, and those analyses have

12   been done on their machines.  So the customers are -- are --

13   have been misled to that regard.

14             THE COURT:  So one piece of information you're

15   seeking to protect is the application notes and data.

16             MR. GUTKOSKI:  Correct.

17             THE COURT:  Even though it's been returned -- and

18   that, you say, has been returned.

19             MR. GUTKOSKI:  Correct.

20             THE COURT:  But you say that there's downstream

21   harm flowing from the taking and use of it before it was

22   returned.

23             MR. GUTKOSKI:  Correct.  And the cases make it

24   clear that if there is a risk of ongoing harm to the trade

25   secret holder, the one whose property has been misused, then

1    an injunction is appropriate to prevent that additional harm

2    to --

3              THE COURT:  So the risk here is that they use that

4    information -- they continue to use that information to

5    compete.

6              MR. GUTKOSKI:  Correct.

7              In addition, Your Honor, not only was it the

8    data and the data points and the measurements, but the UCal

9    software, which Mr. Gajewski admits that he had copies of and

10   misused in order to generate those application notes, as well

11   as to actually service particular customers in moving their

12   calibrations and data from the KPM SpectraStar platform onto

13   the Phoenix platform.  And Blue Sun continues to offer the

14   migration of calibrations to its customers.  So while they

15   claim they have returned all copies of the software, they're

16   still offering that service and apparently would intend to

17   offer that migration to their own platform.

18             THE COURT:  But the migration service, what right

19   do you have to prevent the migration service?

20             MR. GUTKOSKI:  It depends on what types of

21   calibrations they would be migrating.  If it's

22   calibrations -- if it's data that the customer themselves has

23   measured on its own, without any involvement of KPM software

24   or KPM's data libraries, then they would be free to do that,

25   assuming they're not using a copy of our software.

1          If, however, it is a much more extensive dataset

2   that includes KPM data that exists on that machine from a

3   historical standpoint, and they migrate those files, those

4   can only be accessed with our software and with the knowledge

5   that those technicians have regarding our platform.  So it

6   would depend upon the individual circumstance.

7          In addition, Your Honor, if they go out and just

8   try to service the existing Unity machines, there are two

9   points of concern here.  One is tat they are trying to, as

10  they had before they were enjoined, emulate the type of

11  service and the caliber of service that they were providing

12  when they were with KPM, using the same checklists, using the

13  same forms, using the same processes to --

14          THE COURT:  Hold on.

15          Yes, Rachel?

16          THE COURT REPORTER:  I cut out at "using the same

17  forms, using the same processes to," and please start there.

18          MR. GUTKOSKI:  That would require me to remember

19  what I said.

20          Using the same forms and the same processes to

21  provide the same caliber of service to the customers that

22  they previously provided while they were at KPM.

23          But Your Honor, the bigger danger here is to take

24  account of what type of products we're talking about.  And

25  the fact that --

1        THE COURT:  So those are the three things that

2    you're trying to protect, though, right?

3        MR. GUTKOSKI:  We're trying to protect -- from a

4    technical standpoint, yes.  There is a host of customer

5    information, which is attacked by the defendants and

6    responded to in our papers, regarding knowledge of the age of

7    a particular machine at a given customer, how satisfied or

8    dissatisfied that customer has been, what adjustments need to

9    be made on an annual basis to keep that customer happy, what

10   the pricing has been.

11        And rather than look at the entire record of that

12   information and of these customer relationships and of the

13   communications with these customers, instead, the individual

14   defendants have come in here and said, "Well, dissolve the

15   injunction, because when we depose the representatives, the

16   30(b)(6) representative of KPM, he didn't know all the

17   specifics about how we have treated these customers and what

18   the communications has been and to what degree those

19   customers have been either confused by what we have told them

20   or to what extent we have leveraged our prior knowledge of

21   them and their needs in pursuing them, and the success or

22   lack of success we have had in pursuing them both to migrate

23   over to Blue Sun and hopefully to sell them a new Analyzer

24   down the line."

25        Well, KPM doesn't have that information, because

1    everything that was produced to KPM was protected as

2    attorney's eyes only under the protective order.  So KPM does

3    not know the details of each customer relationship and to

4    what extent that customer relationship has been undermined by

5    Blue Sun, unless the customer has shared any of those

6    concerns directly with KPM.  And in a couple of cases that's

7    true, but certainly not for the over 35 customers and over

8    140 machines that were involved by the defendants'

9    inappropriate actions here.

10          So for the individual defendants to come in today

11   and say, "Well, look at the few sound bites that KPM has

12   provided regarding what they know about these relationships,"

13   and/or the fact that, yes, they updated their prices at a

14   given point of time.  But no effort has been made to tie

15   those updates of those prices to any of these customers and

16   what is being offered to these customers.  There's been other

17   product offerings.  True.  But there's been no effort by the

18   defendants to tie any of those new product offerings to what

19   is or is not being offered to these particular customers.

20          So they have come in and asked now the Court, for

21   the fourth time, to say, "Okay.  Before we get to a trial,

22   before we hear all the evidence, lift the injunction, and let

23   us go and compete for these customers."  Why?  Why are they

24   asking now?  Because it's been about a year and a half since

25   the annual servicing happened.  They know these customers are

1    looking for their next customers -- I'm sorry, their next

2    servicing, and they're asking to go out now and be able to

3    provide that servicing in order to continue their effort to

4    migrate those customers over to Blue Sun, rather than go

5    forward, let the jury hear all the evidence as to how these

6    customers have been lied to, how they've been misled, the

7    confusion that has resulted, and the impact on the company's

8    -- Blue Sun and KPM -- and come to a verdict.

9            If there is any actual concern here in terms of the

10   impact on Blue Sun, the solution here is to proceed to a

11   trial, and let all the facts be considered, as opposed to

12   cherry-picking through them the way the defendants seek to do

13   so.

14           Furthermore, Your Honor, for the defendants to come

15   in now and argue that there is some resolution to the

16   irreparable harm to KPM and some sort of impact on Blue Sun

17   is completely contrary to the record.  Mr. Lucas, testifying

18   as the 30(b)(6) on behalf of Blue Sun, made clear that the

19   injunction has had virtually no impact on Blue Sun's

20   revenues, has no impact on their sales, and has no impact on

21   their business.

22           Both ITG's, Mr. Wilt -- when he testified as the

23   30(b)(6) of the parent company, ITG, and Mr. Lucas testifying

24   on behalf of Blue Sun, said that the focus of their business

25   is actually not to compete with KPM, but rather to compete

1    with another competitor, FOSS, and to replace their machines.

2    If that's the case, the fact that they are limited by the

3    very focused injunction that Judge Hillman established,

4    regarding not misusing the customer relationships that the

5    Blue Sun employees took from KPM, should have no impact on

6    them.  If it has been, let them show so at trial.

7                Sorry, Your Honor, we lost you.

8                THE COURT:  Yeah.  Okay.  I was just muted for a

9    second.

10                Okay.  That's helpful.

11                Well, let me segue to another topic, then.  With

12    respect to the motions, this has been really helpful to

13    focus.  I've read all the papers.  I apologize it's taken me

14    a little longer to get to this than I would have liked.  I

15    know these motions have been pending, some of them, for a

16    while, but I intend to resolve both of them promptly.  I've

17    read them all.  I found the arguments of all view helpful to

18    clarify some of the issues in your positions today.

19                A couple, sort of, case management questions while

20    I have you that I wanted to talk to you about.  Obviously,

21    the questions are somewhat contingent on the resolution of

22    these motions, but not completely.  The first is with respect

23    to trial.  Let's -- the longest trial is if everything stays

24    in the case.  ITG is in, all the claims are in.  How long is

25    that trial?

1          MR. GUTKOSKI:  Your Honor's practice is to try 9:00

2     to 1:00?

3          THE COURT:  Yes.  So here's how I do it.  This is

4     my response to -- that question comes up a lot.  So I'll meet

5     with -- the first day we'll go however long it takes to get

6     the jury.  Generally speaking, I go 9:00 to 1:00.  What that

7     means is I'll meet with all of you at 8:30 in the morning, to

8     review evidentiary issues, so that at 9 o'clock sharp, we

9     start with the jury.  And we'll go until 1 o'clock.  So if at

10    five of 1:00, you're done with a witness, let's call the next

11    witness.  So yes, it will be 9:00 to 1:00.

12         Sometimes I'll go do some afternoons, but only if I

13    tell the jury that in advance.  My experience, generally, is

14    that the jurors like the 9:00 to 1:00 a lot, and that if

15    you're efficient, which means spending time talking about

16    legal issues before 9:00 a.m. or after 1:00 p.m., rather than

17    having the jury sit there, you can get almost as much done

18    with 9:00 to 1:00, as you can with, sort of, the 9:00 to

19    1:00, 2:00 do 4:00, or some variation of that schedule.

20         So yes, with that kind of efficient approach, how

21    long do you think it would be?

22         MR. GUTKOSKI:  KPM would expect that we could

23    probably try the entire case in five days, five to seven

24    days, say.

25         THE COURT:  All right.  Does that sound reasonable

```
 1   to you, Mr. Ritchie and Mr. Wilson?
 2            MR. RITCHIE:  Just first reactions, Your Honor,
 3   probably a similar amount of time.  I'm thinking about the
 4   number of witnesses.  And I've never tried a case 9:00 to
 5   1:00.  I actually like the idea.  I've never thought about
 6   that before.  But I would think five to seven days is
 7   probably.
 8            THE COURT:  You know, the Revolution came out of
 9   Boston.  Right?  And it spread a cross the rest of the
10   country.  So this is a way to do things, and eventually maybe
11   it will take hold in the rest of the country, just like, you
12   know, independence.
13            MR. RITCHIE:  That's perfect.  The tea party.
14            THE COURT:  That's right.  The tea party started
15   here.
16            Okay.  So that gives me a sense.
17            So the second issue that I wanted to raise with
18   you -- so how soon are all of you -- suppose I resolved all
19   of this today -- I'm not resolving all of this today.  I'm
20   taking it under advisement.  But you expect me to resolve it
21   pretty quick.  But suppose it were resolved today.  How
22   soon would -- when would we be talking about this trial, from
23   your perspective?  When would you all be ready?
24            And I know you need 30 days, at least, but are
25   talking about is it something that people might be able to --
```

1    subject to schedules, and all of those things -- I'm not
2    asking specific dates now.  But is there was any reason, if I
3    had it all done today, would we be, from your perspective --
4    I'm not sure if I'm available, but from your perspective,
5    would we be talking about, like, April?  Or would we be
6    talking about -- it would make more sense, for whatever
7    reasons, from your perspective, a little later?
8              MR. GUTKOSKI:  This is doable in April or May, Your
9    Honor, from plaintiff's standpoint.
10              THE COURT:  So from your perspective, once I
11    resolve it, the earliest date possible, subject to 30 to
12    45 days to prepare.
13              MR. GUTKOSKI:  Correct.
14              THE COURT:  And subject to individual scheduling
15    about a particular week or something?
16              MR. GUTKOSKI:  Correct.
17              THE COURT:  And how about for the defendants?
18              MR. RITCHIE:  I would agree with that, Your Honor.
19    I think that May is probably -- I think you haven't asked
20    about our personal schedules.  I think May is probably better
21    for me, but I agree generally.
22              THE COURT:  Okay.  So then the other issue that I
23    want to raise with you is this:  This is a Worcester case, if
24    I recall correctly.
25              MR. GUTKOSKI:  Correct.

```
 1            THE COURT:  It was originally Judge Hillman's case,
 2   so it was Worcester division.  So that raises two questions.
 3   One is, I suppose, unless you agree otherwise, I think that
 4   that means that the jury -- that the trial should be in
 5   Worcester, because it would be a Worcester -- it's a
 6   different jury pool in Worcester than Boston.
 7            MR. GUTKOSKI:  I think that's correct, Your Honor.
 8            THE COURT:  I don't think there's any prohibition
 9   on -- I don't know that there's any rule that would prevent
10   me from trying it in Boston, if all of you agree, but I think
11   my -- my general view is that the random assignment and venue
12   rules, you know, is -- it's filed seemingly appropriately.  I
13   have no reason to doubt that.  So Worcester, so it would be a
14   Worcester jury pool.  I wouldn't call Worcester jurors into
15   Boston.  We would do it in Worcester.
16            It's up to you.  I don't have -- I'm not -- you can
17   think about that.  You don't have to answer that now.  But
18   that -- I will just tell you that I think that it goes to --
19   it's tried in Worcester, with a Worcester jury, instead of in
20   Boston, with a Boston jury, unless you all agree.
21            I have to think about that, whether I have any
22   independent authority without your agreement to transfer it.
23   It's certainly more convenient for me in Boston than
24   Worcester.  On the other hand, I don't think that's the
25   touchstone, and so I'd have to see what you all could think
```

1    about that and if you have a view.

2            And the last related issue, that is separate but

3    related, certainly nothing prevents me from going to

4    Worcester to try a case there.  There's a little bit of more

5    scheduling issue, just in terms of courtroom available, and

6    so forth.  But as you may or may not know, I suppose you do

7    know, that Judge Hillman took senior status, and my

8    understanding is that the President has nominated somebody.

9    There were a number of nominees in our district.  And my

10   understanding is they're all -- I think they've all been

11   voted out of the Judiciary Committee, so they're all sitting

12   on the floor of the Senate, waiting for votes to see if the

13   Senate confirms them or not.

14           So if somebody -- if the Senate does confirm those

15   people -- I have no -- they're not confirmed unless and until

16   the Senate decides to confirm them and that is something over

17   which I have no knowledge or influence or role.  But if they

18   do, one of those people will be a Worcester nominee.  I guess

19   the question is, do you have a preference as to whether the

20   case -- this might not be up -- probably not up to you, but

21   some preference about that?

22           And I don't -- look, you're not offending me if you

23   said, "Judge, we really want the Worcester judge."  I don't

24   really care.  I have plenty of cases.  I'm happy to try this

25   case, it doesn't matter to me.

1    So you can think about all of that, those things.

2    You don't have to tell me anything about that.  The only

3    other question that I would have is whether, in thinking

4    about these things, you would want to --

5    Well, I understand that a speedy trial is helpful

6    because of the injunction.  If the injunction stays fully in

7    place or partially in place, you want a speedy trial, because

8    the injunction is preliminary, and you get to the end and

9    then you see what happens.  If you win the case, that's good

10    at the end of the injunction if you're the defendants.  And

11    if you lose it, it's going to be an injunction that's crafted

12    in light of whatever the jury's verdict is, if there is a

13    further injunction.  So -- and from -- I assume the plaintiff

14    has a similar interest in moving fast.  So I get that.  I

15    don't know if that weighs in at all to these questions about

16    a Worcester jury or not or whether you want any opportunity

17    to mediate between the time that I resolve these things and

18    the jury trial date.

19    So you can think about all of that.  This is --

20    unless someone has anything they want to say about that, my

21    thought is to proceed.  I will resolve these motions, and I

22    will either pick a trial date -- probably what I'm likely to

23    do is schedule a trial date, or I'll schedule -- ask you to

24    give me a status report, which says what all of your

25    different positions are.  I'll have a status conference.

1    I'll see.

2            If you do -- since you brought it up, Mr. Ritchie,

3    a fair point, if I do issue a trial date, I won't know what

4    your personal schedules are.  By my picking the date, I don't

5    mean to, like, drive a truck over your personal lives.  And

6    so what I would say is I would like -- what I would say is,

7    if I pick a specific date, then what I'd want you to do is

8    within, like, a week, come back and say, "Judge, that

9    week doesn't -- I have a personal problem with that week.  I

10   a vacation," or, "I have a wedding," or whatever your

11   personal matter is.  And I'm happy to work with all of you to

12   adjust then, if I can.  It's just my first stab at the first

13   available date that I can give you.

14           But don't wait.  If you come back to me a week

15   before the trial and say, "Judge, you know, it conflicts with

16   this wedding of my kid," I'm going to be like, "Yeah, well,

17   did your kid just decide to get married yesterday?"  If they

18   did, okay, maybe.  But if the -- most of these things are

19   planned pretty far in advance, then, like, why didn't you

20   tell me before?  That's why I gave you that week or two to

21   sort of raise it when it's flexible.  But then once it's set,

22   people rely on it.  I make my schedule on it, probably all

23   the witnesses, the lawyers.  So I think you understand.

24           Anything else we can do today?  Anything anyone

25   want to address?

1          MR. GUTKOSKI:  Just one question, Your Honor, of

2    the interrelatedness between the Worcester venue question and

3    the scheduling question.  Assuming we're going forward with

4    having Your Honor try the case, does it make any impact on

5    the trial date or likely trial date if we had an agreement to

6    do it in Boston versus doing it in Worcester?

7          THE COURT:  The honest answer to that question is

8    it probably makes it -- it makes it somewhat easier for me to

9    give you a date earlier.  I can't say for sure, but like all

10   the things being equal, it's just simpler for me in Boston

11   because I'm in Boston, all of my cases are in Boston.  So for

12   me to say, okay, I'm going to Worcester for two weeks or a

13   week, a week and a half, I have to think about am I moving --

14   it's not --

15          I should have said this in the beginning, the Zoom

16   proceeding, you can't, the regular rules apply, which means

17   there's no audio recording, no video recording, no still

18   photography, no broadcasting and rebroadcasting.  But the,

19   sort of, COVID era video authority may be expiring, so it may

20   not be -- so, for example, you're trying in Boston, I can do

21   a sentencing in the afternoon.  If we're in Worcester, I got

22   to come back to Boston and do the sentencing.  It's not clear

23   I'll necessarily be able to do it by the time we try this by

24   video.  Marginally it makes it a little easier in Boston, in

25   terms of scheduling from my perspective.  But, you know,

1    that's -- you know, you make your own decisions about that.

2            Anything else?

3            MR. RITCHIE:  No, Your Honor.

4            THE COURT:  Okay.  Thanks very much.  Super

5    helpful.  I really appreciate it.  You have a great day, and

6    take care.

7            (Court in recess at 2:11 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4            I, Rachel M. Lopez, Certified Realtime Reporter, in

5    and for the United States District Court for the District of

6    Massachusetts, do hereby certify that pursuant to Section

7    753, Title 28, United States Code, the foregoing pages

8    are a true and correct transcript of the stenographically

9    reported proceedings held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13                            Dated this 29th day of April, 2025.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20           _____

             Rachel M. Lopez, CRR
21           Official Court Reporter

22

23

24

25